## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| BILLIE RODRIGUEZ, DANIEL ERWIN, MICHAEL B. ACKERMAN, KYLE FOREMAN, DREW SCRUGGS, MARY JANE MCQUEENY, EMILY THORPE, JENNIFER TRITT and THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF FORD, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| | Case No. 4:24-cv-00803-SRB |
| v. | |
| EXXON MOBIL CORPORATION, CHEVRON USA INC., CHEVRON PHILLIPS CHEMICAL CORPORATION, DUPONT de NEMOURS, INC., DUPONT CORPORATION, CELANESE CORPORATION, DOW INC., DOW CHEMICAL COMPANY, EASTMAN CHEMICAL COMPANY, LYONDELLBASELL INDUSTRIES N.V., and AMERICAN CHEMISTRY COUNCIL, | CLASS ACTION |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ...................................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................3

III.  PARTIES ..................................................................................................................4

IV.  FACTUAL ALLEGATIONS ...................................................................................8

    A.  Background of the Plastic Product Industry ...........................................8

    B.  Most plastics cannot be recycled, causing the plastic waste and pollution crisis. ...9

    C.  Defendants knew that their promotion and production of plastic products for a throw-away lifestyle created a solid-waste crisis without a solution. ...................13

        i.  1950s: The plastics industry touted plastics' supposed disposability. ........13

        ii.  Late 1960s into 1970s: Landfills and burning were the plastic industry's "solution" to the growing pollution problem. .............................................15

        iii.  1980s: After receiving backlash for their earlier "solutions," the plastics industry encouraged recycling of plastics. .................................................18

        iv.  Late 1980s to Mid-1990s: The plastics industry continued its recyclability campaign using trade groups to spread the message. ...............................22

        v.  Mid-1990s to 2010s: The plastics industry successfully curbed pressure to create more recyclable plastics, yet recycling continued to prove to be an ineffective method to combat plastic pollution and waste. ........................36

        vi.  Today: The plastics industry's aggressive misinformation campaign continues to deceive consumers. ...............................................................41

V.  TOLLING OF THE STATUTE OF LIMITATIONS ........................................43

    A.  Discovery-Rule Tolling ...........................................................................43

    B.  Fraudulent-Concealment Tolling ...........................................................44

VI.  CLASS ACTION ALLEGATIONS .......................................................................44

VII.  ANTITRUST INJURY ..........................................................................................48

VIII.    RELEVANT MARKET.................................................................................................49

IX.    CLAIMS FOR RELIEF ...............................................................................................49

A.    VIOLATIONS OF THE SHERMAN ACT..................................................................49

B.    VIOLATIONS OF PUBLIC NUISANCE LAWS ...........................................................50

C.    VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ..................................52

D.    VIOLATIONS OF STATE ANTITRUST LAWS ..........................................................68

DEMAND FOR JURY TRIAL ..............................................................................................92

PRAYER FOR RELIEF ........................................................................................................92

Plaintiffs individually and on behalf of all others similarly situated, file this First Amended Class Action Complaint against the named Defendants, seeking relief to remedy the harms caused by Defendants' coordinated negligent and/or fraudulent representations regarding the recyclability of plastics which led to the production and purchase of more plastics than otherwise would have occurred. These joint misrepresentations have led to higher plastic prices than otherwise would have occurred in a competitive market and massive sanitation problems for county and city governments and their landfills. Plaintiffs' allegations are based on personal knowledge as to Plaintiffs' own conduct and investigation of counsel based on publicly available information.

## I.    <u>INTRODUCTION</u>

1.    This case is about Defendants' profit-driven decision to promote the idea to the American consumer that plastics are recyclable and better for the environment, when in reality only a tiny fraction of plastics are ever recycled.

2.    Defendants' false representations regarding the recyclability of plastics led to increased production of plastic products, increased demand for plastics products, increased prices for plastic products and corresponding issues with the remediation of plastic waste, all of which have harmed the citizens of Missouri and other states.

3.    Through this Class Action Complaint, Plaintiffs, individually and on behalf of the Classes (defined below), seek an injunction to prohibit Defendants from advertising their plastic products as recyclable and damages for the increased cost of plastic products purchased by Plaintiffs during the class period. Plaintiffs also seek damages under state laws to remedy the high prices they paid because of Defendants' conduct and under common law Public Nuisance to remedy the high sanitation costs for plastic waste clean-up and disposal

4.    Plastic pollution is one of the most serious environmental crises facing the world today. Between 1950 and 2015, over 90% of plastics were landfilled, incinerated, or leaked into

1

the environment.[1] Plastic waste is ubiquitous—from our rivers, lakes, and oceans to roadways and coastlines. It is in "the air we breathe, the food we eat, and the water we drink."[2] One study estimates that humans ingest up to five grams or the equivalent of one credit card worth of plastic per week.[3] Some of the largest plastics and gas companies are among the 20 petrochemical companies responsible for more than half of all single-use plastics generated globally.[4] ExxonMobil, for example, is the world's top producer of single-use plastic polymers.[5]

5.      Underpinning this plastic waste crisis is a decades-long coordinated campaign of fraud and deception about the recyclability of plastics.

6.      Despite their longstanding knowledge that recycling plastic is neither technically nor economically viable, petrochemical companies—independently and through their industry trade associations and front groups—have engaged in fraudulent marketing and deceptive public education campaigns designed to mislead the public about the viability of plastic recycling as a solution to plastic waste. These calculated efforts have effectively protected and expanded plastic markets, while stalling legislative or regulatory action that would meaningfully address plastic waste and pollution. Fossil fuel and other petrochemical companies have used the false promise of plastic recycling to exponentially increase virgin plastic production over the last six decades,

---

[1] Roland Guyer, et al., Production, *Use, and Fate of All plastics Ever Made*, 3 SCIENCE ADVANCES 2-3 (2017), https://www.science.org/doi/10.1126/sciadv.1700782.
[2] WWF, NO PLASTIC IN NATURE: ASSESSING PLASTIC INGESTION FROM NATURE TO PEOPLE 6-7 (2019), https://wwfint.awassets.panda.org/downloads/plastic_ingest_web_spreads_1.pdf.
[3] Kala Senathirajah, et al., *Estimation of the Mass Microplastics Ingested – A Pivotal First Step Towards Human Health Risk Assessment,* 404 JOURNAL OF HAZARDOUS MATERIALS 11 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0304389420319944.
[4] *See* Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX: REVEALING THE SOURCE OF THE SINGLE-USE PLASTICS CRISIS 12, 14 (2021), https://cdn.minderoo.org/content/uploads/2021/05/27094234/20211105-Plastic-Waste-Makers-Index.pdf; Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023 18, 57 (2023), https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf.
[5] Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023, *supra* note 4, at *57*.

creating and perpetuating the global plastic waste crisis and imposing significant costs on communities that are left to pay for the consequences.

7.    The Plastic problems described throughout this Complaint amount to a national crisis affecting citizens, children, cities, and counties in all 50 states, including right here in Missouri. In turn, it requires a national, 50-state solution, to stamp out their nationwide scheme.

8.    This case seeks to hold these plastic producers and manufacturers accountable where government enforcement has not (at least not yet). Defendants should be required to repay the consumers, cities, counties, and others that they lied to and defrauded.

9.    The plastics industry—which includes petrochemical companies, their trade associations, and the front groups that represent their interests—should be held accountable for their campaign of deception much like the producers of tobacco, opioids, and toxic chemicals, who engaged in similar schemes.

## II.    <u>JURISDICTION AND VENUE</u>

10.    This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26), as well as the antitrust, fair competition, consumer protection, and public nuisance laws of various states. This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

11.    This Court has proper jurisdiction over this matter in that Defendants have transacted and conducted business within the state of Missouri and in this judicial district. Specifically, each Defendant transacted business throughout the United States, including this District. Each Defendant manufactured, sold, shipped, and/or delivered substantial quantities of plastics throughout the United States, including this District. Each Defendant has substantial contacts with the United States, including this District. And each Defendant engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of

3

causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

12.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiffs are located in a state different from Defendants. This Court has supplemental jurisdiction over Plaintiffs' pendent state-law claims pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction over this action further exists under 15 U.S.C. § 4, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337. This Court also has subject matter jurisdiction as a result of the Class Action Fairness Act.

13.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

14.     Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District, one Plaintiff resides in this District and the Defendants' property at issue (plastics) are located in this District, and each Defendant transacted business, was found, had agents, or resided in this District.

### III.    <u>PARTIES</u>

15.     Plaintiff Billie Rodriguez is a resident of the State of Missouri and purchased plastic products in the states of Missouri and Kansas.

16.     Plaintiff Daniel Erwin is a resident of the State of Kansas and purchased plastic products in the states of Missouri and Kansas.

17.     Plaintiff Michael Ackerman is a resident of the State of California and purchased plastic products in the states of California and New York.

18.     Plaintiff Kyle Foreman is a resident of the State of Florida and purchased plastic products in the state of Florida.

19.     Plaintiff Drew Scruggs is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

20.     Plaintiff Mary Jane McQueeny is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

21.     Plaintiff Emily Thorpe is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

22.     Plaintiff Jennifer Tritt is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

23.     Plaintiff The Board of County Commissioners of the County of Ford is a duly organized county located in Kansas, which purchased plastic products in the State of Kansas, and operated a landfill in the State of Kansas.

24.     Defendant Exxon Mobil Corporation ("Exxon Mobil") is the world's largest plastic producing company in revenue and market capitalization. It is headquartered in Spring, Texas. Exxon Mobil is the successor company to John D. Rockefeller's Standard Plastics Company and was created by merging two plastics giants (Exxon and Mobil). It dominates the American plastics and gas industry and also is the world's largest producer of polyolefins, additives, raw materials, compounds and related polymers and resins. Exxon Mobil Corporation can be served at 22777 Springwoods Village Parkway, Spring, TX 77389-1425. It is registered in the state of Missouri

with its registered agent of Corporation Service Company located at 221 Bolivar Street, Jefferson City, Missouri 65101.

25.    Defendant Chevron USA, Inc. is another plastics and gas company created by the breakup of Standard Plastics Company. It is headquartered in San Ramon, California. It can be served at 6001 Bollinger Canyon Road, San Ramos, CA 94583. It is registered in the state of Missouri with its registered agent of The Prentice-Hall Corporation System, Inc. located at 221 Bolivar Street, Jefferson City, MO 65101.

26.    Defendant Chevron Phillips Chemical Corporation is a joint venture between Chevron USA Inc. and Phillips 66 Company. It is headquartered in The Woodlands, Texas, and is one of the top suppliers of polyethylene in the world today. It can be served at 10001 Six Pines Dr., The Woodlands, TX 77380. It is registered in the state of Missouri with its registered agent of CT Corporation System located at 5661 Telegraph Road, Suite B, Saint Louis, Missouri 63120.

27.    Defendant DuPont de Nemours, Inc.[6] is an American multinational company headquartered in Wilmington, Delaware. It is a leading plastics manufacturer with revenue of over $12 billion dollars in 2023. It can be served at 974 Centre Rd. Bldg. 730, Wilmington, DE 19805.

28.    Defendant Celanese Corporation focuses mainly on specialty chemicals and is a leading producer of acetic acid. It is also one of the world's largest vinyl acetate monomers (VAM) producer. It is headquartered in Irving, Texas. It can be served at 222 W. Los Colinas Blvd., Suite 900N, Irving, TX 75039.

29.    Defendant Dow Inc. is one of the world's leading material science companies. The company conducts its worldwide business through six business units. It was incorporated in Delaware in 2018 to serve as a holding company for the Dow Chemical Company. It is

---

[6] DuPont Corporation is used interchangeably when referencing to Defendant DuPont de Nemours, Inc.

headquartered in Midland, Michigan, and can be served at 2211 H.H. Dow Way, Midland, MI 48674.

30.     Defendant The Dow Chemical Company is headquartered at 2211 H. H. Dow Way Midland, Michigan. As of 2021, Dow Chemical was among the three largest chemical producers in the world. Dow Chemical produces commodity chemicals like polyethylene. Basic plastics make up 26% of Dow Chemical sales. It is an operating subsidiary of Dow Inc. It can be served at 2211 H.H. Dow Way Midland, MI 48674. It is registered in the state of Missouri with its registered agent of The Corporation Company located at 5661 Telegraph Road, Suite 4B, Saint Louis, Missouri 63129-4275.

31.     Defendant Eastman Chemical Company is a global specialty chemicals company that produces a wide range of fibers, chemicals and advanced materials. It is a significant supplier of coatings, adhesives, specialty plastic products and a major supplier of cellulose acetate fibers and copolyesters. It is headquartered in Kingsport, Tennessee. It may be served at 200 S. Wilcox Dr., Kingsport, TN 37660. It is registered in the state of Missouri with its registered agent of United Agent Group Inc. located at 12747 Olive Boulevard, Suite 300, St. Louis, MO 63141.

32.     Defendant LyondellBasell Industries N.V. is a multinational company. It is the largest licensor of polyethylene and polypropylene in the world. Its United States headquarters is located in Houston, Texas. It can be served at 1221 McKinney St., Suite 300, Houston, TX 77010. Defendant Lyondell Chemical Company is a Delaware Corporation and is registered in the state of Missouri with its registered agent of CT Corporation System located at 5661 Telegraph Road, Suite 4B, Saint Louis, MO 63129-4275.

33.     Defendant The American Chemistry Council, known as the Manufacturing Chemists' Association at its founding in 1872, then as the Chemical Manufacturers Association

from 1978 to 2000, is an industry trade association for American chemical companies. It is based in Washington, D.C. The mission of the American Chemistry Council is to promote the interests of the chemical industry. The trade group represents U.S. chemical companies as well as the plastics and chlorine industries, formerly known as the American Plastics Council. It can be served at 700 Second St. NE Washington D.C. 20002. During its operations, the Council has included the following Defendant members: Exxon Mobil, Chevron Phillips, Dow, Dupont, Eastman Chemical Company, Celanese Corporation, and LyondellBasell.

