# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BILLIE RODRIGUEZ, et al., | |
| *Plaintiffs*, | |
| v. | |
| EXXON MOBIL CORPORATION, et al., | **Civil Action No. 2:25-cv-02195-TC-TJJ** |
| *Defendants*, | |
| and | |
| STATE OF KANSAS, *ex rel.*, KRIS W. KOBACH, Attorney General, | **ORAL ARGUMENT REQUESTED** |
| *Defendant-Intervenor*. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' AND DEFENDANT-INTERVENOR'S MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT
TO RULES 12(B)(1) AND 12(B)(6) FILED ON BEHALF OF ALL DEFENDANTS .................1

FACTUAL BACKGROUND ..................................................................................................4

LEGAL STANDARD ..............................................................................................................7

ARGUMENT ...........................................................................................................................8

I.      PLAINTIFFS LACK ARTICLE III STANDING (ALL COUNTS)......................8

II.     PLAINTIFFS FAIL TO STATE ANY ANTITRUST CLAIM (COUNTS
        1, 18–45) ...............................................................................................................10

        A.      Plaintiffs Fail to Allege Any Restraint of Trade .......................................10

        B.      Plaintiffs Fail to Plead an Agreement .......................................................11

        C.      Defendants' Conduct Is Immune Under the Noerr-Pennington
                Doctrine......................................................................................................18

        D.      Plaintiffs Do Not Plausibly Allege an Unreasonable Restraint of
                Trade ..........................................................................................................20

        E.      Plaintiffs Fail to Plead Antitrust Standing ................................................24

        F.      Additional Independent Grounds to Dismiss the State Antitrust
                Claims Exist ...............................................................................................28

III.    FORD COUNTY FAILS TO STATE A PUBLIC NUISANCE CLAIM
        (COUNT 2) ...........................................................................................................29

        A.      Kansas Law Governs Ford County's Public Nuisance Claim ..................30

        B.      Ford County Lacks the Authority to Bring a Public Nuisance
                Claim on Either an Individual or Class Basis ...........................................30

        C.      Ford County's Public Nuisance Claim Fails for Numerous Reasons ........32

IV.     PLAINTIFFS FAIL TO STATE A VIABLE CONSUMER FRAUD
        CLAIM (COUNTS 3-17)......................................................................................39

        A.      Plaintiffs Have Not Satisfied the Rule 9(b) Pleading Standard
                (Counts 3–17).............................................................................................39

B.     Plaintiffs Fail to Establish Standing for Certain of the Consumer Fraud Claims (Counts 3–7 & 9–17)...................................................41

C.     Plaintiffs Fail to Plausibly Allege Any Actionable Deception (Counts 3–17)...........................................................................................42

V.     PLAINTIFFS FAIL TO STATE AN UNJUST ENRICHMENT CLAIM (COUNT 46) ...............................................................................................49

VI.     ALL OF PLAINTIFFS' CLAIMS ARE TIME-BARRED (ALL COUNTS) ...................................................................................................51

CONCLUSION ..................................................................................................................53

CHEVRON U.S.A. INC.'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS ....................................................................................................54

EASTMAN CHEMICAL COMPANY'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS ....................................................................................58

I.     PLAINTIFFS' VAGUE ALLEGATIONS DO NOT STATE A PLAUSIBLE CLAIM AGAINST EASTMAN UNDER TWOMBLY/IQBAL.............................................................................................60

II.     PLAINTIFFS' CLAIMS AGAINST EASTMAN ARE TIME-BARRED...........61

AMERICAN CHEMISTRY COUNCIL, INC.'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS .................................................................61

DOW INC. AND DUPONT DE NEMOURS, INC.'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS .................................................................66

I.     THE COURT LACKS PERSONAL JURISDICTION OVER DOW INC. AND DNPI.....................................................................................................66

A.     Legal Standard for Personal Jurisdiction ....................................67

B.     Plaintiffs Fail to Establish Personal Jurisdiction Under Section 12 of the Clayton Act .........................................................................68

C.     The Due Process Clause Bars Jurisdiction..................................72

II.     PLAINTIFFS FAIL TO PLEAD DIRECT OR INDIRECT LIABILITY AGAINST HOLDING COMPANY DOW INC ....................................................74

KANSAS'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FORD COUNTY'S IMPROPER CLASS ALLEGATIONS AND CLAIMS .........................................76

LEGAL STANDARD.........................................................................................................78

ARGUMENT ................................................................................................................78

I.      FORD COUNTY LACKS STANDING TO ASSERT OR REPRESENT
        KANSAS'S LEGAL CLAIMS..................................................................79

        A.      Ford county lacks inherent sovereignty to remediate harms to
                Kansas's quasi-sovereign interests ...........................................79

        B.      Ford County cannot misuse Rule 23 to offend Kansas's
                constitutional sovereignty .........................................................82

II.     FORD COUNTY'S CLASS CLAIMS MUST BE DISMISSED
        BECAUSE KANSAS IS THE REAL PARTY IN INTEREST FOR
        KANSAS'S CLAIMS ................................................................................84

        A.      Kansas law determines the real party in interest for Kansas's
                claims .......................................................................................84

        B.      Kansas law designates the State as the real party in interest and
                vests statewide authority in the attorney general .......................85

        C.      Ford County's powers end at its county lines.............................87

        D.      Ford County's class claims are an improper exercise of sovereign
                authority and face insurmountable class certification issues ....88

CONCLUSION............................................................................................................90

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.O.A. v. Rennert*,
  350 F. Supp. 3d 818 (E.D. Mo. 2018) ...................................................................41

*Ablulimir v. U-Haul Co.*,
  2011 WL 2731774 (D. Kan. 2011) ......................................................................21

*Ackal v. Centennial Beauregard Cellular L.L.C.*,
  700 F.3d 212 (5th Cir. 2012) ..............................................................................90

*Adidas v. NCAA*,
  64 F. Supp. 2d 1097 (D. Kan. 1999) ...................................................................21

*Ahern v. Apple*,
  411 F. Supp. 3d 541 (N.D. Cal. 2019) .................................................................48

*Alden v. Maine*,
  527 U.S. 706 (1999) ......................................................................................79, 83

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) .............................................................................................79

*Allied Tube v. Indian Head*,
  486 U.S. 492 (1988) .............................................................................................18

*Alpine Bank v. Hubbell*,
  555 F.3d 1097 (10th Cir. 2009) ...........................................................................45

*In re Aluminum Phosphide Antitr. Litig.*,
  905 F. Supp. 1457 (D. Kan. 1995) ...........................................................52, 53, 61

*Alvarado v. KOB-TV, L.L.C.*,
  493 F.3d 1210 (10th Cir. 2007) ...........................................................................58

*Anderson News v. Am. Media Inc.*,
  899 F.3d 87 (2d Cir. 2018) ..................................................................................13

*Appliance Recycling Ctrs. v. JACO*,
  378 F. App'x 652 (9th Cir. 2010) .........................................................................44

*Ariz. v. Cook*,
  391 F. Supp. 962 (D. Ariz. 1975), *aff'd*, 541 F.2d 226 (9th Cir. 1976) ................11

*In re Asbestos School Litig.*,
  46 F.3d 1284 (3d Cir. 1994) (Alito, J.) ...........................................................17, 57

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................7, 8, 54, 61

*Ashley Cnty. v. Pfizer*,
  552 F.3d 659 (8th Cir. 2009) ...............................................................................38

*Ass'n of Surg. Assistants v. Nat'l Bd. of Surg. Tech.*,
  127 F.4th 178 (10th Cir. 2025) ..................................................................... *passim*

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)...............................................................................................25

*Atchison, T. & S. F. Ry. Co. v. Armstrong*,
  80 P. 978 (Kan. 1905) ...........................................................................................33

*Atkins v. Heavy Petroleum Partners, LLC*,
  86 F. Supp. 3d 1188 (D. Kan.), *aff'd*, 635 F. App'x 483 (10th Cir. 2015) ..............84

*In re Auto. Parts Antitrust Litig.*,
  2015 WL 14047405 (E.D. Mich. Apr. 30, 2015).......................................31, 32, 89

*In re Auto. Parts Antitrust Litig.*,
  29 F. Supp. 3d 982 (E.D. Mich. 2014)...................................................................29

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*,
  229 F. Supp. 2d 1209 (D. Kan. 2002) ...................................................................67

*Baldwin v. City of Overland Park*,
  468 P.2d 168, 172 (Kan. 1970) .............................................................................37

*Ballen v. Prudential Bache Secs., Inc.*,
  23 F.3d 335 (10th Cir. 1994) ................................................................................52

*Bd. of Cnty. Comm'rs of Cnty. of Boulder v. Rocky Mountain Christian Church*,
  481 F. Supp. 2d 1181 (D. Colo. 2007)...................................................................81

*Bd. of Cnty. Comm'rs v. Nielander*,
  275 Kan. 257 (2003) ..............................................................................................87

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................ *passim*

*Beltran v. InterExchange, Inc.*,
  2018 WL 1948687 (D. Colo. Feb. 2, 2018) ...........................................................28

*Benne v. Intl. Bus. Machines Corp.*,
　87 F.3d 419 (10th Cir. 1996) ...................................................................30

*Benton v. Cameco Corp.*,
　375 F.3d 1070 (10th Cir. 2004) ...............................................................66

*Blatchford v. Native Vill. of Noatak*,
　501 U.S. 775 (1991) ...............................................................................79

*Blevins v. Hiebert*,
　13 Kan. App. 2d 318 (1989), *aff'd*, 247 Kan. 1 (1990) ...........................82

*In re Blue Cross Blue Shield Antitrust Litig.*,
　225 F. Supp. 3d 1269 (N.D. Ala. 2016) ...................................................72

*Blume v. Meneley*,
　283 F. Supp. 2d 1171 (D. Kan. 2003) ......................................................80

*BMW of N. Am., Inc. v. Gore*,
　517 U.S. 559 (1996) ......................................................................77, 80, 88

*Boilermaker-Blacksmith Nat'l Pension Fund v. Gendron*,
　96 F. Supp. 2d 1202 (D. Kan. 2000) ........................................................68

*Bookends v. Amazon*,
　2022 WL 18144916 (S.D.N.Y. Aug. 24, 2022) ........................................15

*Bos. v. Aetna*,
　506 N.E.2d 106 (Mass. 1987) ..................................................................42

*Bowen v. Georgetown Univ. Hosp.*,
　488 U.S. 204 (1988) ................................................................................29

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
　582 U.S. 255 (2017) ............................................................................72, 73

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
　691 F. App'x 515 (10th Cir. 2017) .......................................................12, 62

*Brody v. Bruner*,
　2024 WL 1912555 (10th Cir. May 1, 2024) .............................................40

*Brown Shoe Co. v. U.S.*,
　370 U.S. 294 (1962) ................................................................................20

*Buccaneer v. Gunnison*,
　846 F.3d 1297 (10th Cir. 2017) .....................................................10, 20, 22

*Budicak, Inc. v. Lansing Trade Grp., LLC,*
2020 WL 758801 (D. Kan. Feb. 14, 2020) ...................................................70

*Budinich v. Becton Dickinson & Co.,*
486 U.S. 196 (1988) ........................................................................................83

*Bule v. Garda,*
2014 WL 3501546 (S.D. Fla. July 14, 2014) ...............................................50

*Bumpers v. Cmty. Bank of N. Va.,*
747 S.E.2d 220 (N.C. 2013) ...........................................................................42

*Burger King Corp. v. H&H Restaurants, LLC,*
2001 WL 1850888 (S.D. Fla. Nov. 30, 2001) ...............................................63

*Burnett v. Mortg. Elec. Registration Sys., Inc.,*
706 F.3d 1231 (10th Cir. 2013) ...........................................................57, 58, 60

*Burtch v. Milbert Factors, Inc.,*
662 F.3d 212 (3rd Cir. 2011) .........................................................................14

*Palmtag v. Republican Party of Nebraska,*
315 Neb. 679 (2024) ........................................................................................64

*Cal. Dental v. FTC,*
526 U.S. 756 (1999) ........................................................................................11

*Campfield v. State Farm,*
532 F.3d 1111 (10th Cir. 2008) .................................................................18, 20

*Cannuscio v. GEICO,*
2022 WL 22881849 (D. Nev. Dec. 13, 2022) ...............................................42

*Caplinger v. Medtronic, Inc.,*
784 F.3d 1335 (10th Cir. 2015) .....................................................................39

*Carefirst of Md., Inc. v. J&J,*
745 F. Supp. 3d 288 (2024) ...........................................................................25

*Cargill, Inc. v. Monfort of Colo., Inc.,*
479 U.S. 104 (1986) ........................................................................................25

*In re Cattle & Beef Antitrust Litig.,*
687 F. Supp. 3d 828 (D. Minn. 2023) ......................................................25, 27

*Cayman Expl. Corp. v. United Gas Pipe Line Co.,*
873 F.2d 1357 (10th Cir. 1989) ................................................................14, 57

*Charleston v. Brabham Oil Co.*,
    2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025) ............................................ 35

*Cherry v. Bd. of Cty. Comms.*,
    446 P.2d 734 (Kan. 1968) ..................................................................................... 38

*Chi. Pro. Sports v. NBA*,
    95 F.3d 593 (7th Cir. 1996) .................................................................................. 11

*Chicago v. Beretta*,
    821 N.E.2d 1099 (Ill. 2004) ...................................................................... 33, 36, 38

*China Privatization Fund (Del), L.P. v. Heritage Bank of Nevada*,
    562 P.3d 1070 (Nev. 2025) .................................................................................... 64

*Cho v. Hyundai*,
    636 F. Supp. 3d 1149 (C.D. Cal. 2022) ................................................................ 50

*In re Chocolate*,
    801 F.3d 383 (3d. Cir. 2015) ................................................................................ 18

*Christou v. Beatport*,
    849 F. Supp. 2d 1055 (D. Colo. 2012) .................................................................. 27

*City of Lafayette v. La. Power & Light Co.*,
    435 U.S. 389 (1978) .............................................................................................. 80

*Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.*,
    956 F. Supp. 910 (D. Kan. 1997) .......................................................................... 84

*Cnty. of Dorchester v. AT & T Corp.*,
    407 F. Supp. 3d 561 (D.S.C. 2019) ................................................................. 89, 90

*Cogswell v. Sherman Cnty.*,
    238 Kan. 438 (1985) .............................................................................................. 82

*Collyer v. Catalina*,
    712 F. Supp. 3d 1276 (N.D. Cal. 2024) ................................................................ 42

*Concord v. Brunswick*,
    207 F.3d 1039 (8th Cir. 2000) .............................................................................. 19

*Conway v. CitiMortgage, Inc.*,
    438 S.W.3d 410 (Mo. 2014) .................................................................................. 63

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
    846 F.2d 284 (5th Cir. 1998) ................................................................................ 17

*Copper Sands v. Copper Sands Realty, LLC*,
    2013 WL 3270430 (D. Nev. June 26, 2013).................................................42

*Corbett v. City of Kensington*,
    530 P.3d 750 (Kan. Ct. App. 2023) ...............................................36, 37

*Corr Wireless Commc'ns, L.L.C. v. AT&T, Inc.*,
    907 F. Supp. 2d 793 (N.D. Miss. 2012)...........................................71

*Cory v. Aztec Steel Bldg., Inc.*,
    468 F.3d 1226 (10th Cir. 2006) .....................................................68, 69

*Craftsmen v. Ford*,
    491 F.3d 380 (8th Cir. 2007) .........................................................23

*In re Crop Inputs Antitrust Litig.*,
    749 F. Supp. 3d 992 (E.D. Mo. 2024).............................................12

*Crownalytics, LLC v. SPINS LLC*,
    2023 WL 3071192 (D. Colo. Apr. 25, 2023)...................................15, 57

*Curtis v. 7-Eleven, Inc.*,
    2022 WL 4182384 (N.D. Ill. Sept. 13, 2022) ................................45, 46

*CVB v. Corsicana*,
    2024 WL 4505044 (D. Utah Oct. 16, 2024) ...................................16

*CVB, Inc. v. Corsicana Mattress Co.*,
    604 F. Supp. 3d 1264 (D. Utah 2022)..............................................56, 57

*Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, LLC*,
    28 F.4th 996 (10th Cir. 2022) .......................................................41

*In re Dairy Farmers Antitrust Litig.*,
    2015 WL 3988488 (N.D. Ill. June 29, 2015) ..................................26

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)...........................................................70

*Davenport v. Charter Commc'ns, LLC*,
    35 F. Supp. 3d 1040 (E.D. Mo. 2014).............................................29

*David v. Bd. of Comm'rs of Norton Cnty.*,
    89 P.3d 893 (Kan. 2004)................................................................82

*Davis v. FEC*,
    554 U.S. 724 (2008)........................................................................7

*De Niz Robles v. Lunch*,
    803 F.3d 1165 (10th Cir. 2015) ...........................................................29

*Dean Operations, Inc. v. One Seventy Assocs.*,
    896 P.2d 1012 (Kan. 1995) ..................................................................75

*Dental Dynamics, LLC v. Jolly Dental Grp., LLC*,
    946 F.3d 1223 (10th Cir. 2020) ...........................................................68

*Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*,
    604 U.S. 321 (2025)..............................................................................75

*Dinh Ton That v. Alders Maint. Ass'n*,
    142 Cal Rptr. 3d 458 (Ct. App. 4th Dist. 2012)...................................62

*Doe 9 v. Varsity Brands, LLC*,
    2023 WL 4113198 (D.S.C. June 21, 2023)...........................................42

*Dougan v. Rossville*,
    15 P.3d 338 (Kan. 2000) ................................................................51, 52

*Drainage Dist. No. 3 v. Riverside Drainage*,
    178 P. 433 (Kan. 1919) ........................................................................31

*Drake v. Cox Enters., Inc.*,
    2013 WL 557024 (D. Kan. Feb. 13, 2013) ...........................................22

*Draughon v. U.S.*,
    103 F. Supp. 3d 1266 (D. Kan. 2015) .............................................30, 84

*In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*,
    2013 WL 5503308 (D.N.J. Oct. 2, 2013)..............................................49

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
    514 F.3d 1063 (10th Cir. 2008) .....................................................67, 68

*Dummar v. Lummis*,
    543 F.3d 614 (10th Cir. 2008) .............................................................53

*E. Enters v. Apfel*,
    524 U.S. 498 (1998)..............................................................................36

*Edwards v. Camden Operations, LLC*,
    2018 WL 3478905 (W.D. Ark. July 19, 2018) .....................................48

*Eighteen Seventy, LP v. Jayson*,
    32 F.4th 956 (10th Cir. 2022) .......................................................68, 73

*Elliott v. BP*,
    407 F.3d 1091 (10th Cir. 2005) ................................................................24

*Ellis v. Nike*,
    2024 WL 1344805 (E.D. Mo. Mar. 28, 2024) ..............................................43, 47

*Ellison-Robbins v. Bimbo Bakeries*,
    2024 WL 4332049 (E.D. Mo. Sept. 27, 2024) ..............................................43

*Embree Const. v. Rafcor, Inc.*,
    411 S.E.2d 916 (N.C. 1992) ...................................................................50

*In re EpiPen Mktg. Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) ........................................................41

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ...........................................................................18

*Faulhaber v. Petzl Am., Inc.*,
    656 F. Supp. 3d 1257 (D. Colo. 2023) ....................................................88, 89

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ............................................................................7

*Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*,
    17 F.3d 1302 (10th Cir. 1994) .................................................................68

*Fejzulai v. Sam's W.*,
    205 F. Supp. 3d 723 (D.S.C. 2016) ...........................................................42

*In re Firearm*,
    126 Cal. App. 4th 959 (2005) .................................................................33

*In re Foods, Inc. Sec. Litig.*,
    275 F. Supp. 3d 970 (W.D. Ark. 2017) .......................................................17

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) ........................................................................68, 72

*Foreman v. Haliron*,
    2021 WL 5139519 (W.D. Ark. Nov. 3, 2021) ................................................49

*Four B Corp. v. Ueno Fine Chems. Indus., Ltd.*,
    241 F. Supp. 2d 1258 (D. Kan. 2003) ........................................................71

*Garcia v. Int'l Elevator Co.*,
    358 F.3d 777 (10th Cir. 2004) .................................................................51

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ........................................................................90

*Gas Sensing Tech. Corp. v. Ashton*,
2017 WL 2955252 (D. Wyo. June 12, 2017) ....................................................60

*GDHI Mkt. v. Antsel*,
416 F. Supp. 3d 1189 (D. Colo. 2019) ........................................................11, 25

*In re Gen. Motors Corp. Litig.*,
966 F. Supp. 1525 (E.D. Mo. 1997) ................................................................41

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ........................................................................................88

*Ginsburg v. InBev*,
623 F.3d 1229 (8th Cir. 2010) ........................................................................27

*Gonzalez v. Am. Honda*,
720 F. Supp. 3d 833 (C.D. Cal. 2024) ............................................................42

*Greenley v. Kochava*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ..........................................................49

*Gregory v. Fort Bridger*,
448 F.3d 1195 (10th Cir. 2006) ................................................................19, 20

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
199 F.3d 1343 (D.C. Cir. 2000) ................................................................69, 70

*Guay v. Sig*,
626 F. Supp. 3d 536 (D.N.H. 2022) ................................................................42

*Guerrero v. Henkel*,
2024 WL 2769745 (E.D. Mo. 2024) ................................................................47

*Hammerling v. Google*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ..........................................................48

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
2020 WL 6270948 (N.D. Cal. Oct. 23, 2020) ....................................................9

*Harrison v. Aerostar*,
316 F. Supp. 2d 186 (E.D. Pa. 2004) ..............................................................25

*Hawaii v. Standard Oil Co. of Cal.*,
405 U.S. 251 (1972) ........................................................................................80

*Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*,
  403 S.C. 623 (2013) ...................................................................................................65

*Hip Hop Bev. v. Monster Energy*,
  2016 WL 7479402 (C.D. Cal. July 7, 2016) ...............................................................24

*Hofstetter v. Myers*,
  228 P.2d 522 (Kan. 1951) ..........................................................................................37

*Hogan v. Pilgrim's Pride Corp.*,
  2018 WL 1316979 (D. Colo. Mar. 14, 2018) ..............................................................13

*Hous. Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City*,
  952 F.2d 1183 (10th Cir. 1991) .................................................................................80

*Hunnicutt v. Zeneca, Inc.*,
  2012 WL 4321392 (N.D. Ok. Sept. 19, 2012) ............................................................28

*Hunter v. J&J*,
  499 P.3d 719 (Okla. 2021) ...........................................................................32, 35, 38

*Huntington v. Attrill*,
  146 U.S. 657 (1892)...................................................................................................80

*Ill. Brick v. Ill.*,
  431 U.S. 720 (1977)...................................................................................................28

*Illinois v. Associated Milk Producers, Inc.*,
  351 F. Supp. 436 (N.D. Ill. 1972) ..............................................................................86

*Indep. Cnty. v. Pfizer*,
  534 F. Supp. 2d 882 (E.D. Ark. 2008), *aff'd Ashley Cnty.*, 552 F.3d 659 (8th
  Cir. 2009) ..................................................................................................................42

*James v. PepsiCo*,
  222 N.Y.S.3d 907 (N.Y. Sup. Ct. 2024) ...........................................................33, 34, 38

*Johnson v. Phoenix Mut. Life Ins. Co.*,
  266 S.E.2d 610 (N.C. 1980)........................................................................................65

*Jones v. Culver*,
  329 P.3d 511 (Kan. Ct. App. 2014) ............................................................................50

*K. A. v. Barnes*,
  134 F.4th 1067 (10th Cir. 2025) ................................................................................83

*Keeton v. Hustler Mag., Inc.*,
  465 U.S. 770 (1984)...................................................................................................67

*Kelley v. Cowesett Hills Assocs.*,
    768 A.2d 425 (R.I. 2001) ................................................................65

*Kelly v. Palmer, Reifler & Assocs., P.A.*,
    681 F. Supp. 2d 1356 (S.D. Fla. 2010) ...........................................63

*In re Keurig Green Mountain Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)...............................................27

*King & King Enters. v. Champlin Petroleum*,
    657 F.2d 1147 (10th Cir. 1981) .......................................................53

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941).........................................................................84

*State ex rel. Kline v. Unified Bd. Comm'rs, Unified Gov't Wyandotte
Cnty./Kansas City*,
    277 Kan. 516 (2004) ........................................................................87

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
    725 F.3d 718 (7th Cir. 2013) ..................................................*passim*

*Korte v. State on Rel. of Bd. of Regents of Nev.*,
    492 P.3d 540 (Nev. 2021).................................................................50

*KPH Healthcare Services, Inc. v. Mylan N.V.*,
    2021 WL 3144711 (D. Kan. July 26, 2021) .....................................5

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012).........................................................................77

*Kwikset v. Sup. Ct.*,
    246 P.3d 877 (Cal. 2011) .................................................................42

*Laccinole v. Gulf*,
    2023 WL 157719 (D.R.I. Jan. 11, 2023) .........................................42

*In re Lead Paint Litig.*,
    924 A.2d 484 (N.J. 2007).................................................................32

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ..................................................29

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)...............................32, 89

*Lizama v. H&M LP*,
    2023 WL 3433957 (E.D. Mo. May 12, 2023) ............................46, 47

*Llacua v. Western Range Assoc.*,
    930 F.3d 1161 (10th Cir. 2019) ................................................ *passim*

*LLM Bar v. Barbri*,
    271 F. Supp. 3d 547 (S.D.N.Y. 2017) ........................................14

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019) .......................................29, 42

*Lofts v. Strategies Floor*,
    224 A.3d 116 (Vt. 2019) ...........................................................42

*Lombardo v. J&J*,
    124 F. Supp. 3d 1283 (S.D. Fla. 2015) .....................................42

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ..................................................26

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................8, 9

*M.F. v. ADT*,
    357 F. Supp. 3d 1116 (D. Kan. 2018) .....................................8, 39

*Macias v. BNSF Ry. Co.*,
    2020 WL 3469680 (D. Kan. June 25, 2020) ..............................60

*Mangiardi v. Dewey*,
    2013 WL 1856338 (D.N.H. Apr. 30, 2013) ...............................50

*Maple Flooring Mfrs. Ass'n v. United States*,
    268 U.S. 563 (1925) .................................................................17

*Marshall v. Miller*,
    276 S.E.2d 397 (N.C. 1981) .....................................................45

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) .................................................................79

*Master's Transp. v. Rev Grp., Inc.*,
    2020 WL 13580661 (W.D. Mo. Nov. 12, 2020) ........................40

*Matthews v. Bergdorf*,
    889 F.3d 1136 (10th Cir. 2018) ................................................60

*May v. Makita*,
    2023 WL 417487 (E.D. Mo. Jan. 26, 2023) .............................50

*Mayor of Balt. v. BP*,
    2024 WL 3678699 (Md. Cir. Ct. July 10, 2024)....................................................................38

*In re McKesson Governmental Entities Average Wholesale Price Litig.*,
    767 F. Supp. 2d 263 (D. Mass. 2011) ..................................................................................83

*Medical Supply Chain, Inc. v. Neoforma, Inc.*,
    419 F. Supp. 2d 1316 (D. Kan 2006)...................................................................................55

*Melnick v. TAMKO Bldg. Prods. LLC*,
    347 F.R.D. 79 (D. Kan. 2024)..............................................................................................90

*Melton v. Carolina Power & Light*,
    2012 WL 2401635 (D.S.C. June 25, 2012)..........................................................................50

*Mem'l Hosp. Ass'n, Inc. v. Knutson*,
    722 P.2d 1093 (Kan. 1986) ............................................................................................85, 86

*Milliken & Co. v. Duro Textiles, LLC*,
    887 N.E.2d 244 (Mass. 2008) ..............................................................................................63

*Milman v. FCA*,
    2019 WL 3334612 (C.D. Cal. Apr. 15, 2019) .....................................................................49

*Moats v. Republican Party of Nebraska*,
    796 N.W.2d 584 (Neb. 2011)...............................................................................................64

*Mont. v. Trinity*,
    473 P.3d 1009 (Mont. 2020)................................................................................................50

*Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan.*,
    891 F.2d 1473 (10th Cir. 1989) ...........................................................................................71

*Moore v. Mack's*,
    2017 WL 4350980 (E.D. Ark. Sept. 29, 2017) ....................................................................42

*Mountain States Legal Found. v. Costle*,
    630 F.2d 754 (10th Cir. 1980) .............................................................................................86

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018)..............................................................................................................83

*In re Musical Instruments Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .......................................................................................16, 23

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)...................................................................................................56

*N. Co. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*,
914 P.2d 902 (Colo. 1996) ................................................................26

*N. Laramie Range All. v. FERC*,
733 F.3d 1030 (10th Cir. 2013) ...........................................................8

*N.L.R.B. v. Greater Kan. City Roofing*,
2 F.3d 1047 (10th Cir. 1993) .............................................................74

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .........................................................................77

*N.Y. v. Exxon Mobil Corp.*,
2025 WL 209843 (N.Y. Sup. Ct. Jan. 14, 2025) ....................................47

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ....................................................................17, 56

*Nash Cnty. Bd. of Educ. v. Biltmore Co.*,
640 F.2d 484 (4th Cir. 1981) ............................................................86

