# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BILLIE RODRIGUEZ, et al.

      Plaintiffs,

      v.

EXXON MOBIL CORPORATION, et al.

      Defendants,

and

STATE OF KANSAS, *ex rel.*
KRIS W. KOBACH, Attorney General,

      Defendant-Intervenor

Case No. 2:25-cv-02195-TC-TJJ

**PLAINTIFFS' OPPOSITION
TO DEFENDANTS' AND DEFENDANT-INTERVENOR'S MOTIONS TO DISMISS
<u>PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT (Doc. 247)</u>**

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 1

    I.    Defendants Falsely Pushed Plastics as Single-Use. ............................................... 2

    II.   Defendants Developed an Industrywide Agreement to Mislead Americans. ......... 3

    III.  Defendants' Conspiracy to Mislead Consumers Caused the Solid-Waste Crisis. ... 5

    IV.  Despite Ongoing Environmental Issues, Defendants' Fraudulent Concealment
           Continues in Recent Years and Perpetuates the Solid-Waste Crisis ....................... 5

LEGAL STANDARD ........................................................................................................ 7

ARGUMENTS AND AUTHORITIES ............................................................................... 8

    I.    Plaintiffs Pled Sufficient Facts to Establish Article III Standing for Their Claims. 8

        A.  Plaintiffs suffered concrete and particularized injuries-in-fact ......................... 8

        B.  Plaintiffs' injuries are traceable to Defendants' unlawful conduct ................. 10

        C.  Plaintiffs' injuries are redressable by a favorable decision. ........................... 12

    II.   Plaintiffs Pled Sufficient Antitrust Claims. ......................................................... 13

        A.  Plaintiffs are the proper parties to bring antitrust claims. .............................. 13

        B.  Plaintiffs sufficiently alleged an antirust injury. ............................................ 14

        C.  Plaintiffs connected antitrust injury to Defendants' conspiracy. .................... 15

        D.  Plaintiffs sufficiently alleged restraint of trade ............................................. 17

        E.  Plaintiffs' evidence of agreement demonstrates anticompetitive behavior. ... 19

            1.    Defendants' parallel conduct and plus factors support plausibility. 20

            2.    Defendants misstate the pleading requirements for an antitrust
                agreement ................................................................................................. 25

        F.  The Noerr-Pennington doctrine is inapplicable. ............................................ 26

        G.  Defendants' state-specific arguments fail ..................................................... 29

            1.    Because Plaintiffs demonstrate Article III standing, Defendants'
                state law standing arguments are premature. .................................... 29

2.    Plaintiffs' state antitrust law claims can proceed............................ 31

III.    Plaintiffs' Public Nuisance Claim is Properly Pled. ................................. 33

A.   Ford County has the authority to bring these claims through its County
Counselor and private counsel. ........................................................ 33

1.    County Counselor of Ford County, Glenn Kerbs, is permitted by
statute to bring a public nuisance claim on behalf of Ford County. 33

2.    The Board of County Commissioners of Ford is permitted by statute
to hire counsel to assist in prosecuting its claims. ........................... 34

3.    Ford County has sufficiently pleaded a public nuisance claim. ...... 35

4.    Ford County may use Rule 23 to represent similarly situated local
governmental entities. ................................................................... 37

B.   Defendants' additional arguments against Ford County's Public Nuisance
claim fall flat. ................................................................................... 37

IV.    Plaintiffs' Complaint Satisfies the Requirements of Rule 9(b). ........................ 39

A.   Plaintiffs' complaint states the "Who" factor with particularity. .................. 41

B.   Plaintiffs' complaint states the "What" factor with particularity.................... 41

C.   Plaintiffs' complaint states the "When" factor with particularity.................. 42

D.   Plaintiffs' complaint states the "Where" factor with particularity................. 42

E.   Plaintiffs' complaint states the "How" factor with particularity. .................. 43

V.    Plaintiffs Plausibly Alleged Actionable Deception (Counts 3-17). ...................... 43

A.   The Reasonable Consumer test is satisfied. ...................................... 44

B.   Neither *Noerr-Pennington* nor the First Amendment protect Defendants...... 45

C.   Defendants' deception is not mandated by the government. .......................... 45

D.   Plaintiffs Plausibly Allege That Consumers Were Misled ............................ 46

E.   Plaintiffs Alleged Actionable Omission (Counts 3-4, 8) .............................. 49

VI.    Plaintiffs Adequately Allege Consumer Fraud Claims Under State Law............. 51

VII.    Plaintiffs Adequately Pled an Unjust Enrichment Claim. ..................................... 55

VIII.    The Statute of Limitations Does Not Bar Plaintiffs' Claims. ............................... 57

CONCLUSION AS TO 12(B)(1) AND 12(B)(6) MOTION TO DISMISS ................................ 59

IX.    Chevron U.S.A., Inc.'s Individual Arguments for its Dismissal Are Unavailing. 60

   A.  Chevron made false and deceptive statements
       regarding plastics recyclability. ...................................................................... 60

   B.  Plaintiffs are entitled to discovery regarding the relationship between CUSA
       and Chevron Chemical ..................................................................................... 61

X.    Plaintiffs State a Plausible Claim Against Eastman. ............................................ 63

   A.  Plaintiffs' Allegations as to Eastman are sufficient for Rule 12 .................... 64

   B.  Plaintiffs' Claims Against Eastman are Timely and Otherwise Tolled .......... 65

XI.    American Chemistry Council Provided the Means for other Defendants' Illegal
       Actions in Violation of State Law, Making ACC Liable ...................................... 66

XII.    The Court has Personal Jurisdiction over Defendant DPNI. ............................... 74

   A.  This Court should adopt the Ninth, Third, and Fifth Circuits' interpretation of
       Section 12 of the Clayton Act. ........................................................................ 75

   B.  Even if this Court does not adopt the Ninth, Third, and Fifth Circuits'
       interpretation, this Court nevertheless has personal jurisdiction over DPNI
       under conspiracy jurisdiction. ......................................................................... 76

XIII.    Kansas Attorney General's Arguments for Dismissal Fail. ................................. 78

   A.  KS AG does not have parens patriae standing. ............................................... 78

   B.  Plaintiff Ford County is not usurping Kansas' sovereign authority. .............. 79

       1.    Ford County has the statutory power to sue under Kansas law. ....... 80

   C.  KS AG misrepresents Tenth Circuit and Supreme Court precedent when
       arguing that Ford County offends constitutional sovereignty ........................ 82

   D.  Recent legislation in Kansas attempting to thwart the power of political
       subdivisions to file claims without the Attorney General's approval failed ... 83

   E.  Ford County is the real party in interest, and the KS AG is not. ................... 84

       1.    Ford County is the real party in interest. ......................................... 84

2.      KS AG cannot be a defendant-intervenor and the real party in interest because no controversy exists between it and Defendants.  85

F.   KS AG's arguments as to Ford County's class action misapply the law........ 86

1.      Rule 23 permits Ford County to use the class action device. .......... 86

2.      The KS AG prematurely raises issues for the class certification stage. ................................................................................................. 86

XIV.    If Necessary, Plaintiffs Request Leave to Amend. ............................................. 88

CONCLUSION ..................................................................................................................... 89

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. WPX Prod. Prods., LLC,*
   184 F. Supp. 3d 1150 (D.N.M. 2016) .................................................................................. 30

*Access Telecom, Inc. v. MCI Telecomm. Corp.,*
   197 F.3d 694 (5th Cir.1999) ........................................................................................... 76-77

*Ackal v. Centennial Beauregard Cellular L.L.C.,*
   700 F.3d 212 (5th Cir. 2012) .............................................................................................. 88

*Action Embroidery Corp. v. Atl. Embroidery, Inc.,*
   368 F.3d 1174 (9th Cir. 2004) ...................................................................................... 75, 76

*Aldrich v. McCulloch Props.,*
   627 F.2d 1036 (10th Cir. 1980) .................................................................................... 58, 59

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ............................................................................................ 79, 80, 85-86

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
   486 U.S. 492 (1988) ....................................................................................................22, 26-27

*Allstate Indem. Co. v. Dixon,*
   304 F.R.D. 580 (W.D. Mo. 2015) ...................................................................................... 49

*Anchem Prods., Inc., v. Windsor,*
   521 U.S. 591 (1997) ............................................................................................................ 29

*Apodaca v. Young Am. Ins. Co.,*
   702 F. Supp. 3d 1094 (D.N.M. 2023) ................................................................................ 73

*Appliance Recycling Ctrs. v. Jaco,*
   378 F. App'x 652 (9th Cir. 2010) ................................................................................. 47, 48

*Arkansas ex rel. Bryant v. R&A Co.,*
   985 S.W.2d 299 (Ark. 1999) .............................................................................................. 67

*Arizona v. Cook Paint & Varnish Co.,*
   391 F. Supp. 962 (D. Ariz. 1975) *aff'd,* 541 F.2d 226 (9th Cir. 1976) .................................... 18

*Arthur v. Microsoft Corp.,*
   267 Neb. 586 (Neb. 2004) .................................................................................................. 71

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 64

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
  127 F.4th 178 (10th Cir. 2025) ...................................................................... 14

*Atkins v. Heavy Petroleum Partners, LLC*,
  635 F. App'x 483 (10th Cir. 2015) ................................................................. 85

*Beer v. Bennett*,
  160 N.H. 166 (2010) ........................................................................................ 72

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 64

*Beltran v. InterExchange, Inc.*,
  176 F. Supp. 3d 1066 (D. Colo. 2016) .......................................................... 19

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 12

*Black v. Occidental Petroleum Corp.*,
  69 F.4th 1161 (10th Cir. 2023) ...................................................................... 15

*Bledsoe v. Bd. of Cty. Comm'rs of Jefferson, Kansas*,
  501 F. Supp. 3d 1059 (D. Kan. 2020)
  *aff'd in part, rev'd in part and remanded sub nom.*, 53 F.4th 589 (10th Cir. 2022) .................. 25

*Blomkest Fertilizer, Inc. v. Potash Corp. Of Saskatchewan*,
  203 F.3d 1028 (8th Cir. 2000) ...................................................................... 24

*Bradley v. Sanford Brown Coll., Inc.*,
  2005 WL 3088696 (W.D. Mo. Nov. 17, 2005) ............................................. 63

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ........................................................................................ 39

*Brooks v. Mentor Worldwide*,
  985 F.3d 1272 (10th Cir. 2013) ........................................................................ 7

*Brown v. JBS USA Food Co.*,
  2023 WL 6294161 (D. Colo. Sept. 27, 2023) ............................................... 26

*Brunswick Corp. v. Pueblo Bow-O-Mat, Inc.*,
  429 U.S. 477 (1977) ........................................................................................ 14

*Brunts v. Hornell Brewing Co.*,
  2023 WL 3568650 (E.D. Mo. May 19, 2023) ........................................................ 43, 44

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*,
  439 F.3d 653 (10th Cir. 2006) ......................................................................... 15

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
  452 F. Supp. 3d 1029 (D. Kan. 2020) .............................................................. 19

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
  2020 WL 758801 (D. Kan. Feb. 14, 2020) ........................................................ 75

*Burcham v. Unison Bancorp., Inc.*,
  276 Kan. 393 (2003) ..................................................................................... 61

*Bureau of Consumer Fin. Protec. v. Commw. Eq. Group, LLC*,
  752 F. Supp. 3d 378 (D. Mass. 2024) .............................................................. 51

*Burnett v. MERS, Inc.*,
  706 F.3d 1231 (10th Cir. 2013) ................................................................... 64, 65

*Butler v. Specialized Loan Servicing LLC*,
  2025 WL 2613745 (D. Colo. Sept. 10, 2025) .................................................... 30

*Carbone v Brown Univ.*,
  621 F. Supp. 3d 878 (N.D. Ill. 2022) .............................................................. 23

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ...................................................................................... 16

*Carriuolo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016) ........................................................................ 51

*Casados v. Safeco Ins. Co. of Am.*,
  2015 WL 11089527 (D.N.M. Nov. 6, 2015) ...................................................... 29

*Cassidy v. Owen*,
  533 A.2d 253 (D.C. 1987) .............................................................................. 54

*Chapman v. Tristar Prods., Inc.*,
  940 F.3d 299 (6th Cir. 2019) .................................................................... 79, 80

*Christou v. Beatport, LLC*,
  849 F. Supp. 2d 1055 (D. Colo. 2012) ........................................................ 15-16

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
  436 Mass. 53 (2002) ............................................................................................ 69

*City of Huntington, West Virginia et al. v. AmerisourceBergen Drug Corp.*,
  --- F.4th ---, 2025 WL 3009526 (4th Cir. 2025 October 28, 2025) .................................... 36, 37

*Clinton v. Sec. Benefit Life Ins. Co.*,
  63 F.4th 1264 (10th Cir. 2023) ................................................................................ 40, 42

*Commodity Futures Trading Comm'n v. Wall St. Underground, Inc.*,
  281 F. Supp. 2d 1260 (D. Kan. 2003) *modified sub nom.*, 2004 WL 1900588
  (D. Kan. June 24, 2004), and *aff'd and remanded*, 128 F. App'x 726 (10th Cir. 2005 ....... 61-62

*Commw. v. Exxon Mobil Corp.*,
  2021 WL 3493456 (Mass. Super. June 22, 2021) ....................................................... 52

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ................................................................................ 28

*Crane Const. Co. v. Klaus Masonry, LLC*,
  114 F. Supp. 2d 1116 (D. Kan. 2000) ...................................................................... 63

*Crompton Corp. v. Clariant Corp.*,
  221 F. Supp. 2d 683 (M.D. La. 2002) ...................................................................... 76

*CSMN Invs., LLC v. Cordillera Metro. Dist.*,
  956 F.3d 1276 (10th Cir. 2020) .............................................................................. 27, 28

*Curtis v. 7-Eleven, Inc.*,
  2022 WL 4182384 (N.D. Ill. Sept. 13, 2022) ............................................................ 48

*Curtis Lumber Co. v. Louisiana Pac. Corp.*,
  618 F.3d 762 (8th Cir. 2010) .................................................................................. 67

*Darke v. Lurie Besikof Lapidus & Co., LLP*,
  550 F. Supp. 2d 1032 (D. Minn. 2008) .................................................................... 19, 20

*Daye v. Cmty. Fin. Serv. Centers, LLC*,
  313 F.R.D. 147 (D.N.M. 2016) ............................................................................... 88

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*,
  887 F.2d 1499 (11th Cir. 1989) .............................................................................. 17

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018) ...................................................................... 16

*Dias v. City & Cnty. of Denver*,
  567 F.3d 1169 (10th Cir. 2009) ............................................................... 8

*Donna M. King, Individually & as Ex'x of the Est. of Harry E. King, Jr., v. Phillip Morris, Inc.*,
  2000 WL 34016358 (N.H. Super. Nov. 2, 2000) ...................................... 54

*Dowd v. Imperial Chrysler-Plymouth, Inc.*,
  381 S.E.2d 212 (S.C. Ct. App. 1989) ................................................. 52, 53

*Dryvit Sys. v. Feldspar Corp.*,
  1995 WL 941376 (R.I. Super. Jan. 19, 1995) ...................................... 53, 54

*Duff v. Morgantown Energy Assocs.*,
  421 S.E.2d 253 (W. Va. 1992) ................................................................ 36

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ............................................................................... 26

*Earth Island Inst. v. Coca-Cola Co.*,
  321 A.3d 654 (D.C. App. 2024) ........................................... 47, 49, 50, 68

*Edgar v. Teva Pharms. Indus. Ltd.*,
  2024 WL 1282436 (D. Kan. Mar. 26, 2024) ....................................... 31, 32

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................... 23

*Exxon Mobil Corp. v. Atty. Gen.*,
  94 N.E.3d 786 (Mass. 2018) ................................................................... 44

*Fed. Trade Comm'n v. Affiliate Strategies, Inc.*,
  2010 WL 11470103 (D. Kan. June 8, 2010) ........................................... 45

*Felix v. American Honda*,
  2008 WL 199817 (D. Kan. 2008) ............................................................ 77

*Ferko v. Nat'l Ass'n of Stock Car Racing*,
  2002 WL 34477591 (E.D. Tex. Oct. 4, 2002) ......................................... 76

*Fernandez v. Clean House, LLC*,
  883 F.3d 1296 (10th Cir. 2018) .............................................................. 66

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021) ............................................................................... 78

*Foreman v. Haliron Power LLC*,
  2021 WL 5139519 (W.D. Ark. Nov. 3, 2021).........................56

*Foster v. Chattem, Inc.*,
  2014 WL 3687129 (M.D. Fla. July 24, 2014) ......................43

*Front Row Techs., LLC v. NBA Media Ventures*, LLC,
  163 F. Supp. 3d 938 (D.N.M. 2016)..................................87

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
  416 F. Supp. 3d 1189 (D. Colo. 2019) .........................14-15, 18

*Geis v. Nestle Waters N. Am., Inc.*,
  321 F. Supp. 3d 230 (D. Mass. 2018)................................69

*Gen. Steel Domestic Sales, LLC v. Denver/Boulder Better Bus. Bureau*,
  2009 WL 535780 (D. Colo. Mar. 2, 2009) ..........................38

*George v. Urban Settlement Servs.*,
  2017 WL 4222620 (D. Colo. Sept. 21, 2017)........................29

*Gibbons v. J. Nuckolls, Inc.*,
  216 S.W.3d 667 (Mo. 2007)..........................................70

*Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*,
  80 F.3d 895 (4th Cir. 1996) ........................................73

*Go-Video, Inc. v. Akai Elec. Co.*,
  885 F.2d 1406 (9th Cir. 1989) ......................................75

*Graebner v. James*,
  2012 WL 6156729 (N.D. Cal. Dec. 11, 2012)........................49

*Gray v. Dignity Health*,
  70 Cal. App. 5th 225 (Cal. Ct. App. 2021).....................67-68

*Gray v. N.C. Ins. Underwriting Ass'n*,
  352 N.C. 61 (N.C. 2000) ...........................................73

*Greenley v. Kochava Inc.*,
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) ...........................56

*Griffith v. Drew's LLC*,
  860 N.W.2d 749 (Neb. 2015) .......................................54

*Habecker v. Town of Estes Park, Colo.*,
　518 F.3d 1217 (10th Cir. 2008) ........................................................ 10

*Harris v. Chevron U.S.A., Inc.*,
　2015 WL 3746989 (W.D. Okla. June 15, 2015) ................................ 63

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
　316 F. Supp. 2d 186 (E.D. Pa. 2004) ................................................ 15

*Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*,
　743 S.E.2d 808 (S.C. 2013) .............................................................. 52

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
　527 F. Supp. 2d 1257 (D. Kan. 2007) ................................................ 20

*HM Compounding Servs., Inc. v. Express Scripts, Inc.*,
　2015 WL 4162762 (E.D. Mo. July 9, 2015) ...................................... 22

*Hodsdon v. Mars*,
　891 F.3d 857 (9th Cir. 2018) ............................................................ 51

*Honey Bum, LLC v. Fashion Nova, Inc.*,
　63 F.4th 813 (9th Cir. 2023) ............................................................. 20

*Huch v. Charter Commc'ns, Inc.*,
　290 S.W.3d 721 (Mo. 2009) .............................................................. 70

*Huffman v. Credit Union of Tex.*,
　758 F.3d 963 (8th Cir. 2014) ............................................................ 55

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
　340 F. Supp. 3d 285 (S.D.N.Y. 2018) .............................................. 65

*In re Air Cargo Shipping Antitrust Litig.*,
　2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ............................... 58

*In re Asacol Antitrust Litig.*,
　907 F.3d 42 (1st Cir. 2018) ............................................................... 30

*In re Auto. Parts Antitrust Litig.*,
　50 F. Supp. 3d 836 (E.D. Mich. 2014) ......................................... 11-12

*In re Auto. Parts Antitrust Litig.*,
　2015 WL 14047405 (E.D. Mich. Apr. 30, 2015) .............................. 35

*In re Auto. Refinishing Paint Antitrust Litig.*,
　358 F.3d 288 (3rd Cir. 2004) ........................................................................ 75, 76, 77

*In re Broiler Chicken Antitrust Litig.*,
　290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................................................................... 24

*In re Broiler Chicken Antitrust Litig.*,
　2025 WL 461407 (N.D. Ill. Feb. 11, 2025) .............................................................. 23

*In re Credit Default Swaps Auctions Litig.*,
　710 F. Supp. 3d 895 (D.N.M. 2023) .................................................................. 26, 64

*In re EpiPen Mktg., Sales Pracs. and Antitrust Litig.*,
　545 F. Supp. 3d 922 (D. Kan. 2021) ....................................................................... 59

*In re Fragrance Direct Purchaser Antitrust Litig.*,
　2025 WL 579639 (D.N.J. Feb. 21, 2025) ...................................................... 16, 21, 23

*In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*,
　966 F. Supp. 1525 (E.D. Mo. 1997) ......................................................................... 55

*In re High Fructose Corn Syrup Antitrust Litig.*,
　295 F.3d 651 (7th Cir. 2002) .................................................................................... 20

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
　383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...................................................................... 16

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
　2009 WL 3122501 (D. Kan. Sept. 24, 2009) ........................................................... 31

*In re Nat'l Prescription Opiate Litig.*,
　332 F.R.D. 532 (N.D. Ohio 2019) ............................................................................ 37

*In re Petroleum Prods. Antitrust Litig.*,
　782 F. Supp. 487 (C.D. Cal. 1991) .......................................................................... 59

*In re Processed Egg Prods. Antitrust Litig.*,
　821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................... 24

*In re Rubber Chems. Antitrust Litig.*,
　504 F. Supp. 2d 777 (N.D. Cal. 2007) ..................................................................... 59

*In re Sch. Asbestos Litig.*,
　921 F.2d 1310 (3d Cir. 1990) ................................................................................... 37

*In re StarLink Corn Prods. Liab. Litig.*,
  212 F. Supp. 2d 828 (N.D. Ill. 2002) ............................................................ 39

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  64 F. Supp. 3d 665 (E.D. Pa. 2014) .............................................................. 60

*In re Syngenta AG MIR 162 Corn Litig.*,
  131 F. Supp. 3d 1177 (D. Kan. 2015) ........................................................... 39

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ....................................................................... 26

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009) ............................................................................... 53

*In re Urethane Antitrust Litig.*,
  409 F. Supp. 2d 1275 (D. Kan. 2006) ........................................................... 57

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
  2022 WL 16729170 (11th Cir. Nov. 7, 2022) ............................................... 30

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018) ............................................. 8, 31, 55-56

*Insignia Sys., Inc. v. News Am. Mkg. In-Store, Inc.*,
  661 F. Supp. 2d 1039 (D. Minn. 2009) ......................................................... 14

*Interstate Cir. v. United States*,
  306 U.S. 208 (1939) .................................................................................... 20

*J. Vangel Elec., Inc. v. Sugar Creek Packing Co.*,
  2011 WL 3102466 (D. Kan. 2011) ............................................................... 87

*J.R. Simplot Co. v. Chevron*,
  2011 WL 5574950 (D. Utah Nov. 16, 2011) ................................................. 62

*Jamieson v. Vatterott Educ. Ctr., Inc.*,
  473 F. Supp. 2d 1153 (D. Kan. 2007) ........................................................... 41

*Johnson v. Gilead Sciences, Inc.*,
  563 F. Supp. 3d 981 (E.D. Mo. 2021) ........................................................... 52

*K. A. v. Barnes*,
  134 F.4th 1067 (10th Cir. 2025) .................................................................. 83

*Katana Silicon Techs. LLC v. Micron Tech.*, Inc.,
    671 F. Supp. 3d 1138 (D. Idaho 2023) ................................................................. 27

*Khalik v. United Air Lines*,
    671 F.3d 1188 (10th Cir. 2012) ............................................................................ 7

*King & King Enters. v. Champlin Petroleum Co.*,
    657 F.2d 1147 (10th Cir. 1981) ........................................................................... 59

*Kucharski-Berger v. Hill's Pet Nutrition, Inc.*,
    60 Kan. App. 2d 510 (2021) ............................................................................... 24

*Lamothe v. Decentral Life, Inc.*,
    2024 WL 5055576 (D. Colo. Oct. 24, 2024) *report and recommendation adopted sub nom.*,
    2024 WL 5055579 (D. Colo. Nov. 12, 2024) ............................................... 62-63

*Lang McLaughry Spera Real Est., LLC v. Hinsdale*,
    35 A.3d 100 (Vt. 2011) ...................................................................................... 74

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    897 F.3d 88 (2d Cir. 2018) ................................................................................. 30

*Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*,
    136 U.S. 1 (1890) ................................................................................. 79, 80, 84

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..................................................................................37-38, 39

*Linde v. Envision Healthcare Corp.*,
    2021 WL 3089214 (D. Kan. 2021) ...................................................................... 88

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ................................................................... 19, 21

*LLW Enter., LLC v. Ryan*,
    2020 WL 2630859 (M.D. Fla. May 4, 2020) ...................................................... 68

*Lohman v. Daimler-Chrysler Corp.*,
    142 N.M. 437 (Ct. Ap. 2007) ............................................................................. 72

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ........................................................................... 15

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 10, 12

*LW Constr. of Charleston, LLC v. U.S.*,
   139 Fed. Cl. 254 (2018) ................................................................................................ 44

*Lynch v. Nat'l Prescription Adm'rs, Inc.*,
   787 F.3d 868 (8th Cir. 2015) ..................................................................................... 80

*Manhattan Credit Co. v. Burns*,
   323 S.W.2d 206 (Ark. 1959) ....................................................................................... 53

*Martin v. Harris*,
   236 N.W. 914 (Neb. 1931) .......................................................................................... 54

*Martinez v. Wexford Health Servs., Inc.*,
   2021 WL 1546429 (N.D. Ill. Apr. 20, 2021) ........................................................... 24