## IV.    FACTUAL ALLEGATIONS

### A.    Background of the Plastic Product Industry

34.    The plastic products at issue in this case can be separated into certain categories based on their chemical composition and end use.

35.    Polyethylene Terephthalate (PET) is used most commonly in water and soft drink bottles, fruit juice containers, domes or covers for prepared meals, cookie/biscuit trays, condiment bottles, cream/nut butter containers, and cooking plastics bottles.

36.    Polyethylene (PE) is used in milk and water jugs.

37.    Polypropylene (PP) is used in hard containers such as pill bottles as well as microwave dishes, yogurt and ice cream containers, and chip bags.

38.    Polystyrene (PS) is used for water station cups and plastic cutlery.

39.    Polycarbonate (PC) is used in longer lasting reusable containers including refillable water bottles, nursing bottles or lab bottles.

40.    High Density Polyethylene (HDPE) is used in milk bottles, freezer bags, ice cream containers, pouches and sachets.

41.    Low Density Polyethylene (LDPE) is used in squeeze bottles, cling wrap, shrink wrap pouches and sachets.

42.    Plastics are part of a sector known as "petrochemicals," or products made from fossil fuels such as plastics and gas. More than 99% of plastics are produced from fossil fuels.[7]

**B.    Most plastics cannot be recycled, causing the plastic waste and pollution crisis.**

43.    There are "thousands of different types of plastic, each with its own chemical composition and characteristics."[8] Almost all of these plastics cannot be "recycled"—meaning they cannot be collected, processed, and remanufactured into new products.[9]

44.    As of 2021, the U.S. recycling rate for plastic is estimated to be only 5-6%.[10] Despite decades of industry promises, plastic recycling has failed to become a reality due to long-known technical and economic limitations.[11]

45.    Certain types of plastics have no end markets (i.e., businesses that buy and use recyclable materials to make new products), and therefore are *impossible* to recycle. To date, viable markets only exist for polyethylene terephthalate (PET) and high density polyethylene (HDPE) plastic bottles and jugs.[12] These are known as plastics #1 and #2, respectively, under the industry's Resin Identification Codes (RICs):[13]

---

[7] Center for International Environmental Law (CIEL), FUELING PLASTICS: FOSSILS, PLASTICS, AND PETROCHEMICAL, FEEDSTOCKS 1 (2017), https://www.ciel.org/wp-content/uploads/2017/09/Fueling-plastics-Fossils-plastics-Petrochemical-Feedstocks.pdf.

[8] Professor plastics, *Types of Plastic: How Many Kinds of plastics are There?*, plastics Make it Possible (Jan. 18, 2012), *available at* https://web.archive.org/web/20220611222514/https://www.plasticsmakeitpossible.com/about-plastics/types-of-plastics/professorplastics-how-many-types-of-plastics-are-there/ (archived June 11, 2022).

[9] U.S. EPA, The U.S. Recycling System, https://www.epa.gov/circulareconomy/us-recycling-system ("In the United States, recycling is the process of collecting and processing materials (that would otherwise be thrown away as trash) and remanufacturing them into new products.").

[10] Beyond plastics & The Last Beach Cleanup, The Real Truth About the U.S. plastics Recycling Rate 3 (2022), https://static1.squarespace.com/static/5eda91260bbb7e7a4bf528d8/t/62b2238152acae761414d698/1655841666913/The-Real-Truth-about-the-USPlastic-Recycling-Rate-2021-Facts-and-Figures-_5-4-22.pdf.

[11] The plastic recycling rate in the U.S. has never exceeded the 2014 peak of 9.5%, and even that figure includes a significant amount of exported plastic waste that was dumped or burned rather than recycled. Id.; John Hocevar, Circular Claims Fall Flat: Comprehensive U.S. Survey of plastics Recyclability 7 (2020), https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf.

[12] John Hocevar, supra note 11, at 7.

[13] Brad Kelechava, Resin Identification Codes (RICs), as Specified by ASTM D7611, American National Standards Institute (Feb. 21, 2019), https://blog.ansi.org/2019/02/resin-identification-codes-rics-astm-d7611/.

| Resin Identification Number | Resin | Resin Identification Code –Option A | Resin Identification Code –Option B |
|---|---|---|---|
| 1 | Poly(ethylene terephthalate) | △ 1 PETE | △ 01 PET |
| 2 | High density polyethylene | △ 2 HDPE | △ 02 PE-HD |
| 3 | Poly(vinyl chloride) | △ 3 V | △ 03 PVC |
| 4 | Low density polyethylene | △ 4 LDPE | △ 04 PE-LD |
| 5 | Polypropylene | △ 5 PP | △ 05 PP |
| 6 | Polystyrene | △ 6 PS | △ 06 PS |
| 7 | Other resins | △ 7 OTHER | △ 07 O |

[14]

46.     After conducting a 10-year review on plastic recycling, in 1991, the U.S. Environmental Protection Agency (EPA) concluded that "it appears that at the present only two types could be considered for making into high quality objects, PET and HDPE," specifically those sourced from bottles.[15]

---

[14] https://web.archive.org/web/20160126213345/http://www.plasticsindustry.org/Aboutplastics/content.cfm?Item-Number=823&navItemNumber=1125.
[15] U.S. EPA, Ten Year Review of plastics Recycling 22 (1991), https://semspub.epa.gov/work/03/17184.pdf.

10

47.    This remains true more than 30 years later.[16] While a minority of municipal recycling programs across the country may collect plastics with RICs #3-7, they do not actually recycle them.[17] Instead, such plastics are incinerated or sent to landfills.

48.    The thousands of different plastics and the variation among them further limit recyclability. When recycling plastic waste, a facility must sort and separate thousands of pieces of plastic by type to maintain a high degree of purity in the recycled material.[18]

49.    For this reason, some types of plastic that are technically "recyclable" are not recycled in practice. For example, many single-use plastics are made of different types of plastic polymers as well as other materials, such as paper, metals, or adhesives.[19] It is impractical—if not impossible—to separate these different components for recycling.[20]

50.    Even products made of a single type of plastic often cannot be recycled together because they include different chemical additives or colorants.[21] For example, PET is widely accepted by municipal recycling programs, yet PET bottles cannot be recycled with PET clamshells and other thermoforms, which are made from a PET material with different chemical properties.[22] Similarly, green PET bottles cannot be recycled with clear PET bottles.[23]

---

[16] John Hocevar, *supra* note 10, at 4 ("Only some PET #1 and HDPE #2 plastic bottles and jugs can be legitimately labeled as recyclable in the U.S. today"); see also Greenpeace, Circular Claims Fall Flat Again: 2022 Update 27-29 (2022), https://www.greenpeace.org/usa/wp-content/uploads/2022/10/GPUS_FinalReport_2022.pdf (estimating that the existing domestic capacity for recycling/reprocessing PET waste is 20.9% and HDPE is 10.3%, while the capacity to recycle other plastics ranges from "negligible" to less than 5%).

[17] John Hocevar, supra note 10 at 4, 7-9; Greenpeace, supra note 15, at 3-4. For example, the City of Knoxville, Tennessee, states on its website that its recycling facility will collect plastics #3-7, but it does not recycle them because "there is no 'end-market' buyer." City of Knoxville, Recycling, https://www.knoxvilletn.gov/cms/One.aspx?portalId=109562&pageId=200229 (last visited Oct. 26, 2023).

[18] Judith Enck & Jan Dell, Plastic Recycling Doesn't Work and Will Never Work, The Atlantic (May 30, 2022), https://www.theatlantic.com/ideas/archive/2022/05/single-use-plastic-chemical-recycling-disposal/661141/.

[19] See Jefferson Hopewell et al., plastics Recycling: Challenges and Opportunities, 364 Philos. Trans. R. Soc. Lond. B Biol. Sci. 2115, 2118 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873020/.

[20] *Id.*

[21] Judith Enck & Jan Dell, *supra* note 16.

[22] *Id.*

[23] *Id.*; *see also* Becky Sullivan, *Sprite Ditches its Iconic green bottle—but Environmentalists Say it's Not Enough*, NPR ( July 28, 2022), https://www.npr.org/2022/07/28/1114242535/sprite-green-bottles-recycle.

51.     The quality of plastic degrades as it is recycled, limiting both the use of recycled plastic and its continued recyclability. The fossil fuel-derived chemicals that form the basis of plastic are vulnerable to heat and other processes used in recycling.[24] As the chemicals degrade, they lose their quality and integrity, making recycled resins unsuitable for many manufacturers.[25]

52.     But plastics can only be recycled – or more accurately "downcycled" – once, rarely twice.[26]

53.     Recycling most plastics is technologically infeasible, as the plastics industry has long known, and subsequent scientific research would confirm. "When recycled, some of the plastic can be remade into similar products; however, most is typically downcycled into a product of lower quality and is unable to displace products made from virgin plastics [citation omitted]."[27] Even PET, the most easily recycled type of plastic, quickly degrades through the recycling process.

54.     The *toxicity* of plastic and its chemical additives limits the recyclability of plastic. Many plastics commonly contain toxic additives such as stabilizers, plasticizers, coatings, catalysts, and flame retardants.[28]

55.     Managed plastic waste contributes to plastic pollution of the environment. As plastic waste degrades in landfills, microplastics are released into the surrounding environment, including contamination of groundwater and surface water by air and by leachate.[29]

---

[24] *See* Huiying Jin et al., *The effect of extensive mechanical recycling on the properties of low density polyethylene*, 97 POLYMER DEGRADATION AND STABILITY 2263 (2012), https://www.sciencedirect.com/science/article/abs/pii/S0141391012003114 ("[P]roperties of mechanically recycled polymers do not remain the same because of degradation from heat, mechanical stress, oxidation and ultraviolet radiation during reprocessing and lifetime").

[25] *See* Sarah DeWeerdt, *Why It's So Hard to Recycle Plastic*, SCIENTIFIC AMERICAN (Dec. 13, 2022), https://www.scientificamerican.com/article/why-its-so-hard-to-recycle-plastic/.

[26] *See* Roland Geyer et al., *supra* note 1, at 2-3.

[27] Moran et al., San Francisco Estuary Institute, A Synthesis of Microplastic Sources and Pathways to Urban Runoff (Oct. 2021) page 76.

[28] *See* John N. Hahladakis et al., *An overview of chemical additives present in plastics: Migration, release, fate and environmental impact during their use, disposal and recycling*, 344 J. of Hazardous Materials 179, 184-168 (Feb. 15, 2018), https://www.sciencedirect.com/science/article/pii/S030438941730763X.

[29] Leachate is a solution or product obtained by leaching, especially from landfills or other sources.

56.    Plastic waste may be further contaminated through curbside collection of containers for pesticides, cleaning solvents, and other household items.[30]

57.    As plastics degrade through use and the recycling process, they begin to leach these toxic substances.[31] For this reason, a vast majority of plastic products cannot be recycled into food-grade packaging, food-contact surfaces, or other high-contact products.[32]

**C.    Defendants knew that their promotion and production of plastic products for a throw-away lifestyle created a solid-waste crisis without a solution.**

**i.    1950s: The plastics industry touted plastics' supposed disposability.**

58.    Beginning in the 1950s, the petrochemical companies that produced plastic resins identified a way to ensure a steady, growing demand for plastic: disposability. If plastic products were used only once, then they would need to be purchased—and thus produced—again and again.

59.    At the Society of the Plastics Industry's ("SPI") 1956 national conference, participants were told that "developments should be aimed at low cost, big volume, practicability, and *expendability*."[33] In short, the producers' aim should be for their products to end up "in the garbage wagon."[34]

60.    The shift to disposables began almost immediately—even for products that had previously been sold to customers because they could be repurposed.[35] Plastic dry cleaning bags

---

[30] Greenpeace, Forever Toxic: The Science on Health Threats from Plastic Recycling 4 (2023), https://www.greenpeace.org/usa/wp-content/uploads/2023/05/GreenpeaceUSA_ForeverToxic_ENG.pdf.
[31] *Id.*
[32] *See* Environment & Climate Change Canada, ASSESSING THE STATE OF FOOD GRADE RECYCLED RESIN IN CANADA AND THE UNITED STATES, 4, 34 (2021), https://www.plasticsmarkets.org/jsfcontent/ECCC_Food_Grade_Report_Oct_2021_jsf_1.pdf.
[33] *plastics in Disposables and Expendables*, 34 MODERN PLASTICS 93 (Apr. 1957) (emphasis in original).
[34] *Id.*
[35] Jeffrey L. Meikle, AMERICAN PLASTIC: A CULTURAL HISTORY 266-67 (Rutgers University Press 1995), https://www.google.com/books/edition/American_Plastic/u_1ePU4GEGAC?hl=en&gbpv=0 (chronicling the shift to disposables). The industry's earlier campaigns promoting plastic as durable have also been chronicled. *See id.* at 186-88; Susan Freinkel, Plastic: A TOXIC LOVE STORY 145 (2011).

were advertised as durable and reusable throughout the 1950s,[36] but the industry quickly changed tack in 1959 after around 80 children suffocated on plastic dry cleaner bags, leading to immense public backlash against the industry and some of the earliest calls for plastic bans.[37]

61.     SPI launched a nationwide public relations campaign, claiming that the bags were meant to be disposable, essentially shifting the blame to the children's parents—and it worked.[38]

62.     This campaign served as a mechanism to insulate the industry from public and regulatory backlash while simultaneously introducing consumers to the idea of disposable plastics. An SPI pamphlet from 1959 **(Figure 1)** explained that customers should "never keep a plastic bag after it has served its intended usefulness. Destroy it: Tear it up … or tie it in a knot … and throw it away."[39] To do otherwise "is the worst mistake a mother could make."[40]



## Figure 1

The Society of the Plastics Industry encouraged consumers to dispose of plastic dry-cleaning bags. SPI, 1959.