*Navajo Nation v. Dalley*,
896 F.3d 1196 (10th Cir. 2018) .........................................................69

*New Jersey v. New York*,
345 U.S. 369 (1953) .........................................................................77

*New Mexico v. McAleenan*,
450 F. Supp. 3d 1130 (D.N.M. 2020) ..................................................81

*New York v. Microsoft Corp.*,
209 F. Supp. 2d 132 (D.D.C. 2002) ....................................................82

*New York v. United States*,
505 U.S. 144 (1992) ....................................................................79, 83

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ....................................................42

*Nivia v. Nationstar*,
2014 WL 4146889 (S.D. Fla. Aug. 21, 2014) ........................................47

*Norris v. Olsen*,
550 P.3d 323 (Mont. 2024) ...............................................................63

*Nova Health Sys. v. Gandy*,
416 F.3d 1149 (10th Cir. 2005) ..............................................8, 10, 78

*Oakland v. BP*,
    325 F. Supp. 3d 1017 (N.D. Cal. 2018) ...................................................................33

*Oberndorf v. City & Cnty. of Denver*,
    900 F.2d 1434 (10th Cir. 1990) ...........................................................................18

*Off. of the People's Couns. for the District of Columbia v. D.C. Water & Sewer
    Auth.*,
    313 A.3d 579 (D.C. 2024) ...................................................................................86

*Ohio v. Am. Ex.*,
    585 U.S. 529 (2018).............................................................................................22

*OneSky v. Sullivan*,
    2012 WL 124739 (D.N.H. Jan. 17, 2012)...........................................................50

*In re Opana ER Antritrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) ..................................................................29

*Owens v. Magill*,
    308 S.C. 556, 419 S.E.2d 786 (1992) .................................................................89

*In re Packaged Ice Antitrust Litig.*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011)..............................................................49

*In re Packaged Seafood Prod. Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017)...............................................................49

*Park v. Express*,
    911 F.3d 505 (8th Cir. 2018) ..............................................................................14

*In re Passenger Antitrust Litig.*,
    767 F. Supp. 3d 681 (N.D. Ohio 2025)...............................................................17

*Patenaude v. Orgain, LLC*,
    594 F. Supp. 3d 108 (D. Mass. 2022) .................................................................42

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)...............................................................................78, 83, 86

*People v. Sturm*,
    761 N.Y.S. 2d 192 (App. Div. 2003) ............................................................35, 38

*Petrowsky v. NextEra Energy Res., LLC*,
    2017 WL 2666361 (D. Kan. June 21, 2017)........................................................76

*Phila. v. Beretta*,
    126 F. Supp. 2d 882 (E.D. Pa. 2000) ..................................................................39

*Piescik v. CVS*,
    576 F. Supp. 3d 1125 (S.D. Fla. 2021) .................................................................42

*Pilot v. Hofarth*,
    550 N.W.2d 27 (Neb. 1996)..................................................................................50

*Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC*,
    2013 WL 1786356 (S.D. Fla. Apr. 25, 2013) .......................................................63

*Pittsburg Cnty. Rural Water Dist. No. 7 v. McAlester*,
    358 F.3d 694 (10th Cir. 2004) ..............................................................................12

*In re Pork Antitr. Litig.*,
    495 F. Supp. 754 (D. Minn. 2020)........................................................................53

*Puerto Rico v. Cordeco Dev. Corp.*,
    534 F. Supp. 612 (D.P.R. 1982)............................................................................86

*Pytlik v. Pro. Res., Ltd.*,
    887 F.2d 1371 (10th Cir. 1989) ............................................................................67

*Quarles v. Fuqua Indus., Inc.*,
    504 F.2d 1358 (10th Cir. 1974) ............................................................................74

*Quik Payday, Inc. v. Stork*,
    549 F.3d 1302 (10th Cir. 2008) ............................................................................50

*Renfro v. Champion Petfoods USA, Inc.*,
    25 F.4th 1293 (10th Cir. 2022) .............................................................................44

*Renne v. Geary*,
    501 U.S. 312 (1991)..............................................................................................78

*Reynolds v. Sims*,
    377 U.S. 533 (1964)..............................................................................................80

*Riddell v. GM LLC*,
    2024 WL 2077559 (E.D. Mo. May 9, 2024) ........................................................48

*Robert E. Ricciardelli v. Home Depot*,
    679 F. Supp. 2d 192 (D. Mass. 2010) .............................................................49, 50

*Rodi v. S. New Eng. Sch. of L.*,
    532 F.3d 11 (1st Cir. 2008) ...................................................................................42

*Ronsick v. Phariss*,
    286 F.2d 316 (10th Cir. 1960) ..............................................................................78

*San Diego Building Trades Council v. Garmon*,
    359 U.S. 236 (1959) ........................................................................................................77

*Sanderson v. Culligan*,
    415 F.3d 620 (7th Cir. 2005) .........................................................................................11

*Sanderson v. Spectrum Labs, Inc.*,
    227 F. Supp. 2d 1001 (N.D. Ind. 2000) ........................................................................72

*Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*,
    137 N.M. 524 (Ct. App. 2005) .......................................................................................64

*In re Santa Fe Nat. Tobacco Co. Liab. Litig.*,
    288 F. Supp. 3d 1087 (D.N.M. 2017) ...........................................................................50

*Santagate v. Tower*,
    833 N.E.2d 171 (Mass. App. Ct. 2005) .........................................................................50

*Saucier v. Countrywide*,
    64 A.3d 428 (D.C. 2013) ...............................................................................................42

*Sharp v. United Airlines*,
    967 F.2d 404 (10th Cir. 1992) .......................................................................................25

*Sierra Club v. Okla. Gas & Elec. Co.*,
    816 F.3d 666 (10th Cir. 2016) .......................................................................................51

*Sipma v. Mass. Cas. Ins. Co.*,
    256 F.3d 1006 (10th Cir. 2001) ...............................................................................40, 41

*Skalla v. Canepari*,
    2013 Ark. 415 (2013) ....................................................................................................62

*Smith v. Pizza Hut, Inc.*,
    2011 WL 2791331 (D. Colo. July 14, 2011) .................................................................28

*Snow v. Am. Morgan Horse Ass'n, Inc.*,
    141 N.H. 467 (1996) ......................................................................................................64

*Snowder v. D.C.*,
    949 A.2d 590 (D.C. 2008) .............................................................................................63

*Southland v. INSpire*,
    365 F.3d 353 (5th Cir. 2004) .........................................................................................40

*Spires v. Hosp. Corp. of Am.*,
    289 F. App'x 269 (10th Cir. 2008) ................................................................................75

*Stallbaumer v. NextEra Energy Res., LLC,*
  2023 WL 3496245 (D. Kan. May 17, 2023) ....................................................75

*Standard Oil Co. of New Jersey v. United States,*
  221 U.S. 1 (1911) ..........................................................................................55

*Stastny v. S. Bell Tel. & Tel. Co.,*
  628 F.2d 267 (4th Cir. 1980) ........................................................................90

*State v. Vrabel,*
  347 P.3d 201 (Kan. 2015) ..............................................................................88

*State ex rel. Stephan v. Bd. of Cnty. Comm'rs of Cnty. of Lyon Cnty.,*
  676 P.2d 134 (Kan. 1984) ..............................................................................81

*Stonebridge Collection, Inc. v. Carmichael,*
  791 F.3d 811 (8th Cir. 2015) ........................................................................62

*Stryker Corp. v. Ridgeway,*
  2015 WL 5308038 (W.D. Mich. 2015) ..........................................................30

*Stubbs v. McDonald's Corp.,*
  224 F.R.D. 668 (D. Kan. 2004) ......................................................................88

*SUEZ v. E.I. du Pont,*
  578 F. Supp. 3d 511 (S.D.N.Y. 2022) ............................................................33

*Sup. Auto LLC v. Arcelor Mittal,*
  238 F. Supp. 3d 1032 (N.D. Ill. 2017) ..........................................................26

*Sup. Auto Transp. v. Arcelor,*
  902 F.3d 735 (7th Cir. 2018) ..................................................................26, 27

*Suture Exp. v. Cardinal,*
  963 F. Supp. 2d 1212 (D. Kan. 2013) ............................................................15

*Swanson v. Bixler,*
  750 F.2d 810 (10th Cir. 1984) ......................................................................78

*Swartz v. Coca-Cola,*
  2023 WL 4828680 (N.D. Cal. July 27, 2023) ..............................................9, 45

*Swartz v. Coca-Cola Co.,*
  2022 WL 17881771 (N.D. Cal. Nov. 18, 2022) ..............................................46

*In re Syngenta AG MIR 162 Corn Litig.,*
  131 F. Supp. 3d 1177 (D. Kan. 2015) ............................................................35

*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006) ....................................................................13, 24, 55

*Taylor v. Airco*,
  503 F. Supp. 2d 432 (D. Mass. 2007) ...................................................................40

*Tepper v. Talent*,
  561 F. Supp. 3d 846 (D. Neb. 2021) .....................................................................42

*Textron Aviation, Inc. v. Superior Air Charter, LLC*,
  420 F. Supp. 3d 1186 (D. Kan. 2019) ...................................................................84

*Thiebaut v. Colo. Springs Utils.*,
  455 F. App'x 795 (10th Cir. 2011) .................................................................79, 80

*Thomas v. FAG*,
  50 F.3d 502 (8th Cir. 1995) ...........................................................................32, 83

*Thomas v. Metro. Life Ins.*,
  631 F.3d 1153 (10th Cir. 2011) .............................................................................41

*Thompson v. Jiffy Lube Int'l, Inc.*,
  2006 WL 8406742 (D. Kan. June 13, 2006) .........................................................39

*Thornton v. Kroger*,
  2022 WL 488932 (D.N.M. Feb. 17, 2022) ............................................................42

*Tobler v. 1248 Holdings, LLC*,
  2025 WL 89052 (D. Kan. Jan. 14, 2025) ...................................................40, 58, 60

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .................................................................................................7

*Trierweiler v. Croxton & Trench Holding Corp.*,
  90 F.3d 1523 (10th Cir. 1996) ...............................................................................30

*Tucker v. Gen. Motors*,
  58 F.4th 392 (8th Cir. 2023) ..................................................................................49

*Uhlig v. CoreLogic*,
  2022 WL 4597858 (D. Kan. Sept. 30, 2022) .........................................................21

*United States v. Scophony Corp. of Am.*,
  333 U.S. 795 (1948) ...............................................................................................71

*In re Universal Serv. Fund Tele. Billing Pracs. Litig.*,
  300 F. Supp. 2d 1107 (D. Kan. 2003) ....................................................................15

*Vincent v. Utah Plastic Surgery Soc.*,
   621 F. App'x 546 (10th Cir. 2015) ...................................................................23, 24, 26

*VinStickers v. Millernet*,
   2008 WL 360578 (D. Kan. Feb. 8, 2008) ..................................................................47

*Volvo Constr. v. CLM Equip.*,
   386 F.3d 581 (4th Cir. 2004) ......................................................................................30

*Walden v. Fiore*,
   571 U.S. 277 (2014)....................................................................................................73

*Walker v. Liggett Grp.*,
   982 F. Supp. 1208 (S.D.W. Va. 1997).................................................................32, 83

*Watkins v. MGA Ent., Inc.*,
   550 F. Supp. 3d 815 (N.D. Cal. 2021) .......................................................................48

*Wenz v. Memery Crystal*,
   55 F.3d 1503 (10th Cir. 1995) ....................................................................................67

*White v. Volkswagen*,
   2013 WL 685298 (W.D. Ark. Feb. 25, 2013).............................................................48

*Wilder v. Aetna Life & Cas. Ins. Co.*,
   140 Vt. 16 (1981) ........................................................................................................65

*Williams v. Amoco Prod. Co.*,
   734 P.2d 1113 (Kan. 1987)..........................................................................................38

*Willis Elec. Co., Ltd., v. Polygroup Macau Ltd. (BVI)*,
   437 F. Supp. 3d 693 (D. Minn. 2020).........................................................................67

*In re Winter Storm Uri Nat. Gas Litig.*,
   772 F. Supp. 3d 1246 (D. Kan. 2025)..........................................................................77

*XMission, L.C. v. Fluent LLC*,
   955 F.3d 833 (10th Cir. 2020) ..............................................................................68, 72

*XMission, L.C. v. PureHealth Rsch.*,
   105 F.4th 1300 (10th Cir. 2024) .................................................................................72

*Young v. Era*,
   513 P.3d 505 (Mont. 2022) .........................................................................................42

*Zanani v. Savad*,
   630 N.Y.S.2d 89 (N.Y. App. Div. 1995) ....................................................................47

**Statutes**

15 U.S.C. § 15c ...........................................................................................................85

15 U.S.C.§ 15h ...........................................................................................................85

28 U.S.C. § 1404(a) ....................................................................................................30

42 U.S.C. § 9627(b) ....................................................................................................45

42 U.S.C. § 13101(b) ...................................................................................................6

*Antitrust Law* ¶ 1503b1 ............................................................................................11

Ariz. Rev. Stat. § 44-1415(A) .....................................................................................29

Ark. Code Ann. § 4-88-101(3) ....................................................................................44

Ark. Code Ann. § 4-88-108 .........................................................................................43

Ark. Code § 4-88-113(f)(1)(B) ....................................................................................42

Ark. Code § 4-88-113(f)(2) .........................................................................................42

Ark. Code § 8-9-302 ...................................................................................................45

Cal. Bus. & Prof. Code § 17580.5 ..............................................................................45

Colo. Rev. Stat. Ann. § 6-4-115 ..................................................................................26

Colo. Rev. Stat. Ann. § 6-4-116 ..................................................................................29

Colo. Stat. § 6-4-114(1) ..............................................................................................29

Conn. Gen. Stat. Ann. § 35-37 ....................................................................................29

Conn. Stat. § 35-46a (2017) ........................................................................................29

D.C. Code § 28-3901(d) ..............................................................................................45

Fla. Stat. § 501.204(2) ................................................................................................45

Fla. Stat. § 501.212(1) ...........................................................................................44, 45

Haw. Rev. Stat. § 480-13.3 .........................................................................................29

Ill. Comp. Stat. § 10/7(2) ............................................................................................29

K.S.A. 19-101 ..................................................................................................81, 87, 89

K.S.A. 19-101a ............................................................................................81, 87, 89

K.S.A. 19-101a(a) .................................................................................................81

K.S.A. 19-101a(a)(4) .............................................................................................82

K.S.A. 19-101c .....................................................................................................87

K.S.A. 19-103 ..................................................................................................81, 89

K.S.A. 50-109 .......................................................................................................85

K.S.A. 50-628 .......................................................................................................85

K.S.A. 60-217(a) ...................................................................................................84

K.S.A. 60-908 ..................................................................................................82, 85

K.S.A. 75-702 .......................................................................................................85

Kan. Stat. Ann. § 60-513(b) ...................................................................................52

Kan. Stat. § 60-908 ...............................................................................................31

Kan. Stat. § 65-3401(e) .........................................................................................34

Kan. Stat. § 65-3425 ...............................................................................................5

Kan. Stat. § 65-3425(b) .........................................................................................34

Mass. Gen. Laws Ann. ch. 93A, § 3 ...................................................................44, 45

Mass. Gen. Laws ch. 93A, § 2 ................................................................................45

Md. Code, Com. Law § 11-209(b)(2) (2017) ............................................................29

Minn. Stat. Ann. § 325D.63 ...................................................................................29

Mo. Ann. Stat. § 407.020(1) ..................................................................................63

Mo. Code Regs. tit. § 15 ........................................................................................45

Mo. Rev. Stat. § 56.060 .........................................................................................32

Mo. Rev. Stat. § 407.020 .......................................................................................43

Mo. Rev. Stat. § 407.025.1(2) ................................................................................49

Mo. Stat. § 407.025 ...............................................................................................42

Mont. Code § 27–2–2116 ...................................................................................45

Mont. Code § 30-14-133(1) ..............................................................................42

N.H. Rev. Stat. § 356:11 (2008) .......................................................................29

N.H. Rev. Stat. § 358-A:1 II .............................................................................64

N.H. Rev. Stat. § 358-A:13 ...............................................................................45

N.M. Stat. Ann. § 57-12-7 ...........................................................................44, 45

N.M. Stat. § 57-12-4 .........................................................................................45

N.Y. County Law § 501 .....................................................................................32

N.Y. Gen. Bus. Law § 340 ................................................................................29

Neb. Stat. § 59-821 (2002) ................................................................................29

Nev. Rev. Stat. Ann. § 598A.210 .....................................................................29

Or. Rev. Stat. § 646.780 ....................................................................................29

Or. Stat. § 646.780(1)(a) (2010) .......................................................................29

R.I Gen. Laws § 6-13.1-4(a) ........................................................................44, 45

R.I. Gen. Laws § 6-13.3-1 .................................................................................45

R.I. Gen. Laws § 6-36-21 ..................................................................................29

S.C. Code Ann. § 4-1-10 ...................................................................................89

S.C. Code Ann. § 4-9-25 ...................................................................................89

S.C. Code Ann. § 4-9-1030 ...............................................................................89

S.C. Code Ann. § 39–5–10(b) ...........................................................................65

S.C. Code Ann, § 39-5-40(a) .......................................................................44, 45

S.C. Code § 39-5-20(b) .....................................................................................45

S.C. Code § 39-5-140 ........................................................................................42

Tenn. Code § 47-25-106(c) ...............................................................................29

Utah Code § 76-10-3109 (2006) .......................................................................29

Vt. Stat. tit. 9, § 2453(b) ................................................................................45

**Other Authorities**

16 CFR § 260.12(a).............................................................................................46

16 CFR § 260.12(b)(1).......................................................................................45

2021-2025 State Solid Waste Management Plan, Kan. Dept. of Health and Env't,
  https://www.kdhe.ks.gov/DocumentCenter/View/22543/State-Solid-Waste-
  Management-Plan-2021-2025-PDF (last visited Sept. 5, 2025)................................................5

Att'y Gen., *Attorney General Bonta Sues ExxonMobil for Deceiving the Public on
  Recyclability of Plastic Products* (Sept. 23, 2024),
  https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-
  exxonmobil-deceiving-public-recyclability-plastic ........................................78

6A Charles A. Miller & Arthur R. Miller, Federal Practice and Procedure § 1555
  (3d ed. May 2025 update) ...................................................................................87

*Company*, Black's Law Dictionary (12th ed. 2024) ......................................74

Fed. R. Civ. P. 4(k)(1)(A)...................................................................................68

Fed. R. Civ. P. 8(a) ............................................................................................78

Fed. R. Civ. P. 12(b)(6), 12(f), 23(d) ...............................................................89

Fed. R. Civ. P. 17(a)(1).......................................................................................84

Fed. R. Civ. P. 23(c)(1)(A), (d)..........................................................................88

Ford County Commissioners' Meeting Minutes (Oct. 21, 2024),
  https://www.fordcounty.net/AgendaCenter/ViewFile/Minutes/_10212024-517 ...................31

Herbert Hovenkamp, *Personal Jurisdiction and Venue in Private Antitrust
  Actions in the Federal Courts*, 67 Iowa L.Rev. 485, 509 (1982) ...........................69

Contribution Agreement by and among Phillips Petroleum Company, Chevron
  Corporation, and Chevron Phillips Chemical Company LLC (May 20, 2000),
  art. II, § 2.3,
  http://sec.gov/Archives/edgar/data/1127399/000095012301502180/y47109a1e
  x10-1.txt........................................................................................................54

Kan. Const. art. 2, § 21 ................................................................................82, 87

Kansas Org. of Recyclers, https://www.kskor.org/Recycling (last visited Sept. 5,
  2025) ...............................................................................................................5

Margaret H. Lemos, *State-Local Litigation Conflicts*, 2021 Wis. L. Rev. 971 (2021) ............................................................................................................77

Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023 57 (2023), https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf ...........................................................................59

Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX: REVEALING THE SOURCE OF SINGLE-USE PLASTICS CRISIS 49 (2021), https://cdn.minderoo.org/content/uploads/2021/05/27094234/20211105-PlasticWaste-Makers-Index.pdf; .........................................................................59

Nora Freeman Engstrom & Robert L. Rabin, *Pursuing Public Health Through Litigation: Lessons from Tobacco and Opioids*, 73 Stan. L. Rev. 285 (2021) ......................77

Recyclables, City of Dodge City, Kansas, https://www.dodgecity.org/157/How-to-Sort-your-Recyclables (last visited Sept. 5, 2025) ...........................................34

Recycling – CREW, City of Dodge City, Kansas, https://www.dodgecity.org/113/Recycling---CREW (last visited Sept. 5, 2025)......................5

Recycling Pledge Form, City of Dodge City, Kansas, www.dodgecity.org/DocumentCenter/View/302/Recycling-Pledge (last visited Sept. 5, 2025) ......................................................................................5

RESTATEMENT (SECOND) OF TORTS § 821B.................................................................36

Solid Waste Management Dist. Funding Allocations; Waste Reduction, Public Educ. & Grants, Kan. Dept. of Health and Env., https://www.kdhe.ks.gov/700/Waste-Reduction-Public-Education-Grants (last visited Sept. 5, 2025) ...........................................................................5

## <u>MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO RULES 12(B)(1) AND 12(B)(6) FILED ON BEHALF OF ALL DEFENDANTS</u>

Plaintiffs seek to impose liability on ten Defendants based on an innocuous and socially beneficial activity: the promotion of recycling. Framed as a three-prong challenge under antitrust law, public nuisance, and consumer fraud law, the gist of the Amended Complaint ("**AC**" or "**Complaint**") (Dkt. No. 48) is that Defendants allegedly entered into a conspiracy to promote plastic recycling in an effort to increase the demand and price for plastic. Each prong of Plaintiffs' theory fails as a matter of law. The law does not prohibit Defendants from making statements that the federal government and government entities in Kansas have been making for decades and which, according to Plaintiffs, led to increased output with no agreement to refrain from price competition.

These claims make no sense and fail from the start. Indeed, *none* of the Defendants sold any of the plastic products that Plaintiffs allege they bought; and, some Defendants did not even make the plastic resins used to make end-use plastic products at all. Not surprisingly, Plaintiffs do not allege that they ever saw—let alone relied on—any of the alleged misstatements. Nor do Plaintiffs even attempt to explain how a handful of alleged decades-old statements by Defendants about recycling, as opposed to the many governmental regulations requiring recycling labeling or the millions of non-party statements promoting recycling, caused the price of plastic products to increase. All of Plaintiffs' claims should be dismissed with prejudice for several reasons.

***First***, Plaintiffs lack Article III standing because they do not allege concrete, materialized injury, and Plaintiffs' allegations lack a plausible causal connection to their purported harm.

***Second***, Plaintiffs' antitrust claims fail because they do not allege *any* restraint of trade. While Section 1 of the Sherman Act prohibits agreements in restraint of trade, the AC is devoid of any allegations that Defendants agreed to or actually did: restrict output; fix prices; or partake in

any conduct that would diminish competition for the sale of plastics. Instead, Plaintiffs allege that output *increased*—as they must to support their public nuisance claim—which is a *procompetitive* effect and thus benefits consumers. Without a restraint pled, there can be no Sherman Act violation.

Plaintiffs also fail to plausibly allege any agreement between Defendants, let alone one that unreasonably restrains trade. There is not one well-pleaded allegation to support what Defendants purportedly agreed to do. Plaintiffs provide no details regarding what the alleged agreement was, when this agreement was supposedly made, who made it, or any other specifics. There can be no conspiracy claim without an agreement. The purported effect of the alleged conspiracy is also entirely implausible. According to the threadbare allegations, Defendants' conspiracy to promote recycling purportedly led to increased demand for plastics, which Plaintiffs claim increased the prices for plastic products. But Plaintiffs allege no facts plausibly demonstrating that any rise in demand was linked to the alleged conspiracy, or how such an increase in demand would diminish competition. Plaintiffs also fail to demonstrate how a few decades-old statements by resin manufacturers dictated today's prices for any plastic product that may use Defendants' resins.

Plaintiffs' market definition similarly makes no sense. A market including all plastic products for end use is not plausible because it is not tethered to the interchangeability of products within the alleged market. Plaintiffs make no attempt to allege that all end-use plastic products are interchangeable, nor could they, as a plastic bottle is not interchangeable with a plastic toy truck. Nor do they attempt to allege that products intended for precisely the same use as a plastic product cannot be interchangeable simply because they are made of a different material, such as a glass bottle or paper packaging. No court has ever recognized such a market. Moreover, by Plaintiffs' own admission, most, if not all, of Defendants' conduct occurred in the context of lobbying and is immunized from antitrust scrutiny under the *Noerr-Pennington* doctrine. Further, Plaintiffs lack

antitrust standing. Plaintiffs have not adequately alleged antitrust injury, a necessary prerequisite to antitrust standing, because they have not plausibly pled that Defendants' challenged conduct caused competitive harm in the market for "plastic products for end use consumption" or that Plaintiffs' injury flowed from any such harm. Plaintiffs are also not "proper parties" because their injuries are remote and lack a causal connection to Defendants' alleged conduct.

*Third*, Plaintiff Ford County's public nuisance claim fails because Ford County is not authorized to bring the claim, which is why the Attorney General of Kansas has intervened to oppose it. The claim also fails for lack of standing, and because Defendants' conduct is lawful and protected, does not violate a recognized public right, is not sufficiently frequent or continuous to be a nuisance, and is not the proximate cause of Ford County's purported harm. The AC also fails to allege how promoting recycling could lead to more garbage, rather than more recycling and less garbage. Moreover, blaming Defendants for producing, promoting, and selling a legal product—recyclable resin—that is used by third-party manufacturers cannot support a public nuisance claim under well-established law across the country.

*Fourth*, Plaintiffs' consumer fraud claims are not pled with the required Federal Rule of Civil Procedure 9(b) particularity, and do not identify any actionable deception or plausibly connect any such deception to the increased plastics prices they allegedly paid. Entirely missing from the AC is any information on Plaintiffs' own plastics purchases—it does not allege that any Plaintiff saw, let alone relied on, any of Defendants' decades-old statements; nor does it allege that Plaintiffs actually purchased products made of unrecyclable plastic material. Plaintiffs' claims also fail for lack of standing and on additional, state-specific grounds.

*Fifth*, Plaintiffs' unjust enrichment claim fails because Plaintiffs purport to bring this claim on behalf of a multi-state class without specifying the applicable law, and Kansas law cannot be

applied extraterritorially. Regardless of what law applies, it is not pled with specificity, it is precluded by adequate legal remedies, and there was no benefit conferred by Plaintiffs or received by Defendants. Additionally, some states prohibit recovery by indirect purchasers or do not recognize unjust enrichment as an independent cause of action at all.

*Sixth*, Plaintiffs' claims, which are all predicated on statements that were purportedly made *decades ago*, are all time-barred and cannot be saved by tolling.

Some complaints—like this one—are so disconnected from law and logic that they must be dismissed. As the Supreme Court noted, "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). This is precisely such a case. Notwithstanding the sprawl of allegations, there is no valid legal theory here and thus the Court should dismiss the AC in its entirety with prejudice. *See Ass'n of Surg. Assistants v. Nat'l Bd. of Surg. Tech.*, 127 F.4th 178, 191 (10th Cir. 2025) (affirming dismissal with prejudice).

## FACTUAL BACKGROUND

Exxon Mobil Corporation, Chevron Phillips Chemical Company LP, Chevron U.S.A. Inc., DuPont de Nemours, Inc., Celanese Corporation, Dow Inc., The Dow Chemical Company, Eastman Chemical Company, and Equistar Chemicals LP (the "**Corporate Defendants**") do not manufacture consumer plastic products. Instead, some of the Corporate Defendants sell plastic resin pellets—small plastic granules, the size of a few millimeters—to other non-party companies that melt down and transform the pellets into finished products that are sold to consumers or to other companies that sell to consumers.[1] *See, e.g.*, AC ¶¶ 4, 24, 98, 146 (alleging Defendants

---

[1] Although the AC suggests that Chevron U.S.A. Inc., DuPont de Nemours, Inc., and Celanese Corporation are manufacturers of the plastic resin at issue in this case, that is incorrect.

manufacture only the resin "used to produce" consumer plastic products, not such products themselves). The Corporate Defendants do not sell plastic resin pellets to consumers, nor do they have any control over how other companies use the pellets or what recyclability claims those companies may make. *Id*.

For decades, trade associations and government entities across the country—including the State of Kansas and the federal government—have actively promoted and mandated recycling.[2] Kansas has allocated millions of dollars to support recycling in the state.[3] Kansas requires manufacturers selling products to utilize the Resin Identification Code ("**RIC**") system and "chasing arrows" logo to assist consumers in recycling plastic. Kan. Stat. § 65-3425. Indeed, Kansas prominently displays the "chasing arrows" logo on its state-administered recycling websites and non-profit affiliate websites.[4] Dodge City, Kansas—Ford County's largest city and county seat—has a website that guides the public on properly sorting recyclables, including plastic.[5] Dodge City urges its citizens to take a "recycling pledge" promising to: (1) "lead by example" by recycling; (2) "email . . . elected officials to ask them to increase" recycling funding; and (3) tell others "that recycling is the easiest thing they can do to slow global warming."[6] And

---

[2] *See* Recycling – CREW, City of Dodge City, Kansas, https://www.dodgecity.org/113/Recycling---CREW (last visited Sept. 5, 2025). The Court may take judicial notice of information on government websites cited in this Motion. *KPH Healthcare Services, Inc. v. Mylan N.V.*, 2021 WL 3144711, at *7 n.6 (D. Kan. July 26, 2021); *infra* n.3–6, 27, 29.