*Melea, Ltd. v. Jawer SA*,
   511 F.3d 1060 (10th Cir. 2007) ................................................................................. 77

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ................................................................................... 30

*Melnick v. Tamko Bldg. Prods., Inc.*,
   2020 WL 5548807 (D. Kan. Sept. 16, 2020) .......................................................... 49

*Milliken & Co. v. Duro Textiles, LLC*,
   887 N.E.2d 244 (Mass. 2008) .................................................................................... 69

*Moehrl v. Nat'l Assoc. of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) ....................................................................... 24

*Moore v. Mack's Sport Shop, LLLP*,
   2017 WL 4350980 (E.D. Ark. Sept. 29, 2017) ....................................................... 53

*Motal v. Allstate Prop. & Cas. Ins. Co.*,
   2021 WL 724564 (E.D. Ark. Feb. 24, 2021),
   *aff'd*, 2023 WL 3515690 (8th Cir. May 18, 2023) ................................................. 52

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ..................................................................................................... 37

*Mtn. Springs Water Co. v. Mtn. Lakes Vill. Dist.*,
   489 A.2d 647 (N.H. 1985) .......................................................................................... 54

*Nat'l Ass'n for the Advancement of Colored People v. Am. Family Mut. Ins. Co.*,
   978 F.2d 287 (7th Cir. 1992) ................................................................................. 30-31

*Navajo Nation v. Urb. Outfitters, Inc.*,
    935 F. Supp. 2d 1147 (D.N.M. 2013)................................................................. 72

*OneSky Litig. Tr. v. Sullivan*,
    2012 WL 124739 (D.N.H. Jan. 17, 2012) ........................................................... 56

*Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*,
    720 F. Supp. 3d 1087 (D.N.M. 2024)................................................................. 19

*Parker v. Arcaro Drive Homeowners Ass'n*,
    791 S.E.2d 283 (N.C. 2016) ............................................................................... 54

*Philip Morris Cos., Inc. v. Miner*,
    462 S.W.3d 313 (Ark. 2015) .........................................................................52-53

*Pioneer Expl. Ltd. v. Kansas Gas Serv. Co.*,
    2004 WL 2931403 (D. Kan. Dec. 17, 2004) ..................................................... 62

*Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC*,
    2013 WL 1786356 (S.D. Fla. Apr. 25, 2013).................................................68-69

*Pub. Emps.' Ret. Sys. v. Harper*,
    2016 WL 3257895 (Nev. June 10, 2016) ........................................................... 54

*Pure Oil Co. v. Suarez*,
    382 U.S. 202, 205 ............................................................................................... 75

*Quintana v. Santa Fe Cnty. Bd. of Comm'rs*,
    973 F.3d 1022 (10th Cir. 2020) ........................................................................... 7

*R.J. Reynolds Tobacco Co. v. Eight Jud. Dist. Ct. in & for Cnty. Of Clark*,
    514 P.3d 425 (Nev. 2022)................................................................................... 71

*Rawson v. ALDI, Inc.*,
    2022 WL 1556395 (N.D. Ill. May 17, 2022)..................................................... 50

*Renfro v. Champion Petfoods USA, Inc.*
    25 F.4th 1293 (10th Cir. 2022)........................................................................... 47

*Riddell v. GM LLC*,
    2024 WL 2077559 (E.D. Mo. May 9, 2024) ..................................................... 50

*Robbins v. Okla.*,
    519 F.3d 1242 (10th Cir. 2008) ........................................................................... 7

*Robert E. Ricciardelli v. Home Depot*,
    679 F. Supp. 2d 192 (D. Mass. 2010)................................................................. 56

*Robertson v. Sea Pines Real Estates Cos., Inc.*,
    679 F.3d 278 (4th Cir. 2012) ................................................................... 21, 25

*Roche Diagnostics Corp. v. Priority Healthcare Corp.*,
    407 F. Supp. 3d 1216 (N.D. Ala. 2019) ....................................................... 63

*Rocky Mtn. Wild v. Dallas*,
    98 F.4th 1263 (10th Cir. 2024) ...................................................................... 9

*Roman v. Cessna Aircraft Co.*,
    55 F.3d 542 (10th Cir. 1995) ....................................................................... 15

*Roper v. Big Heart Pet Brands, Inc.*,
    510 F. Supp. 3d 903 (E.D. Cal. 2020) ......................................................... 43

*Rumble, Inc. v. World Fed'n of Advertisers*,
    2025 WL 2345076 (N.D. Tex. Aug. 13, 2025) ............................................. 76

*Safeway Stores, Inc. v. F.T.C.*,
    366 F.2d 795 (9th Cir. 1966) ....................................................................... 65

*Sanderson v. Culligan Intern Co.*,
    415 F.3d 620 (7th Cir. 2005) ................................................................... 17-18

*Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, N.M.*,
    993 F.3d 802 (10th Cir. 2021) ................................................................ 10-11

*Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*
    137 N.M. 524 (N.M. Ct. App. 2005) ............................................................ 72

*Santosuosso v. Gibbs Ford, Inc.*,
    1992 Mass. App. Div. 167 (Mass. Dist. App. Div. 1992) ............................. 43

*Satsky v. Paramount Commc'ns, Inc.*,
    7 F.3d 1464 (10th Cir. 1993) ....................................................................... 80

*Schenker AG v. Societe Air France*,
    102 F. Supp. 3d 418 (E.D.N.Y. 2015) ......................................................... 58

*Schwartz v. Celestial Seasonings, Inc.*,
    124 F.3d 1246 (10th Cir. 1997) .................................................... 39, 40, 41, 42

*Swartz v. Coca-Cola*,
    2022 WL 17881771 (N.D. Cal. Nov. 18, 2022) ........................................... 48

*Scott v. City of Tulsa,*
  2022 WL 36879 (N.D. Okla. Jan. 4, 2022) .......................................... 25

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015) ............................................................. 21

*Seattle-First Nat. Bank v. Carlstedt,*
  800 F.2d 1008 (10th Cir. 1986) .......................................................... 40

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc,*
  2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) .......................................... 71

*Series 17-03-615 v. Teva Pharms. USA, Inc.,*
  785 F. Supp. 3d 904 (D. Kan. 2025) ...................................................... 8

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
  559 U.S. 393 (2010) ............................................................. 31, 82, 86

*Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n,*
  2024 WL 4884472 (D. Colo. Nov. 25, 2024) ...................................... 20, 21

*Shaykin v. Progressive Cas. Ins. Co.,*
  2020 WL 7042858 (N.M. Ct. App. Nov. 30, 2020) ................................... 52

*Sibley v. St. Albans Sch.,*
  134 A.3d 789 (D.C. 2016) ............................................................ 53-54

*Siqueiros v. Gen. Motors LLC,*
  676 F. Supp. 3d 776 (N.D. Cal. 2023) ..................................................... 9

*Spires as next of Est. of Spires v. Hosp. Corp. of Am.,*
  2009 WL 10712981 (D. Kan. Mar. 26, 2009) ........................................... 88

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ......................................................................... 8

*State ex rel. Graeber v. Marion Cnty. Landfill, Inc.,*
  276 Kan. 328, 76 P.3d 1000 (Kan. 2003) ............................................... 36

*Ste. Marie v. Wells,*
  108 A. 270 (Vt. 1919)................................................................. 53, 54

*Sunbird Air Servs., Inc. v. Beech Aircraft Corp.,*
  789 F. Supp. 364 (D. Kan. 1992)..................................................... 40, 42

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
    238 F. Supp. 3d 1032 (N.D. Ill. 2017) ........................................................ 16

*Suture Exp., Inc. v. Cardinal Health 200, LLC*,
    963 F. Supp. 2d 1212 (D. Kan. 2013) ......................................................... 64

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) ................................................................... 13

*Taylor v. JBS Foods USA*,
    2025 WL 102450 (D.S.D. Jan. 15, 2025) .................................................... 14

*Thayer v. Hicks*,
    793 P.2d 784 (Mont. 1990) ......................................................................... 53

*Thompson v. 1-800 Contacts, Inc.*,
    2018 WL 2271024 (D. Utah May 17, 2018) ................................................ 59

*Tobler v. 1248 Holdings, LLC*,
    2025 WL 89052 (D. Kan. Jan. 14, 2025) ............................................... 64, 65

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ................................................................... 25-26

*TP ST Acquisition, Inc. v. Lindsey*,
    2021 WL 1750872 (D. Kan. May 4, 2021) ................................................. 57

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................... 9

*Uhlig LLC v. CoreLogic, Inc.*,
    2024 WL 1557626 (D. Kan. Apr. 10, 2024) ........................................... 13-14

*U.S. ex rel. Schroeder v. Medtronic, Inc.*,
    2021 WL 4168140 (D. Kan. Sept. 14, 2021) ............................................... 89

*U.S. ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*,
    232 F.3d 902, 2000 WL 1595976 (10th Cir. 2000) ..................................... 40

*U.S. ex rel. Wynne v. Blue Cross & Blue Shield of Kansas, Inc.*,
    2006 WL 1064108 (D. Kan. Apr. 21, 2006) ..................................... 40, 41, 42

*U.S. v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ....................................................... 27, 28, 45

*U.S. v. Philip Morris USA, Inc.*,
   337 F. Supp. 2d 15 (D.D.C., 2004),
   *aff'd in part, vacated in part*, 566 F.3d 1095 (D.C. Cir. 2009) ................................. 27

*United States v. Colgate-Palmolive Co.*,
   375 F. Supp. 962 (D. Kan. 1974) .......................................................... 36

*United States v. Glaub*,
   910 F.3d 1334 (10th Cir. 2018) ........................................................... 45

*United States v. Hardman*,
   297 F.3d 1116 (10th Cir. 2002) ........................................................... 17

*United States v. Novo Nordisk, Inc.*,
   2022 WL 16716299 (W.D. Okla. Nov. 4, 2022) ....................................... 42

*Valdez v. Nat'l Sec. Agency*,
   228 F. Supp. 3d 1271 (D. Utah 2017) ................................................. 7-8

*Vesom v. Atchison Hosp. Ass'n*,
   279 F. App'x 624 (10th Cir. 2008) ....................................................... 14

*Volling v. Antioch Rescue Squad*,
   999 F. Supp. 2d 991 (N.D. Ill. 2013) .................................................... 31

*Washington v. Gen. Motors Corp.*,
   406 U.S. 109 (1972) ........................................................................ 36

*Washington v. Landmark Tech. A, LLC*,
   637 F. Supp. 3d 1154 (W.D. Wash. 2022) ............................................ 27

*Wilder v. Aetna Life & Cas. Ins. Co.*,
   140 Vt. 16 (1981) ........................................................................... 74

*Williams v. Gerber Products Co.*,
   552 F.3d 934 (9th Cir. 2008) .............................................................. 43

*Winningkoff v. Am. Cyanamid*,
   2000 WL 235648 (E.D. La. Mar. 1, 2000) ............................................. 62

*Woodard v. Fid. Nat. Title Ins. Co.*,
   2007 WL 5173415 (D.N.M. Dec. 4, 2007) ............................................. 29

*Wright v. Craft*,
   640 S.E. 2d 486 (S.C. Ct. App. 2007) .................................................. 74

*Zetor N. Am., Inc. v. Rozeboom*,
  2018 WL 3865411 (W.D. Ark. Aug. 14, 2018) ................................................................. 51, 67

**Statutes**

15 U.S.C. § 22 ...................................................................................................................... 75, 76

28 U.S.C. § 1291 ........................................................................................................................ 83

Ark. Code Ann. §§ 4-88-107(a)(1), (a)(10) ............................................................................... 67

Cal. Bus. & Prof. Code § 17200 ............................................................................................... 67

D.C. Code § 28-3904(a) ............................................................................................................ 68

K.S.A. 19-247 .................................................................................................................. 33, 34, 85

K.S.A. 19-723 ....................................................................................................................... 34, 85

K.S.A. 19-101 ............................................................................................................................ 81

K.S.A. 21-6204(a) ...................................................................................................................... 35

K.S.A. 60-908 ............................................................................................................. 33, 81-82, 85

K.S.A. 65-3401 .......................................................................................................................... 35

K.S.A. 65-3402 .......................................................................................................................... 35

La. Rev. Stat. Ann. § 42:263(A) ............................................................................................... 88

Mass. Gen. Laws ch. 93A ......................................................................................................... 69

Mo. Rev. Stat. § 407.020(1) .................................................................................................. 69-70

Mont. Code. Ann. § 30-14-103 ................................................................................................. 70

Mont. Code Ann. § 30-14-101 .................................................................................................. 70

N.C. Gen. Stat. § 75-1.1 ........................................................................................................... 73

N.H. Rev. Stat. Ann. § 358-A ................................................................................................... 72

N.M. Stat. Ann. § 57-12-2(D) ................................................................................................... 72

Neb. Rev. Stat. § 59-1602 ......................................................................................................... 71

Neb. Rev. Stat. § 59-1601 ..................................................................................... 71

Nev. Rev. Stat. §§ 598.0915 ................................................................................. 71

R.I. Gen. Laws § 6-13.1 ........................................................................................ 73

S.C. Code Ann. § 39-5-20(a) ................................................................................ 73

9 V.S.A. § 2453(a) ................................................................................................ 74

**Rules**

Fed. R. Civ. P. 8 ......................................................................................... 24, 40, 56

Fed. R. Civ. P. 9(b) ........................................................................................ 39, 40

**Regulations**

16 C.F.R. § 260.12(a) .................................................................................. 47, 48, 49

**Other Authorities**

Kan. S. Sub. for H.B. No. 2228 (2025) ................................................................. 84

Restatement (Second) of Torts § 821B .................................................................. 36

Kan. Const. art. 12, § 5 ........................................................................................ 81

This case arises from a decades-long, industry-wide conspiracy by the world's largest petrochemical companies, plastics manufacturers, and their trade associations (collectively, "Defendants") to deceive the public about the fundamental nature of their products. As alleged in the First Amended Complaint ("FAC"), Doc. 48, starting in the 1950s and continuing today, Defendants engaged in a coordinated, fraudulent marketing scheme to portray plastics as broadly and readily recyclable, knowing that the vast majority of consumer plastics cannot be and are not recycled. This deception was not incidental; it was a deliberate strategy to assuage consumer guilt, inflate the perceived value of plastic products, and drive ever-increasing sales, all while offloading the staggering environmental and financial costs of plastic waste onto the public.

Defendants' motion to dismiss should be denied in its entirety.

## BACKGROUND

Plastics are part of a sector known as "petrochemicals," or products made from fossil fuels. Doc. 48 ¶ 42. Although many types of plastics are theoretically recyclable, we now know that they are not. *Id.* ¶ 43. Single-use plastic accounts for one-third of all plastic consumed globally and comprises most of the plastic waste on Earth. *Id.* ¶ 144. As of 2021, the plastic recycling rate in the United States was a paltry 5-6%. *Id.* ¶ 44. Once plastic enters the environment, that's it; it remains there forever, causing downstream deleterious effects on humans, terrestrial and marine animals, and the rivers, oceans, forests, and woods we all enjoy. *Id.* ¶¶ 74, 143-45.

Exxon Mobil, Chevron USA, Chevron Phillips, Dupont de Nemours, Dupont, Celanese, Dow Chemical, Eastman, and LyondellBasell n/k/a Equistar Chemicals, ("Defendants") currently produce, have produced, and will continue to produce most of the plastic that exists in the world. *Id.* ¶ 146. These Defendants, through their affiliation and work with Defendant American

Chemistry Council,[1] have lied to consumers about the recyclability of plastics for decades, creating the global solid waste crisis. *Id.* ¶¶ 42-57, 63, 66, 70, 75, 77, 90, 93-95, 99. Defendants use trade associations and industry groups to effectuate their deceptive marketing initiatives. *Id.* ¶¶ 89-91. The American Chemistry Council (ACC) is one of the largest of such groups, and all other Defendants were at all relevant times members of the Council (and its predecessors). *Id.* ¶ 33. Together, the petrochemical companies and trade associations conspired to spread the pervasive and admittedly false message that plastics are universally recyclable and a viable solution to the solid waste problem. *Id.* ¶¶ 76-79, 82-84, 88-89, 92-98, 101-03, 109-112, 114-17, 123, 129, 135.

Plaintiffs allege: (1) Defendants pushed the idea that plastics should be single use while knowing plastics are not recyclable; (2) Defendants conspired, using trade associations and front groups, to mislead the public about the viability of plastic recycling; (3) the solid waste crisis results directly from Defendants' conspiracy to mislead; and (4) Defendants continue to conceal the truth about plastic recycling. As the Complaint alleges, these actions were all carried out because of Defendants' collusive decision to drive demand and prices for end use plastic.

## I.    Defendants Falsely Pushed Plastics as Single-Use.

When plastics were first advertised to the mass market, Defendants tried to convince the public that plastics should be thrown away, emphasizing their convenience. *Id.* ¶¶ 58-62. Defendants recognized that if plastics were used only once, they would need to be produced in much larger volumes, leading to increased profits. *Id.* For example, at a Society of the Plastic's Industry national conference in 1956, participants were told that the industry's aim should be for all plastic products to end up "in the garbage wagon." *Id.* ¶ 59. As a result, plastics were identified as a key contributor to the solid waste crisis by the end of the 1970s. *Id.* ¶ 66. When Defendants

---

[1] The ACC merged with the American Plastics Council (formerly the Council for Solid Waste Solutions ("CSWS") and Partnership for Plastics Progress ("P3")) in 2002. *Id.* ¶¶ 33, 90.

2

faced public backlash on this issue, their interim solutions were landfilling and incinerating, while promising that "it is always possible that scientists and engineers will learn to recycle or dispose of wastes at a profit." *Id.* ¶¶ 4, 47, 65, 68, 72-74, 140.

As early as 1969, Defendants knew plastic recycling was not viable, in part because even on the rare occasion plastics can be recycled, it is more costly and of lower quality than its newly manufactured counterpart. *Id.* ¶¶ 70-74. At a Vinyl Institute meeting in 1989, the members discussed a study on the economics of recycling, concluding that "recycling is not and will never be commercially viable unless it is significantly subsidized by a government entity." *Id.* ¶ 83. In a 1994 meeting with APC, Exxon Chemical Vice President, Irwin Levowitz, explained Defendants' mission, "We are committed to the activities, but not committed to the results." *Id.* ¶ 134. At best, plastic recycling is technically impractical, with only 5-6% of plastics being recycled today. *Id.* ¶ 44. In practice, though, it is functionally impossible; there is no market for recycled plastics and Defendants do not want plastics to be recycled. *Id.* ¶¶ 71, 102, 124-25.

## II.    Defendants Developed an Industrywide Agreement to Mislead Americans.

By the 1980s, still seeking to drive profits, Defendants shifted their focus to misrepresenting the viability of plastic recycling in direct response to public backlash about the solid waste crisis. *Id.* ¶ 84. Trade associations and front groups were created during this time to assist the plastics industry in its fraudulent recycling scheme. *Id.* ¶¶ 90, 97, 104. A variety of organizations were created in this brief span and include Defendants as members: the Plastic Bottle Institute (PBI) in the early 1980s; the Center for Plastics Recycling Research (CPRR) in 1985; the Council on Packaging in the Environment (COPE) in 1986; the Council for Solid Waste Solutions (CSWS) in 1988, *Id.* ¶ 90 (Figure 6), which became known as the Partnership for Plastics Progress (P3) in 1992 before quickly being reorganized as the American Plastics Council (APC), which later merged with Defendant ACC. *Id.* ¶¶ 33, 90. Not coincidentally, The National Association for

PET Container Resources (NAPCOR) was established around the same time. *Id.* ¶ 96. All of these groups had the same directive: defend the plastics industry from restrictive scrutiny. Defendants and the trade groups worked in concert to push the same narrative: selling recycling as a viable solution to plastic waste. *Id.* ¶ 97.

After Defendants joined the Council for Solid Waste Solutions (thereafter APC or ACC), they pushed the plastics recycling message with increased coordination and seriousness. *Id.* ¶ 92. For example, the official-sounding organization took out a 12-page advertisement in a 1989 edition of *Time Magazine*, exclaiming, "The URGENT NEED to RECYCLE." *Id.* ¶ 93. The largest plastic resin producers, including Exxon, Mobil, DuPont, and Dow, invested tens of millions of dollars into multiple aspects of plastic recycling, including public relations efforts to shape consumer perception of recycling. *Id.* ¶ 98. Internal ACC meeting notes from May 1995 indicate the organization changed their reporting methodology for plastic recycling, making it appear that recycling rates increased more than they had. *Id.* ¶¶ 110-11.



**Figure 6**

The executive board members of the Council for Solid Waste Solutions, including many of the world's largest fossil fuel and petrochemical companies, were listed on the cover of the organization's industry newsletter, *Handlers News. CSWS, 1991 (emphasis added).*

III.    **Defendants' Conspiracy to Mislead Consumers Caused the Solid-Waste Crisis.**

The steep increase in plastic production over the past 60 years created a dramatic increase in plastic waste: in the United States, plastic increased as a percentage of municipal solid waste (by mass) from 0.4% in 1960 to 12.2% in 2018. *Id.* ¶ 141. An estimated 44 million tons of plastic waste were generated in the U.S. in 2019 alone. *Id.* And by 2023, Exxon Mobil and other Defendants expanded their U.S. plastic production to 7.7 million tons per year. *Id.* ¶ 141 (*See* Figure 15). While plastic waste volumes have increased, plastic recycling rates have not. *Id.* ¶¶ 44, 95, 110, 140. In 2000, the plastics recycling rate sat at just 6% and only increased three percentage points, to 9%, by 2018. *Id.* ¶ 140. Yet considering plastic waste export data, most of this increase can be attributed to the export of millions of pounds of plastic waste to China and developing countries, supposedly for recycling but often for incineration or landfilling. *Id.*

Today, the rate of plastic waste exports has declined, and the recycling rate has too. *Id.* The current U.S. recycling rate is a dismal 5%. *Id.* For context, if 44 million tons of plastic waste is generated each year, only 2.2 million tons is recycled, leaving 41.8 million tons of plastic waste in our landfills. Every year, new plastic is added on top of the previous year's hoard, leaving municipalities with the bill. *Id.* ¶¶ 47, 50, 73, 79, 105, 141, 143. This is not an abstract problem, but a crisis growing exponentially. *Id.* ¶ 141 (*See* Figure 15).

IV.    **Despite Ongoing Environmental Issues, Defendants' Fraudulent Concealment Continues in Recent Years and Perpetuates the Solid-Waste Crisis.**

In 2019, NAPCOR and its membership of companies conceived a scheme to combat a rising "tide of anti-plastic sentiment." *Id.* ¶ 150. To address this issue, NAPCOR hired a public relations firm. *Id.* The public relations firm created the "Positively PET" slogan for its campaign. *Id.* Internal documents reveal NAPCOR hired social media influencers to push the "Positively PET" campaign. *Id.* ¶ 151. NAPCOR paid these social media influencers to make Positively PET

5

posts containing the claim that PET bottles are 100% recyclable and can be made with 100% recyclable content. *Id.* But that claim does not match NAPCOR's own recycling data for PET Bottle Collection Rates, 2001-2022. *Id.* (*See* Figure 16).

**Figure 16: NAPCOR Recycling Data 2001-2022**



Similarly, Defendants and associated plastics trade groups continue their misleading advertising campaigns even still. *Id.* ¶¶ 152-53. In 2023, Exxon played an active role in the governance of Society of Plastics Industry (SPI) (now Plastics Industry Association (PIA)), where an Exxon Senior Sustainability Advisor was Vice Chair of PIA's Recycling Committee. *Id.* ¶ 153. And again, in 2024 during the Paris Olympics, NAPCOR employed strategy to "newsjack" trending topics with NAPCOR's industry-favoring, misleading recycling messages. *Id.* ¶ 152.

Defendants' efforts to mislead the American consumer have not stopped, all while the world is in crisis. *Id.* ¶¶ 5, 137, 152-53. The Plastics Industry Association, with Exxon Mobil at the helm, continues to play an integral role in pushing the message that plastics are recyclable, as confirmed by its website and companion site, recyclingisreal.com. *Id.* ¶ 154. Widespread production and promotion of single-use plastic have led to persistent plastic leakage into the

environment. *Id.* ¶¶ 4, 142-43. Around the world each year, an estimated 11 million tons of plastic waste become aquatic pollution, and 18 million tons of plastic waste pollute land. *Id.* ¶ 143. Together, that is the equivalent of four garbage trucks of new plastic waste polluting water or land *every minute*. *Id.* Because of Defendants' coordinated, industry-wide conspiracy to deceive American citizens, all polled groups, including—consumers, media members, government officials, and even waste management industry representations—believed plastic could be recycled economically at a much higher rate than it could be. *Id.* ¶ 149.

## LEGAL STANDARD

The Court must "take Plaintiffs' well-pleaded facts as true, view them in the light most favorable to Plaintiffs, and draw all reasonable inferences from the facts in favor of Plaintiffs." *Brooks v. Mentor Worldwide*, 985 F.3d 1272, 1281 (10th Cir. 2013). Rule 8(a) "still lives" so "specific facts are not necessary" and plaintiffs "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). In the *Iqbal/Twombly* era, it remains a "bedrock principle" that a district court "must accept all allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven true." *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008). The term "plausible" does not and cannot mean "'likely to be true.'" *Id.* To the contrary, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). There is a "low bar for surviving a motion to dismiss." *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020). "At the pre-discovery motion to dismiss stage, this court must assume the truth of well-pleaded factual allegations that are not simply legal conclusions or bare assertions of the elements of a claim—so long as the allegations do not 'defy reality as we know it'—even if,

in the court's own judgment, those facts seem at the outset incredible, unbelievable, or highly unlikely to be true." *Valdez v. Nat'l Sec. Agency*, 228 F. Supp. 3d 1271, 1280 (D. Utah 2017) (quotations in original). So "granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (alteration in original) (citation omitted).