---

[36] *See This Bag Spells Business*, 50 DUPONT MAGAZINE 24, 25 (Feb/Mar. 1956), https://digital.hagley.org/1956_50_01 (quoting the general manager of a Providence, Rhode Island dry cleaning company who explained that the film bags combined "maximum transparency as well as the necessary durability." That durability, the article went on to say, allowed consumers to find additional uses for the bags even after they had received their laundered clothes, stating, "Bags of 'Alathon' are reusable, too, as housewives have discovered").
[37] Susan Freinkel, *supra* note 38, at 142-43.
[38] Jeffrey L. Meikle, *supra* note 38, at 249-58; *see also* Hiram McCann, *Hazards in Film Misuse Must Be Taught Parents*, 36 MODERN PLASTICS 262 (June 1959) (on file with CCI #1356.264) (explaining that the bags were "made and costed to be disposable" and lamenting that items ranging from cars to cleaning fluids "kill children every day," but in those cases "[a]dults are blamed–mainly parents. And rightly so").
[39] Society of the plastics Industry (SPI), PLASTIC FILM: CORRECT USE AND MIS-USE 2 (1959).
[40] *Id.* At 3.

63.     The plastics industry's successful navigation of this crisis—and the corresponding threat of plastic bans—provided a model for the future, both in the way the industry would respond to backlash and the way it would insist on disposability by offering customers no alternative.[41] Even as consumers resisted the shift to single-use plastics, which they found jarring after being told since the 1930s that plastics were too valuable to be thrown away, the plastics industry successfully expanded into new markets—especially single-use packaging—at an unprecedented pace.

64.     In 1960, packaging represented just 10% of total plastic production, but amounted to 25% by the end of the decade.[42] By that point, disposable plastics had become the norm for everything from detergent bottles to plastic milk jugs, and plastic rings for canned beverage six-packs.[43]

65.     In 1963, Lloyd Stouffer, editor of the trade journal *Modern Plastics,* congratulated the industry on "filling the trash cans, the rubbish dumps and the incinerators" with single-use plastics.[44] "The happy day has arrived," Stouffer opined, "when nobody any longer considers the plastics package too good to throw away."[45]

### ii.     Late 1960s into 1970s: Landfills and burning were the plastic industry's "solution" to the growing pollution problem.

66.     The industry's success in "selling" disposability and introducing single-use plastics had predictable consequences. By the end of the decade and into the early 1970s, plastics were identified as a key part of the developing solid waste crisis.

---

[41] Jeffrey L. Meikle, *supra* note 39, at 249-58.
[42] *Id.* At 266.
[43] *Id.* At 265-66.
[44] See Rebecca Altman, *American Beauties: How Plastic Bags Came to Rule Our Lives, And Why We Can't Quit them*, Topic (2018), *available at* https://web.archive.org/web/20191113102708/https://www.topic.com/american-beauties (archived Nov. 13, 2019) (quoting Lloyd Stouffer, *plastics Packaging: Today and Tomorrow,* SPI Annual plastics Conference (Nov. 19-21, 1963)).
[45] *Id.*

67.    *Modern Plastics* warned companies that the industry needed to figure out a solution to the pushback they were experiencing before "well-meaning but misinformed authorities step in with homemade remedies and regulations."[46]

68.    Again, facing immense public backlash and a genuine threat of regulation,[47] the plastics industry responded with two "solutions." The first, in response to concerns about litter, was landfilling. As the American Chemical Society explained in 1969, "it is always possible that scientists and engineers will learn to recycle or dispose of wastes at a profit, but that does not seem likely to happen soon on a broad basis."[48]

69.    Different types of plastic cannot be recycled together, even when separating out those that cannot be recycled at all (including thermoset polymers like polyurethanes and vulcanized rubber). For example, a PET bottle cannot be recycled with an HDPE bottle, however similar they appear. Further complicating matters, many plastic products are made by incorporating various additives, as well as mixing different polymers to take advantage of their distinct qualities.

---

[46] Jeffrey L. Meikle, *supra* note 39, at 265 (quoting Joel Frados, *There's Something in the Air*, 4 MODERN PLASTICS 89 (Oct. 1966)).

[47] See Jerome Heckman, General Counsel, SPI, Presentation at the Meeting of the SPI plastics Waste Management Committee: Solid Waste and Litter: Legislative Status and Outlook—1972 (Mar. 1, 1972), *available at* https://cdn.toxicdocs.org/8R/8Rq8Namx-13mzoge1jEG7N0pzm/8Rq8Namx13mzoge1jEG7N0pzm.pdf (claiming that, at the time of the presentation in 1972, there were over "a thousand regulatory proposals . . . at various governmental levels which could adversely affect the interests of the plastics industry"); Lester E. Blaschke, *Analysis of the Resource Recovery Act of 1970 and Its Effect on Implementation of Solid Waste Management Programs*, 34 J. ENVTL. HEALTH 89, 89 (1971), https://www.jstor.org/stable/44545882 (describing the passage of the Resource Recovery Act in 1970, as an EPA official, represented "a significant shift in emphasis from 'disposal' to 'recycling and recovery of materials and energy'").

[48] ACS Committee on Chemistry & Public Affairs, *Cleaning Our Environment–The Chemical Basis for Action*, in C&E NEWS, at 58, 60 (Sept. 8, 1969), available at https://cdn.toxicdocs.org/6b/6bLOmw81KLQJwzb0RQ9mEadx6/6bLOmw81KLQJwzb0RQ9mEadx6.pdf.

70.     As explained by researchers in 1969, "[t]he very success of package makers in marrying dissimilar materials has made packaging materials virtually unrecoverable after use."[49] As a result, the economics of plastic recycling were—and still are— "virtually hopeless," as one industry insider put it in 1969.[50]

71.     Still, the greatest obstacle to plastic recycling was that no market existed for the final product. Recycled plastic was more expensive and of lower quality than virgin resins. This was, in part, intrinsic to the material. Even under ideal conditions, plastics experienced "a degradation of resin properties and performance . . . during the initial fabrication, through aging, and in any reclamation process," as explained in a 1973 report commissioned by SPI.[51]

72.     As a direct result of these limitations, few manufacturers had any interest in purchasing recycled resins.[52]

73.     According to the SPI report, "[r]ecycling of plastics from [municipal sources of plastic waste] poses the greatest challenge," because "there are no effective marketing mechanisms for trade in contaminated, mixed plastics."[53] The report was definitive: "When plastics leave fabrication points, they are almost never recovered. There is no recovery from obsolete products."[54]

---

[49] Arsen J. Darnay & William E. Franklin, *The Changing Dimensions of Packaging Wastes*, in FIRST NATIONAL CONFERENCE ON PACKAGING WASTES at 11, 16; https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000Q54D.TXT; *see also* Thomas B. Becnel, *supra* note 54, at 85 (stating that "it is ironic that the very molecular structure that has made [plastic] so popular creates certain disposal problems").
[50] Eric B. Outwater, Packaging – U.S.A., in Proceedings: First National Conference on Packaging Wastes 1, 7 (1971).
[51] R.L. Glauz, et al., THE PLASTICS INDUSTRY IN THE YEAR 2000 41 (1973), Box 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[52] *Id.*
[53] *Id.*
[54] *Id.*

74.    Throughout the 1970s, SPI officials argued that plastics were an ideal material for landfilling since "they don't biodegrade," they "just sit there."[55] But the alternate "solution" proved to be the industry favored waste-to-energy (WtE) incineration. Support for WtE was reinforced by individual companies and trade associations representing the industry throughout the decade.[56]

75.    And by the 1980s, while the industry pushed the false narrative of recyclability of these plastics products, the same impediments identified in the 1960s and 1970s for why they couldn't be effectively recycled remained.

### iii.    1980s: After receiving backlash for their earlier "solutions," the plastics industry encouraged recycling of plastics.

76.    By the 1980s, while the industry pushed the false narrative of recyclability of these plastics products, the same impediments identified in the 1960s and 1970s for why they couldn't be effectively recycled remained. Neither landfilling nor incineration sufficiently assuaged public concerns or regulatory pressure, and the industry again faced proposed bans on single-use plastics in the mid-1980s. This time, it adopted a solution that it knew was popular among consumers and policymakers alike: recycling.

77.    SPI established the Plastics Recycling Foundation (PRF), bringing together petrochemical companies and bottlers **(Figure 2)**, and PRF immediately began a campaign to demonstrate the industry's supposed commitment to mechanical recycling.[57]

---

[55] Radio Interview with Ralph Harding, President of the Society of the plastics Industry, in Atlanta, Georgia (n.d.).
[56] Jeffrey L. Meikle, *supra* note 38, at 272; *see also, e.g.,* Internal Memorandum from Avron B. Magram, Hatco Chemical Division, W.R. Grace Company on PVC/Ecology (May 11, 1971), available at https://cdn.toxicdocs.org/pe/peX25LzXyN4nbMM8dO6D1Za66/peX25LzXyN4nbMM8dO6D1Za66.pdf (discussing relevant research and updates regarding PVC incineration from January 1970 to May 1971).
[57] *See* Leo H. Carney, *The Environment*, N.Y. TIMES (Sept. 15, 1985) https://www.nytimes.com/1985/09/15/nyregion/the-environment.html; *see also* Judie Neilson, Oregon Dep't of Fish & Wildlife *The Oregon Experience, in* NOAA, PROCEEDINGS OF THE WORKSHOP ON THE FATE AND IMPACT OF MARINE DEBRIS 154, 158 (Richard S. Shomura & Howard O. Yoshida eds., 1985),

**EXXON CHEMICAL COMPANY**

**ENVIRONMENTAL COMPENDIUM**

7. THE COUNCIL FOR SOLID WASTE SOLUTIONS

In 1988, nine major plastics producers, including Exxon Chemical, established a new organization within the Society of the Plastics Industry to deal with the issues of plastics in the environment. This organization, The Council for Solid Waste Solutions, now has 24 members and a budget of about $13M per year.

I. EXTERNAL INVOLVEMENT - Continued

8. THE PLASTICS RECYCLING FOUNDATION

Exxon Chemical is directorate member of the Plastics Recycling Foundation which was formed in 1985 to undertake research on all aspects of plastics recycling. The Foundation has over 50 members and a budget of more than $1M per year. Its principal facilities are located at Rutgers University where it is associated with the Center for Plastics Recycling. Their combined funding is about $3.5M per year.

The PRF is currently doing work on collection of plastics for recovery, sorting plastics, reclaiming resins, and manufacturing articles from mixed recovered resins. The Foundation officers are frequent speakers at conferences on solid-waste management.

## Figure 2

Exxon Chemical, a member of the Society of the Plastics Industry, acknowledged its support for organizations like the Plastics Recycling Foundation and the Council for Solid Waste Solutions in its Environmental Compendium. *Exxon, 1990 (emphasis added).*

78.   But industry support did little to change the basic problem: plastics were notoriously difficult to recycle, as the industry had known for years. Doubts about the viability of municipal solid waste recycling in general went back decades.

79.   Prior to 1980, the plastics industry consistently reached the same conclusion when it explored the possibility of recycling plastic from the municipal waste stream: mechanical recycling was technically and economically infeasible.

80.   In 1986, an industry trade association acknowledged that the situation was virtually the same as it had been decades earlier.

---

https://repository.library.noaa.gov/view/noaa/5680 (noting that "the Society for the plastics Industry has allocated $5 million to establish a Plastic Recycling Foundation and Institute to aggressively pursue methods to make it economically feasible to recycle plastic in large quantities").

81.     The Vinyl Institute (VI), a spin-off organization of SPI, explained in a report that "purity and quality demands set for many applications preclude the use of recycled material."[58] As the organization's founding director, Roy Gottesman, explained to attendees of an industry conference in 1989 **(Figure 3)**, "Recycling cannot go on indefinitely, and does not solve the solid waste problem."[59]



**Figure 3**

The executive director of the Vinyl Institute shared "key considerations to be made when considering recycling" with other members of the plastics industry. *Gottesman, 1989 (emphasis added).*

82.     Ultimately, the VI report **(Figure 4)** concluded, "recycling cannot be considered a permanent solid waste solution, as it merely prolongs the time until an item is disposed of."[60]

---

[58] Vinyl Institute, SOLID WASTE FACT SHEET—DRAFT 5 (July 18, 1986), *available at* https://climateintegrity.org/uploads/deception/1989_Vinyl_Institute_-_Fact_Sheet.pdf.

[59] Dr. Roy T. Gottesman, Executive Director, Vinyl Institute, Presentation at the Institute for International Research Conference on Achieving Market Expansion Through plastics Recycling, *An Overview of Options for Disposal of Vinyl plastics in Municipal Solid Waste* 1 (Sept. 26, 1989), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

[60] *Id.* at 2 (emphasis in original).

> Nevertheless, recycling cannot be considered
> a permanent solid waste solution, as it
> merely prolongs the time until an item is
> disposed of. At that point, recycled
> products also become MSW components.

## Figure 4

A draft "Solid Waste Fact Sheet," created by the Vinyl Institute,
was stark in its assessment of the viability of recycling
to address plastic waste issues. *VI. 1986 (emphasis added).*

83.    At the Vinyl Institute meeting that same year, members discussed a recent study on the economics of recycling. "This study indicates that based on our economic system, on the cost of fuel and transportation, on the economic benefit of downstream markets, on the low cost of plastic feedstocks, and the even lower cost of off grade-off spec plastic feedstocks, recycling is not and will never be commercially viable unless it is significantly subsidized by a government entity."

84.    What led the industry to change its position in the 1980s was not a massive technological breakthrough or an answer to the economic roadblocks to plastic recycling. Rather, the plastics industry began to lie about the viability of recycling as a direct result of the backlash they faced from the public.