[3] *See* Solid Waste Management Dist. Funding Allocations; Waste Reduction, Public Educ. & Grants, Kan. Dept. of Health and Env., https://www.kdhe.ks.gov/700/Waste-Reduction-Public-Education-Grants (last visited Sept. 5, 2025); 2021-2025 State Solid Waste Management Plan, Kan. Dept. of Health and Env't, https://www.kdhe.ks.gov/DocumentCenter/View/22543/State-Solid-Waste-Management-Plan-2021-2025-PDF (last visited Sept. 5, 2025).

[4] *See* Kansas Org. of Recyclers, https://www.kskor.org/Recycling (last visited Sept. 5, 2025).

[5] *See* Recycling – CREW, City of Dodge City, Kansas, https://www.dodgecity.org/113/Recycling---CREW (last visited Sept. 5, 2025).

[6] *See* Recycling Pledge Form, City of Dodge City, Kansas, www.dodgecity.org/DocumentCenter/View/302/Recycling-Pledge (last visited Sept. 5, 2025).

that is against a backdrop where Congress has "declare[d] it to be the national policy of the U.S. that pollution should be prevented or reduced at the source whenever feasible; pollution that cannot be prevented should be recycled in an environmentally safe manner whenever feasible." 42 U.S.C. § 13101(b).

Plaintiffs bring this lawsuit against the Corporate Defendants and a trade association, American Chemistry Council ("**ACC**,"[7] collectively, "**Defendants**"). *See* AC ¶¶ 24–33. Plaintiffs do not allege the Corporate Defendants have any connection with each other, but rather that they are among the hundreds of members of the ACC, or other various trade associations. *Id.* ¶ 33.

Plaintiffs assert that as a result of Defendants' alleged conspiracy, they purchased plastic products at higher prices. *Id.* ¶¶ 3, 173. Defendants allegedly perpetrated this conspiracy by making deceptive public statements about recycling. Notably, however, the AC identifies less than a dozen such statements, allegedly made by certain Defendants and various trade associations, almost all of which were made in the 1980s or 1990s. AC ¶¶ 93–94, 104, 112–13, 115, 150–52. The challenged statements fall into three categories: (1) statements about recycling initiatives that do not comment on the recyclability of any products ("**Recycling Initiative Statements**"), *id.* ¶¶ 93, 94, 112–13, 115; (2) statements that reference the recyclability of product types, but say nothing about whether those product types will in fact be recycled ("**Recyclability Statements**"), *id.* ¶¶ 112, 115, 150–52; and (3) a statement about a forward-looking environmental goal to achieve a certain recycling rate ("**Aspirational Statement**"), *id.* ¶ 104. Plaintiffs do not allege they ever saw or relied on these statements when purchasing plastic products, or even knew that Defendants'

---

[7] ACC has never manufactured, sold, or distributed plastic resins (or any type of plastic product). *See* AC ¶¶ 33, 90, 103, 115, 122.

resins[8] were contained in any products they purchased. Indeed, Plaintiffs do not allege reliance on any statement by *anyone* regarding recycling. In fact, the AC does not allege that certain Defendants made any statements. Plaintiffs also do not explain how pro-recycling statements from the 1980s and 1990s influenced the price of the plastic products they purchased in the present day.

The AC asserts forty-six causes of action, which can be summarized as follows: violations of antitrust law ("**Antitrust Claims**"), including violations of federal law (Count 1) ("**Federal Antitrust Claim**") and state antitrust laws (Counts 18–45) ("**State Antitrust Claims**"); public nuisance (Count 2); violations of consumer protection and deceptive trade practices laws (Counts 3–17) ("**Consumer Fraud Claims**"); and unjust enrichment (Count 46). Plaintiffs purport to bring Count 1 on behalf of a nationwide class of both consumers and government entities (other than entities within California); Count 2 on behalf of a nationwide class of government entities (other than those within California); and Counts 3–46[9] on behalf of a subclass of consumers and government entities from thirty-four states and the District of Columbia. *Id.* ¶¶ 161–63.[10]

## LEGAL STANDARD

Article III standing is a "bedrock constitutional requirement that" is "applied to all manner of important disputes." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024). Plaintiffs bear the burden of demonstrating Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021). Standing is necessary for each plaintiff, "for each claim [a plaintiff] seeks to press[,] and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Rule 12(b)(6) requires dismissal of a complaint that lacks "sufficient factual matter,

---

[8] Here and throughout, reference to "Defendants' resins" is not intended to suggest that ACC, Chevron U.S.A. Inc., DuPont de Nemours, Inc., or Celanese Corp. manufactured plastic resin.

[9] Plaintiffs fail to specify on behalf of which class they purport to bring Count 46, but Defendants presume it is on behalf of the subclass.

[10] To assist the Court in its analysis, Defendants have included a chart providing all of the claims asserted by Plaintiffs, and the applicable defenses to each. *See* Ex. 1.

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, because the Consumer Fraud Claims and unjust enrichment claim sound in fraud, Plaintiffs must satisfy Rule 9(b)'s pleading standard. *M.F. v. ADT*, 357 F. Supp. 3d 1116, 1137 (D. Kan. 2018).

## ARGUMENT

## I.    PLAINTIFFS LACK ARTICLE III STANDING (ALL COUNTS)

To demonstrate that they have Article III standing, Plaintiffs must establish a "causal connection" between their injury and Defendants' alleged conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). Plaintiffs cannot rely on "[s]peculative inferences" to "connect [their] injury to [Defendants'] challenged actions." *Gandy*, 416 F.3d at 1157. Here, Plaintiffs allege that Defendants conspired to increase the demand for and price of plastics by making public statements supporting plastic recycling. But Plaintiffs' allegations and theory of deception rest on "speculative inferences," and lack any plausible causal connection to their alleged harm. *Id.*; *Iqbal*, 556 U.S. at 679 (stating that in assessing such allegations, courts "draw on [their] judicial experience and common sense").

As the AC makes clear, for decades the federal and state governments—including Kansas—have actively endorsed and mandated recycling. AC ¶ 95. Conversely, the AC identifies only a few sparse and vague statements that some (but not all) Defendants made about recycling decades ago. Plaintiffs do not allege that Defendants' statements differed from or were contradictory to the governments' positions on recycling. *Id.* ¶¶ 75, 102, 113. Plaintiffs allege no facts to support the theory that these statements caused the increase in demand for, or any change to the price of, plastic—rather than other factors, including consumer preference and the pervasive

recycling endorsements and mandates that the federal, state and local governments (and countless third parties) have and continue to make. *N. Laramie Range All. v. FERC*, 733 F.3d 1030, 1035 (10th Cir. 2013). Further, Plaintiffs' entire causal theory rests on the assumption that consumers' purchasing patterns are motivated by whether a product can be recycled. However, as Plaintiffs concede, consumers make purchasing decisions for a variety of reasons, most notably related to the product itself, rather than the container or packaging in which the product is sold. AC ¶¶ 63–65. Plaintiffs have not and cannot plausibly allege a causal relationship between consumers' decisions to purchase plastic products and Defendants' decades-old statements as part of that decision. It is thus not surprising that the AC does not identify a single statement made by any Defendant that Plaintiffs relied on when deciding to purchase any plastic product.

The challenged statements are also too attenuated from Plaintiffs' purported harm in light of the many "independent action[s]" by immeasurable "third part[ies] not before the [C]ourt." *Lujan*, 504 U.S. at 560. In addition to the governments' recycling endorsements and manifold consumer preferences, the demand and price of plastics are determined by the many independent actors in the supply chain (and their competitors)—not Defendants, who are merely some of the manufacturers of plastic resins. *Swartz v. Coca-Cola*, 2023 WL 4828680, at *4 (N.D. Cal. July 27, 2023) ("It also bears mention that the consumer deception alleged in the FAC is tied to forces and circumstances well beyond defendants' control . . . . The plausibility of holding defendants to account for statements made in such volatile circumstances is not at all clear in the FAC.").

Indeed, Plaintiffs fail to explain how allegedly increasing the demand for plastic products increased the price, especially given Plaintiffs' separate allegations that the supply of plastic products "exponentially increase[d]." *See, e.g.*, AC ¶¶ 2, 6. Nor do Plaintiffs explain how the supposedly inflated prices for Defendants' resins were "'passed on' to each plaintiff 'through each

of the various intermediate levels of the distribution chain.'" *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2020 WL 6270948, at *2 (N.D. Cal. Oct. 23, 2020). These deficiencies are fatal to establishing traceability. *Id.* at *3 (dismissing indirect purchasers' antitrust, consumer fraud, and unjust enrichment claims because the complaint pled no facts identifying the participants in the distribution chain or establishing "that each participant in the chain necessarily passed on the asserted overcharge to the next participant"); *see also Gandy*, 416 F.3d at 1156.

Plaintiffs' purported harm is not fairly traceable to any alleged deceptive statement or the alleged conspiracy, and Plaintiffs thus do not have standing for any of their claims.

## II.   PLAINTIFFS FAIL TO STATE ANY ANTITRUST CLAIM (COUNTS 1, 18–45)

Plaintiffs' core theory of liability—that Defendants promoted recycling and increased output—is the antithesis of an antitrust claim. Plaintiffs concede that the promotion of recycling has *increased output* in plastics, making it impossible for Plaintiffs to plead a "restraint of trade." 15 U.S.C. § 1. They also fail to allege any agreement between Defendants—let alone one that harms competition. And they fail to allege a viable relevant market, market power, or anticompetitive effects. They fail even to allege what types of plastics they purchased and from which, if any, Defendants. In light of these and other pleading failures, Plaintiffs' Antitrust Claims should be dismissed.

### A.   Plaintiffs Fail to Allege Any Restraint of Trade

Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade." 15 U.S.C. § 1; *Llacua v. Western Range Assoc.*, 930 F.3d 1161, 1174 (10th Cir. 2019); *Buccaneer v. Gunnison*, 846 F.3d 1297, 1306 (10th Cir. 2017) ("[A] plaintiff asserting a claim under § 1 must prove . . . the existence of an agreement or conspiracy between two or more competitors to restrain trade[.]").

Missing from the AC, however, are any allegations that Defendants' conduct restrained trade or competition at all. At best, Plaintiffs allege Defendants misled the public about the

recyclability of plastics, which supposedly increased demand and made consumers willing to pay higher prices for plastic products. But where is the *restraint*? Plaintiffs do not allege that Defendants agreed to, or actually did, restrict output of their products or otherwise diminish competition with one another to sell plastic, such as by agreeing not to compete on price. To the contrary, Plaintiffs allege that Defendants *increased* the output of plastics products, AC ¶ 6—as they must for their public nuisance claim—but which is a fact indicative of a *procompetitive* marketplace. Areeda & Hovenkamp, *Antitrust Law* ¶ 1503b1 (noting an "increase in marketwide output is presumptively procompetitive"); *Cal. Dental v. FTC*, 526 U.S. 756, 775 (1999); *Chi. Pro. Sports v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem."). Plaintiffs also do not allege that Defendants agreed to, or did, fix the price of resins or refrain from price competition in any way. Absent allegations of such conduct, trade is not restrained and there is no Sherman Act violation.

At most, the AC alleges that Defendants made deceptive statements, which courts consistently find insufficient to support a Section 1 claim. *See Sanderson v. Culligan*, 415 F.3d 620, 624 (7th Cir. 2005); *Ariz. v. Cook*, 391 F. Supp. 962, 970 (D. Ariz. 1975) ("[False advertising] conspiracy alleged here is not a 'conspiracy in restraint of trade' within the purview of Section 1[.]"), *aff'd*, 541 F.2d 226 (9th Cir. 1976). "Far from undermining competition, false statements 'set the stage for competition.'" *GDHI Mkt. v. Antsel*, 416 F. Supp. 3d 1189, 1201 (D. Colo. 2019).

## B.    Plaintiffs Fail to Plead an Agreement

Plaintiffs also fail to adequately plead an *agreement* that restrains trade—the "crucial" element of a Section 1 claim. *Twombly*, 550 U.S. at 553. As a threshold matter, Plaintiffs fail to meet the requirement of pleading specificity because they impermissibly lump together and make sweeping generalizations about all "Defendants." Plaintiffs also fail to plead direct evidence of an unlawful agreement, or circumstantial evidence from which this Court can infer one. These

pleading deficiencies doom Plaintiffs' state law claims. *Ass'n of Surg. Assistants*, 127 F.4th at 191 ("[B]ecause all its [federal and state] antitrust claims are factually predicated on a conspiratorial agreement between [defendants,] . . . [plaintiff]'s failure to plead a plausible conspiracy independently dooms its Complaint."); *Pittsburg Cnty. Rural Water Dist. No. 7 v. McAlester*, 358 F.3d 694, 721 (10th Cir. 2004) (addressing merits of "federal and state antitrust claims in tandem under federal law standards").

### 1.    Plaintiffs Rely on Improper Group Pleading

Rather than alleging facts about which specific Defendants agreed to, as well as what and when, Plaintiffs allege only that "Defendants," as an undifferentiated group, entered into a conspiracy. *See* AC ¶¶ 2, 8, 11, 155, 179. And for some Defendants,[11] Plaintiffs allege no specific conduct at all. "Group pleadings," such as this, are insufficient. When plaintiffs assert "complex claims against multiple defendants, it is particularly important to make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations." *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017). "*Twombly* makes clear that at the pleading stage in an antitrust case, each defendant is entitled to know how it is alleged to have conspired, with whom, and for what purpose," and "a complaint based on a theory of collective responsibility must be dismissed." *In re Crop Inputs Antitrust Litig.*, 749 F. Supp. 3d 992, 1007 (E.D. Mo. 2024); *Twombly*, 550 U.S. at 556 (holding that a § 1 claim "requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made"). Thus, Plaintiffs' group pleading allegations cannot support their claims.

---

[11] For example, the AC identifies Chevron Phillips Chem. Co. LP in only three paragraphs (AC ¶¶ 26, 218, 233), without any allegations of specific wrongful conduct or deceptive statements by it. The AC similarly only mentions Eastman Chem. Co., Equistar Chems. and Celanese Co. a handful of times and fails to identify any specific wrongdoing or deceptive statements by them.

2.    <u>Plaintiffs Have Not Pleaded Direct Evidence of an Unlawful Agreement</u>

Plaintiffs also have not alleged direct evidence of an unlawful agreement between Defendants, *i.e.*, a smoking gun allegation "that is explicit and requires no inferences to establish" an agreement. *Llacua*, 930 F.3d at 1177 (citation omitted) (affirming dismissal for lack of direct or circumstantial evidence). Neither "[b]are bones accusations of a conspiracy without any supporting facts," nor the "use of antitrust buzz-words and parroting of general antitrust theories" are "[]sufficient to state an antitrust claim," let alone plead an agreement directly. *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citation omitted). Here, Plaintiffs point to no documents or statements evidencing any agreement. As in *Twombly*, the AC here "mention[s] no specific time, place, or person involved in the alleged conspiracies." *Ass'n of Surg. Assistants*, 127 F.4th at 190.

3.    <u>Plaintiffs Have Pleaded No Circumstantial Evidence From Which an Unlawful Agreement May Be Inferred</u>

Absent direct evidence of a conspiracy, Plaintiffs must plead facts that raise a plausible *inference* of conspiracy (*i.e.*, circumstantial evidence) to survive a motion to dismiss. *Twombly*, 550 U.S. at 556. To establish a conspiracy by circumstantial evidence, the AC "must allege both parallel conduct and circumstantial evidence of a conspiracy." *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) (quotations and citation omitted). Where circumstantial evidence is just "as consistent with" unilateral action as with concerted action, it "does not, standing alone, support an inference of antitrust conspiracy." *Llacua*, 930 F.3d at 1179–80 (conspiracy allegations "must 'tend[] to exclude the possibility' of independent action"). Here, the AC fails to adequately plead either parallel conduct or plus factors.

i    <u>Plaintiffs Fail to Plead Parallel Conduct</u>

Parallel conduct is "proof that defendants took identical actions within a time period suggestive of prearrangement." *Anderson News v. Am. Media Inc.*, 899 F.3d 87, 104 (2d Cir. 2018).

13

Plaintiffs here do not allege facts showing any parallel behavior indicative of a conspiracy.

Plaintiffs' sparse and conclusory allegations provide no basis to determine whether any Defendant acted similarly or engaged in parallel behavior. Plaintiffs must "identify the alleged conspirators, when or how they functioned, or the nature and extent of [each defendant's] participation in the alleged conspiracy." *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989). At best, Plaintiffs point to a few disparate public statements by third-party trade associations over many decades. Plaintiffs do not even adequately allege that all Defendants made such public statements. As discussed above, Plaintiffs' reliance on conclusory allegations and group pleading, with most allegations naming actions taken by "Defendants" or "the plastics industry" at large, is improper.

Additionally, the challenged statements by Defendants and trade associations span decades. Such allegations lack the requisite "temporal proximity" to establish parallel conduct. *Park v. Express*, 911 F.3d 505, 516 (8th Cir. 2018); *Burch v. Milbert Factors, Inc.*, 662 F.3d 212, 228 (3rd Cir. 2011) (finding no "parallel behavior" where conduct occurred "at different time periods"). Plaintiffs point to the proliferation of recycling-oriented trade groups, but Plaintiffs fail to allege that all Defendants were even members of these groups, and these groups were created at different times over several decades. AC ¶ 90. Plaintiffs also point to alleged advertising by third-party organizations (again, not by any specific Defendants), but that occurred at various times across multiple decades. AC ¶¶ 93, 112–13. There is simply no indication that any of these alleged actions were coordinated, and "calling this conduct 'parallel' is a stretch." *LLM Bar v. Barbri*, 271 F. Supp. 3d 547, 579 (S.D.N.Y. 2017) (finding no parallel conduct where actions took place "at different times over the span of several years").

Defendants' alleged statements also vary in substance. The AC includes a purported

magazine advertisement about the "urgent need to recycle," followed by an alleged statement that Mobil was "venturing into recycling" and would adhere to EPA recommendations. *See* AC ¶¶ 93–94. These statements are different and not allegations of parallel conduct. One is aimed at the public encouraging specific action, while the other is about a company's plans.

ii     <u>Plaintiffs Fail To Allege Any "Plus Factors"</u>

"[I]n order to survive a Rule 12(b)(6) motion a plaintiff . . . must plead parallel conduct and additional evidence"—otherwise known as "plus factors"—sufficient to give rise to an inference that the conspirators' conduct was interdependent. *In re Universal Serv. Fund Tele. Billing Pracs. Litig.*, 300 F. Supp. 2d 1107, 1147 (D. Kan. 2003) (emphasis omitted). The Antitrust Claims here also fail because Plaintiffs do not adequately plead the requisite plus factors. "Plus factors" are "economic actions and outcomes that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action." *Crownalytics*, 2023 WL 3071192, at *5 (citation omitted). "Plus factors that 'tend to demonstrate the existence of an agreement' include (1) allegations about the defendants' motive to enter into an unlawful agreement; (2) allegations that the defendants acted contrary to their interests; . . . (3) allegations implying a traditional conspiracy'"; or (4) allegations demonstrating "a high level of interfirm communications." *Id.* at *6 (citation omitted). Without plus factors, parallel conduct may just as easily be "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Plaintiffs have not adequately pled any plus factor. The allegations here do not tend to demonstrate the existence of an agreement and instead describe no more than common and lawful business practices.

***First***, common business motives alone do not support an inference of conspiracy. *Suture Exp. v. Cardinal*, 963 F. Supp. 2d 1212, 1225 (D. Kan. 2013) ("The fact that a defendant could have chosen a different strategy does not produce an inference that the choice of a strategy similar

15

to that of a fellow competitor is a sign of conspiracy."). A common motive to increase profits by encouraging recycling is not a "plus" factor, because that interest is "universally shared by all businesses." *Bookends v. Amazon*, 2022 WL 18144916, at *13 (S.D.N.Y. Aug. 24, 2022) (dismissing where "plus factors alleged . . . [did] not raise a plausible inference" of conspiracy). Plastic recycling was also touted by innumerable entities (including the government) that were not engaged in the alleged conspiracy and did not benefit from the sale of plastics—underscoring that such promotion was a rational response to public concerns, rather than evidence of any conspiracy.

**Second**, the AC does not establish that Defendants took any action against self-interest. To the contrary, the AC demonstrates there were lawful and independent business reasons for Defendants' actions. According to the AC, Defendants faced immense public backlash regarding plastic products and sought "to prevent bans on single-use plastics." AC ¶ 117. If true, the promotion of recycling by any Defendant (consistent with the government's heavy promotion of it) would be a logical, unilateral business response to this increased scrutiny—not evidence of an anticompetitive conspiracy. *In re Musical Instruments Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) ("[F]irms may arrive at identical decisions independently, as they are cognizant of— and reacting to—similar market pressures."); *CVB v. Corsicana*, 2024 WL 4505044, at *8 (D. Utah Oct. 16, 2024) (finding no "conspiracy to mislead consumers" where plaintiff did not sufficiently allege that defendants' statements were "plausibly motivated by an illicit conspiracy to restrain trade rather than part of the normal course of [d]efendants' businesses"). Plaintiffs allege no behavior that is *inconsistent* with any Defendant's independent self-interest.

**Finally**, Plaintiffs devote much of the AC to the unremarkable allegation that Defendants participate in trade associations and industry events. As an initial matter, mere membership in a trade organization that took certain actions is not evidence that the organization's members

conspired to engage in those actions. *Llacua*, 930 F.3d at 1178 ("Not every action by a trade association is concerted action by the association's members."). Indeed, under well-established Supreme Court precedent, "members of trade associations" do not become "conspirators merely because they gather and disseminate information." *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 584 (1925); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1998). "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982). And a defendant "cannot be held civilly liable for any wrongful conduct committed by [a trade association] or its members . . . unless it can be shown that [the defendant's] actions taken in relation to the [organization] were *specifically intended to further such wrongful conduct*." *In re Asbestos School Litig.*, 46 F.3d 1284, 1290 (3d Cir. 1994) (Alito, J.) (emphasis added). That is because "[a] member of a trade group or similar organization does not necessarily endorse everything done by that organization or its members." *Id.* Thus, any conduct by trade and industry organizations cannot be attributed to Defendants—if Defendants were even members.

Further, because trade associations "serve legitimate functions," mere opportunity to conspire through participation in a trade association does not render a conspiracy plausible. *In re Passenger Antitrust Litig.*, 767 F. Supp. 3d 681, 712 (N.D. Ohio 2025) (collecting cases); *In re Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 995 (W.D. Ark. 2017). "Indeed, even though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a walking conspiracy." *Llacua*, 930 F.3d at 1178. Defendants should not have to "devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy" because they are members of the same trade associations or attend

industry events. *Twombly*, 550 U.S. at 567 n.12. Here, Plaintiffs' allegations amount to a speculative "same time, same place" theory that is insufficient as a matter of law to establish conspiracy. *In re Chocolate*, 801 F.3d 383, 409 (3d. Cir. 2015) (evidence executives at trade show meetings "were in the same place at the same time. . . [is] insufficient [for] concerted activity").

### C.    Defendants' Conduct Is Immune Under the *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine immunizes from antitrust scrutiny groups' use of "channels and procedures of government agencies to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors." *Oberndorf v. City & Cnty. of Denver*, 900 F.2d 1434, 1440 (10th Cir. 1990). *Noerr-Pennington* immunity extends to private actions if they are "incidental to a valid effort to influence governmental action." *Allied Tube v. Indian Head*, 486 U.S. 492, 499 (1988). And "[a] publicity campaign directed at the general public, seeking legislative or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods." *Id.* at 499–500.

Plaintiffs' entire theory is virtually indistinguishable from that which the Supreme Court found barred in *Noerr*. In that case, the plaintiff truckers alleged that the defendant "railroads had engaged [a public relations firm] to conduct a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business[.]" *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129 (1961). Just as Plaintiffs here allege Defendants used industry-created front groups, AC ¶ 6, the campaign in *Noerr* "utilized the so-called third-party technique, that is, the publicity matter circulated in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups when, in fact, it was largely prepared and produced by [the public relations firm] and paid for by the railroads." *Noerr*, 365 U.S. at 129–30. The Court started from the premise that liability cannot "be predicated upon mere attempts to influence the passage or enforcement of laws." *Id.* at

35; *see also id.* at 137 ("In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives."). The Court rejected the notion that the railroads' commercial motivation diminished the First Amendment's application: "The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." *Id.* at 139. And the Court held "the railroads' use of the third-party technique," including alleged "deception of the public," was "legally irrelevant" because "a publicity campaign to influence governmental action falls clearly into the category of political activity," and the First Amendment's protections "would go for naught" if the government could "regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical." *Id.* at 140–42. That the railroads allegedly "deliberately deceived the public and public officials," "reprehensible as it is," was of no moment. *Id.* at 145.

Here, Plaintiffs allege that much, if not all, of Defendants' conduct was protected speech made in the lobbying context "to defend the plastics industry from restrictive legislation." AC ¶¶ 6, 61–62, 67–68, 87, 99, 116–17. Under *Noerr-Pennington* immunity, this speech cannot form the basis of the Antitrust Claims. Plaintiffs make no effort to distinguish the effects of these lobbying efforts from any other alleged statements that Defendants and others have made. But even if *Noerr-Pennington* immunity only applies to *some* of the alleged misstatements, Plaintiffs' claims still fail because they have not alleged effects isolated only to the alleged conduct that does not comprise protected speech. *Concord v. Brunswick*, 207 F.3d 1039, 1057 (8th Cir. 2000).

### D.    Plaintiffs Do Not Plausibly Allege an Unreasonable Restraint of Trade

The Antitrust Claims also fail because Plaintiffs have not plausibly alleged that any such restraint is *unreasonable*. *Gregory v. Fort Bridger*, 448 F.3d 1195, 1203 (10th Cir. 2006) ("Section 1 prohibits only concerted action that unreasonably restrains trade."). To assert a Section 1 violation, Plaintiffs must plead the elements under the "rule of reason," the standard under which the finder of fact must "seek to ascertain the extent to which [Defendants'] challenged conduct harms competition." *Buccaneer*, 846 F.3d at 1306.[12] Specifically, Plaintiffs must sufficiently allege "a relevant market," *Ass'n of Surg. Assistants*, 127 F.4th at 186, and that the allegedly unlawful conduct has "a substantially adverse effect" upon the competitiveness of the market, *Buccaneer*, 846 F.3d at 1310. Plaintiffs fail to plead either of these elements.

### 1.    Plaintiffs Fail to Adequately Allege a Relevant Market

***First***, the rule of reason "requires [courts] to analyze the relevant market power of the defendants and therefore requires the plaintiff to allege a valid market." *Campfield v. State Farm*, 532 F.3d 1111, 1119 (10th Cir. 2008); *Ass'n of Surg. Assistants*, 127 F.4th at 186. "A plaintiff cannot arbitrarily choose the product market relevant to its claims[.]" *Id*. at 187. Rather, the relevant market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion

---

[12] There are a limited category of agreements that are deemed *per se* violations where "because of their pernicious effect on competition and lack of any redeeming virtue" they "are conclusively presumed to be illegal" without inquiry into the reasonableness of the restraint. *Gregory*, 448 F.3d at 1203. Plaintiffs do not allege a *per se* agreement or violation. Nor could they, as an agreement to make supposedly misleading statements about recycling is not the type of concerted action that courts have found to be *per se* unlawful. *Ass'n of Surg. Assistants*, 127 F.4th at 178.

to dismiss may be granted." *Campfield*, 532 F.3d at 1118–119; *Ass'n of Surg. Assistants*, 127 F.4th at 189 (dismissing Section 1 claim at pleadings due to "legally insufficient" market definition); *Uhlig v. CoreLogic*, 2022 WL 4597858, at *6–7 (D. Kan. Sept. 30, 2022) (dismissing claim where plaintiff's market definition "fail[ed] to include competitive substitutes") (collecting cases).

Here, Plaintiffs failed to allege a product market consisting of reasonably interchangeable goods. Plaintiffs' proposed relevant market is "plastics products for end use consumption." AC ¶ 177. Plaintiffs engage in *no* discussion whatsoever of possible substitutes or comparable products, which is required to delineate which products are reasonably interchangeable, *i.e.*, within the product market. *Adidas v. NCAA*, 64 F. Supp. 2d 1097, 1103 (D. Kan. 1999) (rejecting market definition where the plaintiff "failed to explain or even address why other similar forms of advertising . . . are not reasonably interchangeable"); *Ablulimir v. U-Haul Co.*, 2011 WL 2731774, at *5 (D. Kan. 2011) (emphasis added) ("A plaintiff *must* define the market in terms of *all products* that are reasonably interchangeable, or explain the rationale for a narrower market definition."). Plaintiffs do not explain why an aluminum can or glass bottle of soda are not reasonable substitutes for a plastic soda bottle to a consumer who is choosing the beverage and not the container. Plaintiffs also make no allegations addressing why a cardboard box is not a reasonable substitute for a plastic box, or why a paper plate is not a reasonable substitute for a plastic one.