## ARGUMENTS AND AUTHORITIES

I.    **Plaintiffs Pled Sufficient Facts to Establish Article III Standing for Their Claims.**

A.    **Plaintiffs suffered concrete and particularized injuries-in-fact.**

The "first and foremost" of standing's three elements is injury in fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). A concrete injury is "'de facto'; that is, it must actually exist." *Id.* at 340. The injury must also be "particularized," meaning it must "affect the plaintiff in a personal and individual way." *Id.* at 339. Plaintiffs' allegations meet this standard.

Plaintiffs allege direct, out-of-pocket financial injury. The Complaint details how Defendants' conspiracy drives up the demand for plastics. *E.g.,* Doc. 48 ¶¶ 58, 99, 102, 103, 104, 105, 155. Plaintiffs paid supracompetitive prices for products they would not have purchased, or would have paid less for, but for Defendants' misrepresentations of recyclability. Doc. 48 ¶¶ 171-76. This overpayment for a product that does not possess qualities advertised is the quintessential form of economic injury recognized by federal courts. A claim that class members spent money that, absent defendants' conduct, they would not have spent is a "'quintessential injury-in-fact.'" *Series 17-03-615 v. Teva Pharms. USA, Inc.*, 785 F. Supp. 3d 904, 942 (D. Kan. 2025) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) and citing *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1332 (D. Kan. 2018)).

This financial harm is both concrete and particularized. It is concrete because it involves a tangible monetary loss—the premium paid for the "recyclability" attribute that was never delivered. As the Supreme Court has consistently held, tangible harms, particularly monetary ones, "readily qualify as concrete injuries under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The injury is particularized because each Consumer Plaintiff personally paid these inflated prices for the plastic products they purchased, affecting their individual financial resources. Doc. 48 ¶¶ 15-23. The moment a Plaintiff purchased a plastic product falsely marketed as recyclable at a premium price, they suffered a concrete economic loss. This is a traditional harm long recognized at common law, akin to claims for fraud and breach of warranty, where a buyer receives something of lesser value than what was represented. *TransUnion*, 594 U.S. at 424 (noting that historical practice is instructive for the concreteness inquiry); *see also Siqueiros v. Gen. Motors LLC*, 676 F. Supp. 3d 776, 825 (N.D. Cal. 2023) ("the law is clear that 'overpayment is a viable theory of economic injury' and that Plaintiffs can satisfy the injury in fact requirement by showing that the defect caused them to overpay") (quoting *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 706 (9th Cir. 2020))

Plaintiffs also allege the accumulation of non-recyclable plastics resulted in tangible environmental damage, constituting a public nuisance that Plaintiffs have a direct interest in abating. Doc. 48 ¶¶ 206-16. It is a physical degradation of property, akin to the harm at issue in other environmental cases where standing is routinely found. *See, e.g., Rocky Mtn. Wild v. Dallas*, 98 F.4th 1263, 1286-87 (10th Cir. 2024) (citing *Summers v. Earth Island. Inst.*, 555 U.S. 488, 494 (2009)). Documents like the EPA report on U.S. recycling underscore the current challenges facing the system, including infrastructure that has not kept pace with today's waste stream, which

directly translates to increased costs for municipalities. *See* Doc. 48 ¶ 43 n.9 (citing EPA, The U.S. Recycling System, https://www.epa.gov/circulareconomy/us-recycling-system).

The materiality of the "recyclable" representation underscores the concreteness of the injury. The Complaint alleges that sustainability is a key driver of consumer purchasing decisions and Defendants systematically exploited this by creating the false impression of a circular plastic economy. Doc. 48 ¶¶ 1-2, 101-07, 116-19, 149-53. Internal industry documents, dating back decades, confirm Defendants' awareness of this dynamic. For example, the Society of the Plastics Industry and the Council for Solid Waste Solutions announced in 1991 a goal to recycle 25% of post-consumer bottles and containers by 1995 but abandoned the goal in 1995. Doc. 48 ¶ 104. Defendants profited directly from this deception by charging more for products that consumers would not have purchased, or would have paid less for, had they known the truth about their non-recyclability. Doc. 48 ¶¶ 171-75. Another report confirms the result of this deception: a recycling rate hovering at a mere 5-6%, exposing the vast gap between Defendants' marketing and reality. Doc. 48 ¶ 44. Plaintiffs allege classic, cognizable injury sufficient to establish injury-in-fact.

## B.    Plaintiffs' injuries are traceable to Defendants' unlawful conduct.

The traceability requirement ensures that plaintiff's injury is connected to the defendant's conduct and not the result of the "independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Ky. Welfare Rts. Org.,* 426 U.S. 26, 41-42 (1976)). The standard is less than proximate causation. *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008). The traceability requirement also does not force Plaintiffs to prove that a "'defendant's actions are the very last step in the chain of causation,'" but requires only that Plaintiffs offer allegations that "allow for the conclusion that the challenged conduct is a 'but for' cause of the injury." *Santa Fe All. for Pub. Health & Safety*

*v. City of Santa Fe, N.M.*, 993 F.3d 802, 814 (10th Cir. 2021) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997) and *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012)).

Here, the causal chain is direct and unbroken. Defendants' conspiracy to misrepresent the recyclability of their products is the direct cause of Plaintiffs' injuries. For the Consumer Plaintiffs, traceability is self-evident. Defendants' false representations about recyclability were made with the intent to induce reliance and influence purchasing decisions. Doc. 48 ¶¶ 135-39. Consumers relied on these misrepresentations and, as a result, paid inflated prices. The economic injury—the overpayment—is directly traceable to the deceptive marketing scheme. There is no intervening cause that breaks this chain. For Ford County, the causal link is equally strong. Defendants' scheme was designed to maximize their profits at any cost, including by increasing the consumption of single-use plastics by creating a false sense of environmental responsibility. *E.g.*, Doc. 48 ¶ 47, 63-65, 76-78. This scheme succeeded, leading to a massive increase in the volume of non-recyclable plastic waste entering the municipal waste stream. The subsequent costs incurred by public entities such as Ford County to manage this waste, and the environmental damage it causes, are the direct and foreseeable results of Defendants' conduct.

Defendants' traceability argument is absurd when applied to the premise of the conspiracy Plaintiffs allege: Defendants, their trade associations, and other co-conspirators conspired to maximize profits by fraudulently marketing the recyclability of single use plastics, thereby raising the price paid on *all* plastics because of its supposed recyclability. Defendants' position ignores the inextricable link between their plastics (and marketing efforts for plastics) and other downstream markets that are made available because of this big lie. Such intertwinement does not prevent indirect purchasers from establishing standing at the Rule 12 stage. *See, e.g.*, *In re Auto.*

*Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 851 (E.D. Mich. 2014) (finding standing because plaintiffs injuries were traceable through various levels of distribution chain).

The actions of consumers in purchasing and discarding plastic products are not an intervening cause that severs the causal chain. Rather, consumer disposal of single-use products is the intended and inevitable culmination of Defendants' business model. Defendants cannot flood the market with products they know are unrecyclable, profit from the deception that they are, and then disclaim responsibility for the entirely foreseeable consequences. As courts have recognized in analogous contexts, when a defendant's conduct sets in motion a chain of events that foreseeably leads to the plaintiff's injury, traceability is satisfied. *See, e.g., Bennett*, 520 U.S. at 168-69 (1997) (finding traceability where a biological opinion caused an agency to take action that harmed plaintiffs, even though the agency retained ultimate discretion).

### C.    Plaintiffs' injuries are redressable by a favorable decision.

The final element, redressability, requires a showing that it is "likely" that a favorable court decision will remedy the plaintiff's injury. *Lujan*, 504 U.S. at 561. Defendants do not contest redressability. This standard is readily met here for both damages and injunctive relief. An award of damages would directly redress Plaintiffs' economic injuries, for the premium they overpaid for products lacking the advertised recyclable quality, including the cost of cleanup and further abatement. This direct compensation for past and ongoing financial losses satisfies the redressability requirement. Injunctive relief would also redress Plaintiffs' injuries by halting Defendants' unlawful conduct and preventing future harm. An injunction ordering Defendants to cease their false and misleading marketing about recyclability would prevent future economic injury to consumers and would stem the flow of non-recyclable plastic waste into municipalities, mitigating future cleanup costs and environmental damage for public entities. Here, an injunction would directly address the source of the ongoing injury.

## II.    Plaintiffs Pled Sufficient Antitrust Claims.

Plaintiffs are proper antitrust plaintiffs. Plaintiffs allege an industry-wide conspiracy among plastics manufacturers and trade groups to actively conceal the true recyclability of plastics in the name of profits. The scheme inflated demand and prices for plastic products and thereby injured purchasers—classic antitrust injury flowing from conduct that reduced competition on truth and quality, and ultimately on price. Plaintiffs also plausibly plead proximate causation: absent the coordinated deception, consumers would have shifted to more sustainable packaging, pressuring Defendants to lower resin prices or develop truly recyclable alternatives. The restraint element is met because the conspiracy's purpose and effect were to distort market signals and raise prices through a decades-long campaign of deceit, not isolated advertising. This industry-wide conspiracy constitutes an unlawful restraint of trade, supported by detailed allegations of an express agreement, including both direct and circumstantial evidence such as collusive meetings and a powerful common motive. *Noerr-Pennington* does not immunize deliberately false, non-petitioning commercial speech. Finally, Defendants' state-law standing attacks are premature and, in any event, the state claims are independently viable.

### A.    Plaintiffs are the proper parties to bring antitrust claims.

Plaintiffs sufficiently allege they have antitrust standing. Antitrust standing requires: "(1) an antitrust injury; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (quotation cleaned up). As explained below, the Complaint's allegations sufficiently establish both prongs. Plaintiffs do not dispute that the state-law antitrust claims also require an injury and proximate causation for purposes of this motion.

Plaintiffs do point out that Defendants circumvented the Court's page limits by citing cases applying federal antitrust standing doctrine to state antitrust cases in an exhibit. *See Uhlig LLC v.*

*CoreLogic, Inc.*, 2024 WL 1557626, at *1 (D. Kan. Apr. 10, 2024) (striking an exhibit that contained argument when a party was trying to circumvent the Court's page limitations).

### B.    Plaintiffs sufficiently alleged an antirust injury.

An antitrust injury is one that "the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bow-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Because antitrust laws protect marketplace participants from anticompetitive behavior, the antitrust injury must stem from the competition-reducing effect by the defendant. *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 192 (10th Cir. 2025). In other words, the court must determine whether alleged conduct "affected the prices, quantity or quality of goods or services, not just [plaintiffs'] own welfare." *Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 638 (10th Cir. 2008) (quoting *Mathews v. Lancaster Gen'l Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)) (internal quotation marks omitted).

As explained below, Plaintiffs allege that Defendants conspired with each other to lie about the recyclability of plastics. Consumers relied on these falsehoods when buying goods in plastic packaging, thus increasing demand and prices. Doc. 48 ¶ 172. If Defendants had been honest about the recyclability of their resins, they would have had to lower the price of their resins to account for the weaker consumer demand for materials that clog the landfills in Plaintiffs' communities. *Id.* ¶ 173. Thus, Plaintiffs adequately allege an antirust injury. *See Insignia Sys., Inc. v. News Am. Mkg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1061 (D. Minn. 2009) (finding false statement could form the basis for an antitrust claim); *Taylor v. JBS Foods USA*, 2025 WL 102450, at *13 (D.S.D. Jan. 15, 2025) (finding harm to market from a conspiracy to mislabel products).

Because Plaintiffs have alleged a market-wide conspiracy to boost demand for plastics, the falsehoods alleged by the Complaint differ from isolated statements at issue in the cases cited by Defendants. *See* Doc. 248 at 54. In *GDHI Mktg. LLC v. Antsel Mktg. LLC*, the operative complaint

contained "a single instance of false statement made about [the plaintiff]." 416 F. Supp. 3d 1189, 1202 (D. Colo. 2019). Similarly, *Harrison Aire, Inc. v. Aerostar Int'l, Inc.* relied on a statement in a manual. 316 F. Supp. 2d 186, 222 (E.D. Pa. 2004). These isolated statements could have—at best—a minimal effect on competition. *GDHI Mkg.*, 416 F. Supp. 3d at 1201; 316 F. Supp. 2d at 224. Thus, Plaintiffs have adequately alleged an antitrust injury.

### C.    Plaintiffs connected antitrust injury to Defendants' conspiracy.

The second prong of the antitrust standing doctrine looks to whether a plaintiff can show the alleged antitrust violation proximately caused the antitrust injury. *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1180 (10th Cir. 2023). For injunctive relief claims, the relevant factors for this analysis include:

> (1) the causal connection between the antitrust violation and the plaintiff's potential injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's potential injury—i.e., whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's potential injury and the market restraint resulting from the alleged antitrust violation.

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 667 (10th Cir. 2006). Courts can also consider the speculative nature of any damages as well as the risk of duplicative recoveries or complex damages apportionment for claims seeking damages as Plaintiffs do with their state law antitrust claims. *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995); *but see Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627 (Minn. 2007) (adopting lower standard to show antitrust standing under Minnesota law than that required under federal law).

Here, the Complaint sufficiently establishes that Defendants' lies were a substantial factor in causing Plaintiffs to buy Defendants' unrecyclable plastics. Doc. 48 ¶ 174. The Complaint alleges a detailed story about how Defendants knew that their lies would artificially increase the demand for plastics. *Id.* ¶¶ 87–94, 173; *cf. Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1070 (D. Colo. 2012) (dismissing complaint that offered no facts about how the defendants' actions

15

caused the antitrust injury). If Defendants were collectively honest, Plaintiffs would have bought goods in packaging that is more sustainable. Doc. 48 ¶ 175. This lie was developed to prevent Plaintiffs and consumers from applying market pressure on Defendants to develop products. *Id.* ¶ 76. As the target of these lies and the ones that ultimately paid the increased prices for Defendants' overpriced plastics, Plaintiffs largely are the most efficient enforcers to bring this antitrust action. These allegations are sufficient to establish antitrust standing.

Defendants' case law is inapt. *Supreme Auto Transp. LLC v. Arcelor Mittal* criticized the Plaintiffs for failing to identify if they bought steel from the Defendants. 238 F. Supp. 3d 1032, 1038-41 (N.D. Ill. 2017). Here, Plaintiffs have because they have sued "essentially all" Plastics manufacturers. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 165 (S.D.N.Y. 2018) (finding causation was met because defendants controlled "essentially all" of the relevant market). So the Court can plausibly infer that Plaintiffs bought Defendants' plastic resins.

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation* rejected standing to assert damages claims under federal antitrust law because the Plaintiffs did not properly allege that those higher up the distribution chain would not be efficient enforcers. 383 F. Supp. 3d 187, 224 (S.D.N.Y. 2019). That concern does not apply here when Plaintiffs raise injunctive relief under federal law. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986) (injunctive relief claims do not implicate the duplicative recovery or complex damages apportionment factors under *AGC*). Nor does it matter under state laws that do not apply *Illinois Brick*. *E.g.*, *In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 WL 579639, at *16 (D.N.J. Feb. 21, 2025) (finding federal antitrust standing sufficiently alleged when "the fact that supracompetitively priced ingredients comprise any amount of the purchase price of end-user products purchased by the plaintiffs is

sufficient to establish that *some* injury occurred.") (italics in original). Thus, Plaintiffs sufficiently alleged that they are efficient enforcers for this antitrust violation.[2]

### D.    Plaintiffs sufficiently alleged restraint of trade.

Plaintiffs sufficiently pled that Defendants restrained trade by artificially increasing demand for and price of plastic products through market distortion. Doc. 48 ¶ 179. Defendants agreed to artificially raise the demand for and price of plastic products by creating and continuing a decades-long scheme of deceit regarding the recyclability of plastics. Doc. 48 ¶¶ 1, 2. Defendants used this scheme to inflate demand and price for plastics by making misrepresentations that plastic could be recycled—despite knowing this is false—that spurred more demand, production, and purchase of plastics than otherwise would've occurred. Doc. 48 ¶¶ 6, 58–65, 69–75, 76–149. Had Defendants accurately represented the recyclability (or lack thereof) of end-use plastics, consumer demand for these materials would have been far weaker, lowering the purchase price of the products. A conspiracy, like this, to artificially inflate or pad the price of a product is a conspiracy to affect price for purposes of antitrust laws. *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1507-08 (11th Cir. 1989).

Defendants misconstrue their decades-long scheme to distort the market for plastics in their favor as mere "deceptive statements" to argue these statements are insufficient to support a Section 1 claim. Doc. 248 at 40. Ignoring for a moment these distortions of Plaintiffs' allegations, Defendants' cases do not support this notion. The *Sanderson v. Culligan Intern Co.* plaintiff's Section 1 claim failed because he did not allege conspiracy—not failure to allege restraint of trade.

---

[2] In a footnote, Defendants argue that the Court should dismiss Consumer Fraud Claims because Plaintiffs fail to adequately allege antitrust standing. Doc. 248 at 56 n.18. As explained above, Plaintiffs adequately allege antitrust standing but, regardless, Defendants have waived this argument by making it in a footnote. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

415 F.3d 620, 622 (7th Cir. 2005). Moreover, *Sanderson* involved false statements about a fellow competitor's rival goods—which may be deemed competitive marketing—not co-conspirator's deceptive scheme to artificially raise prices. *Id.* at 624 ("What producers say about each others' goods in an effort to sway consumers is competition in action.").

Defendants' citation to *GDHI Mtkg. LLC v. Antsel Mtkg. LLC*, is similarly irrelevant. 416 F. Supp. 3d 1189 (D. Colo. 2019). The *Antsel* plaintiff, a magazine marketing home-improvement contractor, alleged defendants engaged in a campaign of spreading false statements about it—such as that it failed to mail clients' magazines on time—to push it out of the market. Unlike here, the *Antsel* plaintiff largely sought relief under Section 2 of the Sherman Act—its sole Section 1 claim was based on allocation of the national market. Accordingly, the Court largely analyzed the Section 2 claims in ruling on the defendants' motion to dismiss and conducted no restraint of trade analysis on the Section 1 claim. It did not analyze whether the plaintiff alleged a restraint of trade because it found the plaintiff failed to allege the defendants were competitors, but instead alleged they were different levels of a franchise. *Anstel* is further inapposite because the false statements there were about a market competitor. Here, as alleged, Defendants did not use false statements to push out a competitor. Instead, Defendants used a sustained effort to mislead the public in furtherance of their conspiracy to distort the plastics market.

And unlike *Arizona v. Cook Paint & Varnish Co.*, where the plaintiff alleged a conspiracy of false advertising insufficient to support a Section 1 claim, Plaintiffs here allege a conspiracy to artificially raise demand for and prices of plastic products that Defendants accomplished via a decades long coordinated scheme of deceit as to the recyclability of plastics—a distinct theory which the *Cook* court suggested would have survived a motion to dismiss. 391 F. Supp. 962, 965-70 (D. Ariz. 1975), *aff'd*, 541 F.2d 226 (9th Cir. 1976).

**E.    Plaintiffs' evidence of agreement demonstrates anticompetitive behavior.**

To prove the existence of antitrust conspiracy, Plaintiffs offer parallel conduct and plus factors that confirm. Plaintiffs contend Defendants' scheme to inflate demand and price for plastics by making misrepresentations about the recyclability of plastics—despite knowing of the fallacy— spurred more demand, production, and purchase of plastics than otherwise would've occurred. A plaintiff withstands a 12(b)(6) motion if they "present[] a combination of direct evidence and circumstantial evidence positing an economically rational theory of an agreement." *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1076 (D. Colo. 2016) (*citing Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1085 (10th Cir. 2006)). This is because, pragmatically, "evidence cannot be neatly sorted into two categories: 'direct' and 'circumstantial.'" *Darke v. Lurie Besikof Lapidus & Co.*, *LLP*, 550 F. Supp. 2d 1032, 1041 (D. Minn. 2008). *Twombly* itself made clear that "'plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.'" *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179, n.28 (10th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). So an agreement exists when "'there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme.'" *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1052 (D. Kan. 2020) (quotation omitted).

Plaintiffs' allegations "should be considered as a whole 'without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1106 (D.N.M. 2024) (quoting *Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)). "Further, an agreement need not be express; rather, the 'character and effect of a conspiracy' can be inferred 'from a course of dealing and other circumstances.'" *Id.* (quoting *E. J.*

19

*Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 301 (10th Cir. 1975)); *see also Interstate Cir. v. United States*, 306 U.S. 208, 226-27 (1939) ("Acceptance by competitors . . . of an invitation to participate in a plan" where competitors "kn[ew] that concerted action was contemplated and invited" and that "the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."). But "[i]n reality, *all* evidence is 'circumstantial,' in the sense that *all* evidence requires the factfinder to make inferences. Even the most 'direct' of direct evidence requires the factfinder to make inferential leaps of some kind." *Darke*, 550 F. Supp. 2d at 1041 (emphasis in original); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1301 (D. Kan. 2007) (testimony regarding agreement was direct evidence, even though it did not "identify who was included in the unwritten understanding").

Categorizing such evidence as direct or circumstantial is unnecessary at this stage. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (evidence that is not direct is "not to be disregarded because of [its] ambiguity" but rather considered alongside "other circumstantial evidence"); *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) ("A plaintiff can establish a conspiracy through direct evidence, circumstantial evidence, or both."). Because Plaintiffs pled sufficient evidence of a conspiracy at this stage, the Motion should be denied as to Plaintiffs' federal and state law antitrust claims.

### 1.    Defendants' parallel conduct and plus factors support plausibility.

"Plus factors are economic actions and outcomes that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action." *Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*, 2024 WL 4884472, at *4 (D. Colo. Nov. 25, 2024) (quotations omitted). They can include "allegations (1) about the defendants' motives to enter into an unlawful agreement; (2) that the defendants acted contrary to their interests; (3)

implying a traditional conspiracy, or (4) of a high level of interfirm communications." *Id.* (quotations omitted). This list is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.* (quotation omitted). "Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place." *Robertson v. Sea Pines Real Estates Cos., Inc.*, 679 F.3d 278, 289-90 (4th Cir. 2012). So the absence of defendant-to-defendant communications is not surprising at the pleading stage and not a requirement of pleading (or proving) a plausible antitrust claim. *Llacua,* 930 F.3d at 1178, 1179 n.28.

### i.    Parallel Conduct

A "showing of parallel pricing requires only evidence that defendants acted similarly, not evidence that they charged the same prices or engaged in identical conduct." *In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 WL 579639, at *8 (D.N.J. Feb. 21, 2025) (citation and internal quotations omitted). Here, Defendants, the trade associations, and other co-conspirators began to promote recycling of plastics around the same time. Doc. 48 ¶¶ 89-90 (noting the plastics industry formed multiple trade associations focused on recycling within a few years of one another); *id.* at ¶¶ 99-100 (detailing how trade associations, Defendants and their co-conspirators pushed for the use of resin identifications codes and the chasing arrows symbol, rather than use some other symbol). These allegations suggest that Defendants were motivated to work together to artificially increase the demand of plastics and injure Plaintiffs through paying increased prices for products that were not worth the premium they were charged. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'") (quotation omitted).

### ii. Common Opportunity and Motive to Conspire

Defendants' motion argues that mere attendance at industry events or participation in trade associations does not suggest collusion. Doc. 248 at 45-46. But Defendants misconstrue Plaintiffs' allegations. Plaintiffs do not allege mere tangential membership of the trade associations; Plaintiffs list decades of involvement and leadership with the trade groups, and that the trade groups exhibit the same strong messaging: plastics are recyclable. Doc. 48 ¶¶ 61-62, 76-77, 89-94, 96-102, 112, 114-16, 125. Public statements from attendees of those meetings are strong evidence of Defendants' agreement. Doc. 48 at ¶¶ 115, 118-19, 121-23, 132, 153-54. "There is no doubt that the members of [trade] associations often have economic incentives to restrain competition[.]" *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988). From the beginning, the major players in the plastics industry were all being told, at once, to focus on developing disposable plastic products. Doc. 48 ¶¶ 59-63 (discussing the push by Defendants and members of the trade association, the Society of the Plastics Industry, for advertising plastic bags as recyclable). Defendant ACC members include Defendants Exxon Mobil, Chevron Phillips, Dow, Dupont, Eastman Chemical Company, Celanese Corporation, and LyondellBasell n/k/a Equistar. Doc. 48 ¶ 33. Defendant ACC merged with the American Plastics Council (formerly the Council for Solid Waste Solutions in 2002. Members of the Council for Solid Waste Solutions included Chevron Chemical Company, Down Plastics, The Dow Chemical Company, Du Pont Company, Exxon Chemical Company, Mobil Chemical Company, and Phillips 66 Company. Doc. 48 ¶ 90.

Use of industry communications shows regular contact discussing the need to collude to avoid government regulation. Such use of trade associations is clear opportunity for collusion of anticompetitive conduct. *HM Compounding Servs., Inc. v. Express Scripts, Inc.*, 2015 WL 4162762, at *5 (E.D. Mo. July 9, 2015) ([m]embership and participation in a trade group facilitates collusion"). Such avenues to collude provided Defendants, working with co-conspirators, with

opportunity and motive to drive the demand for single-use plastics by misleading and defrauding the American public with the unfounded notion of plastics' recyclability. Allegations of a common scheme supported by examples of fixed prices "permit the reasonable inference that Defendants were . . . fixing prices for *all*" plaintiffs. *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *6 (N.D. Ill. Feb. 11, 2025); *accord Carbone v Brown Univ.*, 621 F. Supp. 3d 878, 887 (N.D. Ill. 2022) ("plaintiffs are not required to cite evidence specific to each defendant in their complaint" if they "cite[] evidence specific to certain [defendants] as examples").