85.    As SPI officials discussed in a 1984 memo on the threat of a recycling bill **(Figure 5)**, although they were able to shape the bill "to reflect the . . . commitment of our industry to move forward" on recycling, "there is no question that the State of New Jersey must see substantial short-term progress in the recycling of plastic containers or else punitive legislation . . . will attack the problem head-on."[61]

---

[61] Letter from Roger Bernstein, Letter from Roger Bernstein, Society of the plastics Industry, to the New Jersey Task Force State Government Affairs Committee, New Jersey's Mandatory Recycling Bill 2 (Dec. 20, 1984), available at https://www.toxicdocs.org/d/rpQVOR8obVNLbN5R69K0EJ5pJ?lightbox=1. As an SPI employee put it

**Figure 5**

The Society of the Plastics Industry articulating the industry's support for recycling in the face of potential "punitive legislation" that would attack the plastic waste problem "head-on." *Bernstein, 1991 (emphasis added).*

86.     The industry felt the threat of legislative action acutely throughout the 1980s and 1990s.

> **iv.      Late 1980s to Mid-1990s: The plastics industry continued its recyclability campaign using trade groups to spread the message.**

87.     Looking back at the early days of this regulatory uptick, a representative from Occidental Chemical testified to Congress in 1992 that there was a "rush to demonstrate environmental purity. . . . The call was to recycle or be banned."[62]

88.     Consumer demands that plastics be recycled or banned presented the plastics industry with a severe problem. The industry knew that mechanical recycling was not a viable solution—yet renewed concerns about plastic waste and its impact on the environment meant they

---

in a different memo, "the NJ Recycling office regards plastics as a problem not shared by competitive materials." Memorandum from John C. Malloy, Director of Packaging Services, SPI, to Plastic Bottle Institute (Oct. 12, 1984).

[62] Plastics Recycling: Problems and Possibilities: Hearing Before the Subcomm. on Env't & Emp. of the H. Comm. on Small Bus., 102nd Cong. 121 (1992) (testimony of William F. Carroll, Jr., Ph.D., Director of Commercial Development, Occidental Chemical Corp.). The Occidental representative went on to explain the challenge of the situation given the poor state of plastic recycling infrastructure and development: "The plastics industry was made to feel the pressure acutely. Programs for each plastic, and in many cases each grade of plastic, had to be devised and technically proven. Bottles had to be sorted, cleaned, purified and made into pellets for processors." *Id.*

needed the public to *believe* recycling could address their concerns, and the industry was invested in its success.

89.    The industry took a familiar approach, leaning on its trade associations just as it had in the face of previous crises.[63] SPI's Public Affairs Council ("PAC"), created after SPI successfully defeated a recycling bill in New York City in 1971,[64] served as a model in particular. Initially established as the Plastics Waste Management Fund, PAC brought together 12 petrochemical companies "to fight off restrictive legislation everywhere," in the words of SPI President Ralph Harding, Jr.[65]

90.    Similar trade associations and front groups proliferated during the 1980s and early 1990s. Along with the Plastics Recycling Foundation and Vinyl Institute, the petrochemical companies, with support from SPI, created a variety of organizations in this brief span,[66] including: the Plastic Bottle Institute (PBI) in the early 1980s; the Center for Plastics Recycling Research (CPRR) at Rutgers University in 1985; the Council on Packaging in the Environment (COPE) in 1986; and the Council for Solid Waste Solutions (CSWS) in 1988 **(Figure 6)**, which became known as the Partnership for Plastics Progress (P3) in 1992 before quickly being reorganized as the American plastics Council (APC).[67]

---

[63] *See, e.g.*, Jerome Heckman, *supra* note 50 (addressing the plastics industry as SPI's general counsel amid fighting proposed taxes on plastic containers and other regulation on plastics in 1972).

[64] *Id.*

[65] Jeffrey L. Meikle, *supra* note 38, at 272-73 (quoting a talk given by Ralph Harding, Jr. entitled "Challenges Facing the plastics Industry" on December 8, 1971).

[66] These organizations were not necessarily contained within a single umbrella organization. For example, SPI and the Chemical Manufacturers Association both had official roles in the Partnership for plastics Progress. The board of directors, "made up of the highest level of industry executives," and "function[ed] as a business council under the auspices of the" CMA, while SPI was responsible for "staffing and implementing Partnership programs." Partnership for plastics Progress, *Introducing the Partnership for plastics Progress* (Jan. 1992).

[67] Internal notes at APC indicate that the name was changed after it was poorly received by consumers: "The connect betw[ee]n P3 & SPI was clutter—no good[.] Consumers don't like." Bailey Condrey, APC, *Staff Mtg 8/24/92, in* STAFF MEETINGS 53 (1992). These issues had been anticipated a year prior, when internal discussions about organization names concluded: "P3 great internally, but bad externally," and the group would "[n]eed consumer-friendly name." Bailey Condrey, APC, *Outreach TF 8/23/91, in* NOTES 6 (1991). The Task Force praised another unused acronym because it was "[m]ore publically [sic] focused" and "[n]o conspiracy implied." *Id.* at 7.

**Figure 6**

The executive board members of the Council for Solid Waste Solutions, including many of the world's largest fossil fuel and petrochemical companies, were listed on the cover of the organization's industry newsletter, *Handlers News. CSWS, 1991 (emphasis added).*

91.     The Council for Solid Waste Solutions (the Council) formed in 1988 in furtherance of their campaign to convince the public that recycling was the answer to the plastics waste and pollution crisis.[68]

92.     After Exxon, Mobil, and other major players in the industry formed the Council, they pushed the plastics recycling message with increased coordination and seriousness.

93.     The Council spent millions of dollars on advertisements to herald recycling as the solution to plastic waste in hopes to change public perception. For example, the Council took out a 12-page advertisement in the July 17, 1989 edition of *Time* magazine exclaiming, "The URGENT NEED to RECYCLE." Issued by the official-sounding organization, the "Council for Solid Waste Solutions," this advertisement pushed the Council's agenda and advertised for the Council and its members.

---

[68] Council for Solid Waste Solutions, *The Urgent Need to Recycle* (July 17, 1989) *Time*.

94.    In 1989, Mobil misleadingly promised the public that it was "venturing into recycling mainly out of a sense of environmental concern. 'We are responsible for that segment of the waste stream, so we're going to see that it's disposed of consistent with' the federal [EPA's] recommendations."

95.    At the time that Mobil made these statements, the national plastics recycling rate was between just one and two percent. *See* **Figure 7**: National Recycling and Composting Rates from 1960 to 2018.[69]

**Figure 7**



Recycling Tonnages, 1960–2018

---

[69] U.S. Environmental Protection Agency, *National Overview: Facts and Figures on Materials, Wastes, and Recycling* https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/national-overview-facts-and-figures-materials#Trends1960-Today.

**Recycling and composting as a percentage of generation**

|  | 1960 | 1970 | 1980 | 1990 | 2000 | 2005 | 2010 | 2015 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Paper and Paperboard** | 17% | 15% | 21% | 28% | 43% | 50% | 63% | 67% | 66% | 68% |
| **Glass** | 2% | 1% | 5% | 20% | 23% | 21% | 27% | 28% | 25% | 25% |
| **Plastics** | Neg. | Neg. | <1% | 2% | 6% | 6% | 8% | 9% | 9% | 9% |
| **Yard Trimmings** | Neg. | Neg. | Neg. | 12% | 52% | 62% | 58% | 61% | 69% | 63% |
| **Lead-acid Batteries** | Neg. | 76% | 70% | 97% | 93% | 96% | 99% | 99% | 99% | 99% |

"Neg." means less than 5,000 tons or 0.05 percent.

96.     Other trade associations, such as the National Association for PET Container Resources (NAPCOR) and the Flexible Packaging Association (FPA), were established or took on new importance over the same time period.

97.     All of these groups had the same directive: defend the plastics industry from restrictive legislation; and worked in concert to push the same narrative: selling recycling as a viable solution to plastic waste. **(Figure 8)**.



## Figure 8

Meeting notes from January 2, 1994 indicate that the American Plastics Council intended to take an aggressive approach in responding to public outcry about plastic waste. *Condrey, 1994 (emphasis added).*

98.     The largest resin producers, including Exxon, Mobil, DuPont, and Dow, invested tens of millions of dollars into various aspects of plastic recycling, including public relations efforts to shape consumer perception of recycling.[70]

99.     One of the first and most important steps in this campaign to make consumers believe in plastic recycling was the industry-wide implementation of a labeling system known as Resin Identification Codes, or RICs. First introduced in 1988 by SPI, in an attempt to stave off regulation, the "Voluntary Plastic Container Coding System," as it was originally known, grouped plastics by resin type and labeled them with a number surrounded by a triangle of "chasing arrows," the widely recognized symbol for recycling.[71] The "chasing arrows" symbol, a logo showing three arrows each folded in the middle and arranged in a triangle was invented in 1970 by a student who won a contest held by a box manufacturer to promote recycling of paper.[72]

100.     SPI modified and adopted the chasing arrow symbol for plastic containers, including a number in the middle of the three arrows ranging from 1 to 7, that would correspond to the type of resin the item was made from.

101.     The chasing arrows symbol is now strongly associated with recycling, and consumers usually assume that the symbol identifies items that can be recycled.[73] Even though it is universally understood as the recycling symbol the symbol is unnecessary and misleading.

102.     Indeed, in practice, the symbol led consumers to believe that all labeled plastic items were recyclable. And in turn, drove the demand for plastics by consumers. In truth, however, the plastic resin identification codes confused consumers, who believed that any item containing

---

[70] Susan Freinkel, *supra* note 39, at 162-63.
[71] *Id*. at 177-78.
[72] Che, *His Recycling Symbol Is Everywhere. The E.P.A. Says It Shouldn't Be*., N.Y. Times (Aug. 3, 2023) https://www.nytimes.com/2023/08/07/climate/chasing-arrows-recycling-symbol-epa.html.
[73] *Id*.

the chasing arrows symbol was recyclable. When in fact, most plastic resins could not be recycled because there were no recycling facilities that were capable of recycling most resin numbers. Two surveys in different states showed that between 53 and 74 percent of consumers believed the presence of the symbol on a product meant it could be recycled where they live. In fact, recyclers themselves were clear that they did not need, and in some cases actively opposed, SPI's RIC system. **(Figure 9)**.



## Figure 9

*The Connecticut Department of Environmental Conservation discouraged the state governement from adopting Society of the Plastics Industry's resin identification code system because it was unecessary and likely to confuse consumers. DEC, 1990 (emphasis added).*

103.    Despite these concerns, the plastics industry continued to push for the adoption of the codes, with other trade associations like APC joining SPI in the fight to codify the system through state legislation with a clear purpose: "to prevent bans."[74] The industry encouraged the adoption of the codes not despite the confusion the RIC system would cause, but because of it. As APC officials noted in a 1992 meeting, the chasing arrows were a "consumer tested mark" and

---

[74] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 54.

"most identified."[75] The RIC system conveyed that plastics are recyclable and, by the mid-1990s, 39 states had adopted legislation requiring the symbols.[76]

104.    Industry trade associations also sought to influence consumer views on plastic recycling through other means. The industry heavily publicized repeated "commitments" to recycling, only to quietly ignore them when they were not achieved.[77]

105.    The plastics industry set these goals knowing they were unlikely to meet them, according to a representative of DuPont. "It is no secret that the quantitative goals industry originally set for itself for economically recycling plastic containers extracted from municipal waste streams were extremely ambitious," James Lohr told attendees at a 1992 recycling conference.[78]

106.    Unfortunately for the industry, Lohr explained, "[t]he goals have proven to be an even greater 'stretch' than originally anticipated."[79]

107.    APC internally acknowledged that their publicized goal to recycle 25% of post-consumer plastic bottles and containers by 1995 would be difficult to reach years before.

108.    In 1992, staffers at APC noted that "[a]dvocacy doomed to failure unless signif[icant] resources allocated to recy[cling],"[80] and acknowledged that the goal "will be difficult to reach" since the "value of the product is lower than cost to prod[uce]."[81]

---

[75] Bailey Condrey, *Monday Mar 23 Staff Mtg., in* STAFF MEETINGS, *supra* note 70, at 11.
[76] *See* Richard Lindsay Stover, et al., Ecology Center, Report of the Berkeley plastics Task Force 9 (Apr. 8, 1996), https://ecologycenter.org/plastics/ptf/; Steve Toloken, *FTC Cracks Down on Resin Code Placement*, PLASTICS NEWS (May 4, 1998), https://www.plasticsnews.com/article/19980504/NEWS/305049986/ftc-cracks-down-on-resin-code-placement.
[77] *See, e.g.,* Tom Ford & Roger King, *APC Retreats from Goal To Recycle 25%*, PLASTICS NEWS (Mar. 25, 1996), https://www.plasticsnews.com/article/19960325/NEWS/303259995/apc-retreats-from-goal-to-recycle-25 (SPI and the Council for Solid Waste Solutions announced in 1991 a goal to recycled 25% of post-consumer bottles and containers by 1995, but abandoned the goal in 1995).
[78] James E. Lohr, *supra* note 77, at 4.
[79] *Id*.
[80] Bailey Condrey, *Staff Mtg 4/13/92, in* STAFF MEETINGS, *supra* note 70, at 13.
[81] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 53.

109.    By January 1994, APC staff again acknowledged that they were unlikely to meet the goal and began discussing how they hoped the failure would be viewed.[82] Still, they were careful to avoid emphasizing this in public. An Exxon employee warned APC staff **(Figure 10)** that they did not "want paper floating around saying we won't meet goal" since the issue was "HIGHLY SENSITIVE POLITICALLY."[83]



## Figure 10

Irwin Levowitz of Exxon Chemical discouraged American Plastics Council staffers from being "too open" in their communications about the trade organization's recycling goal in a January 1994 meeting. *Condrey, 1994 (emphasis added).*

110.    In light of these failures, the industry developed new ways of measuring and presenting recycling rates.

111.    Internal APC meeting notes from May 1995, for example, indicate that the organization was "moving from reporting plas[tic] pkg #s [*sic*] to bottles only,"[84] making it appear that rates had increased more than they actually had. This "roll out of new recy[cling] rates" was appealing because it "helps us justify the new methodology."[85]

---

[82] Bailey Condrey, *ART Meeting – Houston 1/26/94, in* NOTES, at 24 (1994).

[83] *Id.* at 25 (emphasis in original).

[84] Bailey Condrey, *Staff Mtg 5/8/95, in* STAFF & COMMUNICATIONS MTGS. 111 (1994-1996).