Plaintiffs also make no allegations establishing that all "plastics products for end-use consumption" are interchangeable with one another. To the contrary, Plaintiffs admit that "[t]here are thousands of different types of plastic, each with its own chemical composition and characteristics" and plastic products "can be separated into certain categories based on their chemical composition and end use." AC ¶¶ 34–43. Plaintiffs allege no facts that could explain, for example, why a consumer who went to a store to purchase water in plastic PET bottles would

purchase a polycarbonate food container if the store was out of the former. Plaintiffs also offer no allegations to support the counter-intuitive notion that a plastic bottle competes with a plastic kayak. "[W]here—as here—a plaintiff facially fails to plausibly allege a relevant market, dismissal is warranted." *Ass'n of Surgical Assistants*, 127 F.4th at 189; *Drake v. Cox Enters., Inc.*, 2013 WL 557024, at *3 (D. Kan. Feb. 13, 2013) (dismissing "overly broad" and "legally insufficient" market that included "books, CDs, and DVDs" because "none of th[o]se products are interchangeable").

### 2.    Plaintiffs Fail to Plausibly Allege Adverse Effects on Competition

**Second**, even if Plaintiffs alleged a relevant market, they fail to allege harm to competition in it. Under the rule of reason, "[t]he plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition." *Buccaneer*, 846 F.3d at 1310. A plaintiff may allege adverse effects by (1) putting forth evidence that "directly establish[es] anticompetitive effect" by showing, for example, that defendants "actually reduced output or raised prices" or (2) indirectly establishing that defendants possess market power. *Id.* at 1311.

Plaintiffs have not plausibly alleged any direct, actual effect on competition. Plaintiffs make conclusory allegations that the alleged conspiracy "artificially increased" price and demand of plastic. But Plaintiffs do not plead facts plausibly establishing either of these effects or that they resulted from the alleged conspiracy, or that competition for plastic was diminished in any way. *Ohio v. Am. Ex.*, 585 U.S. 529, 549 (2018) ("price and output data [are insufficient] absent . . . evidence that tends to prove that output was restricted or prices were above a competitive level").

Plaintiffs allege no facts to support their assertion that Defendants' conduct resulted in higher prices. Plaintiffs do not reference the price of a single plastic product, either before or after the alleged agreement was supposedly formed. Instead, Plaintiffs generically reference the alleged "artificial increase" in *demand* for plastics, *see, e.g.*, AC ¶¶ 172–73, 179, 181, 208, 226, while at the same time conceding that plastics supply has "exponentially increase[d]" over the last six

decades, *id.* ¶ 6. But this says nothing about price or competitive conditions.[13] *See In re Musical Instruments*, 798 F.3d at 1197 n. 13 (affirming dismissal of antitrust claim where "[a]ny manner of economic variables may have contributed to these fluctuations in prices and sales"). Nor do Plaintiffs allege that Defendants agreed to, or did, fix the price of resins or refrain from competition with respect to resins. Accordingly, Plaintiffs' conclusory price allegations fail to indicate any anticompetitive conduct or effect. *Vincent v. Utah Plastic Surgery Soc.*, 621 F. App'x 546, 548 (10th Cir. 2015) (affirming dismissal of antitrust claim containing "bald, unsupported assertion" that defendants' conduct "restrained competition" for failure to allege anticompetitive effect").

Plaintiffs also plead no facts evidencing a causal relationship between any alleged conspiracy and any claimed demand increase. Rather, Plaintiffs plead conclusory allegations about plastic *supply*—a single chart purportedly showing *global* plastic production rising, accompanied by an assertion that U.S. plastic production has similarly risen. AC ¶¶ 141, 147. But Plaintiffs allege no facts linking any rise in plastic production to the alleged conspiracy. *Craftsmen v. Ford*, 491 F.3d 380, 390–91 (8th Cir. 2007) (plaintiff failed to show "actual, sustained adverse effects on competition" where plaintiff pointed to "no evidence that such effects occurred in the limousine industry as a result of the restrictions"). In fact, Plaintiffs' allegations confirm that any increase in demand for plastic production was the result of "disposable plastics [] becom[ing] the norm for everything" by the 1960s, which was decades before the alleged conspiracy. AC ¶ 64. Even if Plaintiffs plausibly alleged a causal relationship (they have not), the AC fails to allege facts demonstrating that competition was restrained or diminished by the alleged conspiracy, or that plastic manufacturers did not compete to meet that demand or fight for market share.

---

[13] Nor do Plaintiffs address the conventional principle that when supply rises with demand, price does not always increase, or if supply increases at a rate faster than demand, price may decrease.

Nor do Plaintiffs plead indirect effects on competition, because they allege no facts regarding Defendants' purported market power or the market structure (let alone actually define a relevant market). *See Ass'n of Surg. Assistants*, 127 F.4th at 190 ("Because [plaintiff] failed to plead a legally sufficient market, it is impossible to assess . . . market power in the relevant market."); *Hip Hop Bev. v. Monster Energy*, 2016 WL 7479402, at *4 (C.D. Cal. July 7, 2016).

### E.     Plaintiffs Fail to Plead Antitrust Standing

Plaintiffs separately lack antitrust standing to pursue their claims, which is a threshold requirement at the pleading stage, and is distinct from and more rigorous than constitutional standing. *Hogan*, 453 F.3d at 1253. A plaintiff must allege (i) "antitrust injury," *i.e.*, an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful," and (ii) that plaintiff is a "proper party to bring a private antitrust action," or an "efficient enforcer" of the antitrust laws. *Id.* Plaintiffs fail to plead facts alleging either of these two standing requirements.

#### 1.     Plaintiffs Have Not Plausibly Alleged Antitrust Injury

Even if Plaintiffs believe they were harmed in some manner by Defendants' alleged conduct, that is not the relevant question for antitrust injury purposes. *Vincent*, 621 F. App'x at 548. The relevant question is whether Plaintiffs' alleged injury is the type of injury "the antitrust laws were intended to prevent"—*i.e.*, conduct that harms competition—"and that flows from that which makes [D]efendant[s]' acts unlawful." *Elliott v. BP*, 407 F.3d 1091, 1124–25 (10th Cir. 2005). Plaintiffs have not shown antitrust injury because, as discussed in Sections II.A and II.D, they have not plausibly alleged any harm to competition. Plaintiffs' allegation that Defendants' conduct was output-*enhancing*—which is indicative of *greater* competition—forecloses them from adequately pleading antitrust injury. *Id.* ("[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the

defendant's behavior"). Nor can Plaintiffs' antitrust injury be predicated on Defendants' allegedly false or misleading statements, which "set the stage for competition." *GDHI*, 416 F. Supp. 3d at 1201–02; *Harrison v. Aerostar*, 316 F. Supp. 2d 186, 221–22 (E.D. Pa. 2004) ("[Where] Plaintiff[s'] damages, if any, arise out of fraud, Plaintiff[s] ha[ve] not suffered 'antitrust injury.'"). In short, because Plaintiffs have failed to plausibly allege a restraint of trade (much less an "unreasonable" restraint), they cannot plausibly allege antitrust injury as a matter of law.

## 2.    Plaintiffs Are Not "Proper Parties"

Plaintiffs also lack antitrust standing because their claims are too attenuated and far removed in the distribution chain from Defendants' conduct. In other words, they are not "proper parties" (sometimes referred to as "efficient enforcers") with regard to the asserted antitrust claims. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540–45 (1983) ("*AGC*"). Whether a plaintiff is a "proper party" is based on six factors:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; and (6) The risk of duplicate recoveries or complex damage apportionment.

*Sharp v. United Airlines*, 967 F.2d 404, 406–07 (10th Cir. 1992).[14] Federal courts, including courts in this Circuit, have found that *AGC* applies to all of Plaintiffs' Antitrust Claims, except for claims brought under Colorado and Minnesota law[15]—but even those states require Plaintiffs to plead and

---

[14] Factors five and six do not apply in standing determinations for injunctive relief. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986).

[15] *In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 841 (D. Minn. 2023) (holding all states at issue would apply *AGC*, except for Colorado and Minnesota, and granting dismissal for lack of antitrust standing); *Carefirst of Md., Inc. v. J&J*, 745 F. Supp. 3d 288, 322 (2024) (dismissing state law antitrust claims on antitrust standing grounds after concluding those states either "explicitly apply the factors from *AGC* or use a substantially similar test"). State-by-State Authority on Applicability of the *AGC* Factors is attached hereto as Exhibit 2.

demonstrate proximate causation (the core of the *AGC* test).[16] *Id.* at 410 (affirming holding that "the same standing analysis applied to plaintiffs' state antitrust claims, and dictated dismissal of those claims"); *Sup. Auto Transp. v. Arcelor*, 902 F.3d 735, 743 (7th Cir. 2018).[17]

All of the *AGC* factors weigh decidedly against antitrust standing here. **First,** Plaintiffs have not alleged a causal connection between their alleged injuries and Defendants' alleged antitrust violations. Plaintiffs do not allege that they purchased plastic resins from Defendants or that plastic resins manufactured by Defendants were used in the products that Plaintiffs purchased. AC ¶ 177. In fact, Plaintiffs do not even identify what "plastics products" they purchased, from whom, or when. *See Sup. Auto LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1040 (N.D. Ill. 2017) (finding indirect purchasers failed to allege the requisite causal connection under *AGC* where the complaint "did not even identify whether the steel in these products came from defendants' steel mills at all"). Indeed, Plaintiffs' few causation allegations are boilerplate and conclusory. AC ¶¶ 173, 175 ("Plaintiffs [] paid supracompetitive prices."); *Vincent*, 621 F. App'x at 548.

***Second***, Plaintiffs' alleged injuries are highly speculative and attenuated from Defendants' alleged conduct, making any damages apportionment enormously difficult. Plaintiffs do not allege

---

[16] *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007) ("Standing under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law."); Colo. Rev. Stat. Ann. § 6-4-115 ("Any person injured, either directly or indirectly, in its business or property by reason of any violation of this article 4 may sue and, if successful, is entitled to recover any actual damages that the person sustained."); *cf. N. Co. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 904 (Colo. 1996) (holding "proximate cause analysis was appropriate for determining whether unreasonable anticompetitive conduct had occurred").

[17] Nineteen of the states at issue have adopted the *AGC* factors or a substantially similar test: Ariz., Cal,, Conn., D.C., Ill., Iowa, Kan., Me., Md., Mich., Miss., Neb., Nev., N.M., N.Y., N.C., N.D., S.C., and Wis. *See* Ex. 2. This Court should hold the remaining seven states would also apply *AGC* in light of the presence of a statutory harmonization provision and the absence of any countervailing law. These states include: Haw., N.H., Or., R.I., Tenn., Utah, and W. Va. *Id.*; *In re Dairy Farmers Antitrust Litig.*, 2015 WL 3988488, at *4 (N.D. Ill. June 29, 2015).

that they directly purchased Defendants' plastic resins; rather, they purchased finished products made from plastic. Defendants' resins, at best, might be a component (and often small) part of the products purchased. Yet, Plaintiffs do not even attempt to describe the complex supply chain for plastic products, or allege which entities—Defendants or intermediaries such as distributors or retailers—actually implemented any alleged price increase. *In re Keurig Green Mountain Antitrust Litig.*, 383 F. Supp. 3d 187, 224 (S.D.N.Y. 2019) (dismissing indirect purchaser antitrust claims because the "conclusory allegations fail[ed] to describe with sufficient factual detail the chain of distribution"). Nor do Plaintiffs explain how such alleged price increases were passed on to consumers. *Sup. Auto*, 902 F.3d at 744 (affirming dismissal because complaint did not "trac[e] the effect of an alleged overcharge on steel"—comprising just "one among many components" of the final products purchased by end users—through "the complex supply and production chain[]").

In short, the prices Plaintiffs paid for a bottle of water or a box of cling wrap are not set by any Defendant, and the effect of Defendants' and other third parties' alleged statements from many years ago on the prices of products Plaintiffs purchased in recent years (of which plastic is often but one component) is sheer speculation. *Christou v. Beatport*, 849 F. Supp. 2d 1055, 1070 (D. Colo. 2012) (affirming dismissal where plaintiffs failed to show "defendants' actions caused or at least contributed to" alleged injury); *Ginsburg v. InBev*, 623 F.3d 1229, 1235 (8th Cir. 2010) (affirming dismissal, in part because allegations of "higher retail beer prices" were "speculative" where "beer [was] sold to consumers through a three-tier distribution system"). Accordingly, the Antitrust Claims should also be dismissed for lack of antitrust standing.[18]

---

[18] Because the Consumer Fraud Claims are "largely based on anticompetitive conduct," the Court must also dismiss such claims where the corresponding State Antitrust Claim fails for lack of antitrust standing. *In re Cattle*, 687 F. Supp. 3d at 843. Thus, the Court should dismiss Counts 4–5 and 10–15. Because Arkansas, Florida, Massachusetts, Missouri, and Vermont would also apply *AGC* or a similar test, *see* Ex. 2, Counts 3, 6–8, and 17 should also be dismissed.

**F.    Additional Independent Grounds to Dismiss the State Antitrust Claims Exist**

Indirect purchasers, like Plaintiffs, lack standing to sue for money damages under the Sherman Act, *see Ill. Brick v. Ill.*, 431 U.S. 720 (1977), so Plaintiffs can only seek injunctive relief under the Sherman Act.[19] Plaintiffs also bring damages claims under the laws of 28 states. But the State Antitrust Claims fail for the same reasons their Sherman Act claim fails because the relevant states apply the same standards as federal courts apply under the Sherman Act, with the exception that they do not require plaintiffs to be direct purchasers to recover damages. *Hobart*, 48 F.4th at 663 (holding that state law antitrust claims "prevail or fail in tandem with federal antitrust claims"); *Insulate*, 797 F.3d at 547. These claims also fail for the following additional reasons.

Plaintiffs lack standing to sue under the laws of states where none of the named Plaintiffs reside or were injured. Courts in the Tenth Circuit have recognized that "named plaintiffs lack standing to bring claims under the laws of states where the named plaintiffs have not [been injured] or resided." *Beltran v. InterExchange, Inc.*, 2018 WL 1948687, at *6 (D. Colo. Feb. 2, 2018); *accord Smith v. Pizza Hut, Inc.*, 2011 WL 2791331, at *10 (D. Colo. July 14, 2011); *Hunnicutt v. Zeneca, Inc.*, 2012 WL 4321392, at *5 (N.D. Ok. Sept. 19, 2012). Plaintiffs bring claims under twenty-eight states' antitrust laws, but the named Plaintiffs reside or made purchases in only: California, Florida, Kansas, Missouri, and New York. AC ¶¶ 15–23. Thus, the Court should dismiss the Antitrust Claims under every other state's law.[20]

Further, under Arizona, Colorado, Connecticut, Hawaii, Minnesota, Nevada, New York, Oregon, Rhode Island, and Utah law, Plaintiffs were required to provide notice and mail a copy of

---

[19] It is unclear what injunctive relief Plaintiffs seek and Plaintiffs have not pled facts on continued risk of threatened injury, which is the predicate for such relief under Section 16 of the Clayton Act. Plaintiffs also have not plausibly alleged the alleged conspiracy is ongoing, nor could they given Plaintiffs allege the limitations to recycling are publicly known. AC ¶¶ 43–57.
[20] Certain of the Consumer Fraud Claims must also be dismissed on this basis. The Court should dismiss Counts 3, 5, 7, 9–18, 20–25, 27–35, and 37–45.

their AC and/or the prior operative complaint to the Attorney General upon filing suit.[21] Because Plaintiffs fail to allege they provided any such notice, their Antitrust Claims (Counts 18, 20–21, 23, 30, 33, 36, 39–40, 43) must be dismissed.[22] Additionally, class action claims brought under Illinois and Tennessee antitrust law (Counts 24, 42) are expressly foreclosed by statute.[23] *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1007 (E.D. Mich. 2014).[24]

Lastly, Plaintiffs seek damages dating back to 1990, but many of the state law statutes permitting indirect purchaser recovery were only enacted in recent years,[25] and are not retroactive. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *De Niz Robles v. Lynch*, 803 F.3d 1165, 1169 (10th Cir. 2015) ("[L]egislation is rarely afforded retroactive effect."). To the extent Plaintiffs seek damages that pre-date the enactment of these statutes, such claims for damages (Counts 20–21, 28, 32–34, 36, 38–40, 43) must be dismissed.[26]

## III. FORD COUNTY FAILS TO STATE A PUBLIC NUISANCE CLAIM (COUNT 2)

Ford County is the only Plaintiff asserting a public nuisance claim, and that claim fails as a matter of law: ***even the Attorney General of Kansas has intervened in this litigation to oppose it.*** Ford County *cannot bring* a public nuisance claim through private lawyers. Kansas law vests that authority in the County Attorney, and the County Attorney has not authorized Ford County to sue on its behalf or *any other* County's behalf. Nor has any other sub-sovereign across the United

---

[21] Ariz. Rev. Stat. § 44-1415(A); Colo. Rev. Stat. Ann. § 6-4-116; Conn. Gen. Stat. Ann. § 35-37; Haw. Rev. Stat. § 480-13.3; Minn. Stat. Ann. § 325D.63; Nev. Rev. Stat. Ann. § 598A.210; N.Y. Gen. Bus. Law § 340; Or. Rev. Stat. § 646.780; 6 R.I. Gen. Laws § 6-36-21; Utah § 76-10-3109.

[22] *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 416 (D.N.J. 2018); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019).

[23] *See* 740 Ill. Comp. Stat. § 10/7(2); Tenn. Code § 47-25-106(c).

[24] *See also Davenport v. Charter Commc'ns, LLC*, 35 F. Supp. 3d 1040, 1050–51 (E.D. Mo. 2014).

[25] Colo. Stat. § 6-4-114(1) (enacted in 2023); Conn. Stat. § 35-46a (2017); Md. Code, Com. Law § 11-209(b)(2) (2017); Neb. Stat. § 59-821 (2002); Nev. Stat. § 598A.210 (1999); N.H. Rev. Stat. § 356:11 (2008); N.Y. GBL § 340(6) (1998); N.D. Cent. Code. § 51-08.1-08 (1991); Or. Stat. § 646.780(1)(a) (2010); 6 R.I. Gen. Laws Ann. § 6-36-7(d) (2013); Utah Code § 76-10-3109 (2006).

[26] *See, e.g.*, *In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d 704, 723–24 (N.D. Ill. 2016).

States authorized Ford County to bring this lawsuit. Thus, the lawsuit filed here is *ultra vires*.

Ford County also fails to plead a viable public nuisance theory. Ford County cannot base a nuisance on the promotion of recycling and sale of lawful plastic products as the conduct is: (1) authorized, encouraged, and in some cases *mandated* by law; (2) not linked to a recognized public right; (3) not sufficiently frequent or continuous; (4) not a proximate cause of Ford County's alleged unspecified harm; and (5) not in Defendants' control as it relates to plastic waste. Ford County's nuisance claim is unauthorized and fundamentally flawed, and thus should be dismissed.

### A.    Kansas Law Governs Ford County's Public Nuisance Claim

A transferee court usually applies the choice-of-law rules of the state in which the transferor court sits when a case is transferred under 28 U.S.C. § 1404(a). *Benne v. Intl. Bus. Machines Corp.*, 87 F.3d 419, 423 (10th Cir. 1996). That rule, however, does not necessarily apply when, as here, the case was transferred instead under the first-filed rule. *Stryker Corp. v. Ridgeway*, 2015 WL 5308038, at *3 (W.D. Mich. 2015). Moreover, if the transferor court lacked personal jurisdiction, the transferee court must apply the choice-of-law rules of the state in which it sits. *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir. 1996).

But the Court need not address which choice-of-law approach applies because the result is the same either way. *Volvo Constr. v. CLM Equip.*, 386 F.3d 581, 600 (4th Cir. 2004). Kansas law applies because Ford County's purported injuries occurred in Kansas, AC ¶ 23, and no factors tie its claim to another state. *Draughon v. U.S.*, 103 F. Supp. 3d 1266, 1282 (D. Kan. 2015).

### B.    Ford County Lacks the Authority to Bring a Public Nuisance Claim on Either an Individual or Class Basis

Ford County is acting *ultra vires*. Kansas law authorizes only three governmental entities to bring claims for public nuisance on behalf of its citizens: (1) "the attorney general," on behalf of the entire state; (2) "a county attorney for enjoining such a nuisance within his or her county";

or (3) "a city attorney for enjoining such a nuisance within his or her city." Kan. Stat. § 60-908. County attorneys in Kansas are independently elected officials who serve terms. *Id.* § 19-701. But this case is brought by private plaintiffs' lawyers purporting to represent the Ford County Board of County Commissioners.[27] It was not filed by Kevin Salzman, the duly elected County Attorney for Ford County, who is the *only* authority specified by statute who can assert the claim for Ford County. Kan Stat. Ann. § 60-908; *Drainage Dist. No. 3 v. Riverside Drainage*, 178 P. 433, 434 (Kan. 1919) (district not authorized to bring public nuisance claim that "should be brought in the name of the state, by the county attorney, or the Attorney General").

Moreover, as Defendant-Intervenor the Kansas Attorney General pointedly demonstrates, Ford County cannot represent other Kansas counties, much less the entire state. Dkt. No. 113-1; *see also* Kansas's Memorandum in Support of its Motion to Dismiss Ford County's Improper Class Allegations and Claims. Other counties in Kansas must be represented by their respective county attorney, and numerous other government entities around the country are subject to "statutory requirements that local state entities must satisfy before being represented by private counsel" like the one representing Ford County here. *In re Auto. Parts Antitrust Litig.*, 2015 WL 14047405, at *7 (E.D. Mich. Apr. 30, 2015).

Further, Ford County does not have any legal authority to represent "all counties, cities, and municipalities" and government entities located "in the United States and its territories," excluding California. *See* AC ¶ 161–63; Kansas's Memorandum in Support of its Motion to Dismiss. Government entities may sue only under the laws of their home state, and Ford County

---

[27]  *See* Ford County Commissioners' Meeting Minutes (Oct. 21, 2024), https://www.fordcounty.net/AgendaCenter/ViewFile/Minutes/_10212024-517 at 99 (County Commissioners, without County Attorney Salzman present, "directed Legal Counsel to enter into contingency agreements with Sharp Law for Oil & Gas and Plastic Waste class action lawsuits").

has no authority to pursue claims on behalf of non-Kansas government bodies. *Id.*; *In re Auto.*, 2015 WL 14047405, at *7 (dismissing class allegations brought on behalf of municipalities other than under the state's laws where the government entity that was a named plaintiff was located); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *18 (N.D. Cal. Oct. 2, 2014) (same).[28] And the Eleventh Amendment separately prohibits Ford County from representing any State absent express waiver. *See In re Auto.*, 2015 WL 14047405 at *4 (citing *Thomas v. FAG*, 50 F.3d 502, 505 (8th Cir. 1995)); *Walker v. Liggett Grp.*, 982 F. Supp. 1208, 1210 (S.D.W. Va. 1997). That is the end of the story and the end of the claim.

### C.    Ford County's Public Nuisance Claim Fails for Numerous Reasons

Even assuming *arguendo* that it could file this lawsuit, Ford County's public nuisance fails for other reasons. Although the state-law label Ford County attaches to its claim may be familiar, the substance and reach of the claim is extraordinary and unprecedented. Indeed, Ford County seeks to declare the production, promotion, and sale of lawful products a public nuisance. But public nuisance is a narrow claim that is typically applied only in the "context of a landowner or other person in control of property conducting an activity on his or her land in such a manner as to interfere with the property rights of a neighbor" and "does not apply to cases involving the sale of goods." *Hunter v. J&J*, 499 P.3d 719, 726 (Okla. 2021) (collecting cases). Indeed, allowing nuisance claims based on the promotion and sale of goods would "stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance." *In re Lead Paint Litig.*, 924 A.2d 484, 494 (N.J. 2007).

---

[28] Separately, Ford County could not represent other states' government entities as states across the country also have laws entrusting only their own government entity attorneys to litigate such claims. *See, e.g.*, Mo. Rev. Stat. § 56.060; N.Y. County Law § 501.

This is particularly true here, where the alleged statements by Defendants are lawful, authorized, and/or mandated by statute. In fact, the alleged statements are the same statements that the State of Kansas, Ford County, and state and municipal governments across the county have made and continue to make. At bottom, Ford County admittedly seeks a "50-state solution" to plastic pollution (AC ¶ 7)—but this just illustrates that the issue alleged is the sort of broad societal problem courts have explained are for legislators to address—not public nuisance suits. *Oakland v. BP*, 325 F. Supp. 3d 1017, 1029 (N.D. Cal. 2018); *James v. PepsiCo*, 222 N.Y.S.3d 907, 917 (N.Y. Sup. Ct. 2024) (dismissing public nuisance claim because applying such a theory to punish defendants for the production or sale of a lawful product would seek to "transform the judiciary into an arm of the legislature"). The AC does not allege a public nuisance for multiple reasons.

1.    <u>Defendants' Lawful Sale of Plastic and Promotion of Recycling Are Authorized and Protected by Law</u>

Ford County does not state a public nuisance claim because the conduct it challenges is authorized by law. Courts, including the Kansas Supreme Court, have long held that acts "done under authority of law . . . cannot be a nuisance." *Atchison, T. & S. F. Ry. Co. v. Armstrong*, 80 P. 978, 979 (Kan. 1905); *PepsiCo*, 222 N.Y.S.3d at 914 ("Essential to demonstrating the viability of a public nuisance claim is to show that the product in question is defective or unlawful."); *Chicago v. Beretta*, 821 N.E.2d 1099, 1116 (Ill. 2004) (affirming dismissal of public nuisance claim because there is no "public right to be free from the threat that some individuals may use an otherwise legal product . . . in a manner that may create a risk of harm"); *SUEZ v. E.I. du Pont*, 578 F. Supp. 3d 511, 546 (S.D.N.Y. 2022) (collecting cases and finding an "almost absolute rule" that lawful sales of lawful products are not public nuisances); *In re Firearm*, 126 Cal. App. 4th 959, 989 (2005) (holding compliance with firearm laws defeated nuisance theory).

Ford County alleges that Defendants created a nuisance because they "encouraged

recycling of plastics" by "marketing that plastics were recyclable." AC ¶¶ 76, 208. But the State of Kansas itself has done exactly the same thing, declaring that "it is the policy of the state to . . . [e]ncourage the wise use of resources through development of strategies that . . . recycle materials." Kan. Stat. § 65-3401(e). And the state defines "Recyclables" to include "plastic." *Id.* § 65-3402(r). Consistent with the express policy of Kansas, Dodge City—the county seat of Ford County—likewise advises consumers to recycle plastics.[29] Defendants' alleged statements about recycling say the same thing that Kansas and the largest city in Ford County say to their residents.

Beyond encouragement, Kansas law *mandates* the use of the RIC system and "chasing arrows" logo, which, although not used by Defendants because they do not sell consumer products, Ford County nonetheless challenges as a nuisance. *See* Section IV.C. Kansas requires all entities distributing or selling any plastic container in Kansas to affix the "nationally recognized code indicating the plastic resin used to produce" the container consistent with the RIC system. Kan. Stat. § 65-3425(b). Failure to comply constitutes a violation punishable by fines of up to $500 per violation. *Id.* § 65-3425(c). Several Kansas government departments and websites use the "chasing arrows" logo. For example, Dodge City uses the logo for its recycling department, which provides plastic recycling resources to city residents. *See supra* n.5. Because the challenged statements are lawful, authorized, and/or mandated by statute, the public nuisance claim fails. Absent a change in course by government actors, "this lawsuit is simply policy idealism" that contradicts and in fact, conflicts with the choices of elected public officials. *PepsiCo*, 222 N.Y.S.3d at 916.