### iii.  Other Plus Factors

Because of Defendants' statements and marketing efforts, plastics have been nearly ubiquitous for decades because Plaintiffs and the public were hoodwinked into believing the recyclability of plastics. *See, e.g.,* Doc. 48 ¶¶ 100-02 (noting that although consumers believed any item with the chasing arrows symbol could be recycled, this was "generally not the case"); ¶¶ 104-09 (noting that Defendants and their trade associations were aware of the limitations with plastics recycling but did not want information about the limitations "floating around" because the issue was "HIGHLY SENSITIVE POLITICALLY"). This opportunity to maximize profits by inflating the demand for plastics through misrepresentations about the recyclability of plastics created an inelastic market for plastics. Courts routinely recognize that collusion is more likely in markets where consumers cannot easily reduce consumption. *In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 WL 579639, at *9 (inelastic demand considered as plus factor); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 597 (N.D. Cal. 2019) (same).

While pushing their plastics recycling agenda, Defendants knew that their behavior would be perceived as anticompetitive and so concealed it from the public. In 1991, the Council for Solid Waste Solutions sought to choose a new, consumer-facing organizational name with "[n]o conspiracy implied." Doc. 48 ¶ 90, n.67. Yet in 1992, the group's new name, "Partnership for

Plastics Progress" (P3), was poorly received, internal staffers recognizing that the "connect betw[ee]n P3 & SPI was clutter—no good[.] Consumers don't like." *Id*; *see also Blomkest Fertilizer, Inc. v. Potash Corp. Of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("[A] high level of communications among competitors can constitute a plus factor[.]"); *Kucharski-Berger v. Hill's Pet Nutrition, Inc.*, 60 Kan. App. 2d 510, 532 (2021), (quoting *Smith v. Philip Morris Companies, Inc.*, 50 Kan. App. 2d 535, Syl. ¶ 8 (2014)) ("Any showing by a plaintiff that tends to exclude the possibility of independent action can qualify as a plus factor.")

### iv. Rule 8 Notice

Despite Defendants' contrary arguments, there is *no per se* rule against grouping defendants for the purpose of asserting allegations. *See Martinez v. Wexford Health Servs., Inc.*, 2021 WL 1546429, at *3 (N.D. Ill. Apr. 20, 2021) (holding that "engaging in group pleading is not per se improper" and noting group pleading at the motion to dismiss stage is not prohibited). This is because "any direct evidence of the agreement will only be uncovered through discovery." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017). Rule 8 itself only requires that Plaintiffs provide a "short and plain statement of the claim showing that the pleader is entitled to relief." In a Section 1 case, plaintiffs need only "allege that each individual defendant joined the conspiracy and played some role in it"; "detailed defendant by defendant allegations" are not required. *Moehrl v. Nat'l Assoc. of Realtors*, 492 F. Supp. 3d 768, 777 (N.D. Ill. 2020) (citation omitted). Plaintiffs' allegations are sufficient where, as here, they "plausibly suggest that the individual defendant actually joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011); *see id.* ("[P]laintiffs need not 'plead each defendant's involvement in the alleged conspiracy in elaborate detail"). *See* Doc. 48 ¶ 33 (listing Defendant ACC members as Defendants Exxon Mobil, Chevron Phillips, Dow, Dupont, Eastman Chemical Company, Celanese Corporation, and LyondellBasell n/k/a Equistar; *see also*

*id.* ¶¶ 33, 90 (detailing ACC merged with the American Plastics Council (formerly the Council for Solid Waste Solutions ("CSWS") and Partnership for Plastics Progress ("P3")) in 2002); *id.* ¶ 90, fig. 6 (identifying Chevron Chemical Company, The Dow Chemical Company, Du Pont Company, Exxon Chemical Company, Mobil Chemical Company, and Phillips 66 Company as members of the CSWS Executive Board); *e.g., id.* ¶¶ 24, 33, 90, 92, 98, 109, 134, 147, 153 (Exxon Mobil allegations); ¶¶ 25, 26, 33, 90 (Chevron Phillips and Chevron allegations), ¶¶ 29, 33, 90, 98, 115 (Dow Chemical Company allegations), ¶¶ 33, 36, 90, 98, 105 (DuPont allegations); ¶¶ 31, 33, 119, 119 n.95 (Eastman allegations); ¶¶ 28, 33 (Celanese allegations); ¶¶ 32, 33, 218, 233 (Lyondell n/k/a Equistar allegations); and ¶¶ 93, 103, 107-111, 113-115 (CSWS/APC allegations).

Further, "the Tenth Circuit never has adopted a blanket prohibition against collective allegations." *Bledsoe v. Bd. of Cty. Comm'rs of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1080 (D. Kan. 2020) *aff'd in part, rev'd in part and remanded sub nom.*, 53 F.4th 589 (10th Cir. 2022); *see also Scott v. City of Tulsa*, 2022 WL 36879, at **7-8 (N.D. Okla. Jan. 4, 2022) ("district courts in this Circuit have repeatedly refused to dismiss complaints for allegedly improper group pleading" and "[d]ismissal for grouping defendants together at the pleading stage is particularly inappropriate because a plaintiff has not yet had the benefit of discovery") (collecting cases).

### 2. Defendants misstate the pleading requirements for an antitrust agreement.

While Defendants demand a smoking gun, Rule 12 does not require one. *Robertson v. Sea Pines Real Est. Cos., Inc.,* 679 F.3d 278, 291 (4th Cir. 2012) ("*Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint. The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset."); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("[E]ven in the absence of direct 'smoking gun' evidence, a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent

25

conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices."). Together with Plaintiffs' allegations, the plus factors offered provide ample circumstantial evidence of collusion. *Brown v. JBS USA Food Co.*, 2023 WL 6294161, at *10 (D. Colo. Sept. 27, 2023) ("[T]he Court rejects the moving defendants' analysis to the extent it evaluates each plus factor as a separate part without examining the allegations as a whole.").

Defendants' argument that Plaintiffs failed to plead direct evidence of agreement, Doc. 248 at 42, is not dispositive. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("[d]irect evidence of conspiracy is not a sine qua non" of antitrust litigation); *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 943-44 (D.N.M. 2023) (direct evidence requirement at pleading stage "would all but nullify the nation's antitrust laws"). Despite Defendants' arguments, circumstantial evidence of an action against self-interest isn't required, but only an example of the types of "plus factors" considered by courts.

Plaintiffs offer sufficient evidence of parallel conduct and supporting plus factors. Such evidence is enough for this stage.

F.    **The Noerr-Pennington doctrine is inapplicable.**

In certain circumstances, the *Noerr-Pennington* doctrine protects companies' petitioning efforts which cause anticompetitive injury to the market; as such, Defendants mischaracterize their actions as immune from scrutiny. Doc. 248 at 48. The doctrine does not protect orchestrated, widespread initiatives created for the sole purpose of manipulating the public, as is the case here.

A prerequisite for the application of the *Noerr-Pennington* doctrine is that a company's speech must be an attempt to influence government action. *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129-37 (1961). Where, "independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence governmental action." *Allied*

*Tube & Conduit Corp.*, 486 U.S. at 499. As such, "genuine petitioning is immune from antitrust liability, [but] sham petitioning is not." *CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1283 (10th Cir. 2020) (citing *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 525-26 (2002)). And most importantly "where statements are deliberately false or misleading, *Noerr–Pennington* does not apply." *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1124 (D.C. Cir. 2009). This determination, of whether the allegations in a complaint are immunized by *Noerr,* is a "fact-intensive inquiry that cannot be resolved via a motion to dismiss." *Washington v. Landmark Tech. A, LLC*, 637 F. Supp. 3d 1154, 1163 (W.D. Wash. 2022).[3]

Only one allegation could conceivably be characterized as government petitioning. Doc. 48 ¶ 87. Defendants' other citations to the Complaint refer to Defendants' deceptive marketing initiatives intended to shape the public's perception of plastic. *See* Doc. 248 at 48. Plaintiffs do not allege that Defendants petitioned the government, directly or indirectly, save for the single allegation above. One example of qualified speech under *Noerr-Pennington* does not insulate Defendants from nearly half a century of antitrust violations. *See Philip Morris USA Inc.*, 566 F.3d at 1124. If we allow corporate defendants to circumvent antitrust liability in this manner, then the *Noerr-Pennington* exception would grow to become a complete abrogation of the Sherman Act.

The most analogous case to the facts here is *U.S. v. Philip Morris*. Philip Morris attempted to immunize "all of their public denials about nicotine manipulation and addiction under the *Noerr-Pennington* doctrine." *U.S. v. Philip Morris USA, Inc.*, 337 F. Supp. 2d 15, 26 (D.D.C., 2004), *aff'd in part, vacated in part*, *Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009). The Circuit Court found that the majority of the challenged public discourse was not protected by *Noerr-Pennington*, except for statements made to Congress. *Philip Morris USA Inc.*, 566 F.3d at 1124.

---

[3] *See also Katana Silicon Techs. LLC v. Micron Tech.*, Inc., 671 F. Supp. 3d 1138, 1155 (D. Idaho 2023) (declining to find *Noerr-Pennington* immunity on a motion to dismiss).

Here, like Philip Morris, even if Defendants could show that some allegations can be characterized as petitioning, that does not mean all the allegations are immunized. *Id.* In reality, the doctrine only possibly applies to a single allegation, containing a single statement made by one non-Defendant industry player to one congressional subcommittee, over 30 years ago. Doc. 48 ¶ 87. Insofar as the doctrine is implicated elsewhere, Plaintiffs allege Defendants knew plastics were not recyclable but chose to advertise they were anyway. "Where statements are deliberately false or misleading, *Noerr–Pennington* does not apply." *Philip Morris USA Inc.*, 566 F.3d at 1124.

In an attempt to expand the doctrine, Defendants cite *Concord v. Brunswick* for their unsupported proposition that even if *Noerr-Pennington* only applies to some allegations, Plaintiffs' other claims still fail because "they have not alleged effects isolated only to the alleged conduct that does not comprise protected speech." Doc. 248 at 48. But *Noerr-Pennington* is not an issue in *Concord*, nor is the procedural posture even remotely similar to the case here. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). *Concord* is an Eighth Circuit order concerning whether the district court abused its discretion in a ruling on a Daubert motion. *Id.* The court did not say that Plaintiffs' claims fail unless they can isolate injury at the pleading stage; it said their *expert's damages model* was unreliable. *Id.* (emphasis added). This is a wholly disingenuous argument intended to mislead the Court.

*Noerr–Pennington* immunity turns on disputed facts of the nature, scope, and intent of Defendant's conduct. Dismissal at this stage would be improper. *Noerr-Pennington* immunity requires genuine examples of government petitioning.[4] Defendants' efforts to inveigle the consumer do not qualify. The doctrine is simply inapplicable to the facts and would constitute an enormous extension of its logical boundary within antitrust jurisprudence.

---

[4] *CSMN*, 956 F.3d at 1283.

G.    **Defendants' state-specific arguments fail.**

    1.    **Because Plaintiffs demonstrate Article III standing, Defendants' state law standing arguments are premature.**

Defendants incorrectly argue that all Plaintiffs' state law antitrust claims fail with their Sherman Act claims.[5] Doc. 248 at 57. These arguments are premature, fail on the merits, or both. Defendants challenge Plaintiffs' Article III standing regarding certain state-law claims, arguing named Plaintiffs either do not reside in those states or their purchases do not satisfy state law requirements. Such arguments are premature under the logical antecedent exception to federal standing law as the analysis is a matter for Rule 23 certification, not Rule 12 dismissal.

The "logical antecedent exception" to the general rule that standing must be established by every plaintiff as to every cause of action at the outset of the case was first recognized by the Supreme Court in *Anchem Prods., Inc., v. Windsor*, 521 U.S. 591, 612 (1997).[6] This exception allows courts to consider class certification before standing issues when class issues are "logically antecedent to the existence of any Article III issues." *Amchem*, 521 U.S. at 612. The test to determine whether class issues are "logically antecedent" to standing is "whether the Plaintiff's putative standing problem would exist but for the class action nature of this case." *Woodard v. Fid. Nat. Title Ins. Co.*, 2007 WL 5173415, at *4 (D.N.M. Dec. 4, 2007).

Other Circuit courts and Tenth Circuit district courts recognize this application of the logical antecedent exception to defer ruling on whether class members can represent class

---

[5] Defendants misleadingly short cite to cases that seemingly imply that all state antitrust law claims rise or fail with federal antitrust claims. Doc. 248 at 57 (citing to *Hobart*, 48 F.4th at 663 and *Insulate*, 797 F.3d at 547). But these two pincites—and these two cases are cited only once each in the brief—address only Minnesota, Michigan, and California law, and not all state antitrust claims brought here. And as discussed elsewhere, Plaintiffs alleged standing for their claims, so Defendants arguments are unavailing.
[6] *See Casados v. Safeco Ins. Co. of Am.*, 2015 WL 11089527, at *4 (D.N.M. Nov. 6, 2015); *George v. Urban Settlement Servs.*, 2017 WL 4222620, at *2 (D. Colo. Sept. 21, 2017).

members in states where they do not reside.[7] *See Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1199-1200 (D.N.M. 2016) (finding "as long as the named Plaintiffs can demonstrate that they have standing to assert the claims they have alleged, whether the named Plaintiffs can represent certain proposed class members is better addressed at the class certification stage" and suggesting "courts should" apply the logical antecedent exception where appropriate); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2022 WL 16729170, at *6 (11th Cir. Nov. 7, 2022) ("all circuits which have addressed whether a plaintiff can represent unnamed class members whose claims fall under different states' laws have concluded that it is a question that concerns Rule 12(b)(6) or Rule 23 – not Article III"); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49–51 (1st Cir. 2018) (state standing Rule 23, not Article III issue); *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 96 (2d Cir. 2018) ("whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III"); *Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015) (state standing Rule 23, not Article III issue).

If a class is not certified for the state law causes of actions, Defendants' challenges will be mooted. Thus, the logical antecedent exception applies, and Defendants' arguments should be reserved for class certification. Moreover, because the weight of the authority recognizes that Article III, at the pleading stage, only requires plausible allegations that the individual plaintiffs have standing to pursue their own claims,[8] and permits deferring their representation of others to

---

[7] Tenth Circuit district courts also defer whether a class representative can assert claims under the laws of states in which they do not reside past Rule 12 dismissal because such analysis "implicates a choice-of-law analysis that is best reserved for the class certification stage." *See, e.g., Butler v. Specialized Loan Servicing LLC*, 2025 WL 2613745, at *5 (D. Colo. Sept. 10, 2025).

[8] Plaintiffs' citation to other states' laws in their Complaint does not mean they are necessarily invoking those states' laws in support of their individual claims. Rather, they are indicating how they hope to prevail in certifying a class. *See Nat'l Ass'n for the Advancement of Colored People v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) (plaintiffs' use of counts to identify various legal theories

the class certification stage, the Court should deny Defendants' request to dismiss.[9]

## 2. Plaintiffs' state antitrust law claims can proceed.

Defendants' additional grounds for dismissal fail because they misstate controlling law.

*First*, Defendants are wrong that Illinois law forecloses class actions in federal court. Defendants cite no caselaw to support this assertion because this statutory class action bar does not apply to class actions in federal court, which are governed by Federal Rule of Civil Procedure 23. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) (plurality opinion) (state bars are a procedural, not substantive conflict, as "Rule 23 provides a one-size-fits-all formula for deciding the class action question"); *see also Edgar v. Teva Pharms. Indus. Ltd.*, 2024 WL 1282436, at *32-33 (D. Kan. Mar. 26, 2024) (denying dismissal of Illinois claims). Likewise, Defendants' off-hand citation to Tenn. Code § 47-25-106(c) is unavailing as it bars recovery for both "injunctive relief and recover damages." Plaintiffs seek injunctive relief under their Sherman Act claims and damages for Tennessee purchases under Tennessee Law. The different remedies sought do not implicate § 106(c). Defendants' arguments miss the mark.

*Second*, Plaintiffs provided the requisite notice to State Attorneys General. Defendants assert that Plaintiffs did not provide the notice to state officials, as required under Arizona,

---

merely assists the court "in seeing how the plaintiff hopes to prevail, but this organization does not track the idea of 'claim for relief' in the federal rules"); *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013) (noting that defendants' attacking of the complaint "count by count" on motion to dismiss "tends to obscure the critical difference between 'claims,' which explain the plaintiff's grievance and demand relief, and 'counts,' which describe legal theories by which those facts purportedly give rise to liability and damages").

[9] If the Court later finds that Plaintiffs are not proper representatives of all class members, it may permit other representatives to become plaintiffs at that time. *E.g., In re Motor Fuel Temperature Sales Pracs. Litig.*, 2009 WL 3122501, at *2 & 2 n.17 (D. Kan. Sept. 24, 2009) (permitting substitution of plaintiffs while noting "[c]ourts in the Tenth Circuit have therefore taken a rather liberal approach in permitting the substitution of class representatives at various stages in the proceedings."); *cf. In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1311 (D. Kan. 2018) ("To the extent the class plaintiffs identify class representatives from any of these states, they may file an appropriate motion seeking leave to amend the Class Complaint to add them as parties.").

Colorado, Connecticut, Hawaii, Minnesota, Nevada, New York, Oregon, Rhode Island, and Utah law. Plaintiffs in fact provided pre-suit notice to the relevant state officials for these, among other jurisdictions. *See* Declaration of Roberta Ranes[10] (providing notice to Attorneys General for the states of Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Oregon, Rhode Island, and Utah).[11] And these notice provisions "do not alter the substantive elements of Plaintiffs' claims and are not a pleading requirement," so Defendants' argument related to notice noncompliance is not a basis to dismiss these claims. *Edgar*, 2024 WL 1282436, at *34 (concluding that plaintiffs' "failure to comply with the notice provisions of Arizona and Hawaii antitrust law does not warrant dismissal.") (quotation omitted)).

*Finally*, Plaintiffs do not dispute that various state-law claims they assert are not retroactive. *E.g.*, Colo. Stat. § 6-4-114(1) (enacted in 2023); Conn. Stat. § 35-46a (2017); Md. Code, Com. Law § 11-209(b)(2) (2017); Neb. Stat. § 59-821 (2002); Nev. Stat. § 598A.210 (1999); N.H. Rev. Stat. § 356:11 (2008); N.Y. GBL § 340(6) (1998); N.D. Cent. Code. § 51-08.1-08 (1991); Or. Stat. § 646.780(1)(a) (2010); 6 R.I. Gen. Laws Ann. § 6-36-7(d) (2013); Utah Code § 76-10-3109 (2006). But this does not bar Plaintiffs from damages during the portions of the Class Periods when the statutes are effective—all have *some* periods where damages occurred and are recoverable.

---

[10] Attached as **Exhibit A**.

[11] Plaintiffs sent notice letters including the Class Action Complaint (Doc. 1). The FAC (Doc. 48) included the same state antitrust and consumer protection claims asserted in the original complaint. *Compare* Doc. 1 at ¶¶ 294-302 (Arizona); 311-15 (Colorado); 316-20 (Connecticut); 326-30 (Hawaii); 210-17 (Nevada); 229-34 (New York); 248-52 (Oregon); 25358 (Rhode Island); 272-77 (Utah) *with* Doc. 48 at ¶¶ 352-59 (Arizona); 368-72 (Colorado); 373-77 (Connecticut); 383-87 (Hawaii); 434-40 (Nevada); 452-56 (New York); 470-74 (Oregon); 475-79 (Rhode Island); 493-97 (Utah). There is no material difference in the complaints for the notice provisions. Plaintiffs provided the required notice to the Attorneys General.

III.    **Plaintiffs' Public Nuisance Claim is Properly Pled.**

A.    **Ford County has the authority to bring these claims through its County Counselor and private counsel.**

Plaintiff Ford County filed a public nuisance claim against Defendants for their conduct that led to the County's increased tonnage fees and environmental issues stemming from the lack of recyclability of plastics, which injures the public health, safety, and welfare of the County. Ford County is enabled by statute to bring this claim through its County Counselor and private counsel.

1.    **County Counselor of Ford County, Glenn Kerbs, is permitted by statute to bring a public nuisance claim on behalf of Ford County.**

The law in the state of Kansas enables and authorizes private law firms to represent municipalities in cases like this. Defendant-Intervenor State of Kansas, *ex rel.* Kris W. Kobach (KS AG) misstates and mispresents the statutory authority that allows Ford County to prosecute civil claims. Under the Kansas statute governing civil abatement of a public nuisance, "such an action may be brought either by the attorney general, or by a county attorney for enjoining such a nuisance within his or her county, or by a city attorney for enjoining such a nuisance within his or her city." K.S.A. 60-908. But this statute is only half the story. Defendant KS AG disregards Kansas' own statutory scheme when claiming Ford County Attorney Kevin Salzman "is the *only* authority specified by statute who can assert the claim for Ford County," Doc. 248 at 60, and ignores other statutory provisions with its unfound claim "[t]hat is the end of the story and the end of the claim." *Id.* at 61. To be clear, Kevin Salzman serves as Ford County's prosecutor to litigate criminal (and other, related) matters, not civil, and not federal class actions.

Glenn Kerbs, duly appointed County Counselor for Ford County,[12] is prosecuting the County's claims alongside the undersigned, under K.S.A. 19-247, authorizing the county

---

[12] Board of County Commissioners of Ford, *Ford County Commissioner's Meeting Minutes, Meeting of January 21, 2025*, https://www.fordcounty.net/AgendaCenter/ViewFile/Minutes/_01212025-

counselor to: "(c) *commence, prosecute* or defend, as the case requires, *all civil suits or actions in which the county is interested and represent the county generally in matters of civil law*" and "(f) *perform all the duties in civil matters that have previously been required by law of the county attorney of the county.*" K.S.A. 19-247 (emphasis added).[13] Mr. Kerbs is explicitly permitted by statute to file this public nuisance claim on behalf of Ford County and has been counsel for Plaintiff Ford County, in his powers bestowed through contract,[14] since the filing of the Complaint.

> **2.      The Board of County Commissioners of Ford is permitted by statute to hire counsel to assist in prosecuting its claims.**

Similarly, the County is statutorily empowered to hire other outside counsel on its behalf.

> When, in the judgment of the board of county commissioners of any county in this state, it becomes necessary or expedient, the said board of county commissioners may employ an additional attorney at law to assist the county attorney of its county in any specific investigation, prosecution or any civil or criminal matter involving the duties of said county attorney.

K.S.A. 19-723. The Kansas Attorney General's Office, long before the election of Kris Kobach in 2023, acknowledged a board of county commissioners' ability to hire additional counsel, "K.S.A. 19-723, which authorizes the board of county commissioners to employ an additional attorney to assist the county attorney, involves a discretionary power held by the board and does not mandate such special assistant be employed."[15] The Board of County Commissioners elected to employ this statutory, discretionary power unanimously in approving the retention of private counsel to help

---

532#:~:text=County%20Counselor%20Contract,Commissioner%20Thomas%20seconded%20the%20mot ion. (Ford County unanimously reappointed Glenn Kerbs as Legal Counselor for Ford County, Kansas). Plaintiffs had no foresight into the Kansas Attorney General's intervention at the time of filing the complaint. Adequately responding to its arguments necessitates going outside the record.
[13] K.S.A.19-247 has been on the books for over 100 years; it was passed in 1917 and compiled into Kansas statutes in 1923.
[14] *See* County Counselor Agreement, attached as **Exhibit B**.
[15] Former Kansas Attorney General Robert T. Stephan, *Attorney General Opinion No. 81-81*, Office of the Kansas Attorney General (March 31, 1981), https://ksag.washburnlaw.edu/opinions/1981/1981-081.pdf.

bring claims against Defendants. Therefore, Ford County satisfied the "statutory requirements that local state entities must satisfy before being represented by private counsel." *In re Auto. Parts Antitrust Litig.*, 2015 WL 14047405, at *7 (E.D. Mich. Apr. 30, 2015).

### 3. Ford County has sufficiently pleaded a public nuisance claim.

In Kansas, a public nuisance claim is cognizable when Defendant "knowingly causing or permitting a condition to exist which injures or endangers the public health, safety or welfare." K.S.A. 21-6204(a). Defendants created, contributed to, and maintained a public nuisance by deceptively advertising and marketing to counties with landfills that plastics were recyclable when, in reality, less than 10% of plastics are recycled. Doc. 48 ¶ 208. This deceptive advertising increased the amount of plastic waste that counties have dispose of within their landfills. *Id.*

The Kansas Legislature has a statement of policy "that protection of the health and welfare of the citizens of Kansas requires the safe and sanitary disposal of solid wastes." K.S.A. 65-3401. Section (e) describes the statewide policy is to "[e]ncourage the wise use of resources through development of strategies that reduce, reuse and recycle materials." K.S.A. 65-3401(e). The definition of solid waste specifically does not include recyclables. *See* K.S.A. 65-3402(a)(1)-(2). But both statutory provisions were adopted in 1970, coinciding with the timing of Defendants' deceptive advertising that convinced legislatures and consumers around the country to believe plastics were truly capable of widespread recycling, like glass or aluminum, which plastics hoped to replace. Doc. 48 ¶¶ 6, 159, 208. Defendants controlled the flow of disinformation regarding the recyclability of plastics to consumers, *id.* ¶ 212, and now Defendants seek to rely on their successful deception to dismiss the public nuisance claims. Doc. 248 at 62-63.