[85] Bailey Condrey, *May 5, 1995 Red Mtg., Tech Review Prog.*, *in* STAFF & COMMUNICATIONS MTGS., *supra* note 70, at 107. An alternative system of measurement and a new phrase, "Recovered for Recycling," had been developed by NAPCOR in partnership with the accounting firm Ernst & Young. *See generally* R.W. Beck, 1995 NATIONAL POST-

112.    Industry advertisements, whether sponsored by individual petrochemical companies or front groups, normalized the idea that plastics could be recycled among consumers and policymakers. But most advertisements simply repeated the same lies about the viability of plastic recycling. According to a NAPCOR ad placed in *Ladies' Home Journal* in 1991 **(Figure 11)**, "a bottle can come back as a bottle, over and over again."[86]



**Figure 11**

113.    CSWS advertised its materials demonstrating how people could set up plastic recycling programs in their communities and left little room for doubt: "The proven systems are in place. The talk is over. Plastics recycling is here."[87] And COPE (then known as the Council on

---

CONSUMER PLASTICS RECYCLING RATE STUDY (Sept. 1996), Box No. 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

[86] National Association for Plastic Container Recovery, *A Bottle That Can Come Back for New Year's Eve is a Cause for Thanksgiving*, LADIES HOME JOURNAL 92 (Dec. 1991).

[87] Council for Solid Waste Solutions, *plastics Recycling Has Taken Off*, STATE LEGISLATURES 35 (Apr. 1991); *see also* Council for Solid Waste Solutions, *Innovations in Recycling: plastics Industry Offers Step by Step Recycling Program Set Up*, STATE LEGISLATURES a2, special insert at 13 (June 1991).

Plastic and Packaging in the Environment) told *Chicago Tribune* readers that they should "Recycle Plastic to Save Landfill Space" to celebrate Earth Day in 1992.[88]

114.    Perhaps most egregiously, plastics industry trade associations representing the petrochemical companies developed "sponsored educational materials" for use in schools.[89]

115.    For example, a 1994 educational guide distributed by the California Department of Conservation Division of Recycling promoted materials created by trade associations and petrochemical companies, including free curriculum materials on plastic recycling from Dow,[90] an APC guide to setting up a school recycling program,[91] and a Foodservice Packaging Institute (FPI) video entitled "Foodservice Disposables: Should I Feel Guilty?" discussing "the growing controversy over reusable versus disposables."[92] Another video, "Working Together for a Healthier Planet," was produced by APC in 1992—it featured a narrator making blatantly false statements, including the claim that "most plastics can be melted and reused over and over again."[93]

116.    When public backlash prompted threats of legislative and regulatory action, the plastics industry recognized that the appearance of action was its best defense. The industry

---

[88] Council for Solid Waste Solutions & National Association for Plastic Container Recovery, *Together, We're Working to Improve Products for Our Environment*, CHICAGO TRIBUNE Z21 (Apr. 5, 1992).

[89] *Molding Young Minds: Firms Spend Big to Get Views into Public Schools*, PLASTICS NEWS (Oct. 30, 1995), https://www.plasticsnews.com/article/19951030/NEWS/310309999/molding-young-minds-firms-spend-big-to-get-views-into-public-schools.

[90] Cal. Dep't of Conservation, Div. of Recycling, EDUCATION & RECYCLING: EDUCATOR'S WASTE MANAGEMENT RESOURCE & ACTIVITY GUIDE 1994 124, 127 (1994).

[91] *Id.* at 131; *see also* National Energy Information Center (NEIC), ENERGY EDUCATION RESOURCES 8 (Mar. 1997) (describing another APC education campaign as "a unique hands-on kit, designed to help middle level science classes explore the world of plastics").

[92] Cal. Dep't of Conservation, *supra* note 93, at 133; *IAMFES Audio Visual Library*, DAIRY, FOOD, & ENVIRONMENTAL SANITATION 195 (Mar. 1993) (describing the educational material as a video that "examines such issues as litter, solid waste, recycling, composting and protection of the earth's ozone layer" and "makes for an excellent discussion opener on . . . the environmental trade-offs (convenience, sanitation and family health) that source reduction necessarily entails").

[93] Working Together for a Healthier Planet, at 8:31 (American plastics Council 1992).

announced direct investments in recycling initiatives, taking the form of research efforts, pilot programs, and company-owned recycling facilities.

117.    Whatever form they took, they shared a common purpose: to prevent bans on single-use plastics. Although heavily publicized in their initial phases, investments in these "recycling" projects rarely lasted. The projects either never came to fruition, or the facilities were never built or shut down quietly when the threat of regulation passed.

118.    Short-term industry investment could not overcome the economic obstacles to plastic recycling. "The basic issue is economics," the director of environmental solutions at B.F. Goodrich explained to an industry panel in 1992. "[F]or commodity plastics, including PVC, the costs of recycling or recovery either overlap or are greater than the selling price for these materials. This is the essence of the problem and the basic reason why recycling is not growing at faster rates."[94]

119.    Ideally, a representative of Eastman Chemical told attendees of an industry conference in 1994 that consumers could put their plastic containers into recycling bins and "be assured that they would be separated into pure streams and would all be sold for viable reuse applications."[95] But "[w]hile someday this may be a reality," he explained, "it is more likely that we will wake up and realize that we are not going to recycle our way out of the solid waste issue."[96]

120.    The petrochemical companies continued to be primarily invested in expanding production, and that meant more virgin resins. Between 1990 and 1996, for every pound of plastic packaging that was recycled, an average of four pounds of virgin plastic was produced.

---

[94] F.E. Krause, Director Environmental Solutions, Geon Vinyl Division, BF Goodrich Co., Presentation to The Vinyl Industry Tripartite Meeting, *PVC Recycling—An Overview* 1 (Sept. 3-4, 1992), *available at* https://www.toxicdocs.org/d/91wxG1YnjQ8KjOnZ3jE9wLxg7?lightbox=1.

[95] Noel Malone, Manager plastics Solid Waste Management, Eastman Chemical Company, Presentation at Bev-Pak America's '94 Program, *Automated Sortation of Plastic Containers* 1-2 (1994), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

[96] *Id*. At 2.

121.    Another employee at Occidental, James R. Clark, explained at a 1992 conference, "the economics of virgin production"— meaning the widespread availability of cheap, virgin resins—"have put downward pressure on recycled resin value in the marketplace."[97] He told attendees that while "[v]irgin resin meets" the criteria of converters—including characteristics like consistent color, low contamination, and processability—"current recycled materials fail in many of these categories."[98]

122.    In 1995, even as APC officials continued their campaign to convince the public that recycling was viable, staffer Bailey Condrey noted internally **(Figure 12)** that "virgin supplies will go up sharply in near future [and] kick the shit out of PCR (Post-Consumer Recycled material) prices."[99]



**Figure 12**

Notes from a November 1995 American Plastics Council staff meeting reveal clear knowledge that recycled plastic was not economically competitive with virgin material. *Condrey, 1994-1996 (emphasis added).*

123.    "Recycling is not always the best option as it does not always effect [*sic*] greatest environmental gain," explained the European Vinyls Corporation in 1993. "In many instances where mechanical recycling is possible, the energy and other resources consumed outweigh the

---

[97] James R. Clark, Product Manager Recycling, Occidental Chemical Company, Presenting at ETEX '92: Turn Waste into Profits, *plastics Recycling Strategy* 1 (Apr. 6-7, 1992), Box No. OS2, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[98] *Id*. at 3.
[99] Bailey Condrey, *Staff Mtg 11/6/95*, *in* STAFF & COMMUNICATIONS MTGS. 111, 182 (1994-1996).

environmental gain."[100] Additional research highlighted these concerns. In 1996, the Association

of Plastics Manufacturers in Europe discussed a study that found "there is a limit . . . to the amount

of household plastics waste which can be mechanically recycled with environmental gains."

(**Figure 13**).[101]



The popularity of recycling increasingly sees different materials being sorted and separated out of the waste stream. Eco-impact studies in the Netherlands and Germany have demonstrated that there is a limit (18 per cent maximum in the Netherlands) to the amount of household plastics waste which can be mechanically recycled with environmental gain. This means that the majority of the remaining waste must be treated by other techniques.

**Figure 13**

A report from the Association of Plastics Manufacturers in Europe acknowledged that recycling could not adequately address plastic waste. *APME, 1996 (emphasis added).*

124.    The plastics industry's failure to overcome the technical and economic obstacles to

mechanical recycling may have suggested the need for additional research and investment, either

a doubling-down on the mission of the "strike force" or exploration of other options in the fight

against plastic waste. But, in reality, the opposite happened.

125.    The Center for plastics Recycling Research shuttered its doors in 1996, as did

several of the plastic recycling facilities owned by various petrochemical corporations, including

Union Carbide.[102]

---

[100] Rolf Buhl, European Vinyls Corp., UPDATE OF THE PVC RELATED ENVIRONMENTAL DEVELOPMENTS IN EUROPE AS PER JANUARY 1993 25 (Jan. 25, 1993), *available at*
https://www.toxicdocs.org/d/O19KKZqrv3EGM5451dXYGmbr1?lightbox=1.
[101] Ass'n of Plastic Mfrs. in Europe (APME), *Summary Report: Separated Mixed Plastics Waste as a Fuel Source* 2 (1996).
[102] *See* Dianne Dumanoski, *Key Events of 1996*, PLASTICS NEWS (Apr 26, 2004),
https://www.plasticsnews.com/article/20040423/NEWS/304239998/key-events-of-1996.

126.    NPRC fell well short of its 25% recycling commitment – it recycled under 2% as of 1995,[103] and was sold in 1999.[104]

127.    Recycling-oriented industry front groups also shifted to the background or, in the case of groups like COPE, ceased operations.[105]

128.    All of these changes reflected a broader shift away from the highly visible campaign for recycling that defined the period between 1985 and 1995.

> **v.    Mid-1990s to 2010s: The plastics industry successfully curbed pressure to create more recyclable plastics, yet recycling continued to prove to be an ineffective method to combat plastic pollution and waste.**

129.    Recycling research and advocacy were no longer the priorities they once had been because, as far as the industry was concerned, the real problem had been addressed. The public had been successfully convinced that plastics could be recycled, and the actual viability of recycling mattered far less to the industry than perception.

130.    By the mid-1990s, public outrage on plastic waste had begun to subside, and plastics fervor waned in state legislatures and city councils across the country.[106]

131.    With that decline in public pressure came a sense of security that the industry had not felt for some time. APC President Red Cavaney explained that "in the early 1990s the public

---

[103] Clare Goldsberry, *supra* note 133.

[104] Steve Toloken, *Thermoformer Elm Packaging Buys NPRC,* PLASTICS NEWS ( July 5, 1999), https://www.plasticsnews.com/article/19990705/NEWS/307059998/thermoformer-elm-packaging-buys-nprc.

[105]    *See    Recycling    Structure    is    Worth    Salvaging*, PLASTICS    NEWS,    (Dec.    9,    1996), https://www.plasticsnews.com/article/19961209/NEWS/312099976/recycling-structure-is-worth-salvaging.    Further confirmation to industry insiders of the declining importance of recycling came in 1996 when Tom Rattray, the recycling expert who explained that petrochemical companies viewed recycling as competition, retired from his position as Procter & Gamble's associate director for environmental quality. The company decided not to fill his position. *Requiem for a Heavyweight*, PLASTICS NEWS (Sept. 16, 1996).

[106] *S See* Roger King, *Big Reforms Not Likely by State Legislatures,* PLASTICS NEWS (Jan. 16, 1995). Internal documents indicate that by this time, industry fears of increased regulation and recycling mandates had largely shifted abroad. In a December 1995 meeting, APC staffers discussed the "European vs. American model" of packaging regulation, noting "more [and] more countries moving toward mandated recycling goals." Bailey Condrey, *Staff Mtg. 12/4/95, in* STAFF & COMMUNICATIONS MTGS., *supra* note 108, at 194.

focus was very much on targets, and they seemed the most easily explained way of showing that something was being done."[107]

132.    But while an APC spokesperson assured the public that the organization remained "very much committed to increased recycling," the situation was different in 1996 than it had been when they set recycled content goals that had not been reached.[108] "The idea of rates, dates, mandates … numerical goals, is all very artificial."[109] The plastics industry had "progressed beyond" these sorts of "targets," Cavaney explained.[110]

133.    This shift reflected the fact that the implementation of a sustainable plastic recycling infrastructure had never been as important to the industry as relieving public and regulatory pressure.

134.    As Exxon Chemical Vice President Irwin Levowitz succinctly explained in a January 1994 meeting with APC staff **(Figure 14)**, "We are committed to the activities, but not committed to the results."[111]



**Figure 14**

Notes from an American Plastics Council meeting in January 1994 quoted Irwin Levowitz of Exxon Chemical. *Condrey, 1994 (emphasis added).*

---

[107] Tom Ford & Roger King, *supra* note 99.
[108] *Id*.
[109] *Id*.
[110] *Id*.
[111] Bailey Condrey, *Gov/Tech Mtg 1/21/94*, *in* NOTES, *supra* note 86, at 7-8.

135.    In essence, the plastics industry had won, and they knew it. As a *Plastics News* columnist told readers in March 1995, "[t]he plastics recycling war is over. We should declare victory and put the money into cancer research. . . . [T]he level of plastics recycling is about 22 percent and won't increase greatly for each new dollar spent."[112]

136.    The results of the plastic recycling research and development sprint had been limited, but the public relations campaign accompanying it had been remarkably effective.

137.    Working in concert, petrochemical companies and their trade associations successfully convinced consumers that recycling presented a viable solution to the plastic waste crisis, and that was enough.