Nor could Ford County predicate its public nuisance claim on the production or sale of plastic. Courts have found that non-defective, lawful products—like plastic resins—cannot support

---

[29] *See* How to Sort your Recyclables, City of Dodge City, Kansas, https://www.dodgecity.org/157/How-to-Sort-your-Recyclables (last visited Sept. 5, 2025).

a public nuisance claim. *See People v. Sturm*, 761 N.Y.S. 2d 192, 192 (App. Div. 2003); *J&J*, 499 P.3d at 725 ("Applying the nuisance statutes to lawful products . . . would create unlimited and unprincipled liability for product manufacturers."). The same goes for promotion of those lawful products because "public nuisance law" does not extend to the "manufacturing, marketing, and selling of lawful products." *Id.*; *see In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1213–14 (D. Kan. 2015) (adopting the "general rule recognized in the common law of nuisance" that a seller/manufacturer of a product is not liable for a nuisance "caused by the use of that product after it has left the seller's control"). As the *J&J* court held, allowing nuisance claims to proceed based on the production, promotion, and sale of lawful products would vitiate the boundaries between nuisance and products liability law and create "a monster that would devour in one gulp the entire law of tort," and that "public nuisance is fundamentally ill-suited to resolve claims against product manufacturers." *J&J*, 499 P.3d at 726. For these reasons, multiple courts have recently dismissed nuisance claims based on the production, promotion and sale of petroleum products, *on the pleadings and as a matter of law*. For example, a court in South Carolina recently held that "[l]ike other state courts, South Carolina courts have recognized nuisance claims based only on a defendant's use of land," and "South Carolina has not recognized private- or public-nuisance claims based on the production, promotion, transportation, sale, and use of lawful consumer products." *Charleston v. Brabham Oil Co.*, 2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025). Similarly, a court in Maryland recently rejected an analogous public-nuisance claims for the same reason, noting that Maryland courts "have yet to extend public nuisance to deceptive marketing complaints." 2024 WL 3678699, at *10. The court emphasized that "public nuisance theory has only been applied to cases involving a defendant's use of land," and "cases concerning production, promotion and sale of consumer products" "are more suited as product liability

claims." *Id.* "Allowing Plaintiff to pursue public-nuisance claims based on the production, promotion, transportation, sale, and use of lawful products would vitiate the carefully crafted rules governing products-liability law." *Id.*

Ford County's theory rests on public statements that certain Defendants allegedly made long ago. But no Kansas or Tenth Circuit case has found a public nuisance based on statements, let alone statements promoting a lawful product.[30] That is because statements do not constitute "an unreasonable interference with a right common to the general public," as required for a public nuisance action. RESTATEMENT (SECOND) OF TORTS § 821B; *Chicago*, 821 N.E.2d at 1111.

### 2.    Ford County Fails to Link Defendants' Conduct to a Public Right

Ford County fails to adequately explain what public right Defendants allegedly interfered with. For example, Ford County claims that it has "a common right to be free from" Defendants' alleged conduct—that is, the alleged deceptive marketing of the recyclability of plastics. AC ¶ 208. This is no different from the *individual* right not to be defrauded described in *Chicago*, 821 N.E.2d at 1115 (distinguishing between individual rights and public rights). But this does not plausibly allege an interference with any recognized public rights: health, safety, peace, comfort, or convenience. RESTATEMENT (SECOND) OF TORTS § 821B. Indeed, a harm that is "collective in nature" is not like the "the individual right that everyone has not to be" "defrauded." *Id.* cmt. g.

### 3.    Ford County Does Not Plead Conduct that Is Frequent or Continuous

Ford County's public nuisance claim also fails because "[a] single offense, or several isolated offenses, may not constitute a nuisance." *Corbett v. City of Kensington*, 530 P.3d 750, 760 (Kan. Ct. App. 2023). The few challenged statements were made by different entities, at different

---

[30] And imposing nuisance liability on Defendants for plastic pollution based on past statements is exactly the kind of "severe, disproportionate, and extremely retroactive burden" that the Constitution prohibits. *E. Enters v. Apfel*, 524 U.S. 498, 528, 538 (1998).

times, to different audiences, and in different mediums. *Compare* AC ¶ 113 (*Chicago Tribune* Earth Day advertisement from 1992 by the Council on Plastic and Packaging in the Environment), *with id.* ¶ 115 (video from 1994 by the Foodservice Packaging Institute distributed in California schools). These statements are insufficient to constitute a public nuisance. *Corbett*, 530 P.3d at 760; *Hofstetter v. Myers*, 228 P.2d 522 (Kan. 1951) (finding operation of an asphalt plant did not constitute nuisance because of its relative infrequency where it ran 29 days in a 58 day period).

4.    <u>No Proximate Cause Links the Alleged Conduct and Ford County's Injury</u>

"To be actionable, the nuisance complained of must be the proximate cause of the injury and damage for which recovery is sought." *Baldwin*, 468 P.2d 168, 172 (Kan. 1970). Plaintiffs do not connect Defendants' alleged statements in the AC with Ford County's alleged plastic pollution. The AC says nothing to support the theory that the alleged sparse and decades-old statements generally promoting recycling proximately caused an increase in plastic demand, let alone any increase in plastic pollution in Ford County. Indeed, Plaintiffs allege that the purported increased demand for plastic and the plastic pollution crisis began well before the statements, and that demand has increased for decades since. AC ¶¶ 64, 141, 147. Plaintiffs also do not allege how Defendants' statements could have led to more pollution. If anything, promoting recycling should have led to less pollution. As the Kansas state government (among many others) has repeatedly made clear, recycling helps to combat plastic litter.[31] Preventing statements advocating for recycling will result in *less* plastic being recycled, and *more* plastic being disposed of improperly.

Defendants' alleged conduct is far too attenuated to be the proximate cause of Plaintiffs' alleged harm. Where, as here, a plaintiff "alleges that Defendants' misrepresentations and deceptive conduct resulted in increased global use of . . . a lawful consumer product," the alleged

---

[31] *See supra* n.6 ("[R]ecycling is the easiest thing [citizens] can do to slow global warming.").

37

harms "are the result of [product usage] by third parties" and thus lack a sufficient nexus to Defendants' alleged conduct to constitute a public nuisance. *Mayor of Balt. v. BP*, 2024 WL 3678699, at *10 (Md. Cir. Ct. July 10, 2024).[32] The acts or omissions of consumers, recycling facilities, waste management entities, and countless third parties are all independent, intervening steps that break the causal chain between Defendants' alleged statements and Ford County's purported injury. *Id.*; *Cherry v. Bd. of Cty. Comms.*, 446 P.2d 734, 737 (Kan. 1968). No one could credibly claim that, when a consumer decides to throw a plastic bottle in the garbage can (as opposed to a recycling bin), Defendants' statements were the cause. *PepsiCo*, 222 N.Y.S.3d at 914 ("Imposing civil liability on a manufacturer for the acts of a third party seems contrary to every norm of established jurisprudence."). In suing only Defendants and not "all [alleged] offenders" that have contributed to the supposed nuisance, Plaintiffs engage in "selective prosecution based on a naïve theory," which is at odds with basic proximate cause principles. *Id.*

### 5.    Disposal of Plastic Was Not Within Defendants' Control

Public nuisance claims typically cover only actions "performed in a location within the [defendant's] control." *J&J*, 499 P.3d at 724; *accord, e.g.*, *Williams v. Amoco Prod. Co.*, 734 P.2d 1113, 1117 (Kan. 1987) (assessing nuisance claim based on the defendant's alleged "control" over natural gas leaking into the water supply). But "a manufacturer does not generally have control of its product once it is sold." *J&J*, 499 P.3d at 726. Most courts refuse to uphold public nuisance claims premised on how a product is used after it leaves a manufacturer's control. *Id.*; *Ashley Cnty.*, 552 F.3d at 673 (affirming dismissal of public nuisance claim based on marketing and sale of

---

[32] *See also Ashley Cnty. v. Pfizer*, 552 F.3d 659, 662–63 (8th Cir. 2009) (affirming dismissal of public nuisance claim against manufacturers of cold medicines who allegedly fueled a methamphetamine crisis, as "totally independent" criminal acts broke the causal chain); *Chicago*, 821 N.E.2d at 1138 (dismissing public nuisance action against gun dealers, as alleged nuisance resulted from criminal acts of third parties); *Sturm*, 761 N.Y.S.2d at 202.

product because subsequent use of the product was not within manufacturer's control). It "would run contrary to notions of fair play" to hold sellers liable if "they lacked direct control over how end-purchasers use" a product. *Phila. v. Beretta*, 126 F. Supp. 2d 882, 911 (E.D. Pa. 2000).

Here, Ford County's injury is based entirely on harms stemming from alleged improper disposal of plastics by end users. Because those alleged actions occurred *after* the plastics left Defendants' control, they cannot serve as the basis for a public nuisance claim.

## IV.    PLAINTIFFS FAIL TO STATE A VIABLE CONSUMER FRAUD CLAIM (COUNTS 3-17)

Plaintiffs' Consumer Fraud Claims (Counts 3–17) also fail for several additional reasons.

### A.    Plaintiffs Have Not Satisfied the Rule 9(b) Pleading Standard (Counts 3–17)

The crux of Plaintiffs' Consumer Fraud claims is that Defendants "ma[de] fraudulent, deceptive, and material misrepresentations about the recyclability of plastics sold in the United States" to "artificially increase[] demand and therefore prices of plastic." AC ¶ 218. The Consumer Fraud Claims are thus grounded in fraud and subject to Rule 9(b)'s heightened pleading standard.[33] *See, e.g.*, *ADT*, 357 F. Supp. 3d at 1137; FED. R. CIV. P. 9(b). Yet the AC falls far short of pleading the "who, what, where, when, and how of the alleged fraud," as required by Rule 9(b). *Caplinger v. Medtronic, Inc.,* 784 F.3d 1335, 1340 n.1 (10th Cir. 2015). For each Plaintiff, the AC states only, in boilerplate fashion, that he or she is a resident of a particular state and that he or she "purchased plastic products" in certain state(s). AC ¶¶ 15–22. Plaintiffs do not identify the quantity or type of plastics they purchased, when they made the purchases and from whom, what they saw or relied on in making their purchases, or how much they paid (or purportedly overpaid) for any of these products. In fact, Plaintiffs do not claim to have ever seen any of the Defendants' alleged

---

[33] Plaintiffs' unjust enrichment claim is also subject to Rule 9(b), *Thompson v. Jiffy Lube Int'l, Inc.*, 2006 WL 8406742, at *7 (D. Kan. June 13, 2006), which similarly fails, *see* Section V.

statements. Nor do they identify which of the purchased products contained resins allegedly manufactured by Defendants, much less specify which Defendant was responsible for which resin.

To obscure these deficiencies, Plaintiffs resort to group pleading and seek to impute statements made by one or more Defendants or third-party trade associations to other Defendants.[34] But neither tactic salvages Plaintiffs' claims. ***First***, as discussed in Section II.B.1, Plaintiffs' group pleading is insufficient to satisfy Rule 9(b) because it fails to "say which defendant is alleged to have done what." *Tobler v. 1248 Holdings, LLC*, 2025 WL 89052, at *4 (D. Kan. Jan. 14, 2025); *see, e.g.*, AC ¶¶ 76, 79, 84, 90.

***Second***, Plaintiffs plead no facts establishing either of the bases upon which statements of one Defendant or third-party trade association could be imputed to another Defendant: that Defendants were in an agency or alter ego relationship. Plaintiffs must plead with particularity the connection between each defendant and the statement it seeks to impute. *Southland v. INSpire*, 365 F.3d 353, 365 (5th Cir. 2004); *Taylor v. Airco*, 503 F. Supp. 2d 432, 446 (D. Mass. 2007) (organization's statements not imputed to members where "no evidence of record indicate[d] to what extent each Defendant controlled the contents" of the organization's publication).

Plaintiffs have not alleged facts to establish an agency relationship. They do not allege any Defendant had the power to act on behalf of another Defendant as an agent, that any Defendant acted at the direction and/or control of another Defendant, or that any Defendant had a fiduciary relationship or otherwise had the power to alter legal relations between another Defendant and a third party. *Master's Transp. v. Rev Grp., Inc.*, 2020 WL 13580661, at *6 (W.D. Mo. Nov. 12, 2020); *Brody v. Bruner*, 2024 WL 1912555, at *6 n.7 (10th Cir. May 1, 2024).

Nor have Plaintiffs alleged facts warranting piercing the corporate veil—"something courts

---

[34] In fact, CP Chem was not formed until 2000, years after the statements at issue were made.

do only in extraordinary circumstances." *Sipma v. Mass. Cas. Ins. Co.*, 256 F.3d 1006, 1010 (10th Cir. 2001). The AC lacks any allegation of control—*i.e.*, "domination of finances, policy, and business practice" so that the corporate entity has no existence of its own; that such control perpetuated fraud or a wrong, a violation of a statutory or other positive duty, or an unjust act in breach of Plaintiffs' rights; or that the control and subsequent breach of duty proximately caused Plaintiffs any injury. *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 836 (E.D. Mo. 2018); *Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, LLC*, 28 F.4th 996, 1007 (10th Cir. 2022). Plaintiffs do not allege any Defendant had unilateral control over the association. Plaintiffs also never allege Defendants have any corporate ties to any other Defendant, let alone that any Defendant had control over another Defendant. AC ¶¶ 24–33. Plaintiffs thus cannot establish that a Defendant used such control to commit fraud, or that such control caused Plaintiffs any harm.

### B.    Plaintiffs Fail to Establish Standing for Certain of the Consumer Fraud Claims (Counts 3–7 & 9–17)

Many of Plaintiffs' Consumer Fraud Claims fail for other independent reasons. ***First***, Plaintiffs bring fifteen state law Consumer Fraud Claims, but the named Plaintiffs reside or made purchases in only three of those states: California, Florida, and Missouri. Plaintiffs fail to allege *any* connection to the remaining twelve states, let alone one that would confer Article III standing, statutory standing, or jurisdiction for this Court to hear Plaintiffs' claims under those states' consumer protection statutes. *In re EpiPen Mktg. Antitrust Litig.*, 336 F. Supp. 3d 1256, 1311 (D. Kan. 2018) (citing *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1159 (10th Cir. 2011)); *see* Sections I and II.F. Accordingly, the Court should dismiss Counts 3, 5, 7, and 9–17 for lack of standing.

***Second***, Plaintiffs do not plead actual reliance and/or causation as required to state a consumer fraud claim under Arkansas, California, Florida, Massachusetts, Missouri, Montana, Nevada, North Carolina, and Vermont law. *In re Gen. Motors Corp. Litig.*, 966 F. Supp. 1525,

1536 (E.D. Mo. 1997).[35] No Plaintiff alleges that they personally encountered or relied on any statement by any Defendant about plastics recycling in deciding to purchase a plastics product. AC ¶¶ 61, 84, 92, 98. ***Third***, the Arkansas, Montana, and South Carolina consumer fraud statutes only permit consumers to bring individual actions, so Plaintiffs' class claims under these statutes must be dismissed. Ark. Code § 4-88-113(f)(1)(B); Mont. Code § 30-14-133(1); S.C. Code § 39-5-140; *Fejzulai v. Sam's W.*, 205 F. Supp. 3d 723, 729 (D.S.C. 2016); *Gonzalez v. Am. Honda*, 720 F. Supp. 3d 833, 847 (C.D. Cal. 2024). ***Fourth***, claims under the Arkansas, Massachusetts, and South Carolina statutes separately fail because those states bar claims by indirect purchasers like plaintiffs here. *Indep. Cnty. v. Pfizer*, 534 F. Supp. 2d 882, 888-89 (E.D. Ark. 2008), *aff'd Ashley Cnty.*, 552 F.3d 659 (8th Cir. 2009); *In re Loestrin*, 410 F. Supp. at 373; *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763 (E.D. Pa. 2014). ***Fifth***, Plaintiffs did not send a demand letter before suing, as required by Massachusetts law. *Bos. v. Aetna*, 506 N.E.2d 106, 109 (Mass. 1987).

## C.    Plaintiffs Fail to Plausibly Allege Any Actionable Deception (Counts 3–17)

The Consumer Fraud Claims are governed by the "reasonable consumer" test. *See* Mo. Stat. § 407.025.[36] To state a claim based on an affirmative misrepresentation under each of the Consumer Fraud Claims, Plaintiffs must allege statements "likel[y]" to "mislead a reasonable

---

[35] Ark. Code § 4-88-113(f)(2); *Kwikset v. Sup. Ct.*, 246 P.3d 877, 888 (Cal. 2011); *Rodi v. S. New Eng. Sch. of L.*, 532 F.3d 11, 19 (1st Cir. 2008); *Copper Sands v. Copper Sands Realty, LLC*, 2013 WL 3270430, at *13 (D. Nev. June 26, 2013); *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 227 (N.C. 2013); *Lombardo v. J&J*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015).

[36] *Moore v. Mack's*, 2017 WL 4350980, at *8 (E.D. Ark. Sept. 29, 2017); *Collyer v. Catalina*, 712 F. Supp. 3d 1276, 1284 (N.D. Cal. 2024); *Saucier v. Countrywide*, 64 A.3d 428, 442 (D.C. 2013); *Piescik v. CVS*, 576 F. Supp. 3d 1125, 1132 (S.D. Fla. 2021); *Patenaude v. Orgain, LLC*, 594 F. Supp. 3d 108, 113 (D. Mass. 2022); *Young v. Era*, 513 P.3d 505, 513 (Mont. 2022); *Tepper v. Talent*, 561 F. Supp. 3d 846, 853 (D. Neb. 2021); *Cannuscio v. GEICO*, 2022 WL 22881849, at *5 (D. Nev. Dec. 13, 2022); *Guay v. Sig*, 626 F. Supp. 3d 536, 545 (D.N.H. 2022); *Thornton v. Kroger*, 2022 WL 488932, at *110 (D.N.M. Feb. 17, 2022); *Bumpers*, 747 S.E.2d at 227; *Laccinole v. Gulf*, 2023 WL 157719, at *4 (D.R.I. Jan. 11, 2023); *Doe 9 v. Varsity Brands, LLC*, 2023 WL 4113198, at *11 (D.S.C. June 21, 2023); *Lofts v. Strategies Floor*, 224 A.3d 116, 127 (Vt. 2019).

consumer." *Ellison-Robbins v. Bimbo Bakeries*, 2024 WL 4332049, at *2 (E.D. Mo. Sept. 27, 2024); *Ellis v. Nike*, 2024 WL 1344805, at *3 (E.D. Mo. Mar. 28, 2024).[37] Plaintiffs premise the Consumer Fraud Claims on a few decades-old statements that generally promote recycling. None of these statements promotes or even relates to the sale of a specific consumer good. As detailed below, Plaintiffs' claims fail as a matter of law because these statements are protected by the First Amendment, are specifically authorized by the FTC's Green Guides, and are subjective, accurate, and consistent with governments' endorsement of recycling. To find these statements deceptive would be to declare governments' own recycling mandates and statements unlawful.

### 1.    Lobbying Efforts Are Protected Under the First Amendment

Plaintiffs allege that statements made by Defendants, trade associations, industry organizations, and other third parties were attempts to influence the legislative process regarding plastics and recycling. *See, e.g.*, AC ¶¶ 87–90. But as discussed above in Section II.C, lobbying efforts are protected under the First Amendment and the *Noerr-Pennington* doctrine and cannot be a basis for liability, including for Plaintiffs' Consumer Fraud Claims.

### 2.    Statements Mandated by the Government Are Protected

Several of the statements Plaintiffs characterize as misleading *are required* by most states' plastics and recycling regimes. For example, Plaintiffs claim the "chasing arrows" logo and the RIC system deceives consumers as to the recyclability of plastics. AC ¶¶ 91–95. But as the AC itself concedes, thirty-nine states *require* plastic product manufacturers to use this logo and system. *Id.* ¶ 103. And various governmental entities—including Kansas—use this logo and system. *Id.*;

---

[37] Under Missouri and Arkansas law, the allegedly deceptive statements are not actionable where, as here, they were not "made in connection with" the sale of a product. Mo. Rev. Stat. § 407.020; Ark. Code Ann. § 4-88-108. Defendants do not sell consumer plastic products and thus any statements regarding recycling could not have been made "in connection with" the sale of a product that Plaintiffs allegedly purchased.

*supra* n.4. Under the consumer fraud statutes of Arkansas, Florida, Massachusetts, Rhode Island, and South Carolina (Counts 3, 6–7, 15–16), actions that are required, authorized, or in compliance with other state or federal laws cannot form the basis for a claim.[38]

The challenged statements are also entirely consistent with the government's mandates and statements regarding recycling. Plaintiffs allege no facts to the contrary. Governmental entities have made far more declarative and specific statements regarding the efficacy and impact of recycling. Notably, Plaintiff Ford County's own government center (Dodge City) affirmatively states and actively encourages its residents "that recycling is the easiest thing they can do to slow global warming." *See supra* n.6. For the challenged statements to be deceptive, the Court must find that the decades of governmental recycling mandates and public statements are unlawful.

### 3.    No Reasonable Consumer Would Be Misled by the Challenged Statements

Despite claims of a decades-long fraudulent campaign, Plaintiffs identify only a few allegedly deceptive statements. *See infra* at 6. However, none of these statements are actionable and none would mislead a reasonable consumer.

***First***, the Recycling Initiative Statements are too subjective, and Plaintiffs have pled no facts establishing falsity or deception.[39] The statements are not "measurable" or "empirically verifiable." *Renfro v. Champion Petfoods USA, Inc.,* 25 F.4th 1293, 1304 (10th Cir. 2022). They contain no remotely "specific" or "quantifiable" claim on recycling rates. *See Appliance Recycling Ctrs. v. JACO*, 378 F. App'x 652, 654 (9th Cir. 2010) (deeming statements describing recycling method as "a 'unique' system with 'unprecedented' results" not actionable as they did not concern "specific or absolute characteristics"); *Renfro*, 25 F.4th at 1304–05. They are thus too "vague" to

---

[38] Ark. Code Ann. § 4-88-101(3); Fla. Stat. § 501.212(1); Mass. Gen. Laws Ann. ch. 93A, § 3; N.M. Stat. Ann. § 57-12-7; R.I Gen. Laws § 6-13.1-4(a); S.C. Code Ann, § 39-5-40(a).

[39] *See* AC ¶ 85 (quoting Time advertisement); *id.* ¶ 105 (quoting *Chicago Tribune* ad); *id.* ¶ 107 (quoting educational materials distributed by California state government).

be actionable. *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1106 (10th Cir. 2009).

Further, the AC confirms the statements are indeed accurate. AC ¶¶ 98–99, 103. Plaintiffs repeatedly explain that many plastic products are ultimately recycled. *See, e.g.*, *id.* ¶ 45 (explaining that there are "viable markets" for PET and HDPE). Moreover, these statements do not even relate to the recyclability of a particular product—much less suggest the ultimate recycling rate for plastics industry-wide. *Curtis v. 7-Eleven, Inc.*, 2022 WL 4182384, at *13 (N.D. Ill. Sept. 13, 2022) (dismissing claim where defendant "never represented anything about the likelihood of recycling"); *Swartz*, 2023 WL 4828680, at *3 (promoting recyclability is not "a promise that an object will actually be recycled"). Thus, the Recycling Initiative Statements are not actionable.

**Second**, the Recyclability Statements—relating to the recyclability of certain types of products—are both foreclosed by state law and not deceptive. Regarding the former, Arkansas, Florida, Massachusetts, New Mexico, Rhode Island, and South Carolina law provide that actions permitted by other state or federal law cannot support a consumer fraud claim.[40] Here, all of these states (except Arkansas) have codified or expressed deference to the FTC's Green Guides as law, which specifically authorize the recyclable claims here.[41] 16 CFR § 260.12(b)(1) (permits plastic marketers to "make unqualified recyclable claims" of recyclability as long as recycling facilities are available to a certain percentage of consumers where the plastics are sold).[42] *Id.* Plaintiffs plead no facts indicating that any of the relevant jurisdictions fails to meet the FTC's recycling facilities threshold. Thus, the claims brought under Florida, Massachusetts, New Mexico, Rhode Island, and

---

[40] *See* Ark. Code § 8-9-302; Fla. Stat. § 501.212(1); Mass. Gen. Laws Ann. ch. 93A, § 3; N.M. Stat. Ann. § 57-12-7; R.I Gen. Laws § 6-13.1-4(a); S.C. Code Ann, § 39-5-40(a).

[41] *See* D.C. Code § 28-3901(d); Fla. Stat. § 501.204(2); Mo. Code Regs. tit. § 15; CSR 60-8.020(1)(A); Mass. Gen. Laws ch. 93A, § 2; Mont. Code § 27–2–2116; N.H. Rev. Stat. § 358-A:13; N.M. Stat. § 57-12-4; S.C. Code § 39-5-20(b); Vt. Stat. tit. 9, § 2453(b); Cal. Bus. & Prof. Code § 17580.5; R.I. Gen. Laws § 6-13.3-1; *Marshall v. Miller,* 276 S.E.2d 397, 399 (N.C. 1981).

[42] And at least one federal statute defines plastic as a recyclable material. *See* 42 U.S.C. § 9627(b).

South Carolina law (Counts 6–7, 13, 15–16) fail for the Recyclability Statements.

Additionally, there is nothing deceptive about the Recyclability Statements as evidenced by the Green Guides. Recyclable claims are not deceptive if a material or product merely "can be collected, separated, or otherwise recovered from the waste stream through an established recycling program"—the material or product need not actually be recycled. 16 CFR § 260.12(a). Further, courts have consistently held that describing plastic as "recyclable" only indicates that it "can be recycled," not that it in fact will be recycled, and not even that it "probably will be recycled" or is "easy to recycle." *Curtis*, 2022 WL 4182384, at *14; *Swartz v. Coca-Cola Co.*, 2022 WL 17881771, at *1 (N.D. Cal. Nov. 18, 2022) (a reasonable consumer would understand that describing a bottle as "100% recyclable" is not "a promise that [the bottle] will actually be recycled"); *Lizama v. H&M LP*, 2023 WL 3433957, at *5 (E.D. Mo. May 12, 2023) (no reasonable consumer would understand statement that a product was made from "more sustainable materials" to mean the product was "inherently 'sustainable'"). This is because, as Plaintiffs concede, there are a host of reasons why recyclable plastics may not be recycled.[43] *Curtis*, 2022 WL 4182384, at *13 ("[R]ecyclable" "is about what can happen," "not a promise about the state of the recycling industry," nor "a prediction of what is likely to happen.").

To support a consumer fraud claim based on a statement that a product is "recyclable," Plaintiffs would have to allege that products advertised as recyclable are not, in fact, recyclable. *Id*. But the AC does not allege the products Plaintiffs allegedly purchased—or Defendants' plastic resin pellets—are not recyclable. To the extent these products are not ultimately recycled, that is unfortunate—but it does not create or establish deception by Defendants. *Id.* at *14. No reasonable

---

[43] *See* AC ¶¶ 49–51 (sorting), 70–71 (economic), 73 (contamination); *Swartz*, 2022 WL 17881771, at *1 (dismissing claims that "100% recyclable" label was misleading where complaint itself explained that certain issues prevented otherwise recyclable products from being recycled).

consumer would be misled by these recyclability statements.

Plaintiffs' allegations concerning recycling rates also illustrate that information concerning plastics recycling has always been "widely available and readily accessible." *Lizama*, 2023 WL 3433957, at *7. Thus, although the challenged statements do not even suggest that most plastic products are ultimately recycled, even if they did, a "reasonable consumer[]" could "independently verify whether these representations are consistent with other, publicly available data." *Id.* Considering the extensive recycling "information . . . available," no reasonable consumer would be misled by these statements. *Ellis*, 2024 WL 1344805, at *4; *Lizama*, 2023 WL 3433957, at *7.

**Third**, as to the Aspirational Statement, Plaintiffs allege that in 1991, trade associations "heavily publicized . . . commitments" of reaching a twenty-five percent recycling rate by 1995. AC ¶ 104. As the article Plaintiffs cite makes clear, however, this commitment was a "goal"—and a "goal" or other "forward looking" statement cannot be deceptive as a matter of law. *Zanani v. Savad*, 630 N.Y.S.2d 89, 89 (N.Y. App. Div. 1995) ("something which is hoped or expected to occur in the future" is inactionable); *VinStickers v. Millernet*, 2008 WL 360578, at *3 (D. Kan. Feb. 8, 2008). No reasonable consumer would mistake this "goal" for a "guarantee." *Nivia v. Nationstar*, 2014 WL 4146889, at *6 (S.D. Fla. Aug. 21, 2014); *Guerrero v. Henkel*, 2024 WL 2769745, at *7 (E.D. Mo. 2024). Moreover, this statement demonstrates the implausibility of Plaintiffs' allegations. After all, the trade associations publicly announced most plastics were not recycled. *N.Y. v. Exxon Mobil Corp.*, 2025 WL 209843, at *11 (N.Y. Sup. Ct. Jan. 14, 2025) (dismissing claims regarding statements on impact of fossil fuels on climate change where complaint conceded that connection between fossil fuels and climate change was public information).

### 4.    Plaintiffs Fail to Allege an Actionable Omission (Counts 3–4, 8)

Plaintiffs only allege an omission claim under Arkansas, California, and Missouri law.

Each claim fails for independent reasons. AC ¶¶ 226, 237, 265. To state an omission claim under these statutes, the allegedly omitted fact must be "material." *See Riddell v. GM LLC*, 2024 WL 2077559, at *7 (E.D. Mo. May 9, 2024).[44] Here, Plaintiffs allege that Defendants deceptively omitted the rates at which plastics were recycled. *See* AC ¶ 218. However, Plaintiffs have pled no facts to establish that the *rates at which specific plastics were recycled* is what motivated their purchases. Indeed, Plaintiffs' motivation was to purchase the *underlying* product packaged in plastic. *See id.* ¶¶ 34–42 (describing plastic products such as soft drink bottles and pill bottles). Thus, all of Plaintiffs' omission claims fail on this basis.