Defendants' conduct foreseeably caused injuries to local county landfills because of its significant interference with the public health, safety, peace, comfort, and/or convenience. Doc. 48 ¶ 209. Plaintiffs' Complaint addresses this significant interference at length, describing how

over 90% of plastics have been landfilled, incinerated, or leaked into the environment. *Id.* ¶¶ 4, 47, 55, 65, 68, 74, 76, 140, 142-143. Thus, Plaintiffs sufficiently plead a public nuisance claim.[16]

Kansas public nuisance law should be read to include plastic pollution as an abatable nuisance.[17] Under Kansas law, "A 'public nuisance' is ***an unreasonable interference with a right common to the general public,*** such as a condition dangerous to health, offensive to community moral standards . . ." *State ex rel. Graeber v. Marion Cnty. Landfill, Inc.*, 276 Kan. 328, 76 P.3d 1000, 1010 (Kan. 2003) (emphasis added).[18] The Fourth Circuit recently made an analogous holding, by concluding that opioids were an abatable public nuisance under West Virginia's public nuisance definition perpetuated by the defendant drug corporations, despite opioid's status as a legal product for sale. *City of Huntington, West Virginia et al. v. AmerisourceBergen Drug Corp.*, --- F.4th ---, 2025 WL 3009526, at **13-14 (4th Cir. October 28, 2025). Kansas' public nuisance law is substantially similar, if not the same, as West Virginia's expansive definition of public nuisance.[19] Although plastics, like opioids, are lawful products, placing unrecyclable plastics in landfills causes environmental issues that harm local government entities, causing a public

---

[16] *See Washington v. Gen. Motors Corp.*, 406 U.S. 109, 114 (1972) ("Air pollution is, of course, one of the most notorious types of public nuisance in modern experience."); *United States v. Colgate-Palmolive Co.*, 375 F. Supp. 962, 967 (D. Kan. 1974) ("The pollution of a waterway will constitute a nuisance.") (quoting 93 C.J.S. Waters § 43, p. 688).

[17] *See City of Huntington, West Virginia et al. v. AmerisourceBergen Drug Corp.*, --- F.4th ---, 2025 WL 3009526, at *20 (4th Cir. 2025 October 28, 2025) (finding the public nuisance has not ceased until the harm is actually abated and emphasizing "the remedy of abatement may be applied both to compel the cessation of wrongful conduct *and* to provide for the remediation of harmful conditions caused by that conduct.").

[18] This is the same language that controls public nuisance law in West Virginia and under the expansive definition from the Restatement (Second) of Torts. *See Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253, 257 & n.6 (W. Va. 1992) ("We believe [our] definition is consistent with the Restatement (Second) of Torts, [] which defines a public nuisance as ***'an unreasonable interference with a right common to the general public.'***" (emphasis added); *see also* Restatement (Second) of Torts § 821B & cmt. g (A.L.I. 1979).

[19] *See City of Huntington* at *11 ("the expansive definition of public nuisance from the Restatement (Second) of Torts § 821B(1) (A.L.I. 1979) [is] that a public nuisance is "an unreasonable interference with a right common to the general public.").

nuisance. Doc. 48 ¶¶ 47, 55, 148. The abatement sought, a restriction of Defendants' widespread deceptive advertising of plastics as recyclable and "remediation of harmful conditions" of plastics in landfills, is a legal remedy Ford County, like the City of Huntington and Cabell County in West Virginia, is empowered to pursue. *See City of Huntington,* 2025 WL 3009526, at \*20.

### 4. Ford County may use Rule 23 to represent similarly situated local governmental entities.

Municipalities are not entitled to Eleventh Amendment immunity. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (When a governmental entity "is more like a county or city than it is like an arm of the State," the entity may not assert Eleventh Amendment immunity.). Thus, Defendants' argument fails and no waiver is necessary for Plaintiff Ford County to represent similarly situated governmental entities. Further, nationwide classes and those on behalf of local municipalities are permitted under Rule 23(b), subject to meeting the usual Rule 23(a) requirements. *In re Sch. Asbestos Litig.*, 921 F.2d 1310, 1312 (3d Cir. 1990); *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532, 543 (N.D. Ohio 2019), *rev'd and remanded on other grounds*, 976 F.3d 664 (6th Cir. 2020). Therefore, assuming Ford County will satisfy the requirements of Rule 23(a) at the class certification phase, Ford County may proceed in representing similarly situated local government entities at this stage.

### B. Defendants' additional arguments against Ford County's Public Nuisance claim fall flat.

First, Defendants misstate the nuisance at issue. Ford County does not plead that the sale of plastic is the nuisance, but that the resulting plastic waste is to blame. Doc. 48 ¶ 206. It is Defendants' misrepresentations to the government that created mandates surrounding the use of the RIC system and chasing arrows logo—ultimately creating the nuisance of plastic waste. *Id.* ¶¶ 98-103. Thus, Defendants' misrepresentations "knowingly caus[ed] or permitt[ed] a condition to exist which injures or endangers the public health, safety or welfare." *See Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. 118, 138 (2014) (A defendant's misrepresentations can cause a plaintiff's harm). Defendants cannot hide behind the protection of mandates that were created as a result of their deception towards the government.

Next, Plaintiffs allege "Defendants conduct created, contributed to, and maintained an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' communities." Doc. 48 ¶ 207. Plaintiffs allege interference with these rights, noting plastics being landfilled, incinerated, or leaked into the environment, as well as the presence of plastic waste being in the food, water, and air we consume. Doc. 48 ¶¶ 4, 47, 65, 68, 74, 140.

To Defendants' third point, the challenged statements are not "isolated." Making "false and misleading representations and omit[ting] material information in [one's] advertising and sales practices" over a period of several years can be deemed "frequent, continual, and intentional." *Gen. Steel Domestic Sales, LLC v. Denver/Boulder Better Bus. Bureau*, 2009 WL 535780, at *17 n.19 (D. Colo. Mar. 2, 2009), *amended on reconsideration in part*, 2009 WL 1292780 (D. Colo. May 8, 2009). The deceptive scheme spans decades, ultimately causing a plastics revolution, resulting in irreversible harm to society and the environment. Plaintiffs plausibly allege frequent or continuous conduct by listing Defendants' several misrepresentations, as well as detailing the resulting plastic waste–a nuisance which impacts Plaintiffs every day.

Regarding Defendants' fourth point, Plaintiffs' Complaint links Defendants' conduct as the proximate cause of Ford County's injury. Doc. 48 ¶¶ 205-216. Defendants' argument perpetuates the fraud that plastic is recyclable, despite extensive research saying the opposite. This continued misrepresentation has led to the increased demand in plastic and the resulting nuisance of plastic waste, because, in fact, plastic is *not* recyclable 95 percent of the time. *Id.* ¶ 140. "A

defendant who "'seeks to promote his own interests by telling a known falsehood *to* or about the plaintiff or his product'" may be said to have proximately caused the plaintiff's harm." *Lexmark Int'l, Inc.,* 572 U.S. at 138; *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008) (quoting Restatement (Second) of Torts § 870, Comment *h* (1977); emphasis added in *Bridge*).

Lastly, to Defendants' fifth point that they lack control over the product causing the nuisance, the Complaint details Defendants' role in labeling plastics with RICs and the chasing arrows logo. Doc. 48 ¶¶ 98-103. This is significant in establishing Defendants' continued control over the disposal of plastics. A defendant manufacturer was found to be in control over a product after its sale when a government agency's "registration of the product imposed on the manufacturer an affirmative duty to enforce the [buyers'] compliance with certain agreements," giving the manufacturer both "control over the use of the product, as well as a means to abate any nuisance from misuse." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1214 (D. Kan. 2015) (citing *In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 847 (N.D. Ill. 2002)). Specifically, it is not that the buyers "defied the manufacturers' instructions, but rather that the instructions themselves violated the EPA's mandates." *In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 847. Here, the relevant mandates and labeling requirements are the very result of Defendants' decades-long misrepresentations to the government. Defendants hold both control over the use of plastics and the ability to abate any nuisance from misuse.

## IV.    Plaintiffs' Complaint Satisfies the Requirements of Rule 9(b).

Plaintiffs' allegations of fraud survive the motion to dismiss by "set[ting] forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir. 1997). In all averments of fraud or mistake, courts read Rule 9(b) in conjunction with the pleading requirements of Rule 8 – that is, while needing to identify with particularity the "who,

what, when, where and how," pleadings must simultaneously be "simple, concise and direct." Fed. R. Civ. P. 9(b); Fed. R. Civ. P. 8(d)(1); *Seattle-First Nat. Bank v. Carlstedt*, 800 F.2d 1008, 1011 (10th Cir. 1986); *Schwartz*, 124 F.3d at 1252 (internal quotations and citations omitted); *U.S. ex rel. Schwartz v. Coastal Healthcare Grp., Inc*., 232 F.3d 902, 2000 WL 1595976, at *3 (10th Cir. 2000) (quoting *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).

The purpose of Rule 9(b)'s heightened "particularity" standard is to give defendants notice of the fraudulent conduct complained of. *Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, 789 F. Supp. 364, 366 (D. Kan. 1992). But Rule 9(b) does not require that a complaint "'recite the evidence or plead detailed evidentiary matter[.]'" *Id*. (quoting *Modern Settings, Inc. v. Prudential–Bache Secur., Inc*., 603 F. Supp. 370, 374 (S.D.N.Y. 1985)). Nor does it require such particularity to replace "general discovery methods." *Id.* Most notably, "where allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to meet the requirements of Rule 9(b)." *Id.* "[E]ven where 'not all of the plaintiffs' allegations' are pleaded with particularity, … a complaint may nonetheless satisfy Rule 9(b)'s requirements when its allegations are sufficiently particularized when 'taken as a whole[.]'" *Clinton v. Sec. Benefit Life Ins. Co*., 63 F.4th 1264, 1280 (10th Cir. 2023); *see also U.S. ex rel. Wynne v. Blue Cross & Blue Shield of Kansas, Inc.*, 2006 WL 1064108, at *8 (D. Kan. Apr. 21, 2006).

Defendants' Motion to Dismiss attempts to impose a more stringent requirement than what Rule 9(b) requires. Plaintiffs' 98-page, detailed Complaint setting forth Defendants' pattern of fraud to coerce the American public over the course of seven decades, meets Rule 9(b) requirements because it sufficiently pled the "who, what, when, where and how" elements with particularity, giving defendants notice of the conduct complained of. Defendants cannot in good faith say they don't know what the allegations against them are, as Plaintiffs detail the ongoing

and coordinated scheme through citations to national, investigative journalism and Defendants'

own statements since the 1950s, including 130 footnotes to cited sources. The pleading meets the

9(b) standard and adequately alleges fraud against Defendants.

### A.    Plaintiffs' complaint states the "Who" factor with particularity.

The "who" factor is satisfied when a complaint identifies the party making the false

statement(s) at issue. *Schwartz*, 124 F.3d at 1253. This Court found that, among other helpful

details, the identity of the individuals involved in the fraudulent practices did "not constitute a

checklist of mandatory requirements that must be satisfied by each allegation included in a

complaint." *U.S. ex rel. Wynne*, 2006 WL 1064108, at *8. Instead, only some details for at least

some of the claims must be pled in order to satisfy Rule 9(b). *Id.* Likewise, Plaintiffs need not

establish an agency relationship at this point. Plaintiffs' citations to numerous news sources

quoting individuals associated with or employed by Defendants *who* made statements about

deceiving the public and/or plastics recyclability associated with Defendants is enough.

### B.    Plaintiffs' complaint states the "What" factor with particularity.

The "what" factor is satisfied when a complaint pleads the contents of the false

representation(s). *Schwartz*, 124 F.3d at 1252. Some courts have expanded this requirement to

include the "subject" of the false representation as well. *Jamieson v. Vatterott Educ. Ctr., Inc.*, 473

F. Supp. 2d 1153, 1157 (D. Kan. 2007) (finding a complaint did not satisfy the requirements of

Rule 9(b) when it only identified the subject of the misrepresentation without identifying what

false representation was made about the subject). But unlike *Jamieson*, where "Defendant ha[d]

no idea what specific representation was made" about the subject, Defendants here have been put

on notice of *what* specific, quoted, misrepresentations (content) were made about plastics (the

subject). *Id*. Defendants' contention that Plaintiffs were required to "identify the quantity or type

of plastics they purchased," and "identify which of the purchased products contained resins

41

allegedly manufactured by Defendants," misconstrues the standard and imposes a premature obligation of Plaintiffs to conduct discovery at the pleading stage. *See U.S. ex rel. Wynne*, 2006 WL 1064108, at *8; s*ee also Sunbird Air Servs., Inc.*, 789 F. Supp. at 366 ("where allegations of fraudulent conduct are numerous or take place over an extended period of time, [even] less specificity is required."). Despite this, Plaintiffs' allegations are specific in naming types of plastics that had misrepresentations made and provide exhibits explaining the plastics at issue.

### C.    Plaintiffs' complaint states the "When" factor with particularity.

The "when" factor is satisfied when a complaint sets forth the time of the false representation(s). *Schwartz*, 124 F.3d at 1252. But less specificity is required when "allegations of fraudulent conduct are numerous and take place over an extended period of time," Plaintiffs' Complaint nevertheless provided specific years of publication, if not exact dates, for all quoted misrepresentations made by Defendant. *Sunbird Air Servs., Inc.*, 789 F. Supp. at 366. This exceeds the level of specificity required of Plaintiffs at this phase. *United States v. Novo Nordisk, Inc.*, 2022 WL 16716299, at *7 (W.D. Okla. Nov. 4, 2022) (finding the "when" element was satisfied when plaintiffs' complaint alleged conduct that occurred over a "specific duration" of years). Contrary to Defendants' insinuation that Plaintiffs were required to conduct discovery and plead "when they made the purchases and from whom," this is not required at this phase. Plaintiffs' Complaint sufficiently provides notice to Defendants of *when* the conduct complained of occurred.

### D.    Plaintiffs' complaint states the "Where" factor with particularity.

The "where" factor is satisfied when a complaint sets forth the place of the false representation(s). *Schwartz*, 124 F.3d at 1252. A complaint is sufficient under Rule 9(b) despite not pleading every single allegation with particularity, so long as "its allegations are sufficiently particularized when 'taken as a whole[.]'" *Clinton*, 63 F.4th at 1280. Plaintiffs' Complaint alleges the specific meetings *where* fraudulent statements took place, and sometimes included meeting

locations. Nothing more is required and Plaintiffs' allegations are sufficient in providing notice to Defendants of the conduct complained of.

      **E.**     **Plaintiffs' complaint states the "How" factor with particularity.**

A complaint satisfies this factor when it alleges how the content of statements "were allegedly fraudulent and how they furthered the fraudulent enterprise[.]" *Id.* at 1279. Plaintiffs' Complaint addresses *how* Defendants' statements were fraudulent by providing over a dozen preliminary allegations containing research refuting the exact statements made by Defendants – that is, most plastics cannot be recycled. Doc. 48 ¶¶ 43-57. Plaintiffs' Complaint then addresses how these fraudulent statements furthered the fraudulent enterprise by identifying the consequences of Defendants' statements: Plaintiffs' detrimental reliance on Defendants' representations that plastics were recyclable, the domination of the plastics industry, and the resulting plastic waste and pollution crisis. Plaintiff's Unjust Enrichment claim results from Defendants' false statements and satisfies Rule 9(b) for the same reasons.

**V.**     **Plaintiffs Plausibly Alleged Actionable Deception (Counts 3-17).**

The entire inquiry into deception is inappropriate at this stage. Defendants ask the Court to decide whether Plaintiffs' allegations are deceptive, necessarily requiring evaluation of the nature of their statements, materiality, and potential to deceive a reasonable person. These are "factual inquiries best suited for resolution at a later stage of the litigation and not on a motion to dismiss." *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 914 (E.D. Cal. 2020).[20] A determination that a reasonable consumer would not be misled, as a matter of law, under 12(b) scrutiny, occurs

---

[20] And *see Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Foster v. Chattem, Inc.*, 2014 WL 3687129, at *1 (M.D. Fla. July 24, 2014); *Brunts v. Hornell Brewing Co.,* 2023 WL 3568650, at *8 (E.D. Mo. May 19, 2023); *Santosuosso v. Gibbs Ford, Inc.*, 1992 Mass. App. Div. 167 (Mass. Dist. App. Div. 1992).

only in "rare circumstance[s]" and "should be made sparingly." *Brunts v. Hornell Brewing Co.,* 2023 WL 3568650, at *8 (E.D. Mo. May 19, 2023).

### A.    The Reasonable Consumer test is satisfied.

Defendants correctly identified that most Consumer Protection statutes use the "reasonable consumer" test. Doc. 248 at 71. But Defendants' argument fails because it isolates each statement from its broader context and ignores the cumulative effect of a coordinated campaign designed to reassure consumers that plastics are recyclable when, in reality, most plastics are not. Plaintiffs plausibly alleged Defendants made statements likely to mislead a reasonable consumer. Doc. 48 ¶¶ 43, 45-46, 51-53, 69. The Court should reject Defendant's arguments.

Defendants' reliance on out-of-circuit law is misplaced as those cases evaluated discrete product-label representations in isolation, not an orchestrated campaign of misdirection spanning decades. Doc. 248 at 71-72 (citing *Ellison-Robbins v. Bimbo Bakeries USA, Inc.*, 2024 WL 4332049 (E.D. Mo. Sept. 27, 2024) and *Ellis v. Nike, Inc.*, 2024 WL 1344805 (E.D. Mo. Mar. 28, 2024)). Courts hold actionable statements that distort the impression of a product's function. *LW Constr. of Charleston, LLC v. U.S.*, 139 Fed. Cl. 254, 290 (2018) (The Supreme Court has explained that "misleading half-truths" of this kind "can be actionable misrepresentations") (citation omitted); *Exxon Mobil Corp. v. Atty. Gen.*, 94 N.E.3d 786, 795 (Mass. 2018) ("advertising may consist of a half-truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information"). Here, the deceptive message was not a single slogan but a sustained narrative that plastics are able to be recycled (despite knowing otherwise). That is the type of deception these statutes are meant to combat.

At bottom, Defendants' argument depends on conflating possibility with reality. They ask this Court to hold that as long as recycling is *conceivable*, describing plastics as recyclable is not deceptive. That reasoning would immunize nearly all forms of greenwashing.

**B.      Neither *Noerr-Pennington* nor the First Amendment protect Defendants.**

As discussed in § II.D, Defendants' attempt to immunize their statements under the First Amendment is foolhardy. Defendants' overbroad assertion of First Amendment protection does not protect deceptive marketing or attempts to mislead the government, *United States v. Glaub*, 910 F.3d 1334, 1337 (10th Cir. 2018) ("[T]he First Amendment does not protect the submission of false claims to the government."), nor to engage in false and deceptive marketing. *Fed. Trade Comm'n v. Affiliate Strategies, Inc.*, 2010 WL 11470103, at *9 (D. Kan. June 8, 2010) ("It is well established that false or misleading commercial speech receives no protection under the First Amendment"). Any argument otherwise would be contrary to centuries of Supreme Court decisions on the issue.

**C.      Defendants' deception is not mandated by the government.**

Plaintiffs' allegations that Defendants created and popularized the "chasing arrows" logo are actionable under the relevant Consumer Fraud statutes. Plaintiffs do not base their claims on the chasing arrows symbol itself, but *the deceptive messaging it conveys*.



Plaintiffs allege that Defendants modified and adopted the symbols and RIC codes and pushed for their use industry-wide. Doc. 48 at ¶¶ 99-104. Some states require them, but only *because* of Defendants' extensive campaign to implement these deceptive symbols. And consumers believed these statements because of the dramatic increase in plastics in solid municipal waste from 0.4 percent in 1960 to 12.2 percent in 2018. Doc. 48 ¶ 141. Had Defendants complied with state law and included the chasing arrows symbols on products but told the truth, i.e., only included recyclable symbols on 5% of plastic products and marked the rest as unrecyclable, Plaintiffs would not have a claim. *Id.* ¶ 140. But those are not the facts. State law may require the chasing arrows symbol, but state Consumer Fraud statutes require Defendants to refrain from misleading and deceptive practices. The two are not mutually exclusive.

### D.    Plaintiffs Plausibly Allege That Consumers Were Misled

Defendants broadly reference Plaintiffs' allegations without paragraph references, concluding "none would mislead a reasonable consumer." Doc. 248 at 73. At the same time, Defendants only take issue with 14 of the 155 paragraphs of the Complaint's factual allegations. Defendants ask the Court to consider the weight and veracity of the evidence presented and make the ultimate decision on its viability, amounting to a request obviously incongruent with the deference given to Plaintiffs on a motion to dismiss.

*First*, Defendants raise what they call the "Recyclability Initiative Statements." This is merely an attempt to group together allegations regarding Defendants' conspiracy to promote recycling, attacking the entire Complaint by *citing only seven paragraphs*. Doc. 248 at 73-74. Plaintiffs have two qualms: (1) Defendants' cited authority is distinguishable and otherwise non-controlling; and (2) indulging Defendants anyway, the Complaint contains abundant allegations that establish falsity and deception, of which Defendants have not contested. *Id.*

46

Defendants rely on several cases; all are distinguishable. Perplexingly, the first, *Renfro v. Champion Petfoods USA, Inc.*, is a Tenth Circuit case in which the Court applied Colorado law to interpret whether claims that a product is "fresh" and "regional" are "specific representation of fact subject to measure." 25 F.4th 1293, 1304 (10th Cir. 2022). But Plaintiffs do not allege a Consumer Fraud claim under Colorado law, and further, "recyclable" *is* a specific representation of fact subject to measure. If a company claims a product is recyclable, it must be recyclable, and Plaintiffs allege that plastics are not, including rates and statistics. *See* 16 C.F.R. § 260.12(a); *see* Doc. 48 at ¶¶ 51-54, 70-73, 108, 120-122. Defendants mischaracterize "recyclable" as a term of art when it carries a widely known, scientific meaning.

The second case, *Appliance Recycling Ctrs. v. Jaco*, is equally inapplicable because Defendants' citation refers to the Court's discussion of the Lanham Act. 378 F. App'x 652, 654 (9th Cir. 2010).[21] Plaintiffs do not allege a Lanham Act violation, but even if they did, the Court limited its discussion of recycling to whether defendant's claims were "general, subjective claims" rather than "specific or absolute." *Id*. Here, Defendants affirmatively claim plastics are recyclable without any qualification. Plaintiffs alleged this is misleading to consumers since only 5% of plastics are actually recycled. *See* Doc. 48 at ¶¶ 140, 149. Defendants' reliance on out-of-circuit *Curtis v. 7-Eleven, Inc.* is not persuasive; there, "the complaint [did] not allege that any of the products are made up of unrecyclable material." 2022 WL 4182384, at *3 (N.D. Ill. Sept. 13, 2022). Similarly inapplicable is out-of-circuit *Swartz v. Coca-Cola*, where the Court considered statements regarding the recyclability of a specific plastic Coke bottle, not an overarching conspiracy affecting all plastics as here. 2022 WL 17881771, at *1 (N.D. Cal. Nov. 18, 2022).

---

[21] *See, e.g.*, *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 670 (D.C. App. 2024) (distinguishing a similar case, "Whatever persuasive force *Bimbo Bakeries* has in interpreting the federal Lanham Act, it is incompatible with the District's CPPA.").

*Second*, Defendants challenge Plaintiffs' "Recyclability Statements" *without a single reference* to the Complaint, ignoring Plaintiffs' allegations that, given their various chemical compositions, the majority of plastics *cannot* be effectively collected, separated, or otherwise recovered from the waste stream. Doc. 48 ¶¶ 43, 47-50, 69-70, 79. Defendants point out that states[22] have "codified or expressed deference to the FTC's Green Guides." Doc. 248 at 74. But the Green Guides require three elements for a marketer to make an unqualified recycling claim: (1) the product must "be collect[able], separ[able], or otherwise recover[able] from the waste stream through an established program, for reuse or use in manufacturing or assembling another item," (2) recycling facilities must be "available to a substantial majority of consumers or communities where the item is sold" (so 60%), and (3) the entire package must be "recyclable, excluding minor incidental components." 16 C.F.R. §§ 260.12(a)-(c). Even if a product meets these standards, "[f]or items that are partially made of recyclable components, marketers should clearly and prominently qualify the recyclable claim to avoid deception about which portions are recyclable." *Id. § 260.12(c).*

Defendants further misquote the FTC Green Guides. Defendants highlight a portion of the relevant Green Guide and then conclude that "the material or product need not actually be recycled." Doc. 248 at 75. Directly after the portion Defendants cite, the Green Guide requires that a product marketed as recyclable must be collected "***for reuse or use in manufacturing or assembling another item***." 16 CFR § 260.12(a). Such claims are expressly discouraged by the FTC, which instructs marketers to "qualify" recyclable claims to avoid consumer misunderstanding. 16 C.F.R. § 260.12(b). The Green Guides instead reinforce liability because Defendants' representations are unqualified assurances that plastics are recyclable.

---

[22] Defendants' argument only applies to Plaintiffs' Arkansas, Florida, Massachusetts, New Mexico, Rhode Island, and South Carolina claims.

*Third*, Defendants again group Plaintiffs allegations as to the statements made by trade associations, only citing one statement. Doc. 48 ¶ 104. Whether this single statement is actionable is immaterial; the simple fact is that Defendants knew their aspirational statements were false. *See Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 659 (D.C. App. 2024) (holding aspirational statements actionable). After making these statements, Defendants continued to mislead consumers via their deceptive campaigns and claims of recyclability. Even if this single allegation is not actionable, that does not affect Plaintiffs' other allegations. *See* Doc. 48 ¶¶ 1-103, 105-155.