138.    Polling conducted for APC in 1997 showed that, while respondents who worked in the waste management field were rapidly losing confidence in recycling and shifting their priorities toward source reduction,[113] "recycling continues to be seen as the best use of a community's time and money for resource management by the media, government, and customers."[114]

139.    Members of the media in particular embraced the industry's narrative on recycling, with a majority favoring plastic recycling over alternatives like reuse or source reduction.[115] Media respondents were also more likely to believe that plastic recycling was economically self-sufficient compared to other groups.[116]

140.    In 2000, the plastics recycling rate sat at only six percent and only increased three percentage points, to nine percent, by 2018.[117] According to plastic waste export data, the

---

[112] Roger King, *Don't Throw More Money at Recycling*, PLASTICS NEWS (Mar. 13, 1995), https://www.plasticsnews.com/article/19950313/OPINION02/303139979/don-t-throw-more-money-at-recycling.
[113] *See* Cambridge Reports, Research Int'l, RESOURCE MANAGEMENT OPTIONS, PLASTICS, AND THE PLASTICS INDUSTRY: VIEWS OF APC'S TARGET AUDIENCES 1 (May 1997).
[114] *Id*.
[115] *Id*.
[116] *Id*. at 2.
[117] U.S. Environmental Protection Agency, *National Overview: Facts & Figures on Materials, Wastes, and Recycling, supra*.

ostensible increase to nine percent was largely due to millions of pounds of plastic waste being exported each year to China and developing countries, supposedly for recycling but often for incineration or landfilling.[118] Today, the plastic waste exports have declined and the U.S. plastics recycling rate is a dismal five percent.[119]

141.    The steep increase in plastic production over the past 60 years, as depicted in **Figure 15**, created a dramatic increase in plastic waste: in the United States, plastic increased as a percent of municipal solid waste (by mass) from 0.4 percent in 1960 to 12.2 percent in 2018.[120] An estimated 44 million tons of plastic waste were generated in the United States in 2019.

**Figure 15 plastics Production Chart and Prediction to 2060**[121]



[118] Beyond plastics and the Last Beach Cleanup, The Real Truth about the U.S. plastics Recycling Rate, *supra* note 9, at page 2.
[119] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022) https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html; *see also* Beyond plastics and the Last Beach Cleanup, *supra* note 9.
[120] Com. on the U.S. Contributions to Global Ocean Plastic Waste, Nat. Academy Sciences, Engineering, and Medicine, Reckoning with the U.S. Role in Global Ocean Plastic Waste (2022) page 3. (Additionally, the generation of municipal solid waste in the United States has increased significantly over the past 60 years).
[121] *Global Plastic Production and Projections, 1950 to 2060,* Our World in Data https://ourworldindata.org/grapher/global-plastic-production-projections.

142.    The excessive amount of plastic waste and pollution is one of the most serious environmental crises confronting Missouri and the planet today. According to the U.S. Environmental Protection Agency's (EPA) latest estimates, approximately 23 percent of global plastic waste was improperly disposed of, burned (creating harmful and toxic emissions), or leaked into the environment in 2019.

143.    Widespread production and promotion of single-use plastic has led to persistent plastic leakage into the environment[122] Around the world each year, an estimated 11 million tons of plastic waste become aquatic pollution, and 18 million tons of plastic waste pollute land. Together, that is the equivalent of four garbage trucks of new plastic waste polluting water or land *every minute.*[123]

144.    Single-use plastics – plastic packaging, bags, straws, and disposable plasticware and utensils – represent the largest plastics application, and account for one-third of all plastics consumed globally.[124] Single-use plastics comprise most of the plastic waste that escapes and/or is discharged into the environment.[125]

145.    Once plastic waste enters the environment as pollution, it is long-lived, cumulative, friable, and mobile, and can have substantial negative effects on a wide range of freshwater, marine, and terrestrial species. Removing plastics from the environment becomes difficult and costly as plastics fragment into smaller and smaller pieces.

146.    Defendants produce the primary chemicals and polymers used to produce plastic and styrofoam products such as bottles, cups, plastics, utensils, take-out containers, and packaging

---

[122] Organization for Economic Cooperation and Development (OECD), *Plastic Pollution is Growing Relentlessly as Waste Management and Recycling Fall Short, Says OECD* (Feb. 22, 2022) https://www.oecd.org/en/about/news/press-releases/2022/02/plastic-pollution-is-growing-relentlessly-as-waste-management-and-recycling-fall-short.html.
[123] Lau et al., *Evaluating Scenarios Toward Zero Plastic Pollution* (2020) 269 Science 1455.
[124] Minderoo 2023, *supra* note 4, page 17.
[125] *Id.*

designed for single-use that are sold throughout United States, and Defendants consider the production of these polymers as the "core" of their chemicals and products portfolio and see 80 percent of its growth potential as "dependent on single-use plastics applications."

147.    Over the years, Exxon Mobil and the other Defendants expanded their U.S. plastic production to 7.7 million tons per year in 2023. Plastic waste has also grown, for instance, from 8.9 percent of all managed trash in California in 1999 to almost 14 percent of all managed trash in California in 2021. Even when millions of tons of waste plastic were still being exported to China each year, plastics recycling never managed to reach 10%. Despite the stark failure of plastics recycling, the plastics, packaging, and products industries have waged a decades-long misinformation campaign to perpetuate the myth that plastic is recyclable.[126]

148.    "Plastic waste is not just an environmental issue. It's a waste management issue. It's also a land use issue because landfills are closing in many areas," Anelia Milbrandt, a senior research analyst at National Renewable Energy Laboratory (NREL) said. "What do we do with all that waste?"[127]

149.    Tellingly, all polled groups—consumers, media members, government officials, and even waste management industry representatives—believed that plastic could be economically recycled at a much higher rate than it could be.[128]

vi.    **Today: The plastics industry's aggressive misinformation campaign continues to deceive consumers.**

150.    In 2019, NAPCOR and its membership of companies that manufacture and distribute PET containers conceived a scheme to attempt to combat a rising "tide of anti-plastic

---

[126] Beyond plastics, The Real Truth about the U.S. plastics Recycling Rate, *supra* note 9, at page 2. *See also* PBS Frontline, "Plastic Wars," March 31, 2020 https://www.pbs.org/wgbh/frontline/documentary/plastic-wars/
[127] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022), https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html.
[128] *See id.*

sentiment." To address this issue, NAPCOR hired a public relations firm to address these concerns and the "voices calling for safe, environmentally conscious packaging alternatives." The public relations firm then created the "Positively PET" slogan for its campaign. NAPCOR's public relations firm hired specifically to address this rising tide advised NAPCOR that it should "not be the overall handle for the account" to ensure that "consumers don't feel like they are being preached to."

151. Instead of NAPCOR promoting the Positively PET campaign, internal documents reveal that NAPCOR hired social media influencers to promote "PET plastics messaging." These social media influencers were paid to post Positively PET posts containing the claim that a PET bottle is 100% recyclable and can be made with 100% recyclable content. But that claim doesn't match NAPCOR's own recycling data for PET Bottle Collection Rates, 2001 – 2022 (**Figure 16**).[129]

**Figure 16: PET Bottle Collection Rates, 2001-2022**



---

[129] *NAPCOR's 2022 PET Recycling Report Demonstrates Bottle-to-Bottle Circulatrity Continues on the Rise* (Dec. 13, 2023), available at: https://napcor.com/news/2022-pet-recycling-report/.

152.    The fraudulent campaign continued into 2024, when NAPCOR entered the debate on the 2024 Paris Olympics ban on single-use water bottles and cups. NAPCOR communications director, Lindsay Nichols, described this strategy on inserting industry-favoring messaging into trending conversations as the opportunity to "newsjack." And to ensure a successful hijack of news and trending topics with NAPCOR's misleading recycling messaging, NAPCOR encouraged all posts to include common hashtags such as #Olympics, #Paris2024, and #TeamUSA.

153.    Similarly, Defendants and associated plastics industry trade group continue their mislead advertising campaign. For example, the previously-discussed Society of Plastics Industry (SPI) changed its name in 2016 to the Plastics Industry Association. Even as recently as 2023, Exxon Mobil played an active role in the Plastics Industry Association's governance, where an Exxon Mobil Senior Sustainability Advisor was Vice Chair of the Plastics Industry Association's Recycling Committee.

154.    The Plastics Industry Association, with Exxon Mobil at the helm, seemingly continues to play an integral role in pushing the messaging that plastics are recyclable, as indicated by its website[130] and companion site, recyclingisreal.com.

155.    Defendants, working in conjunction with these trade groups, have successfully worked for over 60 years to drive the demand for single-use plastics by misleading and defrauding the American public with the unfounded notion that plastics are recyclable.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery-Rule Tolling

156.    Within the period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that most plastics are not recyclable.

---

[130] https://www.plasticsindustry.org/sustainability

157.    Plaintiffs did not discover, and did not know of, facts that would have caused a reasonable person to suspect that most plastics were not recyclable.

**B.    Fraudulent-Concealment Tolling**

158.    All applicable statutes of limitations have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action that most plastics were not recyclable.

159.    Rather than disclosing to consumers the fact that only 15% of all plastics can be recycled, Defendants continued to manufacture, market, distribute, and sell plastics as recyclable and a better alternative to aluminum and glass.

## VI.    CLASS ACTION ALLEGATIONS

160.    Plaintiffs repeat and re-allege every allegation above as set forth above.

161.    **Nationwide Class:** Pursuant to Federal Rule 23(b)(1) and (b)(2), Plaintiffs Billie Rodriguez, Daniel Erwin, Michael Ackerman, Kyle Foreman, Drew Scruggs, Mary Jane McQueeny, Emily Thorpe, Jennifer Tritt and the Board of County Commissioners of the County of Ford bring this suit on their own behalf and on behalf of a proposed class of all other similarly situated persons ("Nationwide Class") consisting of:

> All persons, governmental, and non-governmental entities in the United States and its territories who indirectly purchased plastics for end use from January 1, 1990 until Defendants' conduct ceases or class notice is given, whichever occurs first.

Excluded from the Class are:

a.      The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

a.      The judges in this case and any members of their immediate families;

b.      All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years;

     c.      All persons who are currently incarcerated; and

     d.      The State of California and all cities, counties, and municipalities within.

162.    **State Law Class:** Pursuant to Federal Rule 23(b)(3), Plaintiffs Billie Rodriguez, Daniel Erwin, Michael Ackerman, Kyle Foreman, Drew Scruggs, Mary Jane McQueeny, Emily Thorpe, Jennifer Tritt and the Board of County Commissioners of the County of Ford bring this suit on their own behalf and on behalf of a proposed class of all other similarly situated persons ("State Law Class") consisting of:

> All persons, governmental, and non-governmental entities in the Indirect Purchaser states[131] who indirectly purchased plastics for end use from January 1, 1990 until Defendants' conduct ceases or class notice is given, whichever occurs first.

Excluded from the Class are:

     a.      The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

     b.      The judges in this case and any members of their immediate families;

     c.      All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years;

     d.      All persons who are currently incarcerated;

     e.      The State of California and all cities, counties, and municipalities within.

163.    **Public Nuisance Class**: Pursuant to Federal Rule 23(b)(2) and (3), Plaintiff The Board of County Commissioners of the County of Ford brings this suit on its own behalf and on behalf of a proposed class of all other similarly situated persons ("Public Nuisance Class") consisting of:

---

[131] The Indirect Purchaser States include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

> All counties, cities, and municipalities located within the United States and its territories which have incurred and will continue to incur sanitation costs for plastic waste clean-up and disposal from January 1, 1990 until Defendants' conduct ceases or until class notice is given, whichever occurs first (the "Class").

Excluded from the Class are:

    a.    The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

    b.    The judges in this case and any members of their immediate families; and

    c.    The State of California and all cities, counties, and municipalities within.

164.    Upon information and belief, the Classes consists of millions of persons, governmental, and non-governmental entities residing throughout the United States. Numerosity is therefore satisfied, and it would be impracticable to join all Class Members before the Court.

165.    Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all of the Class Members and which predominate over any individual issues. Included within the common question of law or fact are:

    a.    Whether Defendants' combined deceptive advertising regarding the recyclable nature of plastics, has substantially affected interstate and intrastate commerce;

    b.    Whether Defendants engaged in an agreement, combination or conspiracy to artificially increase the demand for plastics to protect their profits;

    c.    The duration of this conspiracy or combination;

    d.    Whether the alleged conspiracy violated state antitrust and consumer protection laws;

    e.    Whether Defendants' deceptive advertising regarding the recyclable nature of plastics, has substantially affected interstate and intrastate commerce;

    f.    Whether Defendants' deceptive advertising regarding the recyclability of plastics has increased the cost of waste disposal;

    g.    Whether Defendants negligently mispresented its product or pricing;

h.     Whether the Defendants' conduct was an unreasonable interference with the counties' health and welfare;

i.      Whether the conduct of Defendants caused injury to the Class;

j.      The quantum of overcharges paid by the Class in the aggregate;

k.     Whether Defendants negligently mispresented its product or pricing;

l.      Whether Defendants were unjustly enriched by selling plastics at an inflated price.

166.     The claims of Plaintiffs are typical of the claims of Class Members, in that they share the facts above and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests other Class Members.

167.     Plaintiffs will fairly and adequately protect the interests of Class Members and have retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in consumer protection litigation.

168.     A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted is more efficient and manageable for at least the following reasons:

a.     The liability claims presented in this case predominates over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

b.     Absent a Class, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

c.     Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

     d.     When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

     e.     This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

169.    Because Plaintiffs seek relief for the Classes as described above, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual member of the Classes, which would establish incompatible standards of conduct for Defendant.

170.    Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interest of other Class Members who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for adjudication of the issues in this case.

## VII.   <u>ANTITRUST INJURY</u>

171.    Plaintiffs repeat and re-allege every allegation above as set forth above.

172.    Defendants' anticompetitive conduct had the following effects, among others:

     a.     the demand for plastics was artificially increased;

     b.     price competition has been restrained or eliminated with respect to plastic;

     c.     purchasers of plastics have been deprived of free and open competition; and

     d.     purchasers of plastics, including Plaintiffs, paid artificially inflated prices.

173.    The purpose of Defendants' conduct was to artificially increase the demand for plastics to protect their profits. As a direct and foreseeable result, Plaintiffs and the Classes paid supracompetitive prices for plastics during the Class Periods.

174.    Through the alleged violations of antitrust laws, Plaintiffs and the Classes have sustained injury to their business or property, purchasing more plastics than if they had known of the true recyclability rates of plastics and paying higher prices for plastics than they would have paid in the absence of Defendants' illegal conduct, and have suffered damages as a result.