Plaintiffs' omissions claims under California and Arkansas law separately fail because they do not allege facts with the specificity required by Rule 9(b) to establish that Defendants had a duty to disclose recycling rates. *Ahern v. Apple*, 411 F. Supp. 3d 541, 575 (N.D. Cal. 2019). **Under California law**, a duty to disclose arises only where the omission "relates to a safety hazard" or is "material, central to the products' function." *Hammerling v. Google*, 615 F. Supp. 3d 1069, 1085 (N.D. Cal. 2022). Here, Plaintiffs do not allege the purportedly omitted fact—that less than 10% of plastics are recycled—relates to a safety hazard or is central to the products' function. For example, the rate plastic water bottles are recycled at is irrelevant to the water bottle's function—*i.e.*, to hold liquid. **Under Arkansas law**, a duty to disclose only exists where the parties have an established relationship "such as a contractual relationship or a fiduciary relationship." *White v. Volkswagen*, 2013 WL 685298, at *9 (W.D. Ark. Feb. 25, 2013). Plaintiffs allege no relationship with Defendants, nor could they as Defendants do not make consumer products.

Their omission claims under California and Missouri law also fail because Plaintiffs do not

---

[44] *Watkins v. MGA Ent., Inc.*, 550 F. Supp. 3d 815, 833 (N.D. Cal. 2021); *Edwards v. Camden Operations, LLC*, 2018 WL 3478905, at *3 (W.D. Ark. July 19, 2018).

establish "the average consumer would be unlikely to know or be able to research" the omitted fact. *Tucker v. Gen. Motors*, 58 F.4th 392, 398 (8th Cir. 2023); Mo. Rev. Stat. § 407.025.1(2); *Milman v. FCA*, 2019 WL 3334612, at *6 (C.D. Cal. Apr. 15, 2019). As mentioned, Plaintiffs rely on decades of public information on the alleged limitations of recycling, including the very recycling data Plaintiffs claim that Defendants omitted. AC ¶¶ 66, 68, 70–71, 74. Accordingly, to the extent they were not already aware, the average consumer could have learned of the limitations of recycling, and Plaintiffs are not excused from failing to educate themselves "where [they] ha[d] the opportunity to read something but cho[]se not to do so." *See Bell*, 2023 WL 3568623, at *4.

## V.    PLAINTIFFS FAIL TO STATE AN UNJUST ENRICHMENT CLAIM (COUNT 46)

Plaintiffs fail to plead unjust enrichment for several reasons. Plaintiffs assert an "unjust enrichment claim" on behalf of state subclasses, but do not identify the unjust enrichment laws of any particular jurisdiction they seek to invoke. AC ¶¶ 513–20. The failure to identify "any particular jurisdiction . . . is fatal." *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088 (S.D. Cal. 2017). Courts routinely dismiss unjust enrichment claims for "failure to specify the particular state law under which [plaintiffs] intend to proceed." *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308 at *8 (D.N.J. Oct. 2, 2013) (collecting cases). After all, "[s]tate law requirements under unjust enrichment law vary widely," so courts "cannot analyze" unjust enrichment claims where no state's law is specified. *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 667 (E.D. Mich. 2011).

Plaintiffs also cannot state an unjust enrichment claim under Arkansas, California, Massachusetts, and New Hampshire law as these states have held it is not an independent cause of action.[45] Further, Plaintiffs cannot maintain an unjust enrichment claim under California, Florida,

---

[45] *Foreman v. Haliron*, 2021 WL 5139519, at *6 (W.D. Ark. Nov. 3, 2021); *Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1055 (S.D. Cal. 2023); *Robert E. Ricciardelli v. Home Depot*, 679 F. Supp.

Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, and South Carolina law, because each of these states require Plaintiffs to plead an inadequate remedy at law, which Plaintiffs have failed to do here.[46]

Lastly, even if Plaintiffs had identified Kansas law as the applicable law for their unjust enrichment claim, the claim would fail. As an initial matter, the Court cannot apply the law of Kansas to transactions in other states without violating the Dormant Commerce Clause. *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1307 (10th Cir. 2008) (deeming statutes that exert "extraterritorial control of commerce occurring entirely outside the boundaries of the state in question" impermissible under the Dormant Commerce Clause). Further, Plaintiffs do not allege any facts demonstrating how Defendants benefitted from the alleged conspiracy. For example, there are no allegations that Defendants sold more plastic resin, sold plastic resin at a higher price, or that any demand or pricing increase impacted Defendants as opposed to the entities that actually manufactured and sold plastic products to consumers. *See* AC ¶¶ 171–74, 185–87. Nor do Plaintiffs allege that Defendants received any benefit from Plaintiffs, nor could they since Plaintiffs do not allege they purchased anything from Defendants. *Jones v. Culver*, 329 P.3d 511, 514 (Kan. Ct. App. 2014) (explaining that "a benefit conferred upon the defendant by the plaintiff" is an element of an unjust enrichment claim).

---

2d 192, 210 (D. Mass. 2010); *OneSky v. Sullivan,* 2012 WL 124739, at *12 (D.N.H. Jan. 17, 2012).
[46] *Cho v. Hyundai*, 636 F. Supp. 3d 1149, 1173 (C.D. Cal. 2022); *Bule v. Garda*, 2014 WL 3501546, at *3 (S.D. Fla. July 14, 2014); *Santagate v. Tower*, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005); *May v. Makita*, 2023 WL 417487, at *6 (E.D. Mo. Jan. 26, 2023); *Mont. v. Trinity*, 473 P.3d 1009, 1012 (Mont. 2020); *Pilot v. Hofarth*, 550 N.W.2d 27, 33 (Neb. 1996); *Korte v. State on Rel. of Bd. of Regents of Nev.*, 492 P.3d 540, 541 (Nev. 2021); *Mangiardi v. Dewey*, 2013 WL 1856338, at *3 (D.N.H. Apr. 30, 2013); *In re Santa Fe Nat. Tobacco Co. Liab. Litig.*, 288 F. Supp. 3d 1087, 1193 (D.N.M. 2017); *Embree Const. v. Rafcor, Inc.*, 411 S.E.2d 916, 920 (N.C. 1992); *Melton v. Carolina Power & Light*, 2012 WL 2401635, at *2 (D.S.C. June 25, 2012).

## VI.   <u>ALL OF PLAINTIFFS' CLAIMS ARE TIME-BARRED (ALL COUNTS)</u>

Dismissal is appropriate at the pleading stage when "the dates given in the complaint make clear that the right sued upon has been extinguished." *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016). Plaintiffs' own allegations show that each of their claims expired decades ago, and thus all of Plaintiffs' claims should be dismissed as untimely. Plaintiffs try to plead their way out of this timing problem by invoking the discovery rule and fraudulent concealment. But their conclusory invocation of those doctrines is unavailing.

Kansas applies its own statute of limitations to claims based on other states' law, except when, as relevant here, those claims have a specific statute of limitations. *Garcia v. Int'l Elevator Co.*, 358 F.3d 777, 779 (10th Cir. 2004). Many of Plaintiffs' claims lack such a statute of limitations, so Kansas' statute of limitations applies. *See* Ex. 3. Regardless, all claims are time-barred no matter which state's statute of limitations applies. Indeed, the AC itself makes clear that Plaintiffs' claims accrued decades ago. Plaintiffs' Federal Antitrust Claim has a four-year statute of limitations, and their State Antitrust Claims have three to six-year limitations periods. *See* Ex. 3. Antitrust claims generally accrue when the defendant commits an act that injures the plaintiff. *Id.*[47] Even being charitable and assuming the alleged conspiracy began in 1990 (the latest date it is alleged to have begun), the Antitrust Claims are time-barred because the original complaint was filed more than ***thirty years*** later. *See* Dkt. No. 1 (Dec. 16, 2024).

Ford County's public nuisance claim has a two-year limitations period, which accrues when the nuisance either first caused damage or was first discoverable as the purported public nuisance here is permanent in nature.[48] *Dougan v. Rossville*, 15 P.3d 338, 344 (Kan. 2000); *see*

---

[47] A handful of state antitrust claims accrue when plaintiffs could have reasonably discovered their cause of action. *See* Ex. 3. These claims are still barred because Plaintiffs fail to plead they could not have discovered the facts underlying their claims—as discussed herein.

[48] The date of accrual for public nuisance claims depends on if the nuisance is continuing or

Ex. 3. Regardless of when the injury became reasonably discoverable, the claim cannot be brought if over ten years have passed since the act that first caused damage occurred. Kan. Stat. Ann. § 60-513(b). The public nuisance claim is thus time-barred because on the face of the AC, more than ten years have passed since the alleged misrepresentations about plastics' recyclability were made. AC ¶¶ 76–128 (alleging Defendants encouraged plastics recycling from late 1980s to mid-1990s).

Plaintiffs' Consumer Fraud and unjust enrichment claims have statutes of limitations that vary by state, ranging from two to five years. These claims accrue when Defendants' alleged misrepresentations were first made. *See* Ex. 3.[49] Because Defendants' allegedly deceptive statements were made decades ago, AC ¶¶ 78–120, the statutes of limitations on the Consumer Fraud and unjust enrichment claims expired long ago.[50]

In an effort to salvage their claims, Plaintiffs invoke the discovery rule and the doctrine of fraudulent concealment. But to invoke these doctrines, Plaintiffs must plead Defendants' fraudulent conduct under Rule 9(b)—which they fail to do. *Ballen v. Prudential Bache Secs., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994). To satisfy this standard, Plaintiffs must plead: "(1) affirmative acts of concealment by defendants; (2) successful concealment from plaintiffs; and (3) plaintiffs' due diligence until discovery of the facts." *In re Aluminum Phosphide Antitr. Litig.*, 905 F. Supp.

---

permanent in nature. *See Dougan*, 15 P.3d at 343-44. Here, while Plaintiffs purport to allege a continuing nuisance, AC ¶ 209(c) (such that a claim accrued each time they suffered a new injury, *Dougan*, 15 P.3d at 343–44), their factual allegations are best understood as complaining of a permanent nuisance given their contention that the damages resulting from the alleged nuisance are irremediable. *Id.* ¶¶ 141–43, 145 (discussing it is practically impossible to remove the plastic waste and pollution that exist today from the environment). Thus, the claim accrued decades ago.
[49] Some consumer fraud claims accrue at the time the cause of action became reasonably discoverable. *See* Ex. 3*; supra* n.46 (explaining those claims are still time-barred).
[50] The only challenged statements allegedly occurring more recently were by NAPCOR. *See* AC ¶¶ 150–52. However, Plaintiffs do not allege any affiliation between Defendants and NAPCOR, and NAPCOR's members are PET container manufacturers and distributors, not resin manufacturers like Defendants. *See id.* ¶ 150.

1457, 1469 (D. Kan. 1995). "The statute is not tolled by mere unawareness of law or facts." *Id.*

Plaintiffs' allegations fall short on each element. Plaintiffs allege that Defendants misrepresented that "plastic products" can be recycled, but do not allege that any Defendant took any "affirmative steps" to prevent Plaintiffs from "discovering the wrong." *Id.* at 1469–70; *King & King Enters. v. Champlin Petroleum*, 657 F.2d 1147, 1155 (10th Cir. 1981). Indeed, the AC's exclusive reliance on *public statements* confirms the opposite. AC ¶¶ 93–94, 99–104. "It is difficult to reconcile the Plaintiffs' belief that Defendants conducted this conspiracy via public statements with [the] assertion that Defendants were also concealing it." *In re Pork Antitr. Litig.*, 495 F. Supp. 754, 774 (D. Minn. 2020) (rejecting tolling theory).

Nor do Plaintiffs allege facts establishing that they exercised due diligence to discover their claims. Plaintiffs' bare assertion that they could not have discovered the conspiracy or purported truth, AC ¶¶ 156–59, is insufficient. *In re Aluminum Phosphide*, 905 F. Supp. at 1471. The AC alleges decades of *publicly available* information regarding the limitations of recycling and the plastic pollution crisis. AC ¶¶ 66, 68, 70–71, 74. Plaintiffs also allege that Defendants created trade associations in the 1980s to combat information from the government about the limitations of recycling. *Id.* ¶¶ 85, 87, 89–95, 99, 105. But the fact that Defendants had to (allegedly) respond to government information about recycling simply proves that such information was in the public domain. Any consumer (including Plaintiffs) could have reasonably discovered information about the availability and rates of recycling. And Plaintiffs' failure to exercise reasonable diligence dooms their tolling arguments. *Dummar v. Lummis*, 543 F.3d 614, 623 (10th Cir. 2008).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request the Court dismiss Plaintiffs' AC in its entirety with prejudice pursuant to Rules 12(b)(1) and 12(b)(6).

## CHEVRON U.S.A. INC.'S INDIVIDUAL ARGUMENTS
## IN SUPPORT OF THE MOTION TO DISMISS

Defendants' joint motion to dismiss persuasively explains why this Court should dismiss Plaintiffs' claims against all Defendants. But there is a separate and independent basis to dismiss Chevron U.S.A. Inc. ("**CUSA**") from this action at the very outset as a fundamental and threshold matter: Plaintiffs do not identify *a single statement* made by CUSA in their 93-page complaint, let alone one that is allegedly fraudulent or about the recyclability of plastics. Plaintiffs claim that "[t]his case seeks to hold [defendant] plastic producers and manufacturers accountable" for "fraudulent representations regarding the recyclability of plastics," which "led to higher plastics prices." AC at 1; *id.* ¶ 8. But the complaint makes only four conclusory references to CUSA, none of which describe any activity by CUSA that could give rise to Plaintiffs' claims or establish CUSA's role or participation in the supposed antitrust conspiracy that Plaintiffs allege. *See id.* ¶¶ 25, 26, 218, 233. There is no plausible basis to hold CUSA liable for a purported to scheme to make "fraudulent representations" without alleging a single statement CUSA has ever made. The lack of such factual allegations about CUSA is fatal, given that a complaint "armed with nothing more than conclusions" cannot survive a motion to dismiss. *Ashcroft*, 556 U.S. at 678–79.

The absence of such allegations is also unsurprising, given that twenty-five years ago, the former plastic resins business of Chevron was conveyed to co-defendant Chevron Phillips Chemical Company LLC ("**CPChem**") in an agreement forming the joint venture referenced in the complaint (AC ¶ 26)—an agreement that is available on the website of the U.S. Securities and Exchange Commission.[51] As a result, no Chevron entity has engaged in the plastic resins business or produced, manufactured, marketed, advertised, or sold plastic resins in the United States for

---

[51] *See* Contribution Agreement by and among Phillips Petroleum Company, Chevron Corporation, and Chevron Phillips Chemical Company LLC (May 20, 2000), art. II, § 2.3, http://sec.gov/Archives/edgar/data/1127399/000095012301502180/y47109a1ex10-1.txt.

decades, and the complaint's conclusory assertions suggesting otherwise need not be accepted.

**Plaintiffs have failed to allege any activity of CUSA, let alone any actions that could plausibly give rise to Plaintiffs' antitrust, consumer protection, and public nuisance claims.**

That much is clear from the limited references to CUSA in the complaint. AC ¶¶ 25, 26, 218, 233. Two of those references—that (1) CUSA "engaged in . . . acts or practices . . . in violation of . . . state consumer protection laws" (*id.* ¶ 218), and (2) "Plaintiffs bring this Count" alleging violations of the California Unfair Competition Law "on behalf of . . . California Class Members . . . against [CUSA]" (*id.* ¶ 233)—"do[] little more than recite the relevant antitrust laws" and are insufficient to support any plausible claim against CUSA. *Llacua*, 930 F.3d at 1172, n.20; *see also, e.g.*, *Tal*, 453 F.3d at 1261 ("Bare bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim."); *Medical Supply Chain, Inc. v. Neoforma, Inc.*, 419 F. Supp. 2d 1316, 1327 (D. Kan 2006) ("Although plaintiff asserts many conspiracy theories, it does not allege any facts that support its allegations.").

The complaint's two other references to CUSA—that (1) CUSA is "another plastics and gas company created by the breakup of Standard Plastics Company"[52] (AC ¶ 25), and (2) "[CPChem] is a joint venture between [CUSA] and Phillips 66 Company" (*id.* ¶ 26)—allege at most CUSA's involvement in the petroleum industry and that it has an investment in a separate entity (CPChem). These allegations do not support any of Plaintiffs' claims against CUSA.

Plaintiffs' consumer protection and nuisance claims are grounded in the theory that Defendants, "independently and through their industry trade associations and front groups," engaged in "fraudulent marketing" and made "false representations regarding the recyclability of

---

[52] This appears to be an erroneous reference to the breakup of the Standard Oil Company. *See Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911). CUSA is not aware of any entity named "Standard Plastics Company."

plastics." AC ¶¶ 2, 6; *see id.* ¶¶ 205–216 (Public Nuisance), 217–221 (Violations of State Consumer Protection Laws). Yet conspicuously absent from the complaint is any allegation that CUSA made *any* statements or conducted *any* marketing about the recyclability of plastics. Nor does the complaint allege CUSA is a member of any industry trade associations. The complaint does allege that Chevron Chemical Company was part of the Executive Board of the Council for Solid Waste Solutions (AC ¶ 90 fig. 6), but that is irrelevant because Chevron Chemical Company was a separate and distinct legal entity that no longer exists—it is not, and has never been, CUSA.

**Rather than make factual allegations regarding CUSA, the complaint improperly relies on statements by other Defendants and trade associations in which CUSA is not alleged to have been a member.** For example, Plaintiffs allege that the Society of the Plastics Industry "modified and adopted the chasing arrow symbol for plastic containers," which "led consumers to believe that all labeled plastic items were recyclable," and seeks to impute liability for those statements on CUSA. AC ¶¶ 100–02. But this attempt to attribute the statements of others to CUSA does not suffice to state a plausible claim for relief. *See, e.g.*, *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1291–92 (D. Utah 2022) (rejecting plaintiff's attempt to "impute[] the action of one or two [d]efendants to all" eight defendants).

That would be true even if Plaintiffs had alleged CUSA was a member of these trade associations, because "liability [cannot] be imposed by reason of association alone." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982). Plaintiffs instead need "to establish that the group itself possessed unlawful goals and that [CUSA] held a specific intent to further those illegal aims." *Id.* As the Tenth Circuit has noted, "even though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a walking conspiracy." *Llacua*, 930 F.3d at 1178 (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883

F.3d 32, 40 (2d Cir. 2018)); *see also In re Asbestos School Litig.*, 46 F.3d 1284, 1290 (3d Cir. 1994) (Alito, J.) (emphasizing that, absent a showing of specific intent, a defendant "cannot be held civilly liable for any wrongful conduct committed by [a trade association] or its members" because "[a] member of a trade group or similar organization does not necessarily endorse everything done by that organization or its members").

What is needed to state a claim against CUSA are adequate defendant-specific allegations that would allow the Court to determine "*which* defendant is alleged to have done what" and "*what* the misconduct was." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013). Because Plaintiffs allege "no specifics" as to what CUSA said or did, their consumer protection and nuisance claims against CUSA fail. *Id.* at 1238.

Plaintiffs' antitrust claims fare no better because they, too, do not allege any facts about CUSA. Instead, Plaintiffs rely on industry-wide data and allegations of public statements made by some (but not all) Defendants to hold "[t]he plastics industry . . . accountable for their" alleged "campaign of deception." *E.g.*, AC ¶ 9. But courts consistently reject claims that improperly rest on group pleading and conclusory allegations—especially in the antitrust context. *See, e.g.*, *Ass'n of Surgical Assistants*, 127 F.4th at 191; *Crownalytics, LLC*, 2023 WL 3071192, at *6–7; *CVB, Inc.*, 604 F. Supp. 3d at 1291–92, 1295–96. In *CVB*, for example, the court held that "[a] general reference" to defendants' "fraudulent representations" was insufficient when plaintiff "relie[d] on supporting testimony from only two [out of eight] [d]efendants." 604. F. Supp. 3d. at 1291–92. The same is true here. Plaintiffs improperly rely on collective pleadings to impute the actions of others onto CUSA. Because these sorts of allegations fall far short of alleging "the nature and extent of [CUSA's] participation in the [alleged] conspiracy," they are insufficient to state an antitrust claim against CUSA. *CVB, Inc.*, 604 F. Supp. 3d at 1295 (citing *Cayman Expl. Corp.*, 873

F.2d at 1361); *see also, e.g.*, *Tobler*, 2025 WL 89052, at *4 ("Group pleadings will not survive a motion to dismiss when a court 'cannot tell which defendant is alleged to have done what.'" (quoting *Burnett*, 706 F.3d at 1240)).

There is good reason the complaint fails to allege any facts against CUSA relevant to the Plaintiffs' claims. Over twenty-five years ago, the former plastic resins business of Chevron was conveyed to CPChem in an agreement forming the joint venture referenced in the Complaint (AC ¶ 26). *See supra* note 1. Although a motion to dismiss is ordinarily decided on the pleadings alone, the Court "may consider documents referred to in the compliant if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). The Contribution Agreement is incorporated by reference into the complaint because Plaintiffs explicitly reference the CPChem joint venture that was created through the Contribution Agreement (AC ¶ 26), and its authenticity cannot be reasonably disputed (particularly as it can be found on the SEC's website).

\*      \*      \*

Because the complaint falls short of "supply[ing] the factual circumstances necessary" that, accepted as true, state a claim to relief against CUSA that "is plausible and not merely possible," the Court should dismiss all claims against CUSA under Rule 12(b)(6). *Ass'n of Surgical Assistants*, 127 F.4th at 186, 191 (citations omitted).

## EASTMAN CHEMICAL COMPANY'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS

In addition to the jointly asserted grounds for dismissal, Plaintiffs' claims against Eastman are especially defective under Rule 12(b)(6) because they are (1) too vague to put Eastman on notice of the claims against it, and (2) facially untimely.

Besides its identification in the "Parties" section, the only reference to Eastman in the AC is a statement allegedly made by one of its employees more than 30 years ago. *See* AC ¶ 31. Plaintiffs allege that, in 1994, an Eastman employee expressed doubt about whether recycling could solve the "solid waste issue":

> A representative of Eastman Chemical told attendees of an industry conference in 1994 that consumers could put their plastic containers into recycling bins and "be assured that they would be separated into pure streams and would all be sold for viable reuse applications." But "[w]hile someday this may be a reality," he explained, "it is more likely that we will wake up and realize that we are not going to recycle our way out of the solid waste issue."

*Id.* ¶ 119. Plaintiffs do not allege that this statement was false or misleading. And there are no allegations about anything Eastman has done over the next 30-plus years. What is more, Plaintiffs never allege that Eastman produces any of the plastics referenced in the AC, nor that Eastman has engaged in fraudulent or anticompetitive conduct.

The AC's glancing reference to Eastman is no surprise. Plaintiffs say this case is about companies that are "dependent on single-use plastics applications" like bottles, utensils, and take-out containers. AC ¶ 146. But Plaintiffs never allege Eastman produces any of these products. To the contrary, documents incorporated in the AC confirm that Plaintiffs' allegations simply do not apply to Eastman. As Plaintiffs note, the Minderoo Foundation published reports in 2021 and 2023 with its assessment of the top 100 "polymer producers generating single-use plastic waste." *See id.* ¶ 4 n.4.[53] Eastman is not on either list, nor is it mentioned in either report.

Because Plaintiffs do not make any specific claims of wrongdoing against Eastman, and because any possible claims against Eastman are facially time-barred, all of the claims against

---

[53] *See* Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX: REVEALING THE SOURCE OF SINGLE-USE PLASTICS CRISIS 49 (2021), https://cdn.minderoo.org/content/uploads/2021/05/27094 234/20211105-PlasticWaste-Makers-Index.pdf; Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023 57 (2023), https://cdn.minderoo.org/content/uploads/2023/02/04205527/Pla stic-Waste-Makers-Index-2023.pdf.

Eastman should be dismissed.

I.      **PLAINTIFFS' VAGUE ALLEGATIONS DO NOT STATE A PLAUSIBLE CLAIM AGAINST EASTMAN UNDER TWOMBLY/IQBAL.**

Nothing in the AC alleges that Eastman, specifically, has done anything wrong. Rather, the only allegations are those that refer to "Defendants" generally. Such unspecified, group pleading fails to plausibly allege a cause of action.

"Group pleadings will not survive a motion to dismiss when a court 'cannot tell *which* defendant is alleged to have done what, nor . . . tell *what* the misconduct was.'" *Tobler*, 2025 WL 89052, *4 (quoting *Burnett*, 706 F.3d at 1240). Under that standard, dismissal is appropriate when "allegations are too conclusory, vague, and confusing to give each 'defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Burnett*, 706 F.3d at 1240.

As noted, the only specific reference to Eastman in the AC concerns an employee's statement in 1994, and one that Plaintiffs do not allege was false or misleading. The remaining allegations are made against "Defendants" in general. *See, e.g.*, AC ¶ 179 ("Defendants and their co-conspirators entered into a continuing agreement . . . ."); *id.* ¶ 206 ("Defendants created, exacerbated, and maintained a public nuisance . . . ."). Because these collective allegations give Eastman no notice of what conduct it is allegedly liable for, Plaintiffs' claims against Eastman should be dismissed. *Macias v. BNSF Ry. Co.*, 2020 WL 3469680, at *6 (D. Kan. June 25, 2020) (dismissing claim when complaint lacked "factual content or context . . . that shed[] any light on what specific acts [the defendants] are alleged to have taken that resulted in damage to plaintiffs"); *see also Gas Sensing Tech. Corp. v. Ashton*, 2017 WL 2955252, at *12 (D. Wyo. June 12, 2017) (dismissing defendants from case where complaint leaves them "to speculate what claims Plaintiffs are alleging against them"); *Matthews v. Bergdorf*, 889 F.3d 1136, 1148 (10th Cir. 2018) ("A complaint that fails to differentiate wrongful acts among multiple defendants, alleging multiple

violations by unspecified defendants does not provide the fair notice the law requires."). With nothing besides group pleading, the Court cannot "draw the reasonable inference that [Eastman] is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

## II.    PLAINTIFFS' CLAIMS AGAINST EASTMAN ARE TIME-BARRED.

As discussed above in section VI, the longest limitations period for any of the claims Plaintiffs assert is *six years*, yet the only specific allegation against Eastman involves a statement made *over 30 years ago*. Therefore, Plaintiffs' allegations as to Eastman (whatever their basis) are facially time-barred.

Plaintiffs cannot save their claims through the conclusory allegation that the statutes of limitations should be tolled because of "Defendants' fraudulent concealment throughout the period relevant to this action that most plastics were not recyclable." AC ¶¶ 158–59. To invoke that tolling rule, Plaintiffs would have to identify "specific actions by [Eastman] to keep their [conduct] a secret." *In re Aluminum Phosphide Anititr. Litig.*, 905 F. Supp. at 1470. But nothing in the AC alleges that Eastman did anything to conceal information about the recyclability of plastics—much less that Eastman *affirmatively* concealed this information. Thus, Plaintiffs fail to plausibly allege that fraudulent concealment can be invoked to rescue their facially untimely claims.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

## AMERICAN CHEMISTRY COUNCIL, INC.'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS

Unlike any other Defendant in this case, the American Chemistry Council, Inc. ("**ACC**") is a trade association. AC ¶ 33. Plaintiffs do not—and cannot—allege that ACC participates in trade or commerce by manufacturing, selling, or advertising to sell plastics or plastic resins to anybody. Accordingly, ACC separately moves to dismiss Plaintiffs' state consumer protection claims (Counts 3 through 17) for failure to state a claim for which relief can be granted.

Plaintiffs recognize that ACC is not a "plastic producing company," *id.* ¶ 24; a "plastics manufacturer," *id.* ¶ 27; or a producer of any components used in the plastics supply chain, *id.* ¶ 28. *See id.* ¶ 33. As their pleading continues, Plaintiffs resort to impermissible[54] group pleading, losing sight of ACC's unique position as a trade association. Plaintiffs incorrectly plead that "Defendants"—including ACC—manufacture, sell, distribute, or advertise to sell plastics or plastic resins. *See, e.g.*, AC ¶¶ 3, 11, 146, 147, 159, 165, 179–81, 242, 287, 305, 369, 374, 379, 389, 395, 415, 420, 444, 501, and 515–18. This group pleading is at odds with Plaintiffs' specific allegations about ACC.[55] Nowhere do Plaintiffs allege that ACC participated, directly or indirectly, in any consumer transaction or relationship related to the manufacture, sale, distribution, or advertisement of plastics or plastic resins. But fundamental to each of Plaintiffs' alleged state consumer protection claims (Counts 3 through 17) is the existence of *some* consumer transaction or relationship between Plaintiffs and ACC. Specifically:

- Count 3 (Arkansas Deceptive Trade Practices Act): Plaintiffs must plead "a deceptive *consumer-oriented* act or practice." *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (cleaned up) (quoting *Skalla v. Canepari*, 2013 Ark. 415, at 14 (2013)).

- Court 4 (California Unfair Competition Law): California's Unfair Competition Law does not apply where the defendant "does not participate as a business in the commercial market, much less compete in it." *Dinh Ton That v. Alders Maint. Ass'n*, 142 Cal Rptr. 3d 458, 464 (Ct. App. 4th Dist. 2012).

- Count 5 (District of Columbia Consumer Protection Procedures): The District of Columbia

---

[54] *See Bristow Endeavor Healthcare, LLC*, 691 F. App'x at 519; *supra* Section II(B)(1).
[55] The Amended Complaint raises allegations against ACC based on ACC's acquisition of the American Plastics Council. AC ¶ 33.