### E.    Plaintiffs Alleged Actionable Omission (Counts 3-4, 8)

Plaintiffs allege Defendants deceptively omitted the recycling rate of plastics. *See* Doc. 48 ¶¶ 140, 149. With such omissions, "Rule 9(b) is applied more liberally to claims of fraud by omission." *Melnick v. Tamko Bldg. Prods., Inc.*, 2020 WL 5548807, at *4 (D. Kan. Sept. 16, 2020); *Allstate Indem. Co. v. Dixon*, 304 F.R.D. 580, 584 (W.D. Mo. 2015) (where a "complaint alleges omission rather than misrepresentation, Rule 9(b) standards are more lenient"). Defendants' assertion that Plaintiffs were motivated to purchase the underlying product packaged in plastic is inappropriate on a motion to dismiss, as materiality requires factual inquiry. *Graebner v. James*, 2012 WL 6156729, at *5 (N.D. Cal. Dec. 11, 2012) ("The materiality of the omissions are a question of fact."). Plaintiffs have alleged consumers were motivated to purchase and continue to use plastic products because they were advertised as recyclable by Defendants.

Concerning materiality, Defendants concealed fundamental facts about the lack of recycling systems while representing plastics as recyclable, sustainable, and environmentally beneficial, resulting in a material omission. A fact is "material" if a reasonable consumer would consider it important in deciding whether to purchase the product. *See, e.g., Riddell v. GM LLC*, 2024 WL 2077559, at 6 (E.D. Mo. May 9, 2024). Courts recognize that environmental representations are material where they influence consumers' purchasing decisions. *See, e.g.,*

*Earth Island Inst.*, 321 A.3d at 670; *Rawson v. ALDI, Inc*., 2022 WL 1556395, at *8 (N.D. Ill. May 17, 2022) (finding Aldi's "sustainable" label actionable). Plaintiffs allege that nonrecyclable plastics were far less desirable—and thus less valuable—to consumers. Doc. 48 ¶¶ 87-88, 102. Defendants themselves argue that an industry-wide "promotion of recycling" would be a "business response" to consumer demands. Doc. 248 at 45. "The call" from consumers "was to recycle or be banned." Doc. 48 ¶ 87. In fact, Defendants were so keen on this, they did not "want paper floating around" about the failure of their recycling initiatives, as it was "HIGHLY SENSITIVE POLITICALLY." *Id.* ¶ 109. Had Defendants not omitted the true rates of recycling, consumers would have chosen products in "safe, environmentally conscious packaging alternatives" to plastic, such as aluminum or glass. *Id.* ¶ 150. Consumers' plummeting demand for unrecyclable plastics should have similarly driven down the price of plastics, but Defendants' promotion of plastics as recyclable kept demand–and thus prices–higher than they otherwise would have been. Doc. 48 ¶¶ 102, 155, 174. And contrary to Defendants' argument, consumer protection law does not require the public to undertake independent research to verify whether multinational corporations are lying. "Consumers have no obligation to doubt the veracity of express claims, and . . . unsubstantiated claims are inherently likely to mislead." *Bureau of Consumer Fin. Protec. v. Commw. Eq. Group, LLC,* 752 F. Supp. 3d 378, 406 (D. Mass. 2024).

Finally, Plaintiffs alleged sufficient facts to establish a duty to disclose under California law; Arkansas does not have such a requirement. Omissions are actionable in California, but "the omission must be contrary to a representation actually made by the defendant, or *an omission of a fact the defendant was obliged to disclose*." *Hodsdon v. Mars*, 891 F.3d 857, 861 (9th Cir. 2018). Plaintiffs satisfied this standard. Arkansas courts broadly construe ADTPA and allegations here

fall within its scope. *See Zetor N. Am., Inc. v. Rozeboom,* 2018 WL 3865411, at *14 (W.D. Ark. Aug. 14, 2018) (consumer law applies to "marketing and advertising" promotional campaigns).

Plaintiffs plausibly alleged Defendants' statements are actionable under the applicable Consumer Fraud statutes. Accordingly, the Court should reject Defendant's arguments.

## VI.   Plaintiffs Adequately Allege Consumer Fraud Claims Under State Law.

Defendants incorrectly argue that Plaintiffs fail to state consumer fraud claims under the laws of Arkansas, California, D.C., Florida, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Rhode Island, South Carolina, and Vermont because they allege Plaintiffs didn't "personally encounter[] or rel[y] on" any lie from Defendants about the recyclability of plastics. Doc. 248 at 71. This argument misstates the law.

Florida's, Massachusetts', Missouri's, New Mexico's, and South Carolina's consumer fraud laws do not require plaintiff to prove reliance on the allegedly false statement. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) ("Because a plaintiff asserting a FDUTPA claim 'need not show actual reliance on the representation or omission at issue,' … the mental state of each class member is irrelevant.") (quoting *Davis v. Pwertel, Inc.*, 776 So.2d 971, 973 (Fla. Dist. Ct. App. 2000) (internal citation omitted)); *Commw. v. Exxon Mobil Corp.*, 2021 WL 3493456, at *9 (Mass. Super. June 22, 2021) ("A successful G.L.c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation ... or that the defendant intended to deceive the plaintiff ... or even knowledge on the part of the defendant that the representation was false."); *Johnson v. Gilead Sciences, Inc.*, 563 F. Supp. 3d 981, 989–90 (E.D. Mo. 2021) ("[T]he MMPA does not require a plaintiff to have personally 'seen' or rely upon the deceptive practice; rather, the plain language states a plaintiff need only show that his loss was a result 'of a method, act or practice declared unlawful by section 407.020,' such as misrepresentation." (quoting Mo. Rev. Stat. § 407.025)); *Shaykin v. Progressive Cas. Ins. Co.*,

2020 WL 7042858, at *2 (N.M. Ct. App. Nov. 30, 2020) ("Consistent with the national trend of consumer protection statutes and the language of the UPA, a plaintiff 'need not allege or prove that [he or] she relied on [a d]efendant's purported deceptive conduct in order to recover[.]'" (quoting *Smoot v. Physicians Life Ins. Co.,* 87 P.3d 545, 551 (N.M. Ct. App. Nov. 21, 2003)); *Dowd v. Imperial Chrysler-Plymouth, Inc.*, 381 S.E.2d 212, 213 (S.C. Ct. App. 1989) ("Both this Court and our Supreme Court have held that proof of common law fraud is not required to establish a violation of the [South Carolina Unfair Trade Practices] Act." Instead, the Act requires that three elements be met, none of which list reliance. *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry,* 743 S.E.2d 808, 816 (S.C. 2013)). Thus, whether Plaintiffs alleged they "personally encountered or relied on" Defendants' misrepresentation does not doom consumer fraud claims under Florida, Massachusetts, Missouri, New Mexico, and South Carolina laws.

The Arkansas Supreme Court has not determined whether reliance is a required element of an ADTPA claim. *Motal v. Allstate Prop. & Cas. Ins. Co.,* 2021 WL 724564, at *4 (E.D. Ark. Feb. 24, 2021), *aff'd,* 2023 WL 3515690 (8th Cir. May 18, 2023); *Philip Morris Cos., Inc. v. Miner*, 462 S.W.3d 313, 320 (Ark. 2015). Although the Eastern District of Arkansas has determined that reliance is required, *Moore v. Mack's Sport Shop, LLLP*, 2017 WL 4350980, at *8 (E.D. Ark. Sept. 29, 2017), "reliance is to be presumed when, as here, the misrepresentation goes to a material matter." *Manhattan Credit Co. v. Burns*, 323 S.W.2d 206, 208 (Ark. 1959). Montana takes the same approach. *Thayer v. Hicks*, 793 P.2d 784, 793 (Mont. 1990) ("Where representations have been made in regard to a material matter and action has been taken, in the absence of evidence showing the contrary, it will be presumed that representations were relied upon."). So too here. Rhode Island and Vermont allow for reliance to be "inferred by the circumstances." *Dryvit Sys. v. Feldspar Corp.*, 1995 WL 941376, at *13 (R.I. Super. Jan. 19, 1995); *Ste. Marie v. Wells*, 108 A.

270, 270 (Vt. 1919) (affirming a judgment finding that plaintiff did rely on representations despite plaintiff not testifying that he acted in reliance on the same).

While California does require actual reliance to pursue a consumer fraud claim, reliance under California law is not as onerous as Defendants make it seem. *See In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009). Specifically, "a plaintiff need [not] demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement." *Id.* at 40. Instead, "where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on *particular* advertisements or statements." *Id.* (emphasis added). Here, Plaintiffs allege a long-term advertising campaign.[23] *See* Doc. 48, Section C. And they allege that this campaign caused them to buy plastics at inflated prices. *Id.* at 237. They have thus sufficiently alleged a CA consumer fraud claim.

In the District of Columbia, justifiable reliance is a required element. But whether it exists is "usually a question [of fact] for the jury," *Sibley v. St. Albans Sch.*, 134 A.3d 789, 811 (D.C. 2016), "for which disposition by summary judgment is generally inappropriate," *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987), much less at the motion to dismiss stage. New Hampshire and Rhode Island follow this same approach. *Donna M. King, Individually & as Ex'x of the Est. of Harry E. King, Jr., v. Phillip Morris, Inc.*, 2000 WL 34016358, at *10 (N.H. Super. Nov. 2, 2000) (denying defendants' motion to dismiss attacking plaintiff's pleading of the "justifiable reliance" element because "whether [plaintiff's] reliance on these alleged statements was reasonable is a question of fact."); *see Mtn. Springs Water Co. v. Mtn. Lakes Vill. Dist.*, 489 A.2d 647, 649 (N.H. 1985) (refusing to consider factual defenses in reviewing motions to dismiss for failure to state a cause of action); *Dryvit Sys.*, 1995 WL 941376, at *14 (denying a motion for summary judgment

---

[23] Because Plaintiffs allege a wide-spread advertising campaign, this case is more analogous to *Tobacco II* rather than *Kwikset Corp. v. Superior Court*, which Defendants cite. *See* Doc. 248 at 71 n.35.

because the question of reliance was an "issue of fact[.]"). As does North Carolina. *Parker v. Arcaro Drive Homeowners Ass'n*, 791 S.E.2d 283 (N.C. 2016) ("[T]he question of whether reliance was justifiable is a jury question, 'unless the facts are so clear as to permit only one conclusion.'") (quoting *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP,* 513 S.E.2d 320, 327 (N.C. 1999)). When the facts lack "perfect clarity," as they do here, the ambiguity renders the "matter inappropriate for determination by directed verdict," let alone by motion for dismissal. *Id*. Nebraska, Nevada, and Vermont also take a similar approach. *Griffith v. Drew's LLC*, 860 N.W.2d 749, 754 (Neb. 2015) ("Justifiable reliance must be decided on a case-by-case basis."); *Martin v. Harris*, 236 N.W. 914, 915 (Neb. 1931) ("[I]t is for the jury to determine from the evidence whether a party defrauded by false representations relied on them and whether he was justified in doing so under the evidential facts and circumstances."); *Pub. Emps.' Ret. Sys. v. Harper*, 2016 WL 3257895, at *2 (Nev. June 10, 2016) ("Whether [defendant] made false misrepresentations and [plaintiff] justifiably relied on them are questions of fact."); *Ste. Marie*, 108 A. at 270 (Vt. 1919) "([W]here the representations complained of are material and of a nature calculated to induce the person to whom they are made to take a certain course of action with regard to the subject-matter of the representations, the question whether he relied thereon in so doing is one of fact for the jury."). For the same reasons above, Plaintiffs sufficiently alleged a consumer fraud claim under the laws of D.C., New Hampshire, Rhode Island, North Carolina, Nebraska, Nevada, and Vermont.

Defendants' selected case law does not help their argument. *See* Doc. 248 at 70–71. *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.* involved a fraudulent concealment claim—not a claim under Missouri's consumer fraud statute. 966 F. Supp. 1525, 1536 (E.D. Mo. 1997). Fraudulent concealment requires plaintiffs "to allege if, when, where or how they heard any of

defendant[s'] representations." *Id.* But consumer fraud claims reject this requirement. *See Huffman v. Credit Union of Tex.*, 758 F.3d 963, 968 (8th Cir. 2014) ("Unlike common law fraud claims, to recover under the MMPA, a consumer-purchaser need not prove…reliance by the plaintiff….").

Thus, Defendants' arguments against Plaintiffs' consumer fraud claims fail.

## VII.    Plaintiffs Adequately Pled an Unjust Enrichment Claim.

Defendants assert four grounds for dismissing Plaintiffs' unjust enrichment claim (Count 46). *See* Doc. 248 at 78-79. None withstands scrutiny.

*First*, Defendants argue Plaintiffs failed to identify which states' unjust enrichment laws apply. Although the Complaint does not expressly state that Plaintiffs' unjust enrichment claim arises under the common law of all fifty states, it alleges that Defendants' plastic-recycling deception "amount[s] to a national crisis…in all 50 states…requir[ing] a national, 50-state solution." Doc. 48 ¶ 7. That allegation put Defendants on fair notice that Plaintiffs invoke each state's unjust enrichment law and seek nationwide equitable relief. Rule 8(a) requires no more. This Court allowed a multistate unjust enrichment claim to proceed even while acknowledging that "the elements of an unjust enrichment claim differ among various state laws." *In re EpiPen Mktg., Sales Pracs. and Antitrust Litig.*, 336 F. Supp. 3d 1256, 1345-46 (D. Kan. 2018).

*Second*, Defendants misconstrue the law of Arkansas, California, Massachusetts, and New Hampshire in asserting those states do not recognize unjust enrichment as an independent cause of action. None of their cited cases bars recovery; each simply treats unjust enrichment as an equitable theory of restitution or constructive-trust relief. In *Foreman v. Haliron Power LLC*, 2021 WL 5139519, at *6 (W.D. Ark. Nov. 3, 2021), the court explained that unjust enrichment in Arkansas supports imposing a constructive trust—precisely the remedy Plaintiffs seek in ¶ 520 of the Complaint. Similarly, *Greenley v. Kochava Inc.*, 684 F. Supp. 3d 1024, 1055 (S.D. Cal. 2023), treated unjust enrichment as a quasi-contract claim for restitution; *Robert E. Ricciardelli v. Home*

*Depot*, 679 F. Supp. 2d 192, 210 (D. Mass. 2010), recognized unjust enrichment as an equitable remedy and dismissed only because a contract governed the matter; and *OneSky Litig. Tr. v. Sullivan*, 2012 WL 124739, at *12-13 (D.N.H. Jan. 17, 2012), acknowledged equitable restitution and quantum meruit recovery based upon unjust enrichment but dismissed because an adequate legal remedy existed. Taken together, these authorities address only form, not substance, and they do not preclude Plaintiffs' constructive-trust-based unjust enrichment claim. *See* Doc. 48 ¶ 520.

*Third*, Defendants contend that California, Florida, Massachusetts, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, and South Carolina require plaintiffs to plead the absence of an adequate legal remedy. Plaintiffs have done precisely that. Paragraph 519 of the Complaint alleges that "it would be futile for Plaintiffs … to seek a remedy from any party with whom they had privity of contract" and that equitable relief—restitution and disgorgement—is necessary. Those allegations sufficiently plead the lack of an adequate legal remedy at this stage. *See* Fed. R. Civ. P. 8(d)(2) (permitting alternative pleading).

*Finally*, Defendants' Kansas law arguments fail. The Dormant Commerce Clause is irrelevant because Plaintiffs do not seek to apply Kansas law extraterritorially; the Complaint pleads nationwide course of conduct and asserts unjust enrichment claims on behalf of state subclasses under their own laws. Doc. 48 ¶¶ 3, 7. Plaintiffs allege Defendants' deception artificially inflated demand and prices for plastics, conferring measurable economic benefits on Defendants through inflated revenues and profits. *Id.* ¶¶ 1–6, 173–75, 179–82, 515–20. At the pleading stage, those facts adequately allege a benefit conferred, even if indirectly. *TP ST Acquisition, Inc. v. Lindsey*, 2021 WL 1750872, at *16 (D. Kan. May 4, 2021) (finding Kansas law does not require a direct benefit and Kansas courts permit recovery when benefit was conferred indirectly on the unjustly enriched party). Plaintiffs' unjust enrichment claim should stand.

## VIII.   The Statute of Limitations Does Not Bar Plaintiffs' Claims.

Plaintiffs' claims are timely under two separate tolling doctrines: fraudulent concealment and equitable tolling. Plaintiffs allege a coordinated, fraudulent marketing scheme by Defendants and their trade associations to portray plastic products as broadly and readily recyclable that began in the 1950s. But Plaintiffs could not have known the critical details of these schemes and in fact, are still unaware of the full implications of the schemes due to Defendants' continued and ongoing portrayal of the recyclability of plastics—despite internal documents directly to the contrary.

Fraudulent concealment tolls the statute of limitations where, as here, a plaintiff shows "(1) the use of fraudulent means by the defendants; (2) successful concealment from plaintiffs; and (3) that plaintiffs did not know or by the exercise of due diligence could not have known that they might have a cause of action." *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d 1275, 1284 (D. Kan. 2006) (citing *Ballen v. Prudential Bache Sec., Inc.,* 23 F.3d 335, 337 (10th Cir. 1994)).

Plaintiffs plausibly allege each element of fraudulent concealment. Defendants, their trade associations, and their co-conspirators use of Resin Identification Codes and the "chasing arrows" symbol to signify recyclability when their own internal documents showed that this recyclability was "generally not the case." Doc. 48 ¶ 102 and Figure 9. Yet consumers believed this to be true. *E.g.,* Doc. 48 ¶ 102 (noting "surveys in different states showed that between 53 and 74 percent of consumers believed the presence of the symbol on a product meant it could be recycled where they live"); *id.* ¶ 149. Defendants have done nothing to correct these beliefs, instead pushing the misleading symbols to encourage confusion and to prevent banning plastics. Doc. 48 ¶ 103. Plaintiffs could not have known of any claims or injuries due to the self-concealing nature of Defendants' scheme. As a result of that concealment, Defendants' anticompetitive conspiracy was neither public nor widely known. This was intentional and by design on behalf of Defendants. Due to Defendants' conduct, Plaintiffs were not aware of any cause of action, nor that Defendants had

injured them. Defendants' fraudulent concealment continues even still, where Defendants funded social-media influencers, infomercials, and deceptive digital campaigns to promote recycling and obscure the link between their products and pollution. Doc. 48 ¶¶ 150-55.

Further, Defendants' suggestion that "any consumer … could have reasonably discovered information about the availability and rates of recycling" is a red herring and further perpetuates their scheme. Doc. 248 at 82. Even if Plaintiffs possessed information warranting an investigation, "attempts to exercise due diligence would have been futile" because of the decades of Defendants' scheme. *Schenker AG v. Societe Air France*, 102 F. Supp. 3d 418, 426 (E.D.N.Y. 2015); *accord In re Air Cargo Shipping Antitrust Litig.*, 2010 WL 10947344, at *19 (E.D.N.Y. Sept. 22, 2010) ("Due diligence does not demand such unmitigated cynicism on the part of consumers.").

Plaintiffs also pleaded grounds for tolling, which applies when a party acts to conceal the conduct that forms the basis of the complaint. *Aldrich v. McCulloch Props.*, 627 F.2d 1036, 1041–42 (10th Cir. 1980). Further, a statute of limitations defense may only be resolved on a 12(b)(6) motion when "the dates given in the complaint make clear that the right sued upon has been extinguished." *Id.* at 1041 n.4. Because of Defendants' ongoing marketing communications strategies, the limitations period was tolled until Plaintiffs learned of the wrongdoing through those disclosures and public reports. *E.g.*, Doc. 48 ¶¶ 99-107, 150-52. Plaintiffs acted diligently upon discovery, filing suit within the applicable limitations periods once the truth started to be revealed.

Regardless, these are factual issues that are to be tried and not appropriately resolved at the motion to dismiss stage. The Tenth Circuit has held that when "the existence of fraudulent concealment [is disputed], the question is one for the jury." *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1156 (10th Cir. 1981); *see also In re EpiPen Mktg., Sales Pracs. and Antitrust Litig.*, 545 F. Supp. 3d 922, 1019 (D. Kan. 2021) ("Whether plaintiffs diligently

pursued their claims, thus permitting them to avail themselves of the various tolling doctrines, is a factual issue that the jury must decide at trial."). This holding applies with force where, as here, "'the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators.'" *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at \*\*10–11 (D. Utah May 17, 2018) (quoting *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)). Plaintiffs' allegations of concealment and diligence are sufficient to pass Rule 12 muster. *See, e.g.*, *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d at 787–88; *In re Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 487, 489 (C.D. Cal. 1991) ("Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have.").

Defendants' scheme is ongoing. Rather than disclosing the fact that minimal plastics are recycled, Defendants continued to manufacture, market, distribute, and sell plastics as recyclable and a better alternative to aluminum and glass. Such anticompetitive behavior continues today. *E.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 711 (E.D. Pa. 2014) ("continuing to pay artificially inflated prices" constitutes ongoing injury). Thus, through fraudulent concealment or the equitable tolling, Plaintiffs' claims are timely.

## **CONCLUSION AS TO 12(B)(1) AND 12(B)(6) MOTION TO DISMISS**

Defendants' longstanding, ongoing scheme to mislead public and private purchasers about the recyclability of plastics to prioritize profits has gone on too long. Plaintiffs have Article III standing for all claims asserted. Plaintiffs sufficiently plead their antitrust, state law, and public nuisance claims. The statute of limitations is tolled by Defendants' continued actions. The Motion to Dismiss should be denied in its entirety.

IX.    **Chevron U.S.A., Inc.'s Individual Arguments for its Dismissal Are Unavailing.**

Plaintiffs sufficiently pled specific deceptive statements by Chevron and facts sufficient to demonstrate the need for discovery regarding the relationship between Defendant Chevron U.S.A., Inc. ("CUSA") and Chevron Chemical Company ("Chevron Chemical").

A.    **Chevron made false and deceptive statements regarding plastics recyclability.**

Chevron Chemical was a member of the Executive Board of the Council for Solid Waste Solutions ("CSWS") (later the American Plastics Council ("APC")), Doc. 48 ¶ 90, fig. 6; see also *id.* ¶ 91 n.68. As an Executive Board member of CSWS, Chevron Chemical participated with the goal of "convinc[ing] the public that recycling was the answer to the plastics waste and pollution crisis." *Id.* ¶ 91. CSWS engaged in a campaign of false and deceptive activity, including advertising that "most plastics can be melted and reused over and over again," *Id.* ¶ 115. CSWS also promoted the use of the chasing arrows symbol on plastics to confuse consumers, who believed the symbol meant a product was recyclable. *Id.* ¶¶ 99-102. Yet Defendants, including Chevron, knew that recycling was both economically and physically infeasible, as plastic resins degrade, become largely unusable, and leach toxic chemicals. *Id.* ¶¶ 51-54, 70-71, 108.

Chevron Chemical's position on the Executive Board meant Chevron and other Defendants controlled CSWS' false and deceptive statements. *See* Doc. 48 ¶ 90 n.66 ("The Board . . . 'functioned as a business council'") (quoting Partnership for Plastics Progress, *Introducing the Partnership for plastics Progress* (Jan. 1992)); *Burcham v. Unison Bancorp., Inc.*, 276 Kan. 393, 416 (2003) ("[Defendant], as a corporation, acts only through the decisions of its board of directors."). 393, 416 (Kan. 2003) ("[Defendant], as a corporation, acts only through the decisions of its board of directors."). Defendant CUSA's assertion that no Chevron entity has operated a plastics resin business in twenty-five years is irrelevant. Doc. 248 at 83-84. The putative class

period begins on January 1, 1990, while Chevron Chemical manufactured, marketed, and sold plastic resins in the United States until May 23, 2000. *Id.* ¶ 161; Doc. 129-1 ¶ 5.

**B.      Plaintiffs are entitled to discovery regarding the relationship between CUSA and Chevron Chemical.**

Defendant CUSA's arguments are predicated upon its claim that "Chevron Chemical Company . . . is not, and has never been, CUSA." Doc. 248 at 85. Yet the fact that Chevron Chemical was conveyed to Chevron Phillips Chemical Company LP ("CPChem"), a corporation owned 50% by CUSA, Doc. 129-1 ¶ 5, raises questions as to the level of control CUSA had over Chevron Chemical and whether CUSA today is a mere continuation of Chevron Chemical.

First, both CUSA and its "corporate affiliate" Chevron Chemical were part of the overarching Chevron Corporation. Doc. 129-1 ¶ 5; Doc. 248 at 83. Because of the intertwined nature of CUSA and Chevron Chemical, CUSA could be found part of this common enterprise. *Commodity Futures Trading Comm'n v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) ("[w]here one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the other"), *modified sub nom.*, 2004 WL 1900588 (D. Kan. June 24, 2004), and *aff'd and remanded*, 128 F. App'x 726 (10th Cir. 2005). While discovery will be needed to confirm, currently available facts already prove this common enterprise. For example, just before the creation of CPChem, CUSA and Chevron Chemical had at least some common officers. *See, e.g., Winningkoff v. Am. Cyanamid*, 2000 WL 235648, at *8 (E.D. La. Mar. 1, 2000) (same individual served as the Assistant Secretary of both CUSA and Chevron Chemical.) Additionally, as part of the Chevron Corporation, CUSA and Chevron Chemical may have operated as part of a common enterprise seeking to promote the narrative that plastics are recyclable. *See Commodity Futures Trading Comm'n*, 281 F. Supp. 2d at 1271 (citations omitted) (a common enterprise may be found when, for example, "there is common

control of the entities" and when one entity advertised exclusively through the other). In Chevron's 10-K Form for 1999, Chevron Chemical Company LLC was identified as one of CUSA's three primary divisions.[24] *See also J.R. Simplot Co. v. Chevron*, 2011 WL 5574950, at \*1 (D. Utah Nov. 16, 2011) (naming Chevron Chemical as a division of CUSA). A division, unlike a subsidiary, is generally not a separate legal entity. *See, e.g., Pioneer Expl. Ltd. v. Kansas Gas Serv. Co.*, 2004 WL 2931403, at \*2 (D. Kan. Dec. 17, 2004) (citation omitted) ("A division of a corporation does not possess the formal separateness . . . and thus is not an independent entity for jurisdictional purposes.").