175.    Plaintiffs paid higher prices for plastics that would have in the absence of Defendants' conduct.

176.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   RELEVANT MARKET

177.    The relevant product market for this action is plastics products for end use consumption and the relevant geographic market is the United States and its territories.

## IX.   CLAIMS FOR RELIEF

## A.   VIOLATIONS OF THE SHERMAN ACT

### COUNT 1
### VIOLATION OF 15 U.S.C. § 1
**(On Behalf of the Nationwide Class for Injunctive Relief)**

178.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

179.    From at least January 1, 1990, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to artificially increase the demand for plastics in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

180.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and to artificially increase the demand for plastics to protect their profits.

181.    The combination and conspiracy alleged has had at least the following effects:

    a.    The demand for plastics was artificially increased;

    b.    Price competition in the sale of plastics has been restrained, suppressed, and/or eliminated in the United States; and

    c.    Those who purchased plastics indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition and paid artificially high prices for plastics.

182.    Plaintiffs and Class Members have been injured and will continue to be injured in their businesses and property by paying more for plastics purchased indirectly from Defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

183.    Plaintiffs and Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged.

184.    Plaintiffs and the Nationwide Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described violates § 1 of the Sherman Act (15 U.S.C. § 1).

**B.    <u>VIOLATIONS OF PUBLIC NUISANCE LAWS</u>**

**<u>COUNT 2</u>**
**<u>PUBLIC NUISANCE</u>**
**(On Behalf of the Public Nuisance Class)**

205.    Plaintiffs repeat and re-allege each and every allegation set forth above.

206.    Defendants created, exacerbated, and maintained a public nuisance by increasing

plastic waste which proximately caused injury to Plaintiffs.

207.     A public nuisance is an unreasonable interference with a right common to the general public. Defendants conduct has created, contributed to, and maintained an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' communities. *See* Restatement (Second) of Torts § 821B.

208.     Defendants have created, contributed to, and maintained a public nuisance by deceptively advertising and marketing that plastics were recyclable when in reality less than 10% of Plastics are recycled. This deceptive advertising caused various agencies not to ban Plastics, artificially increased the demand for Plastics and increased the amount of Plastics waste that counties have had to dispose of. This conduct has unreasonably interfered with the public health, welfare, and safety in Plaintiffs' communities. Plaintiffs have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

209.     The interference is unreasonable because Defendants nuisance-creating conduct:

    a.     Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

    b.     Was and is proscribed by state laws and regulations at all relevant times; and/or

    c.     Is of a continuing nature and, as Defendants know, has had and continues to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

210.     The significant interference with rights common to the general public is described in detail throughout this Complaint.

211.     Defendants are liable for creating, contributing to, and maintaining the public

nuisance because their intentional, knowing, reckless, and unreasonable and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiffs.

212.    Defendants had control over its conduct in Plaintiffs' communities and that conduct has had an adverse effect on rights common to the general public. Defendants have controlled the dissemination of information regarding the recyclability of Plastics to consumers for years.

213.    It was reasonably foreseeable that Defendant's actions and omissions would result in the public nuisance and harm to Plaintiffs described here.

214.    The externalized risks associated with Defendants nuisance-creating conduct as described here greatly exceed the internalized benefits.

215.    The nuisance created by Defendants conduct is abatable.

216.    As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendant, Plaintiffs have been damaged.

## C.    VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

217.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

218.    As alleged throughout this Class Action Complaint, Exxon Mobil Corporation, Chevron USA, Inc., Chevron Philips Chemical Corporation, Celanese Corporation, Dow Inc., Dow Chemical Company, Dupont de Nemours, Inc., Dupont Corporation, Eastman Chemical Company, LyondellBasell Industries N.V., and American Chemical Counsel engaged in unfair methods of competition; unfair or deceptive acts or practices; and/or unconscionable acts or practices in violation of the following state consumer protection laws by taking the following actions, including but not limited to:

a.    making fraudulent, deceptive, and material misrepresentations about the recyclability of plastics sold in the United States;

b.    not disclosing that less than 10% of plastic products are recycled;

    c.    exploiting the perceived recyclability of plastics to artificially increased demand and therefore prices of plastic.

219.    As a result of Defendants' practices, Plaintiffs and the class members have suffered damages and are entitled to recover those damages and costs, including reasonable attorneys' fees.

220.    Plaintiffs and the Class are also entitled to an injunction to stop Defendants continued deceptive and unconscionable practices of advertising and selling plastics as recyclable.

221.    By engaging in the conduct set forth throughout this Class Action Complaint, Defendants have engaged in unfair competition and unfair or deceptive acts or practices or unconscionable practices in violation of the following state consumer protection statutes:

## COUNT 3
## VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (Ark. Code Ann. § 4-88-101, *et seq.*)
### (On Behalf of the State Law Class)

222.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

223.    Through the conduct alleged, Defendants have violated ARK. CODE § 4-88-101 *et seq.*

224.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the plastics market, a substantial part of which occurred within Arkansas.

225.    Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

226.    Defendants concealed, suppressed, and omitted to disclose material facts to members of the Arkansas Class concerning Defendants' unlawful activities and artificially inflated prices for plastics. They concealed, suppressed, and omitted facts would have been important to members of the Arkansas Class as they related to the cost of products they purchased.

227.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in plastics by making public statements that were not in accord with the facts.

228.    Defendants' statements and conduct related to the price of their products were deceptive as they had the tendency or capacity to mislead members of State Law Class to believe that they were purchasing at prices established by a free and fair market.

229.    The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of ARK. CODE § 4-88-107(a)(10).

230.    As a direct and proximate result of Defendants' unlawful conduct, members of the State Law Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for plastics due to Defendants' unlawful conduct.

231.    Accordingly, members of the State Law Class seek all relief available under the Arkansas Deceptive Trade Practices Act.

## COUNT 4
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)
### (On Behalf of the State Law Class)

232.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

233.    Plaintiffs bring this Count on behalf of all Class Members who are or have been residents of California at any relevant time ("California Class Members") against Exxon Mobil Corporation, Chevron USA, Inc., Chevron Philips Chemical Corporation, Celanese Corporation, Dow Inc., Dow Chemical Company, Dupont de Nemours, Inc., Dupont Corporation, Eastman Chemical Company, LyondellBasell Industries N.V., and American Chemical Council.

234.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

235.    As alleged throughout this Class Action Complaint, Defendants engaged in unfair, deceptive, and/or unlawful practices in violation of California's Unfair Competition law by, at a minimum: (a) making material misrepresentations about the recyclability of plastics; and (b) causing confusion or misunderstanding regarding the recyclability of plastics.

236.    As indicated by the below statements of California and federal policy, Defendants' grossly excessive and unfair plastics pricing violates public policy and is, as such, unlawful under CAL. BUS. & PROF. CODE § 17200.

237.    Defendants' unfair, unlawful and/or deceptive activity alleged caused Plaintiffs and the California Class Members to purchase plastics at inflated prices. Accordingly, Plaintiffs and the California Class Members have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

238.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. BUS. & PROF. CODE § 3345; and for such other relief set forth below.

## COUNT 5
## VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES (6 Del. Code § 2513, *et seq.*)
### (On Behalf of the State Law Class)

239.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

240.    Plaintiffs and Class Members purchased plastics for personal, family, or household purposes.

241.    Through the conduct alleged, Defendants have violated D.C. CODE § 28-3901, *et seq*.

242. Defendants are "merchants" within the meaning of D.C. CODE § 28- 3901(a)(3).

243. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

244. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

245. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. CODE § 28-3901, *et seq.*

## COUNT 6
## VIOLATIONS OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, *et seq.*)
### (On Behalf of the State Law Class)

246. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

247. The Florida Deceptive & Unfair Trade Practices Act, FLA. STAT. § 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

248. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

249.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

250.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. See FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

251.    Plaintiffs and Class Members purchased plastics within the State of Florida during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

252.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

253.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property because of overcharges for plastics and are threatened with further injury.

254.    Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including injunctive relief pursuant to FLA. STAT. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

### COUNT 7
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT,
### (Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)
### (On Behalf of the State Law Class)

255.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

256.    Through the conduct alleged, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, et seq.

257.    Plaintiffs and Class Members purchased plastics within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth, the price paid would have been lower, in an amount to be determined at trial.

258.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

259.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

260.    Plaintiffs and Class Members purchased plastics, primarily for personal, family, or household purposes.

261.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

262.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under MASS. GEN. LAWS ch. 93A § 9.

**COUNT 8**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES**
**(ACT, MO. ANN. STAT. § 407-010, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

263.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

264.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization. MO. REV. STAT. § 407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the

concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and MO. REV. STAT. § 407.025, which provides for the relief sought in this count.

265.    The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for plastics. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the State Law Class as they related to the cost of plastics they purchased.

266.    The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in plastics by making public statements that were not in accord with the facts.

267.    The Defendants' statements and conduct related to the price of plastics were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the State Law Class to believe that they were purchasing plastics at prices established by a free and fair market.

268.    Plaintiffs and Class Members purchased plastics for end use within the State of Missouri during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

269.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

270.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in

an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### COUNT 9
### VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECT ION ACT OF 1970,
### (Mont. Code § 30-14-103, *et seq.* and § 30-14-201, *et seq.*)
### (On Behalf of the State Law Class)

271.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*

273.    Defendants' unlawful conduct had the following effects: (1) the demand for plastics was artificially increased throughout Montana; (2) Plaintiffs and Class Members were deprived of free and open competition; and (3) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for plastics.

274.    Plaintiffs and Class Members purchased plastics, primarily for personal, family, or household purposes.

275.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

276.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30 14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and Class Members seek all relief available under that statute.

## COUNT 10
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1602, *et seq.*)
### (On Behalf of the State Law Class)

277.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

278.    Through the conduct alleged, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

279.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

280.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

281.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

282.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

283.    Because of the foregoing, Plaintiffs and Class Members seek all relief available under the statute, NEB. REV. STAT. § 59-1601, *et seq*.

## COUNT 11
## VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (Nev. Rev. Stat. § 598.0903, *et seq.*)
### (On Behalf of the State Law Class)

284.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

285.    Through the conduct alleged, Defendants have violated NEV. REV. STAT. § 598.0903, *et seq*.

286.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

287.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

288.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

289.    Defendants' conduct was willful.

290.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

291.    Because of the foregoing, Plaintiffs and Class Members is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

### COUNT 12
### VIOLATIONS OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
#### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)
#### (On Behalf of the State Law Class)

292.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

293.    Through the conduct alleged, Defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq*.

294.    Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

295.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

296.    Defendants' conduct was willful and knowing.

297.    Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

298.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

299.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

300.    Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief available under N.H. REV. STAT §§ 358-A:10 and 358-A:10-a.

## COUNT 13
## VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)
### (On Behalf of the State Law Class)

301.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

302.    Through the conduct alleged, Defendants have violated N.M. STAT. § 57-12-3, *et seq*.

303.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

304.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

305.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and Class Members and the price paid by them for Defendants' oil as set forth in N.M. STAT. § 57-12-2E.

306.    Defendants' conduct was willful.

307.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

308.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

### COUNT 14
### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)
### (On Behalf of the State Law Class)

309.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

310.    Through the conduct alleged, Defendants have violated N.C. GEN. STAT. § 75-1.1, *et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

311.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

312.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

313.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

314.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

315.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

316.    Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

## COUNT 15
## VIOLATIONS OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### (R. I. Gen. Laws § 6-13-1.1, *et seq.*)
### (On Behalf of the State Law Class)

317.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

318.    Through the conduct alleged, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq*.

319.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

320.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

321.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

322.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

323.    Defendants' conduct was willful.

324.    Plaintiffs and Class Members purchased goods plastics, primarily for personal, family, or household purposes.

325.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

326.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen. Laws § 6-13.1-5.2.

## COUNT 16
## VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-10, *et seq.*)
### (On Behalf of the State Law Class)

327.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

328.    Through the conduct alleged, Defendants have violated S.C. Code Ann. § 39-5-10, *et seq.*

329.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

330.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

331.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

332.    The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the State Law Class seek all relief available under that statute.

### COUNT 17
### VIOLATIONS OF VERMONT CONSUMER PROTECTION ACT
#### (Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*)
#### (On Behalf of the State Law Class)

333.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

334.    Through the conduct alleged, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq*.

335.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, among other things, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT. ANN. tit. 9, § 2453(a).

336.    Plaintiffs and Class Members purchased plastics within the State of Vermont during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

337.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see* also *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

338.    Defendants competed unfairly by restraining trade as set forth, in violation of VT. STAT. tit. 9, § 2453, *et seq*.

339.    Defendants' violations of Vermont law were flagrant.

340.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

341.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

342.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

343.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**D.    <u>VIOLATIONS OF STATE ANTITRUST LAWS</u>**

344.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

345.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to artificially increase the demand for plastics to protect their profits, the production of plastics in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

346.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to artificially increase the demand for plastics, which injured Plaintiffs and Class Members; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

347.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to artificially increase the demand for plastics to protect their profits. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members were deprived of free and open competition and paid more to purchase plastics than they otherwise would have absent Defendants' unlawful conduct. This injury is of the type

that the antitrust and consumer protection laws of the below states were designed to prevent and flows from what makes Defendants' conduct unlawful.

348.    Defendants have also profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and Class Members.

349.    Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, as allowed by the following state laws.

350.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

351.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 18
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,
### (ARIZ. REV. STAT. § 44-401, *ET SEQ.*)
### (On Behalf of the State Law Class)

352.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

353.    Through the conduct alleged, Defendants have violated ARIZ. REV. STAT. § 44-1401, *et seq*.

354.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

355.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the plastics market, a substantial part occurred within Arizona.

356.    Defendants' violations of Arizona law were flagrant.

357.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce (plastics).

358.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

359.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief available under ARIZ. REV. STAT § 44-1401, *et seq*.

**COUNT 19**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**(CAL. BUS. & PROF. CODE § 16700 *ET SEQ.*)**
**(On Behalf of the State Law Class)**

360.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

361.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

362.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

363.    A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including, but not limited to, creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. § 16726.