Consumer Protection Procedures Act "was designed to police trade practices arising *only* out of consumer-merchant relationships." *Snowder v. D.C.*, 949 A.2d 590, 599 (D.C. 2008) (emphasis added).

- Count 6 (Florida Unfair and Deceptive Trade Practices Act): The Florida Unfair and Deceptive Trade Practices Act applies only to consumer relationships and has "no application to entities complaining of tortious conduct which is not the result of a *consumer transaction*." *Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC*, No. 13-20803-CIV, 2013 WL 1786356, at *1 (S.D. Fla. Apr. 25, 2013) (quoting *Burger King Corp. v. H&H Restaurants, LLC*, No. 99-2855, 2001 WL 1850888, at *9 (S.D. Fla. Nov. 30, 2001)); *see also Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1374 (S.D. Fla. 2010).

- Count 7 (Massachusetts Consumer Protection Act): To apply, the Massachusetts Consumer Protection Act requires a "commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context.'" *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 259 (Mass. 2008).

- Count 8 (Missouri Merchandising Practices Act): The Missouri Merchandising Practices Act applies only where the defendant has made some sale or advertisement. *See Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. 2014); Mo. Ann. Stat. § 407.020(1).

- Count 9 (Montana Unfair Trade Practices and Consumer Protection Act): To state a cause of action under the Montana Consumer Protection Act, plaintiffs have the burden to establish that the defendant is an "entity providing goods and services in trade and commerce in Montana as defined by §§ 30-14-102(6) and (8)." *Norris v. Olsen*, 550 P.3d 323, 327 (Mont. 2024).

- Count 10 (Nebraska Consumer Protection Act): Under the Nebraska Consumer Protection Act, "[t]rade and commerce mean the sale of assets or services." *Moats v. Republican Party of Nebraska*, 796 N.W.2d 584, 592 (Neb. 2011), *disapproved of on other grounds by Palmtag v. Republican Party of Nebraska*, 315 Neb. 679 (2024).

- Count 11 (Nevada Deceptive Trade Practices Act): "[T]o survive a motion to dismiss [claims pursuant to the Nevada Deceptive Trade Practices Act], [plaintiffs] needed to plead facts indicating that [defendants] made false representations i*n transactions* that directly harmed them." *China Privatization Fund (Del), L.P. v. Heritage Bank of Nevada*, 562 P.3d 1070 (Nev. 2025).

- Count 12 (New Hampshire Consumer Protection Act): A violation of the New Hampshire Consumer Protection Act requires some "transaction involving either 'advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate.'" *Snow v. Am. Morgan Horse Ass'n, Inc.*, 141 N.H. 467, 471 (1996) (quoting N.H. Rev. Stat. § 358-A:1 II).

- Count 13 (New Mexico Unfair Practices Act): The New Mexico Unfair Practices Act "contemplates a plaintiff who seeks or acquires goods or services and a defendant who provides goods or services." *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 137 N.M. 524, 529 (Ct. App. 2005).

- Count 14 (North Carolina Unfair and Deceptive Trade Practices Act): Under the North Carolina Unfair and Deceptive Trade Practices Act "'[c]ommerce' in its broadest sense comprehends intercourse for the purposes of trade in any form.… The use of the word 'trade' interchangeably with the word 'commerce' indicates that the statute contemplated

a narrower definition of commerce which would comprehend an exchange of some type." *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 620 (N.C. 1980).

- Count 15 (Rhode Island Unfair Trade Practice and Consumer Protection Act): To state a claim under the Rhode Island Unfair Trade Practice and Consumer Protection Act, "a plaintiff must establish that he or she is a consumer, and that [the] defendant is committing or has committed an unfair or deceptive act while engaged in a business of trade or commerce." *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 431 (R.I. 2001).

- Count 16 (South Carolina Unfair Trade Practices Act): To state a claim under the South Carolina Unfair Trade Practices Act, a plaintiff must show, among other things, that "the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce . . . . 'trade or commerce' includes 'the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State.'" *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 403 S.C. 623, 638-639 (2013) (quoting S.C. Code Ann. § 39–5–10(b)).

- Count 17 (Vermont Consumer Protection Act): The Vermont Consumer Protection Act deals "solely with consumer transactions in which there is an actual sale of goods or services involving a buyer, a seller, and the goods or services." *Wilder v. Aetna Life & Cas. Ins. Co.*, 140 Vt. 16, 19 (1981).

Because the Amended Complaint recognizes that ACC, a trade association, does not manufacture, sell, distribute, or advertise to sell plastics or plastic resins—except in group pleadings at odds with its specific allegations—the Amended Complaint fails to state a claim for

any of the state consumer protection laws. For this reason, as well as the reasons expressed in the

joint motions to dismiss, the Court should dismiss Counts 3 through 17 against ACC.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### DOW INC. AND DUPONT DE NEMOURS, INC.'S INDIVIDUAL ARGUMENTS IN SUPPORT OF THE MOTION TO DISMISS

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER DOW INC. AND DNPI

Neither Dow Inc. nor DuPont de Nemours, Inc. ("**DPNI**") is subject to personal jurisdiction

in this Court. Both are *recently created holding companies* that have *never* manufactured,

produced, distributed, marketed, or sold plastics—in Kansas or elsewhere.[56] Nor do they have any

presence in Kansas *whatsoever*, much less any relevant contacts.[57] Although Plaintiffs "seek [] to

hold [defendant] plastic producers and manufacturers accountable" for "fraudulent

representations" about recyclability that "led to higher plastics prices," AC ¶¶ 1, 8, the AC does

not identify *any* actionable conduct by Dow Inc. or DPNI in its 93 pages. That is unsurprising

given that neither company is a plastic producer or manufacturer, and neither has *ever* engaged in

the conduct alleged here. Massey Decl. ¶¶5–8, 10(a)–(i) (Ex. 4); Schaper Decl. ¶¶ 6–9, 11 (Ex. 5).

In short, Dow Inc. and DPNI are holding companies not subject to personal jurisdiction for the

activities of their subsidiaries absent extraordinary circumstances, none of which Plaintiffs allege

here. *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (rejecting personal

jurisdiction over parent company based on wholly owned subsidiary's contacts where plaintiff had

---

[56] The AC suggests DPNI is a manufacturer of plastic resin, but that is wrong. *See* Schaper Decl.
[57] Neither Dow Inc. nor DPNI is incorporated or headquartered in Kansas. Massey Decl. ¶ 3; Schaper Decl. ¶¶ 3–4. Neither has ever rented, leased, owned, used, or operated a manufacturing facility, office, or real property in Kansas, and neither has employees in the State. Massey Decl. ¶ 10(a)–(e); Schaper Decl. ¶¶ 7–11. Additionally, Dow Inc. does not test, design, manufacture, distribute, supply, or market any products in Kansas; nor does it target Kansas for business solicitation, promotion, or advertising. Massey Decl. ¶ 10(f)–(h). DPNI likewise has never designed, developed, manufactured, released, or arranged for disposal or treatment of any products in Kansas. Schaper Decl. ¶ 11.

"not alleged nor produced evidence to show that [the subsidiary was] the general agent or alter ego of [the defendant]"); *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 229 F. Supp. 2d 1209, 1219 (D. Kan. 2002) (explaining that "a normal parent-subsidiary relationship will not result in a subsidiary's contacts being attributed to the parent").

Plaintiffs' complaint seeks to establish personal jurisdiction for its single federal antitrust claim (Count I) against Dow Inc. and DPNI under Section 12 of the Clayton Act, 15 U.S.C. § 22. AC ¶¶ 11, 14. However, Plaintiffs cannot establish nationwide personal jurisdiction over Dow Inc. and DPNI using Section 12 without first satisfying its special venue provisions—which they cannot do. *Willis Elec. Co., Ltd., v. Polygroup Macau Ltd. (BVI)*, 437 F. Supp. 3d 693, 703 (D. Minn. 2020). As a result, for both defendants, Plaintiffs "must establish personal jurisdiction some other way." *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 730 (7th Cir. 2013). But they cannot do so because Dow Inc. and DPNI are neither incorporated nor otherwise "at home" in Kansas, and have no contacts with the State that could give rise to jurisdiction over *any* claims. *See* Massey Decl. ¶¶ 3–4; Schaper Decl. ¶¶ 3–4. Accordingly, the Court lacks personal jurisdiction over both defendants for *all* counts.

## A.    Legal Standard for Personal Jurisdiction

Under Rule 12(b)(2), "the plaintiff has the burden of proving jurisdiction exists." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). That inquiry is defendant-specific and focuses on the defendant's forum contacts. *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984). The presumption that well-pleaded facts are true does not extend to conclusory allegations or legal conclusions, *Wenz*, 55 F.3d at 1505, and dismissal is appropriate if the plaintiff fails to allege sufficient jurisdictional facts, *Pytlik v. Pro. Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989).

To establish personal jurisdiction over Dow Inc. and DPNI, Plaintiffs must show that the exercise of jurisdiction is (1) sanctioned by statute, ***and*** (2) comports with due process. *Dudnikov*

*v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Congress may authorize nationwide service of process by statute, permitting personal jurisdiction under Rule 4(k)(1)(C) so long as the statute allows it and the "exercise of jurisdiction comports with Fifth Amendment due process." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006); *see Boilermaker-Blacksmith Nat'l Pension Fund v. Gendron*, 96 F. Supp. 2d 1202, 1215 (D. Kan. 2000) (Fifth Amendment requires nationwide contacts and fairness). Otherwise, Plaintiffs must establish jurisdiction under Kansas's long-arm statute and the Fourteenth Amendment's due process framework, which requires minimum contacts with the forum state. *Dudnikov*, 514 F.3d at 1070 (federal question) (citing Fed. R. Civ. P. 4(k)(1)(A)); *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022) (diversity of citizenship). Because Kansas's long-arm statute extends to the limits of federal due process, courts proceed directly to the constitutional issue. *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994).

At that point, due process requires that "contacts with the forum State must be such that the defendant should reasonably anticipate being haled into court there." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020) (citations omitted). Personal jurisdiction may be general or specific. *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 n.2 (10th Cir. 2020). Specific jurisdiction, which Plaintiffs purport to rely on, applies only when the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State" and the plaintiffs' claims "arise out of or relate to the defendant's contacts" with the forum. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation omitted).

### B.  Plaintiffs Fail to Establish Personal Jurisdiction Under Section 12 of the Clayton Act

Plaintiffs assert personal jurisdiction over Dow Inc. and DPNI on their Sherman Act claim under Section 12 of the Clayton Act, 15 U.S.C. § 22. AC ¶¶ 11, 14. That statute authorizes

nationwide service of process, but only when venue is proper under its special venue provision. Here, Section 12's venue requirement is not met in this District as to either defendant, and so Plaintiffs cannot invoke Section 12 to establish personal jurisdiction over Dow Inc. or DPNI.

Section 12 provides:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process *in such cases* may be served in the district of which it is an inhabitant, or wherever it may be found."

15 U.S.C. § 22 (emphasis added). The first clause of Section 12 concerns venue. The second clause provides for nationwide service of process and thus nationwide personal jurisdiction under Rule 4(k)(1)(C), which permits jurisdiction through service of a summons or waiver when "statutorily authorized . . . , provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process." *Cory*, 468 F.3d at 1229.

Critically, most circuits interpreting the statute have concluded that Plaintiffs "must satisfy the venue provisions of Section 12's first clause" to avail themselves "of the privilege of nationwide service of process." *KM Enters.*, 725 F.3d at 730. Reading Section 12 "as a package deal," *id.*, interprets Section 12 "'the way it is written.'" *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (quoting Herbert Hovenkamp, *Personal Jurisdiction and Venue in Private Antitrust Actions in the Federal Courts*, 67 Iowa L.Rev. 485, 509 (1982) ("A better approach is to interpret section 12 the way it is written. Worldwide service is proper only when the action is brought in the district where the defendant resides, is found, or transacts business.")).

Moreover, severing the two clauses would defeat the explicit limitations Congress imposed on venue. *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (avoiding statutory interpretation that would "wholly swallow" a jurisdictional limitation by rendering part of the

statute "mere surplusage") (citing *Antonin Scalia & Bryan A. Garner*, Reading Law: The Interpretation of Legal Texts 174 (2012)). As the Seventh Circuit explained in *KM Enterprises*, "allowing antitrust plaintiffs to mix and match Section 12's service-of-process provision with Section 1391's general venue provision renders the venue inquiry meaningless, since venue is satisfied in every federal judicial district under subsection [1391](c)(2)." 725 F.3d at 729; *see GTE New Media*, 199 F.3d at 1351 (finding it "quite unreasonable to presume that Congress would intentionally craft a two-pronged provision with a superfluous first clause").

Decoupling the venue and service-of-process inquiries also "runs contrary to Congress's apparent intent in passing Sections 12 and 1391 that there be *some* limits on venue, in antitrust cases specifically and in general." *KM Enters.*, 725 F.3d at 730 (emphasis in original); *accord Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 425–26 (2d Cir. 2005) ("[N]othing in the legislative history suggests that any member intended to extend service of process beyond the carefully expanded venue provision."). "Viewed in this context," as the Second Circuit in *Daniel* explained, "Congress's decision in Section 12 to provide for worldwide service of process only 'in such cases' as satisfied the expanded venue provision sensibly served to maintain the desired venue balance at the same time that it ensured its effective operation." *Id.* Although the Tenth Circuit has not yet had occasion to interpret Section 12's venue and service provisions, this District has recognized the weight of authority treating them as interdependent. *See Budicak, Inc. v. Lansing Trade Grp., LLC*, 2020 WL 758801, at *3 n.20 (D. Kan. Feb. 14, 2020) (acknowledging circuit split but declining to reach the issue after finding venue proper under Section 12).

Applying the prevailing standard here, Plaintiffs cannot meet their burden to establish venue under Section 12 as to Dow Inc. and DPNI. Plaintiffs allege generally that "each Defendant transacted business, was found, had agents, or resided in this District." AC ¶14. But such

conclusory assertions—unsupported by any "well pled facts"— "do not establish the 'transaction of business'" in Kansas. *Four B Corp. v. Ueno Fine Chems. Indus., Ltd.*, 241 F. Supp. 2d 1258, 1261–62 (D. Kan. 2003); *see Corr Wireless Commc'ns, L.L.C. v. AT&T, Inc.*, 907 F. Supp. 2d 793, 800 (N.D. Miss. 2012) (rejecting "general unsubstantiated allegations" that defendant was "transacting business" as insufficient to establish venue under Section 12). Venue under Section 12 demands much more.

Nor can Plaintiffs show otherwise: they cannot dispute that Dow Inc. and DPNI are neither (i) inhabitants of, nor (ii) found or (iii) transact business in, this District. *See* 15 U.S.C. § 22. *First*, Dow Inc. and DPNI are not "inhabitants" of this District. "A corporation inhabits the district in which it is incorporated." *KM Enters.*, 725 F.3d at 725. Neither defendant is incorporated under the laws of Kansas, and neither maintains its headquarters there. Massey Decl. ¶¶ 3–4; Schaper Decl. ¶¶ 3–4. *Second*, Dow Inc. and DPNI are not "found" in this District. A corporation is "found" only in districts where it is present and carrying on continuous local activities, *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 805 (1948), and neither defendant has any such presence in Kansas, *see generally* Massey and Schaper Decls.

*Third*, Dow Inc. and DPNI do not "transact business" in this District. Under Section 12, that phrase means the "practical, everyday business or commercial concept of doing or carrying on business 'of any *substantial* character'" within the district. *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan.*, 891 F.2d 1473, 1478 (10th Cir. 1989) (quoting *Scophony Corp. of Am.*, 333 U.S. at 807) (emphasis added). At the threshold, Dow Inc. and DPNI maintain no offices, facilities, or employees in Kansas. Massey Decl. ¶ 10; Schaper Decl. ¶¶ 7–9. Nor do they engage in any business or persistent course of conduct in the State. *See* Massey Decl. ¶ 10; Schaper Decl. ¶¶ 5–11. Plaintiffs therefore cannot establish what courts have called "the most

important factor to consider" in the venue analysis: "the dollar amount of business transacted in the district." *In re Blue Cross Blue Shield Antitrust Litig.*, 225 F. Supp. 3d 1269, 1293 (N.D. Ala. 2016) (internal citation omitted); *see KM Enters.*, 725 F.3d at 731–32 (holding no "transacting business" under Section 12 where defendant's technology was present in the district but sales totaled only $2,327.25).

At bottom, Plaintiffs plead no facts showing that Dow Inc. or DPNI transact business within this District, let alone the *substantial* business Section 12 requires. Their failure to allege these essential facts precludes venue under the Clayton Act. *See Sanderson v. Spectrum Labs, Inc.*, 227 F. Supp. 2d 1001, 1007 (N.D. Ind. 2000) ("[A] plaintiff cannot merely plead that a defendant is 'transacting business', but must plead sufficient facts demonstrating that the defendant transacts business of a substantial nature within the district."). Accordingly, Plaintiffs cannot rely on Section 12's nationwide service of process to establish personal jurisdiction over these defendants.

### C.    The Due Process Clause Bars Jurisdiction.

Because Plaintiffs cannot rely on the Clayton Act to establish personal jurisdiction for their federal antitrust claim, they must establish personal jurisdiction through minimum contacts with Kansas. Specific jurisdiction demands "an affiliation between the forum and the underlying controversy"; otherwise, jurisdiction is absent "regardless of the extent of a defendant's other activities connected to the forum." *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1312 (10th Cir. 2024) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 264 (2017), and *Fluent LLC*, 955 F.3d at 840). To satisfy due process, a defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State," ***and*** the suit must "arise out of or relate to the defendant's contacts with the forum." *Ford Motor*, 592 U.S. at 359 (internal quotations omitted).

Plaintiffs fail to satisfy these threshold pleading requirements. Their claims rest on an overarching theory that Defendants misled consumers about the recyclability of plastics. *See* AC ¶ 1 ("This case is about Defendants' profit-driven decision to promote the idea to the American consumer that plastics are recyclable and better for the environment, when in reality only a tiny fraction of plastics are ever recycled."). Yet Plaintiffs allege *no facts* showing that Dow Inc. or DPNI made any of the challenged statements—let alone that they did so in Kansas or "purposefully directed" them there. Plaintiffs have thus failed to establish any nexus between their claims and in-state conduct by Dow Inc. and DPNI. *Eighteen Seventy, LP*, 32 F.4th at 969 affirming dismissal where plaintiff failed to show that defendant's conduct was "expressly aimed" at the forum in a meaningful way) (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)).

Nor could Plaintiffs establish such a nexus. As evident from the supporting declarations, Dow Inc. and DPNI have no connections to Kansas, much less those sufficiently related to Plaintiffs' claims. *See supra*, at Section I. More fundamentally, Dow Inc. and DPNI could not *possibly* have any ties to Kansas relating to the decades-old conspiracy activities alleged, because both entities were only recently formed. Massey Decl. ¶ 4; Schaper Decl. ¶ 5. In the face of these facts, Plaintiffs' sweeping allegation that all defendants share a sufficient nexus to Kansas based on decades-old conduct falls well short of satisfying their pleading burden as to Dow Inc. and DPNI.[58]

Accordingly, specific jurisdiction is absent for Dow Inc. and DPNI, and any exercise of personal jurisdiction would violate due process. The Court should dismiss both under Rule

---

[58] Even if Kansas Plaintiffs could somehow establish specific jurisdiction over Dow Inc. and DPNI, the Court would still lack jurisdiction over nonresident Plaintiffs, who allege no residence, injury, or relevant conduct in the State. *See Bristol-Myers*, 582 U.S. at 264–65; *supra* Section IV(B).

12(b)(2).

## II.    PLAINTIFFS FAIL TO PLEAD DIRECT OR INDIRECT LIABILITY AGAINST HOLDING COMPANY DOW INC

There are additional, independent reasons to dismiss Defendant Dow Inc. under Rule 12(b)(6), based on the allegations of the AC alone. Unlike the jurisdictional argument above— which relies in part on declarations and applies to both Dow Inc. and DPNI—this section is limited to Dow Inc. and confined to the face of the complaint. As Plaintiffs concede, Dow Inc. "was incorporated in Delaware in 2018 to serve as a *holding company* for the Dow Chemical Company." AC ¶ 29 (emphasis added). Thus, to state a viable claim and overcome the well-established presumption that a parent company is not liable for its subsidiary's conduct, Plaintiffs must plead that Dow Inc. either (i) directly engaged in the allegedly illegal conduct, or (ii) so dominated its subsidiary that it should be treated as the alter ego of The Dow Chemical Company. *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362–1363 (10th Cir. 1974); *see N.L.R.B. v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993) ("corporate form" should be disregarded only in "extreme circumstances"). Plaintiffs allege neither.

*First*, Plaintiffs do not allege that Dow Inc. had *any* direct involvement in the challenged conduct. Nor would any such allegation make sense given Plaintiffs' own admission that Dow Inc. is merely a holding company. As a holding company, its *sole* purpose is to own shares of its "operating subsidiary," The Dow Chemical Company. AC ¶¶29–30; *see Company*, Black's Law Dictionary (12th ed. 2024) (defining "holding company" as "[a] company formed to control other companies . . . [that] does not participate in making day-to-day business decisions in those companies"). Plaintiffs cannot answer how a holding company with no operations—created only in 2018, AC ¶29—could have *possibly* participated in the decades-old conduct alleged. Plaintiffs' otherwise exclusive reliance on group pleading is insufficient as a matter of law, *see supra*, at

Section II(B)(1), and directly contradicts their own allegation that Dow Inc. didn't even exist during the relevant period.[59] *See Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 272 (10th Cir. 2008) ("A parent company is not liable merely because of the parent-subsidiary relationship, but rather must assume the duty of the subsidiary to a third party by some affirmative undertaking.").

***Second***, Plaintiffs do not even attempt to plead alter ego liability. That omission alone is fatal. *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321, 327 (2025) ("[Plaintiff] admits that it never tried to make the showing needed for veil-piercing. So the demand to respect corporate formalities remains."). In any event, such a theory would require factual allegations establishing that (1) Dow Inc.'s control is "so dominating" that The Dow Chemical Company no longer has a "separate mind, will, or existence of its own," ***and*** (2) "the legal fiction of separateness of the corporate structures result[ed] in an injustice." *Dean Operations, Inc. v. One Seventy Assocs.*, 896 P.2d 1012, 1016–17, 1020 (Kan. 1995). The AC lacks even threadbare alter ego allegations, much less those sufficient to meet Plaintiffs' burden. *Stallbaumer v. NextEra Energy Res., LLC*, 2023 WL 3496245, at *5 (D. Kan. May 17, 2023) (rejecting alter ego theory where plaintiff relied on "conclusory allegation[s]" without explaining "how [the parent companies] can be held liable"). In fact, Plaintiffs' own allegations confirm corporate separateness: they plead that Dow Inc. is merely a "holding company," and that its "operating subsidiary," The Dow Chemical Company, is "among the three largest chemical producers in the world." AC ¶¶29–30. Those admissions confirm separation, not control, and make veil-piercing implausible as a matter of law. *See*

---

[59] Only two paragraphs out of their 93-page AC refer to Dow Inc. These allegations, verbatim and in their entirety, are "Dow Inc. is one of the world's leading material science companies; The company conducts its worldwide business through six business units; It was incorporated in Delaware in 2018 to serve as a holding company for the Dow Chemical Company; It is headquartered in Midland, Michigan, and can be served at 2211 H.H. Dow Way, Midland, MI 48674," AC ¶ 29; and The Dow Chemical Company "is an operating subsidiary of Dow Inc." *Id.* ¶ 30. Even these few allegations concede the basis for dismissal of Dow Inc. as a holding company.

*Petrowsky v. NextEra Energy Res., LLC*, 2017 WL 2666361, at *5 (D. Kan. June 21, 2017) (dismissing holding company where complaint failed to allege "a total unity of interest" and instead "recognize[d] a distinction between [it] and [its subsidiaries]").

Taken together, Plaintiffs' failure to allege direct or alter ego liability—coupled with their own allegations confirming corporate separateness—forecloses any viable claim against Dow Inc. The Court should dismiss Dow Inc. with prejudice.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

## KANSAS'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FORD COUNTY'S IMPROPER CLASS ALLEGATIONS AND CLAIMS[60]

By cloaking its case as a class action, Ford County attempts to undermine Kansas's sovereignty, exercise the state's legal authority, and violate the federal Constitution and state law.[61] Ford County improperly seeks relief for every individual and governmental entity nationwide that indirectly purchased plastics products in the past 35 years.[62] Likewise, it seeks abatement for a nationwide public nuisance.[63] Because plastic is "ubiquitous" and allegedly caused "one of the most serious environmental crises facing the world today[,]" Ford County pursues a "50-state solution" to "hold these plastics producers and manufacturers accountable" for "a national crisis

---

[60] Defendant-Intervenor State of Kansas, *ex rel.*, Kris W. Kobach, Attorney General does not join the Defendants' foregoing Joint Motion or any Individual Defendants' Argument herein. *See* Dkt. No. 244.

[61] Kansas was granted intervention as of right, (Dkt. No. 85), to defend its constitutional, sovereign, quasi-sovereign, statutory, and private interests, (Dkt. Nos. 81, 81-1). Kansas's intervention is purposefully limited to Ford County and extends to the remaining plaintiffs only if there becomes a class of consumers and businesses that is improperly attempting to represent Kansas's interests. *See* Dkt. No. 81 at n.1.

[62] *See* AC ¶ 161 (defining "Nationwide Class," excluding California and its political subdivisions); (*id*. ¶ 162) (defining "State Law Class," excluding California and its political subdivisions); (*id*. ¶¶ 178–84) (Sherman Act claims); (*id*. ¶¶217–343) (state consumer protection law claims); (*id*. ¶¶ 344–512) (state antitrust law claims); (*id*. ¶¶513–20) (common law unjust enrichment claims on behalf of an undefined "Damages Class").

[63] *See* (AC ¶ 163) (defining "Public Nuisance Class," excluding California and its political subdivisions); (*id*. ¶¶ 205–16) (common law public nuisance claims).

affecting citizens, children, cities, and counties in all 50 states[.]" AC ¶¶ 4, 7–8.

Comparing itself to state attorneys general who successfully sued Big Tobacco and opioid manufacturers,[64] Ford County suggests that "stalling legislative or regulatory action that would meaningfully address plastic waste and pollution" permits it to charge ahead with its suit. *Id.* ¶ 6. That Ford County seeks to impose its regulatory prerogative coast to coast through a class action shows its desire to seize regulatory authority from the federal government and the states. *See Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (recognizing "state regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy" (cleaned up)); *In re Winter Storm Uri Nat. Gas Litig.*, 772 F. Supp. 3d 1246, 1264 (D. Kan. 2025) (dismissing in part because plaintiffs' damages claims had an impermissible "regulatory effect").[65]

But Ford County does not possess the inherent sovereignty necessary to enact its policy for all of Kansas—much less the country. The Court should protect each state's "sovereign dignity" from being "judicially impeached on matters of policy by" Ford County. *See New Jersey v. New York*, 345 U.S. 369, 373 (1953). Accordingly, this Court should dismiss Ford County's class

---

[64] AC ¶ 9; *see, e.g.*, Nora Freeman Engstrom & Robert L. Rabin, *Pursuing Public Health Through Litigation: Lessons from Tobacco and Opioids*, 73 Stan. L. Rev. 285 (2021) (contrasting successful attorneys general suits in tobacco and opioid litigation with less successful individual class actions and political subdivision suits); Margaret H. Lemos, *State-Local Litigation Conflicts*, 2021 Wis. L. Rev. 971 (2021) (discussing state-led actions favorably as more effective, consistent, and resourceful for statewide interests).

[65] *See also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.17 (1996) ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised"); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief.").

allegations and class claims because Ford County lacks authority to assert the claims of Kansas (and other respective states) and Kansas is the real party in interest for the claims.[66]

## LEGAL STANDARD

Federal courts have limited jurisdiction. U.S. Const. art. III., § 2. And because federal courts presumptively lack jurisdiction, Ford County bears the burden to "allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up); Fed. R. Civ. P. 8(a). Thus, Rule 12(b)(1) requires dismissal because Ford County fails to show it has standing to sue for its claims. *Gandy*, 416 F.3d at 1154-55. Likewise, Rule 12(b)(6) requires dismissal because Ford County is not the real party in interest under Rule 17(a). *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984); *cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (discussing the Eleventh Amendment's bar on suits where the state is the real party in interest).

## ARGUMENT

Ford County purports to be the best representative for the legal claims of *every* state, state agency, county, city, and other political subdivision in the country (except California). This is absurd and false. By excluding and imitating California, Ford County acknowledges it attempts to exercise statutory and common law authority that it transparently lacks.[67] Ford County's class allegations intrude upon three categories of Kansas's legal interests: its sovereign, quasi-sovereign,

---

[66] Kansas respectfully requests dismissal with prejudice as to Ford County's class allegations and class claims but dismissal *without* prejudice as to the real parties in interest. *See Ronsick v. Phariss*, 286 F.2d 316, 318 (10th Cir. 1960) (affirming dismissal with prejudice of wrong party but modifying judgment to dismissal without prejudice for real party in interest).