If during the relevant period, CUSA controlled Chevron Chemical, then CUSA would be liable for the actions of Chevron Chemical – including the false and deceptive statements regarding plastics recycling. *See, e.g., Lamothe v. Decentral Life, Inc.*, 2024 WL 5055576, at \*4 (D. Colo. Oct. 24, 2024), *report and recommendation adopted sub nom.*, 2024 WL 5055579 (D. Colo. Nov. 12, 2024) (finding "that it is reasonable to attribute the fraudulent statements to all involved entities because they were controlled and represented by the same individuals."). Though CUSA itself is not a purchaser of Chevron Chemical, the "mere continuation rule is based upon the notion that corporate entities cannot escape valid claims merely by undergoing some insignificant change in form." *Crane Const. Co. v. Klaus Masonry, LLC*, 114 F. Supp. 2d 1116, 1119 (D. Kan. 2000).

CUSA, not Plaintiffs, is in the best position to understand its relationship with the other Chevron entities and their role in these trade associations. Courts have denied motions to dismiss before discovery, even when plaintiffs insufficiently identified "the defendant responsible for each alleged misrepresentation," holding instead that plaintiffs "need an opportunity to discover defendants' corporate structure and the inter-relationship, if any, of the named defendants."

---

[24] Chevron Corp., Annual Report (Form 10-K) (Mar. 30, 2000).

*Bradley v. Sanford Brown Coll., Inc.*, 2005 WL 3088696, at *2 (W.D. Mo. Nov. 17, 2005); *see also Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216, 1250 (N.D. Ala. 2019) (citation omitted) ("When defendants maintain a confusing corporate web and reclusively seek to conceal the entities spun within it, plaintiffs should be permitted to use discovery to untangle the web of entities and ascertain who relates to whom."); *see also Harris v. Chevron U.S.A., Inc.*, 2015 WL 3746989, at *2 (W.D. Okla. June 15, 2015) (denying motion to dismiss and confirming that "Plaintiff is entitled to additional discovery to determine precisely which of the named entities is a proper Defendant").

Taking Plaintiffs' allegations as true, Chevron Chemical made deceptive statements regarding plastics recycling and is a proper defendant. But should the Court disagree at this stage, Plaintiffs request discovery regarding the relationship between CUSA and Chevron Chemical.

## X.        Plaintiffs State a Plausible Claim Against Eastman.

Even after *Iqbal* and its predecessor, *Twombly*, the Tenth Circuit still recognizes that "Rule 8(a)(2) . . . lives," and that "specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Burnett v. MERS, Inc.*, 706 F.3d 1231, 1235-36 (10th Cir. 2013). It would "strain credulity" to expect Plaintiffs to possess "intentionally hidden communications at the pleading stage" to assert specific, exacting allegations. *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 944 (D.N.M. 2023) (explaining that requiring plaintiffs to plead specific "suspect communication" at the pleading stage would "nullify … antitrust laws," except in rare whistleblower actions).

Plaintiffs' allegations are simple and not to be confused by Eastman's attempt to escape accountability. Plaintiffs plausibly allege a conspiracy between Defendants. Doc. 48 ¶¶ 11, 91 n.68, 165, 180-82, 224, 345-48, 355, 364, 391. The Complaint is replete with allegations from which a plausible inference can be drawn that Defendants had a "unity of purpose, a common

design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223 (D. Kan. 2013). At the motion to dismiss stage, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement…; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 301 (2007). It does not matter that Eastman claims to produce a semantically different kind of plastic. This is an issue of fact not suitable for determination at the motion to dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint mentions Eastman specifically and alleges it participated in the ongoing, coordinated conspiracy. *See* Doc. 48 ¶¶ 31, 33, 33 n.95, 119, 218, 233.

### A.    Plaintiffs' Allegations as to Eastman are sufficient for Rule 12.

As discussed above, group pleadings are sufficient in antitrust cases involving multiple defendants, particularly when a conspiracy is alleged. *See Tobler v. 1248 Holdings, LLC*, 2025 WL 89052, at *2 (D. Kan. Jan. 14, 2025). Under a single-enterprise theory of antitrust liability, Plaintiffs need not allege that each specific Defendant independently satisfied each element of their claims. Where a complaint "alleges each Defendant's participation separately, it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as '… Defendants.'" *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018). "Once the existence of the common scheme is established," only "slight evidence" is needed to connect any defendant with the alleged conspiracy. *Safeway Stores, Inc. v. F.T.C.*, 366 F.2d 795, 801 (9th Cir. 1966). Given Defendants' similar roles and conduct, group allegations are both efficient and appropriate under Rule 8, particularly at the pleading stage where the claim need only put defendants on fair notice of the alleged misconduct.

Eastman's cited authorities do not compel a different result. In *Tobler*, the Court held plaintiffs' group pleadings alleged a conspiracy and identified defendant 1248 as a participant. *Tobler*, 2025 WL 89052, at *4. The Court held this sufficient to put 1248 on notice. *Id.* So too here. Plaintiffs more than adequately proffered allegations to put Eastman on notice of the claims against it. In *Burnett v. MERS, Inc.*, the Court found plaintiff's complaint too vague chiefly because it included "fifty unknown Doe defendants" and a "litany of diverse and vague alleged acts." 706 F.3d at 1240. Here, the allegations are not vague, and Eastman is not anonymous. Plaintiffs' Complaint contains over 100 pages of specific factual allegations and legal argument. The Complaint mentions Eastman specifically. *See* Doc. 48 ¶¶ 31, 33, 119 n.95, 218, 233.

This is a putative class action lawsuit against multiple defendants. Plaintiffs cannot, at all times, make specific allegations against every Defendant. The pleadings incorporate Eastman by reference when using "Defendants." This is explicitly mentioned and obviously implied.

### B.    Plaintiffs' Claims Against Eastman are Timely and Otherwise Tolled

It is Defendants' burden to establish a statute of limitations affirmative defense, and so "[o]nly when the plaintiff pleads itself out of court–that is, admits all the ingredients of an impenetrable defense–may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)" on timeliness grounds. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1298-99 (10th Cir. 2018) (citation omitted). Eastman does not come close to meeting this heavy burden, rather it merely claims Plaintiffs' allegations are time barred without any citation to authority.

As discussed above in § VIII, when the existence of fraudulent concealment is disputed, the question is one for the jury—especially when the proof relating to the extent of the fraudulent concealment is alleged to be primarily in the hands of the conspirators. Plaintiffs' allegations of fraudulent concealment are sufficient to pass Rule 12 muster.

Further, Plaintiffs plausibly allege each element of fraudulent concealment. Plaintiffs could not have known of claims or injuries due to the self-concealing nature of Defendants' scheme. As a result of that concealment, Defendants' anticompetitive conspiracy was neither public nor widely known. *See* Doc. 48 ¶¶ 91-98, 107-109, 138-140, 147-155. This was intentional and by design by Defendants, including Eastman. Due to this conduct, Plaintiffs were not aware of any cause of action, nor that Defendants injured them. Defendants' fraudulent concealment continues even still.

## XI.    American Chemistry Council Provided the Means for other Defendants' Illegal Actions in Violation of State Law, Making ACC Liable

Plaintiffs also assert state-law claims for the harms suffered by consumers in various states. Doc. 48 ¶¶ 217-512. Defendant American Chemistry Council (ACC) identifies no explicit language in these states' consumer protection statutes excluding trade associations from liability. Plaintiffs' detailed factual allegations, spanning decades, include that ACC and its predecessors organized, coordinated, and executed deceptive recycling campaigns on behalf of petrochemical manufacturers, causing inflated demand, supracompetitive prices, and environmental harm. Because ACC's coordination with the other Defendants, who were member companies, fall squarely within these statutes, its arguments for exemption lack merit.

**Arkansas:** ACC's narrow reading of the Arkansas Deceptive Trade Practices Act (ADTPA) fails. The statute expressly prohibits "knowingly making a false representation as to the characteristics...of a good" and from engaging in "any unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. §§ 4-88-107(a)(1), (a)(10). Arkansas courts construe the ADTPA broadly, to protect the public. *See Curtis Lumber Co. v. Louisiana Pac. Corp.,* 618 F.3d 762, 780 (8th Cir. 2010), citing *Arkansas ex rel. Bryant v. R&A Co.*, 985 S.W.2d 299, 302 (Ark. 1999) (holding that a "liberal construction of the [A]DTPA is appropriate"). Plaintiffs allege that Defendants—including ACC—disseminated misleading advertising claiming

66

plastics were recyclable, which "substantially affected Arkansas commerce" and caused consumers to pay inflated prices. Doc. 48 ¶¶ 222–228. Such deceptive advertising falls squarely within the scope of the ADTPA. *See Zetor N. Am., Inc. v. Rozeboom,* 2018 WL 3865411, at *14 (W.D. Ark. Aug. 14, 2018) (Arkansas consumer protection law applies to "deceptive consumer-oriented act[s]" including "advertising and marketing.").

**California:** Defendant ACC contends it is not a business in the commercial market, under the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq*. Doc. 248 at 91. But the UCL "broadly prohibits 'any unlawful, unfair, or fraudulent business act or practice and deceptive, untrue, or misleading advertising[.]" *Gray v. Dignity Health*, 70 Cal. App. 5th 225, 236 (Cal. Ct. App. 2021). The Complaint plainly alleges ACC and its predecessors participated in consumer-directed advertising designed to halt the public's decreasing demand for plastic and to deceive the public into purchasing more plastic products. Doc. 48 ¶¶ 87-88, 107–122, 153. Defendants' trade-association campaign, through and including ACC, was intended to influence purchasing decisions of consumers in California and nationwide. These facts are sufficient.

**D.C.:** The single, misleading citation misstates the scope of the D.C. Consumer Protection Procedures Act (CPPA). The CPPA forbids *any* deceptive representations in connection with goods or services, "whether or not any consumer is in fact misled, deceived, or damaged thereby," including "represent[ations] that goods or services have...characteristics...that they do not have[.]" D.C. Code § 28-3904(a). Courts interpret the CPPA broadly, to include public misrepresentations and advertising. *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 671 (D.C. 2024) ("[Defendant]'s packaging is part of the products that it sells, and the environmental impact of how it creates that product, and what becomes of it, are qualities of the product itself under the CPPA's broad approach to goods and services.") The Complaint alleges that ACC, along with the

other Defendants, engaged in nationwide deceptive advertising—including in the District—misleading consumers about a characteristic of plastics, i.e., recyclability. Doc. 48 at ¶¶ 5–6, 107–122. Plaintiffs therefore properly plead a consumer-oriented injury under the CPPA.

**Florida:** The Florida Unfair and Deceptive Trade Practices Act (FDUTPA) applies beyond direct consumer transactions and not just to the alleged "tortious conduct" despite ACC's contention. Doc. 248 at 92. Plaintiffs allege consumers purchased plastic goods in reliance on and as a result of industry-funded advertising falsely touting recyclability made by and facilitated through the ACC and its predecessors. *See* Doc. 48 ¶¶ 5–6, 107–22. The FDUPTA "forbids any unfair or deceptive acts committed in the conduct of any trade or commerce[,]" not merely contractual transactions, and is "construed liberally" to promote the protection of the consuming public. *LLW Enter., LLC v. Ryan*, 2020 WL 2630859, at \*6 (M.D. Fla. May 4, 2020). And ACC's reliance on *Pinecrest Consortium, Inc. v. Mercedes-Benz USA, LLC* is similarly inapplicable. No consumer transaction occurred in *Pinecrest* because the *plaintiff* had not purchased the product. 2013 WL 1786356, at \*1 (S.D. Fla. Apr. 25, 2013). Plaintiffs here purchased the products at issue and suffered harm resulting from ACC's role in Defendants campaign falsely promoting the narrative of plastics recyclability. *See* Doc. 48 ¶¶ 15–23.

**Massachusetts:** ACC's assertion that the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, requires a direct commercial transaction, Doc. 248 at 92, applies the wrong section of the MCPA. Plaintiffs' Complaint seeks relief under Mass. Gen. Laws ch. 93A § 9. Doc. 48 ¶ 26. In contrast, *Milliken & Co. v. Duro Textiles, LLC*, which ACC quotes, refers *only* to Mass. Gen. Laws ch. 93A § 11, which applies specifically to "[a]ny person who engages in the conduct of any trade or commerce," not to ordinary consumers. 887 N.E.2d 244, 259 (Mass. 2008). Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," and

§ 9 gives standing to "any person, *other* than a person entitled to bring action under section eleven of this chapter," Mass. Gen. Laws ch. 93A §§ 2, 9 (emphasis added), injured by deception "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Geis v. Nestle Waters N. Am., Inc.,* 321 F. Supp. 3d 230, 245 (D. Mass. 2018) (citations omitted). Plaintiffs allege pervasive deception in marketing plastics as recyclable, which inflated prices and affected Massachusetts commerce, meeting Mass. Gen Laws ch. 93A's broad remedial standard. Doc ¶¶ 256–261; *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 61–62 (2002) (recognizing indirect purchaser standing in consumer-fraud context).

**Missouri:** ACC also tries to evade Missouri liability by disingenuously claiming the Missouri Merchandising Practices Act (MMPA) requires Defendant to have made a direct sale or advertisement. Doc. 248 at 92. The Complaint refutes that contention. The MMPA broadly prohibits "the act, use or employment by *any* person of *any* deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact *in connection with* the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020(1) (emphasis added). Plaintiffs allege that Defendants—including the ACC—"concealed, suppressed, and omitted material facts" about plastics' recyclability and "made public statements that were not in accord with the facts." Doc. 48 ¶¶ 264–266. Plaintiffs also allege end-use purchases of plastics in Missouri and standing for indirect purchasers. *Id.* ¶¶ 268-269. The MMPA's broad reach imposes civil liability on those "who engage in conduct that it deems unlawful," regardless of whether the defendant is the direct seller. *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 725 (Mo. 2009) (en banc); *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) (MMPA's "plain language does not contemplate a direct contractual relationship between plaintiff and defendant, and Missouri courts

have not imposed such a requirement through statutory construction.") The deceptive advertising at issue was integral to the sale of plastics within Missouri and is thus within the MMPA's scope.

**Montana:** Montana's Unfair Trade Practices and Consumer Protection Act (MCPA), Mont. Code Ann. § 30-14-101 et seq., applies to entities "providing goods or services in trade and commerce in Montana" and encompasses the ACC. Doc. 248 at 92. The MCPA prohibits "*any* unfair or deceptive act or practice in the conduct of any trade or commerce," Mont. Code. Ann. § 30-14-103, which includes "the advertising...[of any] article, commodity, or thing of value, wherever located, and includes commerce directly or indirectly affecting the people of this state." Mont. Code Ann. § 30-14-103, 102(8). Plaintiffs allege that ACC and its member companies orchestrated and financed deceptive national advertising—disseminated in Montana—to falsely represent plastics as recyclable, thereby influencing consumer purchasing behavior and inflating prices. Doc. 48 ¶¶ 272–276. Because ACC participated in deceptive "advertising" within the meaning of the MCPA, it engaged in "trade or commerce" even if ACC itself did not sell plastics.

**Nebraska:** Contrary to ACC's contention, Nebraska's Consumer Protection Act (NCPA) applies broadly to "unfair or deceptive acts or practices in the conduct of any trade or commerce," Neb. Rev. Stat. § 59-1602. Courts, rejecting arguments that "restrict[] recovery to 'consumer-oriented' conduct," have held that the NCPA is "broad, with no indications that recovery is restricted to certain types of conduct" and that "trade and commerce" means "any commerce directly or indirectly affecting the people of the State of Nebraska." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, 2018 WL 7197233, at *46 (S.D.N.Y. Dec. 26, 2018), citing Neb. Rev. Stat. § 59-1601(2); *Arthur v. Microsoft Corp.*, 267 Neb. 586, 597 (Neb. 2004). Plaintiffs allege that Defendants' coordinated false advertising about recyclability, through their

membership in ACC and its predecessors, caused consumers in Nebraska to pay supracompetitive prices, satisfying the requirements of the NCPA. Doc. 48 ¶¶ 277–83.

**Nevada:** ACC implies, by citing an unpublished disposition, that Nevada's Deceptive Trade Practices Act (NDTPA) always requires a direct transaction. Doc. 248 at 93. However, the NDTPA also prohibits a person from, "in the course of his or her business or occupation… knowingly mak[ing] a false representation(s) as to the characteristics...of goods...for sale[.]" Nev. Rev. Stat. §§ 598.0915(5). This includes broad marketing schemes. *R.J. Reynolds Tobacco Co. v. Eight Jud. Dist. Ct. in & for Cnty. Of Clark*, 514 P.3d 425, 430-31 (Nev. 2022) (holding that a plaintiff can bring an NDTPA claim against a defendant that made false and misleading statements about a product category, even if the plaintiff did not actually purchase or use the defendant's product). The Complaint thus states a valid NDTPA claim by alleging ACC engaged in national advertising—including in Nevada—that falsely portrayed plastics as recyclable, misleading consumers and affecting statewide markets. Doc. 48 ¶¶ 284–85.

**New Hampshire:** The New Hampshire Consumer Protection Act (NHCPA) does not require a direct transaction, it prohibits "*any* unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce, such as "[r]epresenting that goods or services have…characteristics…that they do not have[.]"" N.H. Rev. Stat. Ann. § 358-A:2(V) (emphasis added). Plaintiffs' allegations against ACC fall squarely in the scope of the NHCPA. *See Beer v. Bennett*, 160 N.H. 166, 171 (2010) (holding that the NHCPA covers misleading advertising and omissions, "even if the individual representations could be read as literally true" if the advertisement "created an overall misleading impression."). Plaintiffs allege that ACC's false and deceptive claims regarding plastics recycling, directed at consumers in New Hampshire, caused them to overpay for plastic goods. Doc. 48 ¶¶ 287–290.

**New Mexico:** New Mexico's Unfair Practices Act (UPA) applies to any "false or misleading statement" made in connection with the sale of goods or services. N.M. Stat. Ann. § 57-12-2(D). ACC's citation to *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.* does not apply here. 137 N.M. 524, 529 (N.M. Ct. App. 2005); Doc. 248 at 93. The "true holding[]" of *Santa Fe* "is that a *seller* of goods cannot sue the *buyer* of its goods under the NMUPA." *Navajo Nation v. Urb. Outfitters, Inc.*, 935 F. Supp. 2d 1147, 1173 (D.N.M. 2013) (emphasis in original). The UPA is construed "liberally," and "the plain language of the act and the underlying policies suggest that a commercial transaction between a claimant and a defendant *need not be alleged* in order to sustain a UPA claim." *Lohman v. Daimler-Chrysler Corp.*, 142 N.M. 437, 443 (Ct. Ap. 2007) (emphasis added). Plaintiffs allege ACC provided a coordinated campaign to misrepresent recyclability and inflate prices to New Mexico consumers, conduct actionable under the UPA. Doc. 48 ¶¶ 291–295; *Apodaca v. Young Am. Ins. Co.,* 702 F. Supp. 3d 1094, 1122 (D.N.M. 2023).

**North Carolina:** ACC's attempt to narrow North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1, with a case from 1980, interpreting the version of the UDTPA in force prior to its *1977* amendment, is not persuasive. The UDTPA generally prohibits "unfair or deceptive acts or practices in *or affecting* commerce," defined expansively to include "all business activities, however denominated." N.C. Gen. Stat. Ann. § 75-1.1(b) (emphasis added). North Carolina courts have consistently rejected efforts to narrow the statute's scope. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (N.C. 2000). False advertising, which ACC promoted and facilitated, is a quintessential UDTPA violation, since it has "the capacity or tendency to deceive." *See Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 902 (4th Cir. 1996). Plaintiffs' UDTPA claim is properly pled.

**Rhode Island:** Under the Rhode Island's Deceptive Trade Practices Act (RIDTPA), "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. R.I. Gen. Laws § 6-13.1-2. "Trade or commerce" includes "advertising…of any…article, commodity or things of value" including trade or commerce "directly or indirectly affecting the people of this state." R.I. Gen. Laws § 6-13.1-1(5). Plaintiffs allege ACC's national advertising campaigns, which reached Rhode Island consumers, falsely claimed plastics were recyclable, increasing demand for and prices of plastics, satisfying the requirements of RIDTPA. Doc. 48 ¶¶ 302–306.

**South Carolina:** ACC violated The South Carolina Unfair Trade Practices Act (SCUTPA) by engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a). "Trade or commerce" includes "the advertising, offering for sale, sale or distribution of any services and any property." § 39-5-10(b). Courts interpret the SCUTPA broadly, even finding that a truthful statement may be deceptive and cognizable under the SCUTPA if it has a "capacity or tendency to deceive." *Wright v. Craft*, 640 S.E. 2d 486, 500 (S.C. Ct. App. 2007) (citation omitted). Plaintiffs allege that Defendants' deceptive advertising on recyclability reached South Carolina consumers and resulted in inflated market prices for plastics. Doc. 48 ¶¶ 307–312. That conduct is plainly "in commerce" within the scope of SCUTPA.

**Vermont:** Defendant relies on *Wilder v. Aetna Life & Cas. Ins. Co.* 140 Vt. 16 (1981), to incorrectly argue that the Vermont Consumer Protection Act, 9 V.S.A. § 2453(a), applies only to entities directly providing goods or services to consumers. *Wilder*, which involved a dispute over an insurance contract, not a good or service, simply held that a private plaintiff must demonstrate a transaction, not that the defendant must be the immediate seller. *Wilder*, 147 Vt. at 19. To prevail on a VCPA claim, all a plaintiff must show is that "(1) there was a representation, practice, or omission likely to mislead the consumer; (2) the consumer interpreted the message reasonably

under the circumstances; and (3) the misleading effects were material." *Lang McLaughry Spera Real Est., LLC v. Hinsdale*, 35 A.3d 100, 111 (Vt. 2011) (citation and internal quotations omitted). Plaintiffs' allegations about ACC falsely portraying plastics as recyclable to promote the sale of plastics in Vermont, resulting in inflated demand and thus higher prices. Doc. 48 ¶¶ 313–317. Defendant cannot rely on Wilder, and Plaintiffs have sufficiently alleged a claim.

Defendant American Chemistry Council's arguments for dismissal under consumer protection laws fail. Plaintiffs allege extensive consumer-directed deception by the ACC and its members, establishing causation, consumer orientation, and statutory standing under all named states' laws. ACC's Motion to Dismiss Counts 3-17 of Plaintiffs' Complaint should be denied.

## XII.    The Court has Personal Jurisdiction over Defendant DPNI.

Defendant DuPont de Nemours, Inc. ("DNPI") seeks to evade this Court's jurisdiction and its own liability for decades-long deception about plastic recycling. But this Court has personal jurisdiction over DPNI under Clayton Act Section 12, 15 U.S.C. § 22, because, in the absence of Congress' intent to combine two historically discrete concepts, *see Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1179-80 (9th Cir. 2004), the Act's special venue provision should be read independently of its personal jurisdiction provision.[25] *See also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288 (3rd Cir. 2004). Regardless of interpretation, this Court has personal jurisdiction over DPNI because it has conspiracy jurisdiction over all Defendants.

DNPI's arguments misconstrue both the law and the facts in Plaintiffs' Complaint. Even under Section 12's stricter reading, which this Circuit has not adopted, the Complaint plausibly alleges that Defendants, including DNPI—through integrated subsidiaries and coordinated trade

---

[25] While a circuit split exists as to whether the Clayton Act's special venue and personal jurisdiction provisions should be read together or independently, the Tenth Circuit has yet to answer this question. *Budicak, Inc. v. Lansing Trade Grp., LLC*, 2020 WL 758801, at *3 n.20 (D. Kan. Feb. 14, 2020).

groups—designed, financed, and directed a nationwide campaign to mislead consumers and municipalities about plastics' recyclability. Personal jurisdiction is therefore proper under both Section 12 of the Clayton Act and under traditional due process principles, because DNPI actively participated in the conspiracy when it controlled, funded, and derived substantial revenue from conduct targeting Kansas.

### A.    This Court should adopt the Ninth, Third, and Fifth Circuits' interpretation of Section 12 of the Clayton Act.

Section 12 of the Clayton Act is intended to provide a "valued tool of worldwide service of process" whose "broadening" effect allows plaintiffs to pursue "legitimate claims under the antitrust laws." *Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1410–11 (9th Cir. 1989); *see also Pure Oil Co. v. Suarez*, 382 U.S. 202, 205 (reading special venue provision of the Jones Act in light of "more general doctrines of venue rules[.]")

Consistent with controlling authority of the United States Supreme Court, the Ninth and Third Circuits, along with several courts in the Fifth Circuit, read the Section 12 provisions independently – meaning the Clayton Act authorizes nationwide personal jurisdiction regardless of whether the special venue provision is satisfied. *Go-Video, Inc.*, 885 F.2d at 1410-11; *Action Embroidery Corp.,* 368 F.3d at 1178–80; *In re Auto. Refinishing Paint Antitrust Litig.,* 358 F.3d at 296-97; *Crompton Corp. v. Clariant Corp.*, 221 F. Supp. 2d 683, 688 (M.D. La. 2002); *Ferko v. Nat'l Ass'n of Stock Car Racing*, 2002 WL 34477591, at *7 (E.D. Tex. Oct. 4, 2002) (finding the Fifth Circuit joined the Ninth Circuit's approach view that the special venue and personal jurisdiction provisions operate independently of each other). *But see Rumble, Inc. v. World Fed'n of Advertisers*, 2025 WL 2345076, at *6 (N.D. Tex. Aug. 13, 2025) ("The Fifth Circuit has not taken a side in the circuit split."). Defendants' argument that Plaintiffs are required to satisfy Section 12's special venue provision fails.