364.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the plastics market, a substantial part of which occurred within California.

365.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq*.

366.    Plaintiffs and Class Members purchased plastics within the State of California during the Class Period. But for Defendant's conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

367.    Plaintiffs and Class Members were with respect to purchases of plastics in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### COUNT 20
### VIOLATION OF THE COLORADO ANTITRUST ACT,
### (COLO. REV. STAT. ANN. § 6-4-101, *ET SEQ.*)
### (On Behalf of the State Law Class)

368.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

369.    Plaintiffs and Class Members purchased Defendants' plastics within Colorado during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastic would have been lower, in an amount to be determined at trial.

370.    The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations Colorado antitrust law for actual damages. *See* C.R.S. § 6-4-115 (emphasis added).

371.    Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq*.

372.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Colorado and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

## COUNT 21
## VIOLATION OF THE CONNECTICUT ANTITRUST ACT,
### (CONN. GEN. STAT. ANN § 35-24, *ET SEQ.*)
### (On Behalf of the State Law Class)

373.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

374.    Plaintiffs and Class Members purchased Defendants' plastics within Connecticut during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

375.    The Connecticut Antitrust specifically allows a private act of recovery for indirect purchasers by prohibiting a defendant from "assert[ing] a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* C.G.S.A. § 35-46a.

376.    Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation C.G.S.A. § 35-24, *et seq*. Defendants' conducts and conspiracies restrained, suppressed, and eliminated the price competitive for plastics; artificially increased the demand for plastics, while depriving Plaintiffs and Class Members of free and open competition. These acts resulted in Plaintiffs and Class Members paying supracompetitive, artificially inflated prices for plastics.

377.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 22**
**VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,**
**(D.C. CODE § 28-4501, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

378.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

379.    Plaintiffs and Class Members purchased Defendants' plastics within the District of Columbia during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

380.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

381.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia in violation of D.C. CODE § 28-4501, *et seq*.

382.    Plaintiffs and Class Members were injured with respect to purchases of plastics in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 23**
**VIOLATION OF HAWAII ANTITRUST ACT,**
**(HAW. REV. STAT. ANN § 480-1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

383.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

384.    Plaintiffs and Class Members purchased plastics within Hawaii during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

385.    The Hawaii Antitrust Act specifically allows a private act of recovery for indirect purchasers. *See* HRS § 480-13.3.

73

386.    Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation of H.S.R. § 480-1, *et seq*.

387.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Hawaii and are entitled to all forms of relief, including actual damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 24**
**VIOLATION OF ILLINOIS ANTITRUST ACT,**
**(740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.*)**
**(On Behalf of the State Law Class)**

388.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

389.    Plaintiffs and Class Members purchased Defendants' plastics within the State of Illinois during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

390.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN. 10/7(2).

391.    Defendants entered into contracts or engaged in a combination or conspiracy to artificially increase the demand for plastics sold within the State of Illinois.

392.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT 25**
**VIOLATION OF IOWA COMPETITION LAW,**
**(IOWA CODE § 553.1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

393.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

394.    Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

395.    Plaintiffs and Class Members purchased Defendants' plastics within the State of Iowa during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

396.    Defendants contracted, combined or conspired to restrain trade in the plastics market, in violation of IOWA CODE § 553.1, *et seq*.

397.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

### COUNT 26
### VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,
### (KAN. STAT. ANN. § 50-101, *ET SEQ.*)
### (On Behalf of the State Law Class)

398.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

399.    The Kansas Restraint of Trade Act aims to prohibit practices which, among other things, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

400.    Plaintiffs and Class Members purchased plastics within the State of Kansas during the Class Period.

401.    But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

402.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

403.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT 27**
**VIOLATION OF MAINE'S ANTITRUST STATUTE,**
**(ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

404.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

405.    Plaintiffs and Class Members purchased plastics within the State of Maine during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

406.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

407.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT 28**
**VIOLATION OF MARYLAND'S ANTITRUST STATUTE,**
**(MD. CODE ANN. § 11-201, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

408.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

409.    The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

410.    Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE ANN. § 11-209(b)(2)(i).

411.     Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

412.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT 29**
**<u>VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,</u>**
**<u>(MICH. COMP. LAWS § 445.771, *ET SEQ.*)</u>**
**(On Behalf of the State Law Class)**

413.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

414.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq*.).

415.     Plaintiffs and Class Members purchased Defendants' plastics within the State of Michigan during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

416.     Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

417.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**COUNT 30**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**(MINN. STAT. §§ 325D.49 *ET SEQ.* & 325D.57 *ET SEQ.*)**
**(On Behalf of the State Law Class)**

418.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

419.     The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into . . . whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

420.     Plaintiffs and Class Members purchased Defendants' plastics the State of Minnesota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

421.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

422.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**COUNT 31**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**Miss. Code Ann. § 75-21-1, *et seq.***
**(On Behalf of the State Law Class)**

423.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

424.     Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

425.    "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, among other things, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

426.    Plaintiffs and Class Members purchased plastics within the State of Mississippi during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

427.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

428.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**COUNT 32**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**(NEB. REV. STAT. § 59-801, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

429.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

430.    Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

431.    Plaintiffs and Class Members purchased plastics within the State of Nebraska during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

432.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. § 59-821.

433.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### COUNT 33
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
### (NEV. REV. STAT. § 598A.010, *ET SEQ.*)
### (On Behalf of the State Law Class)

434.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

435.    The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

436.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060.

437.    Plaintiffs and Class Members purchased plastics within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

438.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

439.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Nevada in that at least thousands of sales of plastics took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

440.    Accordingly, Plaintiffs and Class Members are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 34**
**<u>VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,</u>**
**<u>(N.H. REV. STAT. ANN. TIT. XXXI, § 356:1, <em>ET SEQ.</em>)</u>**
**(On Behalf of the State Law Class)**

441.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

442.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

443.    Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

444.    Plaintiffs and Class Members purchased Defendants' plastics within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

445.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II). Defendants established, maintained or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq*.

446.    Plaintiffs and Class Members were injured with respect to purchases of Defendants' plastics in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 35**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**(N.M. STAT. ANN. § 57-1-1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

447.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

448.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

449.    Plaintiffs and Class Members purchased plastics within the State of New Mexico during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

450.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

451.    Plaintiffs and Class Members were injured with respect to purchases of plastics in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 36**
**VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW,**
**(N.Y. GEN. BUS. LAW § 340, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

452.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

453.    Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

454.    Plaintiffs and Class Members purchased plastics within the State of New York during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

455.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

456.     Plaintiffs and Class Members were injured with respect to purchases of plastics in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq*.

## COUNT 37
## VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, (N.C. GEN. STAT. § 75-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

457.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

458.     Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

459.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

460.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

461.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

462.     Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq*.

**COUNT 38**
**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D.**
**(Cent. Code § 51-08.1-01, *et seq.*)**
**(On Behalf of the State Law Class)**

463.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

464.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. Cent. Code § 51-08.1-01, *et seq.*

465.    Plaintiffs and Class Members purchased plastics within the State of North Dakota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

466.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

467.    Defendants' violations of North Dakota law were flagrant.

468.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

469.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. Cent. Code § 51-08.1-01, *et seq.*

**COUNT 39**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**(Or. Rev. Stat. § 646.705, *et seq.*)**
**(On Behalf of the State Law Class)**

470.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

471.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

472.    Plaintiffs and Class Members purchased plastics within the State of Oregon during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

473.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

474.    Plaintiffs and Class Members were injured with respect to purchases of plastics within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

### COUNT 40
### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
### (6 R.I. GEN. LAWS § 6-36-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

475.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

476.    The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

477.    Plaintiffs and Class Members purchased plastics within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

478.    Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

479.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

### COUNT 41
### VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,
### (S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.*)
### (On Behalf of the State Law Class)

480.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

481.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

482.    Plaintiffs and Class Members purchased plastics within the State of South Dakota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

483.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

484.    Plaintiffs and Class Members were injured with respect to purchases of plastics in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**COUNT 42**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**(TENN. CODE § 47-25-101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

485.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

486.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, among other things, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

487.     Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

488.     Defendants competed unfairly and colluded by meeting to restrain output, artificially increase demand, divide markets, and otherwise restrain trade as set forth, in violation of TENN. CODE ANN. § 47-25-101, *et seq*.

489.     Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for plastics was restrained, suppressed, and eliminated throughout Tennessee; (2) artificially increase the demand for plastics throughout Tennessee; (3) Plaintiffs and Class Members were deprived of free and open competition; and (4) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for plastics.

490.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as plastics refined from Defendants plastics was sold in Tennessee.

491.    Plaintiffs and Class Members purchased plastics within the State of Tennessee during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

492.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## COUNT 43
## VIOLATION OF THE UTAH ANTITRUST ACT,
### (UTAH CODE ANN. § 76-10-3101, *ET SEQ.*)
### (On Behalf of the State Law Class)

493.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

494.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

495.    Plaintiffs and Class Members purchased plastics within the State of Utah during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

496.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

497.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT 44
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
### (W. VA. CODE § 47-18-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

498.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

499.    The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

500.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

501.    Plaintiffs and Class Members purchased Defendants' plastics within the State of West Virginia during the Class Period. But for Defendant's conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

502.    Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq*., may bring an action for damages under W. Va. Code § 47-18-9.").

503.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

504.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business and property in that they paid more for plastics than they otherwise would have paid absent Defendants' unlawful conduct.

505.    As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and Class Members seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

### COUNT 45
### VIOLATION OF THE WISCONSIN ANTITRUST ACT,
### (WIS. STAT. § 133.01, *ET SEQ.*)
### (On Behalf of the State Law Class)

506.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

507.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

508.    Plaintiffs and Class Members purchased plastics within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

509.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

510.    Defendants contracted, combined or conspired in restraint of trade or commerce of plastics, with the intention of injuring or destroying competition, in violation of WIS. STAT. § 133.01, *et seq.*

511.    Plaintiffs and Class Members were injured with respect to purchases of Defendants'

plastics in Wisconsin in that the actions alleged substantially affected the people of Wisconsin,

with at least thousands of consumers in Wisconsin paying substantially higher prices for plastics

in Wisconsin.

512.    Accordingly, Plaintiffs and Class Members are entitled to all forms of relief,

including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive

relief.

## COUNT 46
## UNJUST ENRICHMENT

513.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

514.    Through their conduct, Defendants caused damages to Plaintiffs and to Class

Members.

515.    By misleading the American public into thinking that plastics are completely, or

near completely recyclable, Defendants artificially increased the demand for their plastics. This

deception not only allowed Defendants to avoid plastic bans, but the artificially inflated demand

allowed them to increase the prices of their plastics. By purchasing plastics at an inflated price in

the United States, which Defendants forced them to do, Plaintiffs and the Class Members conferred

a benefit on Defendants in the form of the inflated and unconscionable price of the product.

516.    Defendants appreciated the benefit because, were consumers not to purchase

plastics, Defendants would have no sales and make no money off Plastic sales in the

aforementioned states.

517.    Defendants were directly involved in, the deceptive advertising of plastics, setting

the price for plastics, making material misstatements, and directing the sale and distribution of

plastics nationwide in the United States.

518.    Plaintiffs and Class Members have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and the artificial increase in the demand of plastics to the economic detriment of Plaintiffs and the Class. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants unconscionable sales, and unlawful acts.

519.    Equity cannot in good conscience permit Defendants to be economically enriched for its unjust actions at Plaintiffs and Class Members' expense and in violation of state law, and therefore restitution or disgorgement or both of such economic enrichment is required. It would be futile for Plaintiffs and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and the Class.

520.    Plaintiffs and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23 for each of the Classes; direct that reasonable notice of this action, as provided by Fed. R. Civ. P.  23(c)(2) be given to the Classes; and declare that Plaintiffs are the representatives of the Classes;

b.    Require Defendants to pay for sending notice to the certified Classes as required by relevant states' law;

c.      Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

d.      Issue an injunction under 15 U.S.C. § 26 to enjoin Defendants from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged in this First Amended Class Action Complaint;

e.      Issue an injunction under 15 U.S.C. § 26 to enjoin Defendants from engaging in anticompetitive conduct in the plastics market;

f.      Find that Defendants have caused a public nuisance by their conduct which has injured the Plaintiffs;

g.      Provide abatement, remediation, and cleanup of this public nuisance at the Court's direction;

h.      Award compensatory damages to Plaintiffs and the proposed Classes in an amount to be established at trial;

i.      Award treble damages as permitted by law;

j.      Award pre- and post-judgment interest;

k.      Award punitive damages based on Defendants' reprehensible and deliberate conduct;

l.      Award reasonable attorneys' fees and costs; and

m.     For all such other and further relief as may be just and proper.

Dated: January 17, 2025.                    Respectfully submitted,

                                            */s/ Rex A. Sharp*
                                            Rex A. Sharp, MO #51205
                                            Isaac L. Diel, MO #39503
                                            W. Greg Wright, MO #49545
                                            Sarah T. Bradshaw, MO #66276
                                            Hammons P. Hepner, MO #77258
                                            SHARP LAW, LLP
                                            4820 W. 75th Street
                                            Prairie Village, KS 66208
                                            (913) 901-0505
                                            (913) 261-7564 Fax
                                            rsharp@midwest-law.com
                                            idiel@midwest-law.com
                                            gwright@midwest-law.com
                                            sbradshaw@midwest-law.com
                                            hhepner@midwest-law.com

                                            --and--

                                            Dave Rebein, KS #10476
                                            REBEIN BROTHERS, PA
                                            1715 Central Ave.
                                            Dodge City, KS 67801
                                            Tel: (620) 227-08126

                                            --and--

                                            Glenn I. Kerbs, KS #09754
                                            Samantha F. Sweley, KS #26833
                                            KERBS LAW OFFICE, LLC
                                            1715 Central Ave.
                                            Dodge City, KS 67801
                                            Tel: (620) 255-0238
                                            gkerbs@kerbslaw.com
                                            ssweley@kerbslaw.com

                                            *Attorneys for Plaintiffs*
                                            *and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 17, 2025, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Rex A. Sharp*
Rex A. Sharp