[67] *Compare* (AC), *with* Cal. Dep't of Justice, Off. of the Att'y Gen., *Attorney General Bonta Sues ExxonMobil for Deceiving the Public on Recyclability of Plastic Products* (Sept. 23, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-exxonmobil-deceiving-public-recyclability-plastic.

and proprietary claims. Because Ford County lacks the authority to represent any of Kansas's legal interests here, the Court should see Ford County's conduct for what it is—an unlawful power grab—and cut it off now.

## I.    FORD COUNTY LACKS STANDING TO ASSERT OR REPRESENT KANSAS'S LEGAL CLAIMS

Ford County's class claims are an *ultra vires* attempt to exercise Kansas's sovereignty. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (describing states' sovereign interests as "the power to create and enforce a legal code" and "the demand for recognition" of its sovereignty); *Alden v. Maine*, 527 U.S. 706, 713-14 (1999) (noting "[a]ny doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment" (cleaned up)). But Ford County, as a political subdivision, is not a sovereign, and it is not authorized to represent Kansas's legal interests.

### A.    Ford County lacks inherent sovereignty to remediate harms to Kansas's quasi-sovereign interests

The nation's history and tradition dictate a sacred balance of sovereignty shared between the federal government and the States. "[T]he States entered the federal system with their sovereignty intact[,]" and "the judicial authority in Article III is limited by this sovereignty." *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991) (cleaned up). "States are not mere political subdivisions of the United States . . . . The Constitution instead 'leaves to the several States a residuary and inviolable sovereignty,' reserved explicitly to the States by the Tenth Amendment." *New York v. United States*, 505 U.S. 144, 188 (1992) (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961)).

Nevertheless, a state "surrenders certain sovereign prerogatives" when it enters the Union, which entitles it to "special solicitude in [the] standing analysis." *Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007). This "special solicitude" includes, in part, the common law doctrine of

"*parens patriae*," which is "inherent in the supreme power of every State." *Snapp*, 458 U.S. at 600 (cleaned up). Simply put, "*parens patriae*" is a standing doctrine derived from a state's sovereignty "to prevent or repair harm to its [quasi-sovereign] interests." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972). A state's quasi-sovereign interests generally fall into two categories, including the state's interest in the physical and economic health and well-being of its residents in general. *Snapp*, 458 U.S. at 607-08. The *Snapp* Court explained that "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens" is based on a state's quasi-sovereign interests "is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id*.

But unlike a state, Ford County is a subordinate governmental entity that lacks inherent sovereignty and thus lacks *parens patriae* authority. *See Reynolds v. Sims*, 377 U.S. 533, 575 (1964) (political subdivisions "never were and never have been considered as sovereign entities" and instead are "subordinate governmental instrumentalities"); *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 412 (1978) (recognizing "States' subdivisions generally have not been treated as equivalents of the States themselves"); *Blume v. Meneley*, 283 F. Supp. 2d 1171, 1175 (D. Kan. 2003) ("Counties in Kansas are legal fictions created by the legislature.").

Therefore, Ford County must be specifically authorized by state statute to exercise Kansas's sovereign interests.[68] *See Hous. Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183, 1192-93 (10th Cir. 1991) (examining state law to determine plaintiff's ability

---

[68] And when a state has authorized a political subdivision to represent that state's sovereign interests, the authorized political subdivision cannot exercise its authority on behalf of *other* states. *See Gore*, 517 U.S. at 571 (noting that states can only act within their jurisdiction because each state is independent); *Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States.").

to represent state's sovereign interests). The *Kaw Tribe* Court recognized that the "assertion of representational standing" by a political subdivision "is better understood as a *parens patriae* action" due to "its status as a body politic." *Id.* Because *parens patriae* standing is inherently derived from a state's sovereignty, federal courts in the Tenth Circuit "consider state law" to "decid[e] whether a plaintiff qualifies for *parens patriae* standing" to "represent the state's sovereign interests." *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 800 (10th Cir. 2011) (applying *Kaw Tribe*); *see also New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1188 n.15 (D.N.M. 2020) (recognizing *Thiebaut* and *Kaw Tribe* direct federal courts to look to state law); *Bd. of Cnty. Comm'rs of Cnty. of Boulder v. Rocky Mountain Christian Church*, 481 F. Supp. 2d 1181, 1185-86 (D. Colo. 2007) (concluding county lacked standing to sue when its action was not authorized by state law).

Kansas law does *not* empower Ford County to bring this suit. Ford County's actual statutory authority under Kansas law provides that counties "may transact all county business and perform all powers of local legislation and administration it deems appropriate," "subject to all acts of the legislature which apply uniformly to all counties." K.S.A. 19-101a(a); *see State ex rel. Stephan v. Bd. of Cnty. Comm'rs of Cnty. of Lyon Cnty.*, 676 P.2d 134, 138 (Kan. 1984) ("The home rule powers of a [Kansas] county are . . . subject to determination and limitation by the legislature and do not emanate from the constitution."); K.S.A. 19-101 (each county is created by statute as a corporate body with power to sue and be sued and "determine their local affairs and government" authorized by statute, among other enumerated powers); K.S.A. 19-101a (county home rule allows counties to "perform all powers of local legislation and administration" subject to statutory limitations, such as uniform statutes); K.S.A. 19-103 (county powers exercised by

board of commissioners); K.S.A. 60-908 (granting county attorney—not board of county commissioners—authority to abate a nuisance).

And Kansas law forbids Ford County from doing exactly what it attempts here: superseding or impairing other political subdivisions' exercise of their home rule authority. K.S.A. 19-101a(a)(4); *see also Blevins v. Hiebert*, 13 Kan. App. 2d 318, 321 (1989) (noting the "exercise of home rule powers by a county must be directed to local legislation and administration" and that any "[l]ocal acts with extraterritorial impact should stand if not in conflict with a state statute"), *aff'd*, 247 Kan. 1 (1990); *David v. Bd. of Comm'rs of Norton Cnty.*, 89 P.3d 893, 897-98 (Kan. 2004) ("we note that a County's exercise of police power still cannot conflict with state law"). The Kansas Constitution restricts Ford County's use of its statutory authority to its "local" affairs. *See* Kan. Const. art. 2, § 21; *Cogswell v. Sherman Cnty.*, 238 Kan. 438, 440-41 (1985) (reiterating that the state constitution limits counties to "matters of local concern" as opposed to "the power to legislate statewide"). Kansas law, as discussed below, vests only the attorney general with authority to represent Kansas's sovereign, quasi-sovereign, and proprietary interests. Accordingly, Ford County's class claims should be dismissed for lack of standing.

## B.    Ford County cannot misuse Rule 23 to offend Kansas's constitutional sovereignty

Ford County's lawsuit is an improper attempt to exercise Kansas's *parens patriae* authority to recover for "sufficiently severe and generalized harm to the welfare of [the] state's citizens[.]" *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150 (D.D.C. 2002) (cleaned up). "It cannot, therefore, be said that this is a case where the primary thrust of an alleged wrong is injury to a narrowly limited class of individuals, and the harm to the economy as a whole is insignificant by comparison." *Id*. at 152 (cleaned up). Instead, "this is a case where the direct impact of the alleged wrong is felt by a substantial majority, though less than all, of the state's citizens, so that the suit

can be said to be for the benefit of the public." *Id.* (cleaned up). But, Ford County does not end its power grab there—it also asserts claims on behalf of Kansas and all arms of the State by neglecting to exclude state governments from its class. In other words, Ford County seizes Kansas's sovereign, quasi-sovereign, and proprietary claims.

Rule 23 cannot be used to invade Kansas's sovereignty and usurp its legal claims. Kansas has a constitutional guarantee of its sovereignty under the Tenth Amendment. *Alden v. Maine*, 527 U.S. 706, 713-14 (1999); *New York v. United States*, 505 U.S. 144, 188 (1992). The Tenth Amendment forbids federal procedural statutes like Rule 23 from being used to improperly establish standing. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988). Thus, Ford County violates the Tenth Amendment when it attempts to misuse Rule 23 against Kansas (and almost every other state). *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018) (discussing the Tenth Amendment limits on Congress under the anticommandeering doctrine).

Additionally, the Eleventh Amendment stands as a jurisdictional bar against Ford County's misuse of Rule 23. *K. A. v. Barnes*, 134 F.4th 1067, 1073 (10th Cir. 2025). As discussed below, Kansas is the real party in interest for the Kansas legal claims pursued by Ford County. Where Kansas is the real party in interest, the Eleventh Amendment applies. *Halderman*, 465 U.S. at 101. Because Ford County is attempting to usurp Kansas's sovereign interests, Ford County likewise offends Kansas's Eleventh Amendment sovereign immunity. *See In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 271 (D. Mass. 2011) ("as sovereigns, states have a strong interest in individually controlling the prosecution of their own cases."); *Thomas*, 50 F.3d at 505-06 (holding Eleventh Amendment barred involuntary joinder of arm of state in environmental litigation); *Walker*, 982 F. Supp. at 1210-11 (finding dismissal appropriate under Rule 12(b)(1) where plaintiffs improperly sought to represent states' interests).

Because Ford County misuses Rule 23 to violate Kansas's Tenth and Eleventh Amendment constitutional guarantees of state sovereignty, this Court should dismiss its claims.

## II.    FORD COUNTY'S CLASS CLAIMS MUST BE DISMISSED BECAUSE KANSAS IS THE REAL PARTY IN INTEREST FOR KANSAS'S CLAIMS

Kansas, *not* Ford County, is the real party in interest for Kansas's claims. All actions in federal court "must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). In diversity cases, the forum state's substantive law determines the real party in interest under Rule 17(a). *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Under Kansas law, only the attorney general is authorized to sue to vindicate Kansas's statewide sovereign, quasi-sovereign, and proprietary interests. Ford County lacks this same authority for Kansas's claims and so it fails to state a claim upon which relief can be granted. *See Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.*, 956 F. Supp. 910, 916 (D. Kan. 1997) (noting that Rule 12(b)(6) motions may be based on objections to the real party in interest).

### A.    Kansas law determines the real party in interest for Kansas's claims

"Under Kansas choice-of-law principles, the Court must consider the law of the place of the wrong except where the injury and the negligent conduct occur in different states, in which case the place of injury controls." *Textron Aviation, Inc. v. Superior Air Charter, LLC*, 420 F. Supp. 3d 1186, 1193 (D. Kan. 2019) (quoting *Draughon*, 103 F. Supp. 3d at 1282). In other words, the state where the harm occurred is the state whose substantive law governs. Here, any harm to Ford County (and Kansas) necessarily occurred in Kansas.

"Under Kansas law, the real party in interest is the one who, by virtue of the substantive law, holds the right sought to be enforced." *Atkins v. Heavy Petroleum Partners, LLC*, 86 F. Supp. 3d 1188, 1201 (D. Kan.), *aff'd*, 635 F. App'x 483 (10th Cir. 2015); *see also* K.S.A. 60-217(a) (Kansas civil action may be prosecuted on behalf of real party in interest when authorized by

84

statute). Kansas law vests *only* the State, through its attorney general, with the right to sue for the Kansas claims statewide.

### B.    Kansas law designates the State as the real party in interest and vests statewide authority in the attorney general

The inherent sovereign and statutory authority to sue over statewide claims based on federal antitrust laws, restraints of trade, and unjust enrichment and to otherwise protect its residents' health and wellbeing is reserved to Kansas as a quasi-sovereign interest. *See* K.S.A. 50-109 (authorizing attorney general to bring statewide restraint of trade claims); K.S.A. 75-702 (authorizing attorney general to represent the State in all actions, including in federal court); K.S.A. 50-628 (authorizing attorney general to enforce state consumer protection laws statewide); K.S.A. 60-908 (authorizing attorney general to abate nuisances statewide); 15 U.S.C. § 15c (authorizing attorney general to enforce federal antitrust laws on behalf of the State as *parens patriae*); 15 U.S.C.§ 15h (referring to state law for applicability of federal antitrust *parens patriae* actions).

The Kansas Legislature codified its intent to designate the attorney general—not political subdivisions—as the representative for the State in statewide litigation. For instance, K.S.A. 75-702 provides that the attorney general

> shall appear for the state, and prosecute and defend any and all actions and proceedings, civil or criminal, in the Kansas supreme court, the Kansas court of appeals and in all federal courts, in which the state shall be interested or a party, and shall, when so appearing, control the state's prosecution or defense.

As the Kansas Supreme Court has recognized,

> The attorney general is the superior of the county attorney, and whenever the state and the public interest are involved, the attorney general is a party to the action. Wherever the public interest is involved or the state is a party, the attorney general is primarily the proper counsel to appear.

*Mem'l Hosp. Ass'n, Inc. v. Knutson*, 722 P.2d 1093, 1097 (Kan. 1986). This aligns with the "general rule" recognized by the Tenth Circuit (and other courts) that "the state attorney general . . . alone has the right to represent the state as to litigation involving a subject matter of statewide interest." *Mountain States Legal Found. v. Costle*, 630 F.2d 754, 771 (10th Cir. 1980); *see also Off. of the People's Couns. for the District of Columbia v. D.C. Water & Sewer Auth.*, 313 A.3d 579, 587 (D.C. 2024) (contrasting agency's "limited" litigation authority "with the D.C. Attorney General's plenary authority to litigate").

Ford County's class action is effectively a statewide suit (on a nationwide basis) to resolve statewide antitrust, restraint of trade, consumer protection, and public nuisance claims. But when alleged harms affect governmental units on a statewide basis, the State (via the attorney general) is the proper party to sue. *See Mem'l Hosp. Ass'n, Inc.*, 722 P.3d at 1097; *Nash Cnty. Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 496 (4th Cir. 1981) ("[C]ommon sense dictates that when an alleged wrong affects governmental units on a state-wide basis, the state should seek redress on their behalf as well as on its own rather than parcelling out the actions among local agencies."); *Illinois v. Associated Milk Producers, Inc.*, 351 F. Supp. 436 (N.D. Ill. 1972) (holding the state, by its attorney general, was the real party in interest to bring statewide antitrust claims on behalf of itself and its political subdivisions). Because Kansas law vests the authority to bring statewide claims exclusively in the State, Kansas—*not Ford County*—is the real party in interest. *See, e.g.*, *Puerto Rico v. Cordeco Dev. Corp.*, 534 F. Supp. 612, 614–16 (D.P.R. 1982) (concluding Puerto Rico was the real party in interest in case because it had inherent and statutory power of eminent domain).[69]

---

[69] The Court should dismiss under Rule 12(b)(6), rather than substituting Kansas as a plaintiff under Rule 17(a)(3), because Kansas does not waive its sovereign immunity to become a plaintiff in this suit. *See Halderman*, 465 U.S. at 101 (noting the "well established" principles that the

### C.   Ford County's powers end at its county lines

Although Kansas law grants counties "home rule" power allowing them to govern local affairs, their authority is strictly limited and cannot extend beyond a county's boundaries. *See* K.S.A. 19-101c (Kansas counties' statutory home rule authority); *Bd. of Cnty. Comm'rs v. Nielander*, 275 Kan. 257, 264 (2003) (discussing county home rule powers as limited to "local and administrative duties" as local unit deems appropriate and subject to constitutional and statutory limitations). When Kansas counties exercise their home rule power, they may only act *locally* and *consistent with* Kansas law. *See* K.S.A. 19-101 (Kansas counties are empowered "to determine their local affairs and government," as authorized by statute); K.S.A. 19-101a; *cf.* Kan. Const. art. 2, § 21 ("The legislature may confer powers of local legislation and administration upon political subdivisions.").

Ford County cannot manipulate its home rule authority to exercise its local "self-government" statewide. A political subdivision making *statewide* legal claims necessarily reaches beyond its borders to infringe on the constitutional and statutory rights of all other Kansas political subdivisions and the State itself. *See State ex rel. Kline v. Unified Bd. Comm'rs, Unified Gov't Wyandotte Cnty./Kansas City*, 277 Kan. 516, 520 (2004) (noting that "[t]he legislature retains power over statewide matters.").

Kansas and federal law designate the attorney general as the *exclusive* representative of the State in matters of statewide concern. Any political subdivision's attempt to expand its *localized authority* to statewide (or nationwide) claims infringes on the State's sovereign powers, encroaches

---

Eleventh Amendment applies when "the state is the real, substantial party in interest"); *see also* 6A Charles A. Miller & Arthur R. Miller, Federal Practice and Procedure § 1555 (3d ed. May 2025 update) ("[I]t has been held that when the determination of the right party to bring the action was not difficult and when no excusable mistake had been made, then Rule 17(a)(3) is not applicable and the action should be dismissed.").

on the rightful authority of other political subdivisions, and grossly exceeds the scope of its home rule authority. Political subdivisions like Ford County have no authority to act outside of their boundaries. *See State v. Vrabel*, 347 P.3d 201, 210-11 (Kan. 2015) (discussing the importance of jurisdictional limitations on cities and counties to protect local autonomy of other political subdivisions, specifically in a law enforcement context); *cf. Gore*, 517 U.S. at 571 (noting that states can only act within their jurisdiction because each state is independent).

### D.   Ford County's class claims are an improper exercise of sovereign authority and face insurmountable class certification issues

The Supreme Court has "repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (cleaned up). Ford County—on its face—does not share the same sovereign interests or injuries of the states or other political subdivisions. As discussed above, allowing Ford County to proceed would improperly expand its local authority to usurp Kansas's sovereign powers and commandeer other Kansas political subdivisions' local interests, both of which are contrary to Kansas law.

The Court should probe Ford County's pleadings at this stage to determine whether the interests of absent parties are fairly represented. *See id.* at 160; Fed. R. Civ. P. 23(c)(1)(A), (d). This Court has previously examined facially deficient class allegations at the pleading stage. *Stubbs v. McDonald's Corp.*, 224 F.R.D. 668, 674 (D. Kan. 2004) (noting federal courts regularly examine class viability at the pleading stage); *see also Faulhaber v. Petzl Am., Inc.*, 656 F. Supp. 3d 1257, 1271 (D. Colo. 2023) (examining class allegations "where the pleading makes clear that the purported class cannot be certified and no amount of discovery would change that

determination." (quoting *Cnty. of Dorchester v. AT & T Corp.*, 407 F. Supp. 3d 561, 565-66 (D.S.C. 2019))); Fed. R. Civ. P. 12(b)(6), 12(f), 23(d).[70]

Ford County's proposed class is wholly incompatible with federal and state constitutional, statutory, and common law, which will inevitably defeat the proposed class. *See Cnty. of Dorchester*, 407 F. Supp. 3d at 568 (finding proposed class of counties could not proceed because it impedes on other counties and the state, contrary to state law); *In re Auto. Parts Antitrust Litig.*, 2015 WL 14047405, at *7 (dismissing governmental entity named plaintiffs' class allegations for lack of standing and declining the exploration of "every municipal and regional government in the nation"); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *18 (dismissing political subdivision plaintiffs for lack of manageability and noting the broad procedural powers of Rule 23 does not confer on court the power permit named plaintiffs to represent classes of governmental plaintiffs).

The *Dorchester* Court found Rule 23 could not be used to "impede on the sovereignty" of "other counties across the state" because state law vested "the authority to decide when a claim should or should not be brought by a governmental entity" with the local government entity. 407 F. Supp. 3d at 568-69. The court's reasoning in *Dorchester* was tied directly to the authority vested in each county's governing body. *Id.* (citing *Owens v. Magill*, 308 S.C. 556, 419 S.E.2d 786, 789 (1992)); *compare* S.C. Code Ann. § 4-1-10 (county designation as body politic and corporate); S.C. Code Ann. § 4-9-25 (general powers of counties); S.C. Code Ann. § 4-9-1030 (powers of county boards), *with* K.S.A. 19-101; K.S.A. 19-101a; K.S.A. 19-103.

---

[70] If the Court declines to dismiss, it should strike Ford County's class allegations under Rule 12(f). *See, e.g.*, *Stubbs*, 224 F.R.D. at 674; *Faulhaber*, 656 F. Supp. 3d at 1271; *Dorchester*, 407 F. Supp. 3d at 565–69.

Although *Dorchester* is most analogous to Kansas law and this case's posture, the Fifth Circuit's decision in *Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212, 218 (5th Cir. 2012), shows federal courts generally rely on state law to determine political subdivisions' authority to bring class action suits. In *Ackal*, the Fifth Circuit vacated the certification of a local governmental entities class because the class was certified and operated contrary to state law. *Id.* at 218-20 (reiterating that Rule 23 cannot certify a class that operates as an "opt-in" class because political subdivision participation required adherence to state law).

Treating states and their interests as indistinguishable from ordinary class-action parties disregards the distinct and individualized interests of *each* state, county, city, and other political subdivision. Ford County's class allegations do not account for these highly individualized and localized interests. Courts have consistently rejected class allegations where claims (like those raised here) require individualized factual and legal inquiries. *See, e.g.*, *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 279-81 (4th Cir. 1980) (finding a class with "almost complete local autonomy" statewide was "inappropriate"); *Garcia v. Johanns*, 444 F.3d 625, 632 (D.C. Cir. 2006) (class allegations rejected where "multiple decisionmakers with significant local autonomy exist"); *Melnick v. TAMKO Bldg. Prods. LLC*, 347 F.R.D. 79, 109 (D. Kan. 2024). At the end of the day, Ford County has not and will not meet its burden under Rule 23(b) because it lacks legal authority over sovereign states and those states' political subdivisions. The Court should thus dismiss Ford County's class allegations.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss Ford County's class allegations and claims without prejudice.

Dated: September 8, 2025

Respectfully submitted,

By:  Richard N. Bien

Thomas P. Schult, D. Kan. No. 70463
Jeffrey D. Morris, KS Bar No. 16123
Lauren Tallent, KS Bar No. 28490
Courtney A. Kroeger, KS Bar No. 29324
**BERKOWITZ OLIVER LLP**
2600 Grand Boulevard, Suite
1200 Kansas City, Missouri 64108
Telephone: (816) 561-7007
Facsimile: (816) 561-1888
tschult@berkowitzoliver.com
jmorris@berkowitzoliver.com
ltallent@berkowitzoliver.com
ckroeger@berkowitzoliver.com

Joshua D. Dick (admitted *pro hac vice* )
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 393-8200
jdick@gibsondunn.com

Theodore J. Boutrous Jr. (admitted *pro hac vice* )
Christopher D. Dusseault (admitted *pro hac vice* )
Perlette Michèle Jura (admitted *pro hac vice* )
Bradley J. Hamburger (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
tboutrous@gibsondunn.com
cdusseault@gibsondunn.com
pjura@gibsondunn.com
bhamburger@gibsondunn.com

*Attorneys for Defendant, Chevron U.S.A. Inc.*

Kara T. Stubbs (KS #15805)
**BAKER STERCHI COWDEN & RICE, LLC**
2400 Pershing Road, Suite 500

Richard N. Bien (D. Kan. #70101)
William F. Ford (D. Kan. #70021)
Emma C. Halling (KS #27924)
Grant A. Harse (KS #24666)
Brody Sabor (D. Kan. #79098)
**LATHROP GPM LLP**
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
Telephone: (816) 292-2000
Telecopier: (816) 292-2000
richard.bien@lathropgpm.com
bill.ford@lathropgpm.com
emma.halling@lathropgpm.com
grant.harse@lathropgpm.com
brody.sabor@lathropgpm.com

David J. Lender (Pro Hac Vice)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Telecopier: (212) 310-8007
david.lender@weil.com

David R. Singh (Pro Hac Vice)
Morgan D. MacBride (Pro Hac Vice)
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Telecopier: (650) 802-3100
david.singh@weil.com
morgan.macbride@weil.com

*Attorneys for Defendant, ExxonMobil Corporation*

Robert J. Hoffman (KS #16453)
Robert M. Thompson (KS #14673)
Grace E. Martinez (KS #29120)
**BRYAN CAVE LEIGHTON PAISNER**
One Kansas City Place
1200 Main Street, Suite 3800
Kansas City, MO 64105-2122

Kansas City, MO 64108
Telephone: 816- 471-2121
Facsimile: 816- 472-0288
stubbs@bakersterchi.com

Nader R. Boulos, P.C. (admitted *pro hac vice*)
Daniel E. Laytin, P.C. (admitted *pro hac vice*)
Jonathan Adair (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: 312-862-2198
Facsimile: 312-862-2000
Nader.boulos@kirkland.com
Daniel.laytin@kirkland.com
Jonathan.adair@kirkland.com

*Attorneys for Defendant, DuPont de Nemours, Inc.*

David L. Anderson (pro hac vice)
Sheila A.G. Armbrust (pro hac vice)
David A. Goldenberg (pro hac vice)
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
dlanderson@sidley.com
sarmbrust@sidley.com
dgoldenberg@sidley.com

Zachary Parker (SBN 79250)
**SIDLEY AUSTIN LLP**
One S. Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
zparker@sidley.com

*Attorneys for Defendant, American Chemistry Council, Inc.*

Karrie J. Clinkinbeard (KS #19583)
Brian M. Nye (KS #24094)
**ARMSTRONG TEASDALE LLP**
2345 Grand Boulevard, Suite 1500
Kansas City, Missouri 64108-2617

Telephone:(816)-374-3229
Telecopier:(816)-374-3300
bob.hoffman@bclplaw.com
rmthompson@bclplaw.com
grace.martinez@bclplaw.com

Nader R. Boulos, P.C. (admitted *pro hac vice*)
Daniel E. Laytin, P.C. (admitted *pro hac vice*)
Jonathan Adair (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: 312-862-2198
Facsimile: 312-862-2000
Nader.boulos@kirkland.com
Daniel.laytin@kirkland.com
Jonathan.adair@kirkland.com

*Attorneys for the Dow Defendants*

Tristan L. Duncan (MO 39525; KS #70481)
Holly Pauling Smith (KS #19984)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, MO 64108
Tel: 816-474-6550
Fax: 816-421-5547
Email: tlduncan@shb.com
Email: hpsmith@shb.com

Daniel B. Rogers (FL #0195634)
**SHOOK, HARDY & BACON L.L.P.**
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Tel: 305-358-5171
Fax: 305-358-7470
Email: drogers@shb.com

*Attorneys for Defendant, Chevron Phillips Chemical Company LP*

David C. Kiernan (admitted pro hac vice)
Craig E. Stewart (admitted pro hac vice)
Emily F. Knox (admitted pro hac vice)
**JONES DAY**
555 California Street, 26th Floor
San Francisco, CA 94104-1500

816.221.3420
816.221.0786 (Facsimile)
kclinkinbeard@atllp.com
bnye@atllp.com

Gregory J. DuBoff (admitted pro hac vice)
**MCGUIREWOODS LLP**
800 E. Canal Street
Richmond, Virginia 23219
(804) 775-1000
gduboff@mcguirewoods.com

Michael E. Scoville (admitted pro hac vice)
**MCGUIREWOODS LLP**
888 16th Street NW
Washington, D.C. 20006
(202) 857-1700
mscoville@mcguirewoods.com

*Attorneys for Defendant, Eastman Chemical Company*

**KRIS W. KOBACH**
**Attorney General of Kansas**

Melanie S. Jack, Kan. Bar No. 13213
  *First Assistant Attorney General*
Nicholas C. Smith, Kan. Bar No. 29742
  *Assistant Attorney General*
Adam T. Steinhilber, Kan. Bar No. 30468
  *Assistant Solicitor General*
**OFFICE OF ATTORNEY GENERAL**
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 296-3751
Fax:    (785) 291-3699
Email: Melanie.Jack@ag.ks.gov
        Nicholas.Smith@ag.ks.gov
        Adam.Steinhilber@ag.ks.gov

*Attorneys for State of Kansas*

Telephone: (415) 875-5700
cstewart@jonesday.com
dkiernan@jonesday.com
egoldbergknox@jonesday.com

Andrew M. Ryngaert (admitted pro hac vice)
J. Bruce McDonald (admitted pro hac vice)
Nicole M. Perry (admitted pro hac vice)
**JONES DAY**
717 Texas, Suite #3300
Houston, TX 77002
Telephone: (832) 239-3855
aryngaert@jonesday.com
bmcdonald@jonesday.com
nmperry@jonesday.com

G. Edgar James (KS #22407)
James M. Humphrey, IV (KS #29652)
**JAMES SOBBA, LLC**
4435 Main Street, Suite 910
Kansas City, MO 64111
Telephone: (816) 623-0544
ejames@jamessobba.com
jhumphrey@jamessobba.com

*Attorneys for Equistar Chemicals, LP*

Forrest James Robinson, Jr. (KS # 11589)
**HITE, FANNING & HONEYMAN, LLP**
100 N. Broadway, Suite 950
Wichita, KS 67202-2209
Tel: (316) 265-7741
Fax: (316) 267-7803
robinson@hitefanning.com

Richard C. Godfrey (admitted *pro hac vice*)
R. Allan Pixton (admitted *pro hac* vice)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
191 N. Wacker Dr., Ste. 2700
Chicago, IL 60606
P: 312 705 7400
F: 312 705 7401
richardgodfrey@quinnemanuel.com
allanpixton@quinnemanuel.com

*Attorneys for Defendant, Celanese Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was electronically filed with the Court this 8 day of September, 2025, and served via the Court's ECF system upon all counsel of record.

<u>*/s/ Richard N. Bien*                    </u>
An Attorney for Defendant ExxonMobil Corporation