Regarding personal jurisdiction, Section 12 states: "[A]ll process in such cases may be served in the district of which [the corporation] is an inhabitant, or wherever it may be found." 15 U.S.C. § 22. In conducting a minimum contacts analysis, the Ninth, Third, and Fifth Circuits hold that defendant need only sufficient aggregate contacts with the United States as a whole. *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 298; *Go–Video, Inc.,* 885 F.2d at 1415 (the "worldwide service provision of § 12 justifies [the] conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts."); *Access Telecom, Inc. v. MCI Telecomm. Corp.,* 197 F.3d 694, 718 (5th Cir.1999) ("When jurisdiction is invoked under the Clayton Act, the court examines the defendant's contacts with the United States as a whole to determine whether the requirements of due process have been met.") Personal jurisdiction under Section 12 of the Clayton Act extends to the constitutional limits of due process. *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 299.

As a resident corporation of the United States, Defendant DPNI has sufficient minimum contacts in the United States. Doc. 48 ¶¶ 11, 27, 29. Therefore, the exercise of personal jurisdiction over Defendant DPNI does not violate Due Process and is thus proper.

**B.    Even if this Court does not adopt the Ninth, Third, and Fifth Circuits' interpretation, this Court nevertheless has personal jurisdiction over DPNI under conspiracy jurisdiction.**

This Court has personal jurisdiction over DPNI under conspiracy jurisdiction, as "the existence of a conspiracy and acts of a co-conspirator within the forum" can "subject another co-conspirator to the forum's jurisdiction. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007). Even co-conspirators who have no other contact with the forum may nevertheless have sufficient minimum contacts to confer personal jurisdiction when its co-conspirators perform acts in or directed towards the forum state in furtherance of the conspiracy. *Id.* at 1070.

76

Conspiracy jurisdiction applies when a plaintiff alleges a conspiracy to commit a business tort which had foreseeable consequences in Kansas. *Felix v. American Honda,* 2008 WL 199817, *2 (D. Kan. 2008) (citation and internal quotation omitted). By alleging that Plaintiffs purchased plastic products in the state of Kansas at inflated prices, due to Defendants' nationwide false and deceptive advertising which did not exclude Kansas, Plaintiffs alleged with particularity an antitrust conspiracy which had foreseeable consequences both nationwide and specifically in Kansas. *Id.* ¶¶ 11, 15-16, 23, 179-184.

DNPI's blanket statement that it did not "manufacture[], produce[], distribute[], or sell[] plastics in Kansas" does not allow it to evade this Court's jurisdiction. Doc. 248 at 95. That argument ignores Plaintiffs' detailed allegations that DNPI was part of the group of Defendants that conspired to fund, direct, and profited from a campaign pushing a false and deceptive narrative that plastics are recyclable, which was marketed nationwide and in Kansas. Plaintiffs allege that DNPI: (1) participated in the creation and use of recycling labels and educational programs that Kansas municipalities adopted, Doc. 48 ¶¶ 23, 98-99, 114-115, 206-209; (2) was on the Executive Board of trade associations whose deceptive messaging was implemented by Kansas waste authorities, *id.* ¶¶ 33, 90, fig. 6, 99, 206-209; and (3) derived substantial revenue from plastics sold to Kansas distributors and consumers through controlled subsidiaries, *id.* ¶¶ 27, 173, 177, 180-181; *see also* Doc. 248 at 34-35. These are not random or attenuated contacts—they are targeted efforts to shape consumer behavior and regulatory policy in Kansas.

Further, Plaintiffs' injuries—overpayment for unrecyclable plastics and municipal waste costs—arise directly from those contacts with the state. See *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (specific jurisdiction is proper when plaintiff's claims "arise out of or relate to the defendant's contacts" with the forum). DNPI used nationwide

marketing and labeling systems to influence Kansas markets and to target Kansas consumers. It cannot be disputed that Defendants' (including DNPI's) attempt to confuse the fact that end use plastics were *not* recyclable had an effect in this forum and injured the people who live here. It cannot be disputed that Defendants' (including DNPI's) attempt to cloak the fact that end-use plastics were *not* recyclable had an effect in this forum and injured the people who live here. Defendant DPNI has minimum contacts with the state of Kansas because of their participation in the conspiracy and overt acts taken by co-conspirators in Kansas. Thus, this court has personal jurisdiction over Defendant DPNI.

## XIII.    Kansas Attorney General's Arguments for Dismissal Fail.

The State of Kansas, *ex rel.* Kris Kobach's (the "KS AG") arguments fail for many reasons, largely because such arguments are procedurally nonsensical and because the state intervened in the case on the wrong side of the v. If the Kansas Attorney General wanted to litigate these claims on behalf of Kansans, it would be working in tandem with Plaintiff Ford County, not attempting to enjoin them from litigation against Defendants who have financially harmed them. The Court should reject the KS AG's novel application of *parens patriae* authority and permit Ford County, as the real party in interest, to pursue its individual claims and evaluate its ability to pursue such claims on a representative basis under Rule 23 at the appropriate stage.

### A.    KS AG does not have parens patriae standing.

The privilege of *parens patriae* "is inherent in the supreme power of every state, whether that power is lodged in a royal person, or in the legislature," but the doctrine "has no affinity to those arbitrary powers which are sometimes exerted by irresponsible monarchs to the great detriment of the people, and the destruction of their liberties." *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 57 (1890).

English common law of *parens patriae* vested authority in the King to guard the interests of "persons under legal disabilities to act for themselves." *Id.* But development of *parens patriae* in American law "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982). If the State is simply "a nominal party without a real interest of its own," then the State will not have *parens patriae* standing. *Id.*; *see also Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305-06 (6th Cir. 2019) (denying the State of Arizona *parens patriae* standing because it failed to allege a specific injury or the injury's indirect effects on the State of Arizona as a whole, making it "merely a nominal party").

A State may have standing to sue under *parens patriae* if it can pass the *Snapp* test, meaning the State, through its Attorney General, must "articulate an interest apart from the interests of particular private parties" and "express a quasi-sovereign interest." *Snapp*, 458 U.S. at 607. Although not defined explicitly by the Supreme Court, the characteristics of a quasi-sovereign interest falls into two categories: (1) "the health and well-being–both physical and economic–of its residents in general" or (2) "in not being discriminatorily denied its rightful status within the federal system." *Id.* The State must allege more than an injury to an identifiable group of individual residents, and "the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id*.

## B. Plaintiff Ford County is not usurping Kansas' sovereign authority.

Plainly, the KS AG attempts to invoke an "arbitrary power[] . . . to the great detriment of the people" of Kansas. *Late Corp.*, 136 U.S. at 57. The KS AG has not alleged injury to *any* segment of the Kansas population, making it "merely a nominal party." *Chapman*, 940 F.3d at 305-06. This attempted hijacking of Ford County's case, with a hollow commitment to investigate the viability of these claims for future litigation, is detrimental to fixing the ongoing plastics pollution

in Kansas counties. Realistically, the KS AG could have intervened as an intervenor-*plaintiff* to work alongside Ford County to pursue these claims. But it would rather oppose its own citizens.

Although KS AG claims otherwise, Ford County did not plead *parens patriae* authority. When examining *parens patriae* standing, the Tenth Circuit expressed that "a state may not sue to assert the rights of private individuals" because "increased operating expenses, increased costs of personal protection from contaminated domestic water or the threat of contaminated domestic water, loss of water quality or quantity" are "purely private interests." *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1469-70 (10th Cir. 1993) (collecting cases); *see also Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 873 (8th Cir. 2015) (finding the New York Attorney General did not invoke *parens patriae* authority because it requires an "affirmative invocation," and the Attorney General never used the words "parens" or "patriae" in the complaint, and the Attorney General specified statutory bases for standing). Here, the only party required (and permitted) to satisfy the doctrinal requirements for *parens patriae* can be (and is) the Kansas Attorney General. Ford County never attempted to invoke the doctrine in its complaint.

In any event, Ford County can still have standing via Article III or prudential standing to pursue its claims. As discussed above in § III.A.1, Ford County has statutory authority to bring these claims to abate public nuisances within its borders. Further, the KS AG is not the real party in interest because there is no controversy between it and the other Defendants, in fact, as shared Defendants seeking dismissal of Ford County's claim, their interests are aligned. Ford County is the real party in interest here, and its claims should be allowed to proceed.

### 1.    Ford County has the statutory power to sue under Kansas law.

Kansas adopted the home rule for cities in Article 12, Section 5 of the Kansas Constitution in 1960 and adopted the home rule for counties by statute through the Kansas Legislature in 1974. Kan. Const. art. XII, § 5; K.S.A. 19-101; § 19-101a; K.S.A. 19-101c ("The powers granted

counties pursuant to this act shall be referred to as county home rule powers and they shall be liberally construed for the purpose of giving to counties the largest measure of self-government."). The home rule doctrine provides that each Kansas county "shall be a body corporate and politic, and as such shall be empowered for the following purposes: *First*, to sue and be sued […] *fifth*, to exercise the powers of home rule to determine their local affairs and government authorized under the provisions of K.S.A. 19-101a." K.S.A. 19-101.

> Under Kansas public nuisance law:
>
> a private party may enjoin the continuance of a common nuisance affecting his or her personal rights, and in addition thereto, an injunction may be granted in the name of the state to suppress the keeping or maintenance thereof. The petition may be verified on information and belief, and such an action may be brought either by the attorney general, or by a county attorney for enjoining such a nuisance within his or her county, or by a city attorney for enjoining such a nuisance within his or her city.

K.S.A. 60-908. As described above in § III.A.1, Ford County through its county counselor is statutorily authorized to bring these claims.

Both here and in other cases where Ford County seeks to represent a class of political subdivisions, the KS AG has no precedent for its application of *parens patriae* authority. When asked if it could cite a single case that supported its position that the Attorney General "alone has the right to represent the state as to litigation involving the subject matter of a statewide interest," counsel for the KS AG said, "No, I cannot and the reason why is because the issue we're bringing is novel but it is based in the constitutional authority of the state to own its own prerogative over these issues." *In re Shale Oil Antitrust Litig.*, No. 1:24-md-03119-MLG-LF, Hearing Transcript on Motion to Intervene, at 39:1-13 (D.N.M. July 15, 2025).[26]

---

[26] Hearing transcript is attached as **Exhibit C.**

Here, Ford County seeks to enjoin a public nuisance within its county and recover abatement damages for the public nuisance, alongside similarly situated local governmental subdivisions, through a class action to represent their collective grievances. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) ("There is no reason, in any event, to read Rule 23 as addressing only whether claims made eligible for class treatment by some *other law* should be certified as class actions.") (italics in original). Ford County seeks to sue on behalf of those counties who have also experienced injury due to the ongoing public nuisance from plastic pollution and the lack of plastic recyclability, employing its power granted by statute. *See* K.S.A. 60-908; Doc. 48 ¶¶ 23, 47-49, 163. Ford County is not attempting to represent the State of Kansas as a whole or all of its sister counties uniformly; it represents itself and those counties with similar public nuisance claims.

> **C.     KS AG misrepresents Tenth Circuit and Supreme Court precedent when arguing that Ford County offends constitutional sovereignty.**

While crying foul about Ford County's claims and Rule 23, KS AG misuses and misapplies Supreme Court precedent on the Tenth and Eleventh Amendment to mislead the Court. KS AG cites to *Budinich v. Becton Dickinson & Co.* for its contention that the "Tenth Amendment forbids federal procedural statutes like Rule 23 from being used to improperly establish standing." Doc. 248 at 112 (citing 486 U.S. 196, 199 (1988)). But *Budinich* specifically discusses 28 U.S.C. § 1291 and what constitutes a "final decision" for appeal; it does not mention either Rule 23 or standing a single time. Next, KS AG cites *Murphy v. Nat'l Collegiate Athletic Ass'n* to argue that "Ford County violates the Tenth Amendment when it attempts to misuse Rule 23 against Kansas (and almost every other state)." Doc. 248 at 112 (citing 584 U.S. 453, 471 (2018)). Again, this case makes no mention of Rule 23, and the cited page instead discusses limits on *state* authority and *congressional* powers. These cases have no bearing on the issues before the Court.

Further, KS AG again feigns binding case law and misleads the Court by paraphrasing Tenth Circuit law, stating "the Eleventh Amendment stands as a jurisdictional bar against Ford County's misuse of Rule 23." Doc. 248 at 112 (citing *K. A. v. Barnes*, 134 F.4th 1067, 1073 (10th Cir. 2025)). This is wholly inaccurate because the Eleventh Amendment only serves as a jurisdictional bar when the state or one of its arms is a defendant. *Barnes*, 134 F.4th at 1073 ("The Eleventh Amendment generally bars suits ***against a state*** in federal court commenced by citizens of that state or citizens of another state.") (emphasis added). "The Eleventh Amendment has been interpreted to bar suits ***against states and state agencies*** for money damages in federal court." *Id.* (quoting *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008)) (emphasis added). KS AG then cites *Pennhurst State Sch. & Hosp. v. Halderman* to support its contention that "Where Kansas is the real party in interest, the Eleventh Amendment applies." Doc. 248 at 112 (citing 465 U.S. 89, 101 (1984)). But the Eleventh Amendment only bars suits when the State is named as a ***defendant*** or when the State should be the party prosecuting claims ***against state officials***. *See Halderman*, 465 U.S. at 101 ("The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'") (citation omitted). The cited case law doesn't apply. So KS AG's baseless argument that Ford County offends Kansas' constitutional sovereignty through its use of Rule 23 should be disregarded entirely.

### D.    Recent legislation in Kansas attempting to thwart the power of political subdivisions to file claims without the Attorney General's approval failed.

The KS AG, fearful of counties using their statutory authority to sue for harm they suffer, pushed legislation to require a political subdivision to hold an open meeting on any contingency fee contract for legal services before approving such a contract and requiring the attorney general

to approve those contracts. *See* S. Sub. for H.B. 2228.[27] Yet on April 9, 2025, Kansas Governor Laura Kelly vetoed Senate Substitute for House Bill 2228, and the veto was later sustained by the House of Representatives. Again, the KS AG attempts to employ an "arbitrary power [grab]" leading to "the destruction of [Kansans'] liberties." *Late Corp.*, 136 U.S. at 57.

### E.    Ford County is the real party in interest, and the KS AG is not.

Finally, Ford County is the real party in interest to alleviate the strain on its landfills caused by Defendants, through a public nuisance cause of action. Doc. 48 ¶¶ 23, 47-49, 163. The KS AG is not the real party in interest because he has no controversy and is not interested in putting an end to the issues and injuries that are the subject of this litigation; rather, the KS AG seeks to play the "irresponsible monarch" to stall or dismiss Ford County's claims. *Late Corp.*, 136 U.S. at 57.

#### 1.    Ford County is the real party in interest.

Under Kansas law, a real party in interest is "the party who, by the substantive law, has the right sought to be enforced." *Atkins v. Heavy Petroleum Partners, LLC*, 635 F. App'x 483, 488 (10th Cir. 2015) (quoting *Ryder v. Farmland Mut. Ins. Co.*, 807 P.2d 109, 118 (Kan. 1991)). Plaintiff Ford County is the real party in interest in this case because Ford County suffered concrete injury caused by Defendants' conduct and alleges how this caused harm. Doc. 48 ¶¶ 47-49, 163.

Further, Ford County has the authority to pursue these claims. As stated above in § III.A.1, the county counselor is vested with the power to pursue public nuisance claims affecting "his or her county." K.S.A. 60-908; *see* K.S.A. 19-247(f) (The county counselor shall "perform all the duties in civil matters that have previously been required by law of the county attorney of the county."). The Attorney General retains the power to sue on behalf of the state, but the State of Kansas is not implicated here. County commissioners are statutorily authorized to hire additional

---

[27] Kan. S. Sub. for H.B. No. 2228 (2025),
https://www.kslegislature.gov/li/b2025_26/measures/documents/hb2228_01_0000.pdf.

counsel to assist the county attorney in any matter "involving the duties of said county attorney." K.S.A. 19-723; *see* K.S.A. 19-247(c) (defining the duties of county counselor to "commence, prosecute or defend, as the case requires, all civil suits or actions."). Ford County is the real party in interest and has the authority to represent itself in court without the Attorney General. The Court should not allow the KS AG to subvert its own legislature.

### 2.    KS AG cannot be a defendant-intervenor and the real party in interest because no controversy exists between it and Defendants.

KS AG also claims it is the real party in interest simply because Ford County exists within its borders. Perplexingly, the KS AG intervened in this litigation as an intervenor-defendant, and yet alleges it has a sufficient quasi-sovereign interest under *parens patriae* to be considered the real party in interest. Even so, KS AG speaks out of both sides of its mouth and cannot harmonize its decision to intervene as a defendant and its "quasi-sovereign interest" as the real party in interest because there is no controversy between the KS AG and the Defendants here. *See Snapp*, 458 U.S. at 602 ("A quasi-sovereign interest must be sufficiently concrete **to create an actual controversy between the State and the defendant**.") (emphasis added). The KS AG cannot be the real party in interest because its Attorney General elected to intervene as a *defendant* and oppose its own self-proclaimed "interests." The KS AG cannot have its cake and eat it too.

The underlying reason for intervening as a defendant—what the KS AG is actually interested in—is stopping a county from filing a class action lawsuit because it disagrees with what Ford County is doing politically.[28] The idea that the KS AG *may* attempt to file these claims as a

---

[28] Kris Kobach Attorney General of Kansas, *Kobach seeks to intervene in Ford County lawsuit that attacks American energy*, Kansas Attorney General's Office, (Feb. 2, 2025), https://www.ag.ks.gov/Home/Components/News/News/150/1292 ("'Left-wing environmentalist attorneys have hijacked Ford County and are using the county to push a radical, anti-oil agenda,' Kobach said. 'If this abuse is allowed to stand then any county in America could launch any number of attacks to cripple American energy production.'"). Straight from the horse's mouth, Mr. Kobach admits he would never bring these claims, making the intervention's purpose crystal clear.

plaintiff at some future date is not a controversy, and the Court should reject the KS AG's novel and unprecedented take on *parens patriae* authority and allow Ford County's claims to proceed.

### F.    KS AG's arguments as to Ford County's class action misapply the law.

#### 1.    Rule 23 permits Ford County to use the class action device.

Representing an entire State generally and representing a statewide class are distinct legal positions with different purposes, representation, and procedural frameworks. Ford County, under Rule 23 and Supreme Court precedent, is permitted to bring its claims through a class action device. *Shady Grove*, 559 U.S. at 406 ("Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met.") (emphasis in original). Using Rule 23 to prosecute claims alongside similarly situated political subdivisions does not strip state sovereignty from Kansas. A Rule 23 class action does not and has never encroached on any state's sovereignty or ability to sue under *parens patriae*. Ford County chose the former in its Complaint, despite KS AG's assertions that it plead the latter.

#### 2.    The KS AG prematurely raises issues for the class certification stage.

The KS AG motion to dismiss morphs into a motion to strike class allegations because the suit is claimed to be "cloak[ed] as a class action" that is actually an explicit attack on the State's sovereignty and *parens patriae* authority. Doc. 248 at 105. Despite the melodramatic handwringing of the KS AG, Ford County is not attempting to represent the entire State of Kansas or every single Kansas county, but only those with similar injuries who could fit the class definition. Doc. 48 ¶ 163. And, as discussed above, such action does not usurp the state of Kansas's authority. Indeed, Ford County's allegations are for the injury it suffered from increased sanitation costs due to unrecyclable plastics being put into a county landfill within its borders. *Id.* ¶¶ 23, 47, 163. Only if the Court found Ford County an adequate representative for a putative class during class certification could Ford County purport to represent other governmental entities, non-

governmental entities, or private parties. Fed. R. Civ. P. 23(a). Challenging Ford County's ability to represent the class at this stage, before any discovery, is premature, as class certification has not been sought, and the class definition may still be amended. Accordingly, the Court should allow Ford County's claims to proceed until that juncture.

Further, if the KS AG wished to convert its motion to strike these allegations, it should have explicitly asked. *J. Vangel Elec., Inc. v. Sugar Creek Packing Co.*, 2011 WL 3102466, at *2 (D. Kan. 2011). But a motion brought under Rule 12(b)(6) should not be converted to a motion to strike. *Front Row Techs., LLC v. NBA Media Ventures*, LLC, 163 F. Supp. 3d 938, 991 (D.N.M. 2016). The appropriate time to rule on class certification requirements is *at the time of class certification*. At the motion to dismiss stage, the Court must accept Plaintiffs' allegations as true and should only strike class allegations where it is clear from the face of the pleadings that the requirements of Rule 23 cannot be met. *Linde v. Envision Healthcare Corp.*, 2021 WL 3089214, at *6 (D. Kan. 2021) (citing *In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 1391045, at *2 (D. Kan. 2016)); *see Spires as next of Est. of Spires v. Hosp. Corp. of Am.*, 2009 WL 10712981, at *4 (D. Kan. Mar. 26, 2009) (finding "Plaintiffs have met the basic pleading requirements for asserting a class claim."). This is a high bar Defendants have failed to reach. Precedent emphasizes that "the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Daye v. Cmty. Fin. Serv. Centers, LLC*, 313 F.R.D. 147, 159 (D.N.M. 2016) (quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968)).

KS AG cites out-of-circuit law to advance the unsupported proposition to the contrary. First, by arguing federal courts rely on state law to determine political subdivisions' authority to

bring class action suits. *Ackal v. Centennial Beauregard Cellular L.L.C.,*[29] Doc. 248 at 119. But the Louisiana statute, La. Stat. Ann. § 42:263(A) (2010), requires "parish governing authorit[ies]" and certain "local or state board[s]" to seek the approval of the attorney general before pursuing a class action. The irony that the KS AG cites this case is not lost, given that it is painfully aware that Kansas has no such statute; Senate Substitute for House Bill 2228 failed in the Kansas Legislature.

Notably, the KS AG recently conceded Ford County's ability to pursue its claims as representatives of other counties. In a hearing discussing the KS AG's motion to intervene in another class action in which Ford County is a plaintiff, it was confirmed:

> If Ford County was seeking to represent specific municipal public utilities that only represented the southwestern portion of the state which is where Ford County is located, we really wouldn't have an issue with that because it would be very localized. It'd be individualized to the interests of Ford County and the counties around it. We also would not mind if they used . . . Rule 23 to exercise that relief on behalf of their – to get that more particularized relief for those that are affected.

*In re Shale Oil Antitrust Litig.*, No. 1:24-md-03119-MLG-LF, Hearing Transcript on Motion to Intervene, **Ex. C** at 33:18-34:3 (D.N.M. July 15, 2025). KS AG acknowledges Ford County may use Rule 23, as here, but baselessly seeks to limit the class it can serve as class representative for. Because the KS AG improperly raises a motion to strike class allegations at this stage of the litigation, the Court should disregard the State's argument altogether.

## XIV.    If Necessary, Plaintiffs Request Leave to Amend.

If the Court finds that Plaintiffs did not sufficiently plead any of the claims, they move for leave to amend. Rule 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires." *U.S. ex rel. Schroeder v. Medtronic, Inc.*, 2021 WL 4168140, at *20 (D. Kan. Sept. 14,

---

[29] Again, KS AG omits crucial legal context when citing to *Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212, 218 (5th Cir. 2012) because the underlying Louisiana statute specifically prohibited class actions without the LA Attorney General's approval. *See* La. Rev. Stat. Ann. § 42:263(A) (2010).

2021). "Refusing to grant leave to amend 'is generally only justified upon a showing of undue delay, unique prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'" *Id.* (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)). None of the reasons are present here. Defendants may argue Plaintiffs should not be allowed another opportunity to amend because they once amended. But Plaintiffs' previous amendment was as a matter of course under Rule 15(a)(1). This would be "the first ruling by the Court on the sufficiency of the allegations," so the Court should "grant [Plaintiffs] one additional opportunity to attempt to state cognizable claims." *Id.*

## <u>CONCLUSION</u>

Defendants' attempts to dismiss Plaintiffs' plausible Complaint and the many, well-founded claims against them fall flat. The Motion to dismiss should be denied entirely.

Dated: November 5, 2025.                                Respectfully submitted,

                                                        */s/ Rex A. Sharp*
                                                        Rex A. Sharp, KS #12350
                                                        Isaac L. Diel, KS #14376
                                                        W. Greg Wright, KS #18352
                                                        Sarah T. Bradshaw, KS #26551
                                                        Hammons P. Hepner, KS #29138
                                                        SHARP LAW, LLP
                                                        4820 W. 75th Street
                                                        Prairie Village, KS 66208
                                                        (913) 901-0505
                                                        (913) 261-7564 Fax
                                                        rsharp@midwest-law.com
                                                        idiel@midwest-law.com
                                                        gwright@midwest-law.com
                                                        sbradshaw@midwest-law.com
                                                        hhepner@midwest-law.com

                                                        --and--

                                                        Dave Rebein, KS #10476
                                                        REBEIN BROTHERS, PA
                                                        1715 Central Ave.
                                                        Dodge City, KS 67801
                                                        Tel: (620) 227-08126

                                                        --and--

                                                        Glenn I. Kerbs, KS #09754
                                                        Samantha F. Sweley, KS #26833
                                                        KERBS LAW OFFICE, LLC
                                                        1715 Central Ave.
                                                        Dodge City, KS 67801
                                                        Tel: (620) 255-0238
                                                        gkerbs@kerbslaw.com
                                                        ssweley@kerbslaw.com

                                                        *Attorneys for Plaintiffs*
                                                        *and the Proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 5, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Rex A. Sharp*_____
Rex A. Sharp
