# EXHIBIT 1

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 2 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

2025 WL 3459468
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
JUDICIAL DISTRICT OF HARTFORD.

STATE OF CONNECTICUT
v.
EXXON MOBIL CORPORATION

DOCKET NO. HHDCV206132568S
|
NOVEMBER 26, 2025

MEMORANDUM OF DECISION
ON MOTION TO STRIKE

436946 Farley, J.

**\*1** The defendant, Exxon Mobil Corporation ("ExxonMobil" or "defendant"), moves to strike the plaintiff's claims of unfair and deceptive trade practices associated with its sale and marketing of fossil fuel products in Connecticut. The plaintiff, State of Connecticut, claims that the defendant violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by engaging in a decades-long "systematic campaign of deception" concerning the impact of its fossil fuel products on the earth's climate and a more recent "greenwashing" campaign designed to bolster its image as an environmental steward in order to attract consumers. The defendant argues that the plaintiff's claims are: (1) precluded by federal law; (2) legally insufficient under CUTPA; and (3) barred by the First Amendment. The defendant further challenges certain of the plaintiff's claims for relief as legally insufficient, time barred or presenting due process violations. The court denies the motion.

FACTUAL AND PROCEDURAL BACKGROUND

In its second amended complaint ("complaint") the plaintiff alleges that the defendant has contributed to climate change by selling fossil fuels and petroleum products "that emit large quantities of greenhouse gases responsible for trapping atmospheric heat that causes global warming." The plaintiff claims that the defendant "knew decades ago that the release of greenhouse gases, including carbon dioxide ("CO2"), when fossil fuels are combusted, was a substantial factor in causing global warming." As early as the 1950s and 1960s the defendant allegedly was aware that the combustion of fossil fuels was impacting the climate, and by the early 1980s the defendant was able to predict "the concentration of carbon dioxide in the atmosphere and the corresponding temperature increase for the year 2020."

The plaintiff alleges that despite the defendant's knowledge of the harmful effects of its fossil fuel products, it "continuously advertised and sold those products at multiple locations in Connecticut" throughout the 1970s and up to the present day. While doing so, according to the plaintiff, the defendant engaged in a "campaign to deceive Connecticut consumers about the harmful climatic effects of its fossil fuel products by misrepresenting and omitting material facts about how the use of its fossil fuel products significantly increased CO2 and other heat-trapping emissions that ExxonMobil knew contributed to climate change." The plaintiff alleges that the defendant carried out this campaign in "advertisements, public speeches, articles, media statements and published writings during the last five decades... [which] knowingly deceived consumers by systematically and routinely misrepresenting and/or omitting information about ExxonMobil's products' effects on the climate, its knowledge about the effect of its products on the climate, and scientific consensus about the effects of [its] products on the climate." The defendant also is alleged to have funded and collaborated with third party groups who spread disinformation about the effects of fossil fuel products on the climate. The plaintiff alleges that the defendant "executed this unfair and deceptive campaign in order to maximize profits by selling more oil and gasoline than consumers would have purchased had the reality of climate change been disclosed." According to the complaint, the defendant's efforts to mislead consumers have been "so successful that many consumers still do not believe the scientific facts that climate change is real, is caused primarily by fossil fuel combustion, and is having and will have devastating consequences for Connecticut and all of humanity."

**\*2** The plaintiff alleges further that that the defendant's "campaign of deception" continues, despite its more recent acknowledgment that the use of fossil fuels contributes to climate change, through "greenwashing" – advertising that claims or implies that the defendant's activities are

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 3 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

"beneficial to the environment." The plaintiff alleges that the defendant's "greenwashed advertising deceives consumers by downplaying ExxonMobil's contributions to climate change and falsely portraying ExxonMobil as a corporation committed to seriously combatting climate change," while continuing to be "a major contributor to climate change."

The plaintiff alleges that the defendant, together with other parties, sponsored and participated in efforts to mislead the public into believing that the science on climate change was uncertain, that warnings about the impact of climate change were unjustified, and spread doubts as to whether climate change was occurring at all. These efforts, in speeches, articles, brochures and other materials distributed to the public, were allegedly part of an elaborate effort to misinform the public for the purpose of perpetuating the fossil fuel business and delaying efforts to develop alternative sources of energy. The plaintiff focuses particularly on an advertising campaign that began in 1970 and continued until 2007 or later. The campaign utilized "advertorials," described as "paid advertisements appearing similar to editorial content," that appeared in the New York Times and other newspapers with wide national circulation. The plaintiff alleges that the defendant placed advertorials in the New York Times nearly every Thursday between 1972 and 2001. The advertorials allegedly contained many deceptive statements such as:

- Claiming that "a greenhouse effect" that could "melt the polar ice caps and devastate U.S. coastal cities" was a "lie" and a "myth of the 1960s and 1970s."

- Describing predictions concerning the impact of global warming as "media hype" creating "an unwarranted sense of crisis."

- Promoting the delay of any response to climate change based on a supposed "lack of scientific data."

- Warning of economic turmoil that would accompany unwarranted actions taken to combat climate change.

- Describing international efforts to combat climate change as based on scientifically unsupported speculation which, if implemented, would "wreak havoc" on the American economy.

- Using scientific data in a misleading fashion to suggest that fossil fuels had little to do with global warming and that "little if any warming" had occurred.

- Suggesting that climate change may be "trivial" and may actually be "beneficial" in the future.

- Characterizing scientific evidence as political, not scientific.

The plaintiff alleges that these representations and others like it were repeated for years in the defendant's advertorials and contradicted the scientific knowledge developed by the defendant's own scientists.

The plaintiff alleges that the defendant's "advertising has also deceptively promoted ExxonMobil products as environmentally beneficial." The defendant has allegedly employed such "greenwashing" in its advertising since the 1970s but increased its use of greenwashing after the New York Times advertorial campaign had been discontinued. The plaintiff alleges that the defendant promotes its allegedly minor and insignificant alternative fuels program to obscure its continued focus on its fossil fuel business and mislead the public into believing that the defendant is making serious efforts to address climate change. The defendant's advertising also allegedly misleads consumers into believing that "certain of its fossil-fuel-based products can help consumers reduce greenhouse gas emissions and improve fuel economy." According to the plaintiff, the defendant's greenwashing campaign "deceives reasonable consumers into believing that purchasing ExxonMobil products is a responsible choice because ExxonMobil is addressing climate change by investing in alternative energy sources." By these efforts, the defendant has allegedly "sought to falsely induce purchases and brand affinity by portraying ExxonMobil as a company working on a solution to climate change through selling 'green' products."

**\*3** The plaintiff alleges that the impacts of climate change, caused in part by the use of the defendant's products, have already been felt in Connecticut and that "climate change will continue to have increasingly serious, life-threatening, and financially burdensome impacts on the people of Connecticut and the lands, waters, coastline, species, natural resources, critical ecosystems, infrastructure and other assets owned by the State and its political subdivisions." The plaintiff claims that climate change has caused and will continue to have detrimental economic impacts in Connecticut, and it will cost the state billions of dollars to adapt to the consequences of climate change. The plaintiff faults the defendant's false representations for delaying the transition to alternative fuels and cites the defendant's plans to continue

2025 WL 3459468

to develop new fossil fuel resources and continue the sale of fossil fuel products as likely to cause more damage. The plaintiff, however, avoids making a claim for damages to compensate for the harm it maintains the defendant has already caused. The plaintiff does seek injunctive relief, civil penalties and other relief afforded under CUTPA, as well as "[a]n order for restitution, including disgorgement of profits, to the State of Connecticut on behalf of its citizens for unfair and/or deceptive sales of fossil-fuel based products." The plaintiff claims the injunctive relief it seeks is not intended to regulate emissions associated with the use of the defendant's products. Rather, it includes measures aimed at regulating the defendant's conduct to conform to CUTPA's prohibition on unfair and deceptive practices and to force the disclosure of "all research and studies in its possession" related to climate change. Beyond that, however, the plaintiff seeks "equitable relief... for mitigation, adaptation and resiliency" and also asks the court to order the defendant to "fund a corrective education campaign to remedy the harm inflicted by decades of disinformation, to be administered and controlled by the State or such other independent third party as the Court may deem appropriate."

The plaintiff's claims are asserted in eight counts, including two claims of deceptive acts or practices, two claims for unfair acts or practices, and four counts related to each of the foregoing claims alleging that the defendant acted wilfully. Count one claims that the defendant engaged in deceptive acts or practices in violation of CUTPA by making representations about fossil fuels and climate change that are "material and false or likely to mislead consumers when reasonably interpreted, including, but not limited to, the following:

    a. that ExxonMobil was uncertain that climate change was real, occurring or would occur in the future;

    b. that ExxonMobil was uncertain that human activity, including the combustion of fossil fuels, contributed to climate change;

    c. that there was time to wait before taking action;

    d. that there was a balanced debate amongst scientists about whether climate change was occurring, its relationship to human activity, and whether its effects would be positive or negative;

    e. that ExxonMobil's research supported the assertions in (a) – (d)."

The plaintiff claims further that the defendant engaged in this conduct "to mislead Connecticut consumers about its knowledge regarding climate change and the industry, including, but not limited to, the following:

    a. that scientists employed by ExxonMobil knew that human activity, including the combustion of fossil fuels, contributed to climate change;

    b. that climate change has potentially catastrophic effects;

    c. that use of ExxonMobil products contributes to climate change;

    d. that ExxonMobil decided to emphasize the uncertainty as part of its disinformation campaign as a way to continue to profit off the sale of oil and gasoline;

    e. that ExxonMobil knew that reduction of fossil fuel combustion was the primary realistic course of action to address climate change; and

    f. that there was scientific consensus, including from ExxonMobil's own scientists, that the combustion of fossil fuels was contributing to climate change and that the effects could be devastating."

Count two alleges that the defendant's conduct described in count one was wilful and seeks civil penalties of up to $5,000 per wilful violation pursuant to General Statutes § 42-110*o* (b).

In count three, the plaintiff claims that the conduct described in count one constitutes unfair acts or practices in "contravention of Connecticut's public policy promoting truth in advertising." The plaintiff claims the defendant's conduct violated CUTPA by:

    a. deceiving Connecticut consumers about the catastrophic health, safety, economic, and environmental effects of burning fossil fuels; and

    b. undermining and delaying the creation of alternative technologies, driven by informed consumer choice, which could have avoided the most devastating effects of climate change.

Count four alleges that the defendant's conduct described in count three was wilful and seeks civil penalties of up to $5,000 per wilful violation pursuant to General Statutes § 42-110*o* (b).

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 5 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

**\*4** Count five alleges that the defendant's alleged greenwashing campaign is a deceptive act or practice in violation of CUTPA, in that the defendant:

a. made false and/or misleading statements regarding ExxonMobil's activities and their effect on the climate and/or the environment;

b. failed to disclose that the continued use of fossil fuels will have a negative impact on the climate;

c. created an impression that the company is expending far more resources toward developing sustainable energy solutions than it actually is;

d. failed to disclose that the amount of resources ExxonMobil is devoting to research and development of "green" technologies, including but not limited to algae production, is far exceeded by the amount of resources it is expending on exploration, extraction and refinement of oil;

e. created a false impression that ExxonMobil is meaningfully addressing climate change through development of alternative energy resources;

f. used words and imagery to give the appearance that ExxonMobil products are not environmentally harmful; and

g. asserted half-truths about its products and practices and their environmental impact.

Count six alleges that the defendant's conduct described in count five was wilful and seeks civil penalties of up to $5,000 per wilful violation pursuant to General Statutes § 42-110*o* (b).

Count seven alleges that the defendant's alleged greenwashing campaign is an unfair act or practice in violation of CUTPA, in "contravention of Connecticut's public policy promoting truth in advertising." The plaintiff claims the defendant's conduct violated CUTPA by:

a. deceiving Connecticut consumers about the catastrophic health, safety, economic, and environmental effects of burning fossil fuels; and

b. undermining and delaying the creation of alternative technologies, driven by informed consumer choice,

which could have avoided the most devastating effects of climate change.

Count eight alleges that the defendant's conduct described in count seven was wilful and seeks civil penalties of up to $5,000 per wilful violation pursuant to General Statutes § 42-110*o* (b).

The defendant has moved to strike the plaintiff's complaint in its entirety on several grounds. The defendant argues that:

1. the plaintiff's claims are precluded by federal law because they seek to recover for harm caused by interstate and international emissions;

2. even if the plaintiff's claims are not precluded by federal law, the plaintiff does not sufficiently allege violations of CUTPA; and

3. the First Amendment to the United States Constitution bars all the plaintiff's claims.

The defendant also argues that the plaintiff's claims for disgorgement of profits and restitution should be stricken because: they violate fundamental principles of due process; the claim for restitution is time-barred with respect to conduct prior to September, 2017; and the plaintiff may not seek disgorgement of profits "on behalf of" citizens.

DISCUSSION

I. Motion to Strike

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves,* 262 Conn. 480, 498, 815 A.2d 1188 (2003). "A motion to strike admits all facts well pleaded; it does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings." (Emphasis in original; internal quotation marks omitted.) *Faulkner v. United Technologies Corp.,* 240 Conn. 576, 588, 693 A.2d 293 (1997). "[A] motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court .... [The court] construe[s] the complaint in the manner most favorable to sustaining its legal sufficiency.... Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied.... Moreover, [the court notes] that [w]hat is necessarily implied [in an allegation]

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 6 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

need not be expressly alleged.... It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted.... Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 398, 142 A.3d 227 (2016). "If any facts provable under the express and implied allegations in the plaintiff's complaint support a cause of action ... the complaint is not vulnerable to a motion to strike." *Bouchard* v. *People's Bank*, 219 Conn. 465, 471, 594 A.2d 1 (1991).

II. Federal Preclusion

**\*5** The defendant argues that the plaintiff's claims are precluded by federal law because they seek monetary relief for injuries allegedly caused by interstate and international greenhouse-gas emissions. The plaintiff denies that the complaint seeks to regulate or obtain monetary relief based on emissions. Rather, according to the plaintiff, its complaint seeks to regulate the defendant's alleged unfair and deceptive advertising and to obtain curative relief for that alleged misconduct. Courts in similar climate change tort cases against fossil fuel companies have reached different conclusions concerning the same preemption argument. The Second Circuit Court of Appeals has held that federal law precludes climate change cases aimed at impacting interstate and international greenhouse-gas emissions. *City of New York* v. *Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021). Other courts have disagreed. See e.g. *City and County of Honolulu v. Sunoco LP*, 537 P.3d 1173 (Haw. 2023), cert. denied, ___U.S. ___, 145 S. Ct. 1111, 220 L.Ed.2d 413 (2025). In the present case, the court adopts the Second Circuit's framework of analysis but distinguishes the plaintiff's claims from those advanced in *Chevron* to conclude that federal law does not preclude the plaintiff's claims.

In *Chevron*, the plaintiff brought a federal court action against several multinational oil companies. The complaint alleged that, despite the defendants' knowledge that fossil fuels pose a severe risk to the climate, they had "downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant changes to the City's climate and landscape." *City of New York* v. *Chevron Corp.*, supra, 993 F.3d 86-87. The complaint asserted common law causes of action for "(1) public nuisance, (2) private nuisance, and (3) trespass under New York law stemming from the [defendants'] production, promotion, and sale of fossil fuels. The [plaintiff] requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property, as well as an equitable order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would go into effect should the [defendants] fail to pay the court-ordered damages." *Id.*, 88. The district court dismissed the case, concluding that the plaintiff's state law claims were displaced by federal common law and the Clean Air Act, as amended in 1970.

On appeal, the Second Circuit agreed with the district court that federal common law retains some vitality "[i]n the aftermath of *Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)... *Erie* was not a death knell to all federal common law. On the very day that the Supreme Court declared that there is no federal *general* common law, ... the Court nevertheless reaffirmed the existence of what ... we may call *specialized* federal common law.' " (Citations omitted; emphasis in original; internal quotation marks omitted.) *City of New York* v. *Chevron Corp.*, supra, 993 F.3d 89. "In a nutshell, federal common law exists in only the few and restricted enclaves... where a federal court is compelled to consider federal questions [that] cannot be answered from federal statutes alone.... And once Congress speaks directly to those questions, the need for such an unusual exercise of lawmaking by federal courts disappears.... In that sense, federal common law functions much like legal duct tape – it is a necessary expedient that permits federal courts to address issues of national concern until Congress provides a more permanent solution." (Citations omitted; internal quotation marks omitted.) *Id.*, 89-90. The "few and restricted enclaves" of federal common law include "those in which a federal rule of decision is necessary to protect uniquely federal interests." *Id.*, 90. Under those circumstances, where there is a conflict between such a federal interest and state law, federal common law precludes application of the state law. However, "the necessary conflict need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the [s]tates have traditionally occupied." (Internal quotation marks omitted.) Id.

**\*6** Addressing the plaintiff's claim, the court in *Chevron* rejected the plaintiff's characterization of its claims as avoiding the regulation of emissions, deeming it "artful pleading." The court determined that "the question before us is whether a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may proceed under New York law." The court held that it could not proceed. The court noted that "a mostly unbroken

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 7 of 29
STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....
2025 WL 3459468

string of cases has applied federal law to disputes involving interstate air or water pollution.... because such quarrels often implicate two federal interests that are incompatible with the application of state law: (i) the overriding... need for a uniform rule of decision on matters influencing national energy and environmental policy, and (ii) basic interests of federalism." (Internal quotation marks omitted; citations omitted.) Id., 91. The court held that the regulation of interstate and international greenhouse-gas emissions was one of the "few and restricted enclaves" of federal common law and that "[w]here federal common law exists, it preempt[s] and replace[s] state law." Id., 89, 90.

Having concluded that federal common law traditionally occupied the field of regulating interstate and international emissions, the court then recognized that the Clean Air Act had displaced federal common law for both abatement and compensatory damage remedies. Id., 95-96; see *American Electric Power Co.* v. *Connecticut*, 564 U.S. 410, 421, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011) ("AEP") (Clean Air Act displaced any federal common law right to seek abatement of emissions from fossil fuel-fired power plants). The court held, however, that the displacement of federal common law by the Clean Air Act did not make room for state common law to enter the field of regulating emissions, except those within a state's own borders. "[S]tate law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." *City of New York* v. *Chevron Corp.*, supra, 993 F.3d 98. The court concluded that when federal legislation displaces federal common law precluding state tort claims, only express authorization from Congress can open the door to state tort claims previously precluded by the displaced federal common law. Id., 99-100. Observing that the Clean Air Act restricted a state's authority to regulate emissions to apply only to sources located within their state, the court upheld the district court's dismissal of the case, which sought "to impose New York nuisance standards on emissions emanating from all 50 states and the nations of the world." Id., 100.

Courts have followed this framework of analysis – starting with federal common law, proceeding to its preemption by the Clean Air Act and then to consideration of the viability of state law causes of action. Courts have been divided, however, on the question whether federal law precludes the assertion of those claims. Some decline to credit the distinction drawn between the regulation of emissions and the regulation of alleged unfair and deceptive advertising, a distinction relied upon by the plaintiff in the present case. See, e.g. *Mayor and City Council of Baltimore* v. *BP P.L.C.*, Circuit Court of Maryland, Docket No. 24-C-18-004219 (July 10, 2024) (2024 WL 3678699) (state law claims preempted despite characterization as claims based on campaign of deception); *Platkin* v. *Exxon Mobil Corp.*, Superior Court of New Jersey, Docket No. MER-L-001797-22, (Feb. 5, 2025) (2025 WL 604846) (same). Other courts have held federal common law on this subject no longer exists or, alternatively, that it does not apply to claims of false and misleading statements in the promotion and sale of fossil fuel products. *City and County of Honolulu* v. *Sunoco LP*, supra, 537 P.3d 1173; *County Commissioners of Boulder County* v. *Suncor Energy USA, Inc.*, Colorado Supreme Court, Docket No. 24SA206 (May 12, 2025), ___P.3d ___, (2025 WL 1363355), Petition for Certiorari Docketed by *Suncor Energy (U.S.A.) Inc.*, v. *County Commissioners of Boulder County*, United States Supreme Court, Docket No. 25-170; *Minnesota* v. *American Petroleum Institute*, District Court of Minnesota, Second Judicial District, Docket No. 62-CV-20-3837 (Feb. 14, 2025) (2025 WL 562630), review denied, Minnesota Court of Appeals, Docket Nos. A25-0419 and A25-0421 (April 22, 2025) (2025 WL 1203047).

**\*7** In *City and County of Honolulu* v. *Sunoco LP*, supra, the plaintiffs alleged that the defendant fossil fuel companies "knew about the dangers of using their fossil fuel products, failed to warn consumers about those known dangers, and engaged in a sophisticated disinformation campaign to increase fossil fuel consumption, all of which exacerbated the impacts of climate change in Honolulu." Id., 1184. The complaint did not seek to limit or restrict the production and sale of fossil fuels, but rather sought damages for the impacts of climate change on the local environment attributable to the defendants' "tortious marketing and failure to warn claims." Id., 1195. The Hawai'i Supreme Court held that the plaintiffs' claims were not preempted by either federal common law or the Clean Air Act. The court disagreed with the defendants' argument based on *Chevron* that under the "basic scheme of the Constitution," federal common law governs any dispute involving interstate or international greenhouse gas emissions. Id., 1195-96. The court concluded that the Clean Air Act displaced the federal common law concerning interstate pollution claims and that, having been displaced by Congress, the federal common law plays no role. "When a federal statute displaces federal common law, the federal common law ceases to exist.... And as the Supreme Court explained in AEP, once federal common law is displaced, 'the availability vel non of a state

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

lawsuit depends inter alia on the preemptive effect of the federal Act,' not displaced federal common law." (Citation omitted; internal quotation marks omitted.) Id., 1195, quoting *American Electric Power Co.* v. *Connecticut*, supra, 564 U.S. 429.

Responding specifically to the Second Circuit's decision in *Chevron*, the court in *Honolulu* disagreed with its "flawed reasoning." *City and County of Honolulu* v. *Sunoco LP*, supra, 537 P.3d 1196. The court viewed the Second Circuit's decision as flawed because it relied upon displaced, and therefore "nonexistent," federal common law to preclude the plaintiff's claim. Id., 1200. The court went further, however, and held that even if federal common law governing interstate and international emissions retained its preclusive effect after being displaced by the Clean Air Act, the claims asserted by the plaintiffs were outside the scope of that federal common law. The court held, "[e]ven if federal common law governing interstate pollution claims had not been displaced, Plaintiffs' claims would not be preempted by it. The claims permitted by federal common law in this area were brought against polluting entities and sought to enjoin further pollution.... Thus, the source of the injury in federal common law claims is pollution traveling from one state to another. That is not what Plaintiffs allege here.....Simply put, the source of Plaintiffs' alleged injury is Defendants' allegedly tortious marketing conduct, not pollution traveling from one state to another." (Citations omitted; footnote omitted.) Id., 1200-01.

The court also held that the Clean Air Act did not preempt the plaintiffs' claims. The court considered all three types of substantive preemption: "(1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." Id., 1203, quoting *New York SMSA Ltd. Partnership* v. *Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). The Clean Air Act contains no express language preempting state tort claims. The *Honolulu* court held field preemption did not apply because the Clean Air Act "does not occupy the entire field of emissions regulation...." Id., 1204. It does not bar state law claims against emitters; rather it expressly preserves such claims. Id., 1203-04. Finally, conflict preemption did not apply. State tort claims did not "stand[ ] as an obstacle" to the objectives of Congress

because the plaintiffs' claims arose from the defendants' "alleged failure to warn and deceptive marketing conduct, not emissions-producing activities regulated by the [Clean Air Act.]" Id., 1205. While the Clean Air Act seeks to protect the environment by regulating emissions, the plaintiffs' tort law claims sought to regulate the defendants' marketing conduct. The court disagreed that the Clean Air Act preempts state tort claims challenging emitters' marketing activities, as distinguished from state tort claims seeking to impose liability based on damage to the environment in one state caused by emissions generated in another state. Id., 1205-07, distinguishing *International Paper Co.*, v. *Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (Clean Air Act does not permit state tort law to address harm caused by emissions from other states). The rationale of *Ouellette* did not apply because the plaintiffs' claims challenged non-polluting activity that was related to emissions, not the emissions themselves. Id., 1206-07, citing *In re Methyl Tertiary Butyl Ether (MTBE) Product Liability Litigation (MTBE)*, 725 F.3d 65, 101 (2d Cir. 2013) (Clean Air Act did not preempt state tort claims challenging conduct related to emissions, but not producing emissions, where it was possible to comply with both state and federal law).

**\*8** In *Boulder County,* the Colorado Supreme Court adopted the reasoning of the Hawai'i Supreme Court to conclude that claims of public and private nuisance, trespass, unjust enrichment and civil conspiracy against fossil fuel companies were not preempted by federal common law. "As the Supreme Court explained in *Virginia Uranium, Inc.* v. *Warren*, 587 U.S. 761, 767, 139 S.Ct. 1894, 204 L.Ed.2d 377 (2019) (plurality opinion)... 'Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Commissioners of Boulder County* v. *Suncor Energy USA, Inc.*, supra 2025 WL 1363355 \*9. Like the *Honolulu* court, the *Boulder County* court distinguished the claims before it from those that "attempt to regulate [greenhouse gas] emissions." Id. See also, *Minnesota* v. *American Petroleum Institute*, supra, 2025 WL 562630 (rejecting Second Circuit federal common law analysis and applying traditional preemption analysis to Clean Air Act to conclude state tort claims against fossil fuel companies not precluded). Because federal common law had been displaced by the Clean Air Act, the court concluded that to the extent federal common law once might have precluded the plaintiffs' claims, that federal common law no longer exists and can no longer operate to

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 9 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

preclude those claims. Relying on *American Electric Power Co.* v. *Connecticut,* supra, 564 U.S. 429 and its progeny, the court held, "In line with this settled precedent, we, too, conclude that the [Clean Air Act] displaced the federal common law in this area, and, therefore, federal common law does not preempt Boulder's claims here. Instead, we must look to whether the [Clean Air Act] preempts Boulder's claims." *County Commissioners of Boulder County* v. *Suncor Energy USA, Inc.,* supra, 2025 WL 1363355 **5-6. The court went on to apply traditional preemption principles, as the court in *Honolulu* did, to conclude that the Act did not preempt state tort claims.

Two justices dissented in *Boulder County.* The dissent adopted the view taken by the Second Circuit in the *Chevron* case, that federal common law "remains relevant after its displacement by the [Clean Air Act]. There are compelling reasons why interstate air pollution has not historically been a state-law field, and those reasons remain true after the enactment of the [Clean Air Act]." Id., *14. The dissent rejected the notion that the complaint did not seek to abate or regulate interstate emissions, focusing on the relief sought in the complaint that included damages for the harm imposed on people and property allegedly caused by the exacerbating impact of the defendants' business activities on climate change. The complaint also sought "remediation and/or abatement of the hazards" caused by those activities "by any other practical means." Id., *16. Reframing the question to reflect the Second Circuit analysis, the dissent maintained that "the question before us now is not whether federal law *preempts* state law, as the majority concludes, but rather whether federal law *'authorizes* resort to state law.' " Id., *17. "This alteration of the typical ordinary preemption analysis (from preemption of state law to authorization of state law) makes sense because the presumption that a state-law cause of action is not preempted is only warranted in 'a field which the [s]tates have traditionally occupied.' " Id., quoting *Buckman Co.* v. *Plaintiffs' Legal Committee,* 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

Turning to the Clean Air Act, the dissent found no express authorization to regulate interstate and international emissions by applying state nuisance law. Id., **19-20, citing *International Paper Co.* v. *Ouellette,* supra, 479 U.S. 481. In *Ouellette,* the court held that the Clean Water Act precluded a nuisance claim brought under Vermont common law that sought to impose liability on a New York source of water pollution. The *Boulder County* dissent argued that "[n]early identical provisions in the [Clean Water Act] have been

narrowly interpreted to only allow aggrieved individuals to bring 'a nuisance claim pursuant to the law of the source [s]tate,' thereby barring a nuisance claim 'under an affected [s]tate's law.' *Ouellette,* 479 U.S. at 495, 497, 107 S.Ct. 805. The Supreme Court in *Ouellette* reasoned that interpreting the savings clause in this way 'would not frustrate the goals of the [Clean Water Act]' because (1) it would not 'disturb the [Clean Water Act's] balance among federal, source-state, and affected-state interests,' and (2) it would 'prevent[ ] a source from being subject to an indeterminate number of potential regulations.' Id. at 498–99, 107 S.Ct. 805. Because this suit is an attempt to apply Colorado law to activities in other states allegedly creating pollution, *Ouellette's* reasoning is applicable." *County Commissioners of Boulder County* v. *Suncor Energy USA, Inc.,* supra, 2025 WL 1363355 *20.

**\*9** Like the dissent in *Boulder County,* other courts have adopted the Second Circuit's analysis to preclude state tort claims against fossil fuel companies. In *Mayor and City Council of Baltimore* v. *BP P.L.C.,* supra, 2024 WL 3678699, the plaintiff asserted causes of action for nuisance, product liability, negligence, trespass and violations of the Maryland Consumer Protection Act (MCPA) against fossil fuel companies. Underlying all the claims was an allegation that the defendants had "deployed a sophisticated campaign of deception to misrepresent and conceal their products' risks." Id., *1. Characterizing the plaintiff's complaint, the court found that it was "entirely about addressing the injuries of global climate change and seeking damages for such alleged injuries. The explanation by Baltimore that it only seeks to address and hold Defendants accountable for a deceptive misinformation campaign is simply a way to get in the back door what they cannot get in the front door." Id, *5. The court agreed with the defendants' characterization of the complaint. The complaint did "not allege that Defendants' campaign of deception and disinformation or failures to warn are in and of themselves a public nuisance. Plaintiff thus cannot deny that it seeks redress for harms allegedly caused by climate change - a global phenomenon caused by emissions from sources in literally every State and Nation in the world - or that it seeks to hold Defendants liable under Maryland law for those out-of-state emissions." (Internal quotation marks omitted) Id. The proper characterization of the complaint was "particularly important when deciding the preemptive effect of the [Clean Air Act]." Id., *6.

Having characterized the complaint as seeking damages for the harm caused by the impact of fossil fuels on climate change, the *Baltimore* court concluded the plaintiff's claims

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 10 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

were "preempted by federal common law (and the [Clean Air Act])." Id. The court followed the Second Circuit's analysis in *Chevron* agreeing that there are "limited areas of law where federal common law continues to exist because of uniquely federal interests." Id. "The Second Circuit held that federal law governs cases such as this because it implicate[s] two federal interests that are incompatible with the application of state law, namely, the overriding need for a uniform rule of decision on matters influencing national energy and environmental policy and the basic interests of federalism." Id. Recognizing that the Clean Air Act had displaced federal common law on interstate emissions, the court also followed the Second Circuit's analysis of preemption under the Act. Id., **7-9. See also *Platkin v. Exxon Mobil Corp.*, supra, 2025 WL 604846* (federal common law precluded state causes of action against fossil fuel companies based on deceptive marketing practices exacerbating climate change).

On the foregoing legal landscape, the court must decide whether federal common law and the Clean Air Act preclude the plaintiff's CUTPA claims in the present case. In doing so, the court is cognizant of the fact that the leading case supporting preclusion is a decision from the Second Circuit Court of Appeals. *City of New York v. Chevron Corp.*, supra, 993 F.3d 81. While not strictly bound by that decision, "in applying federal law in those instances where the United States Supreme Court has not spoken, we generally give special consideration to decisions of the Second Circuit Court of Appeals." *Schnabel v. Tyler*, 230 Conn. 735, 743, 646 A.2d 152 (1994), citing *Red Maple Properties v. Zoning Commission*, 222 Conn. 730, 739 n. 7, 610 A.2d 1238 (1992). Consequently, with respect to the continued existence of federal common law and its relationship to the Clean Air Act, the court defers to the Second Circuit's decision in *Chevron*. This does not end the analysis, however, because the determinative question is how to properly characterize the plaintiff's complaint. That is, the proposition that federal common law and/or the Clean Air Act preclude the plaintiff's emissions-related claims is based on the premise that the claims conflict with federal interests "on matters influencing national energy and environmental policy." *City of New York v. Chevron Corp.*, supra, 993 F.3d 91-92. The deference shown to Second Circuit decisions on matters of federal law does not extend to characterizing a plaintiff's complaint for the purpose of applying federal law. There are substantial differences between the plaintiff's complaint in *Chevron* and the plaintiff's complaint in the present case.

In *Honolulu, Boulder County* and *Minnesota v. American Petroleum Institute*, in addition to disagreeing with *Chevron* on the vitality of federal common law and its impact on preemption under the Clean Air Act, the courts distinguished *Chevron* by focusing on the deceptive marketing claims underlying the various causes of action and, to some extent, the nature of the relief being sought. *City and County of Honolulu v. Sunoco LP*, supra, 537 P.3d 1200-01; *County Commissioners of Boulder County v. Suncor Energy USA, Inc.*, supra, 2025 WL 1363355 **10, 12; *Minnesota v. American Petroleum Institute*, supra, 2025 WL 562630 **11-15. The distinctions drawn by these courts can be questioned and criticized based on the particular complaints before them, but the distinction is theoretically sound. On questions concerning the preclusion of state law claims by federal law, a determinative question is whether the state claim would regulate an area that is restricted to federal regulation. In the present case the question is whether allowing the plaintiff's CUTPA claims to proceed amounts to state regulation of the production, sale and use of fossil fuels, or whether it is confined to regulating the associated marketing conduct, and whether the two are distinguishable for purposes of preclusion.

**\*10** In *Chevron*, the City of New York asserted claims of nuisance and trespass and sought "compensatory damages for the past and future costs of climate-proofing its infrastructure and property, as well as an equitable order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would go into effect should the Producers fail to pay the court-ordered damages." *City of New York v. Chevron Corp.*, supra, 993 F.3d 88. Both the substantive claims and the damages sought were not aimed exclusively at deceptive marketing practices, although the alleged suppression of knowledge about the impact of fossil fuels on climate change played a role in the plaintiff's claims. Unlike the present case, however, the plaintiff's claims were not confined to alleged deceptive marketing practices and claims for relief tailored to those practices.

In *Baltimore*, the plaintiff asserted causes of action for nuisance, product liability, negligence, trespass and violations of the Maryland Consumer Protection Act (MCPA), addressing federal removal jurisdiction, characterized the complaint as follows: "When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign. Of course, there are many references to fossil-fuel production

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 11 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

in the Complaint, which spans 132 pages. But, by and large, these references only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil-fuel products contribute to greenhouse gas pollution. Although this story is necessary to establish the avenue of Baltimore's climate-change-related injuries, it is not the source of tort liability. Put differently, Baltimore does not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil-fuel products; it is the concealment and misrepresentation of the products' known dangers—and the simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change." *Mayor and City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 233-34 (4th Cir. 2022). When the Maryland Circuit Court dismissed the case on preemption grounds, it characterized the complaint much differently than the Fourth Circuit did. The Maryland Circuit Court characterized the complaint as being "entirely about addressing the injuries of global climate change and seeking damages for such alleged injuries." *Mayor and City Council of Baltimore v. BP P.L.C.*, supra, 2024 WL 3678699 *5. The Maryland Circuit Court did not explain why its characterization of the complaint was so at odds with the characterization offered by the Fourth Circuit, but instead, in conclusory fashion, parroted the Second Circuit's placement of an "artful pleading" label on the complaint in *Chevron*, which was substantively different. See *Platkin v. Exxon Mobil Corp.*, supra, 2025 WL 604846 (same).

The Second Circuit has already had occasion to construe the plaintiff's claims in the present case. The Second Circuit has characterized the plaintiff's claims in a fashion that supports the plaintiff's argument that its CUTPA claims do not seek to regulate interstate and international emissions. In *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 142 (2d Cir. 2023), the court addressed federal removal jurisdiction in a decision that resulted in the remand of the present case to this court. In that context, the court said, "Each of the three necessary elements of Connecticut's deception claim is one that a court could ... resolve[ ] ... without reaching the federal common law of transboundary pollution.... We entirely agree with the district court's analysis of this point: Connecticut alleges that ExxonMobil lied to Connecticut consumers, and that these lies affected the behavior of those consumers. The fact that the alleged lies were about the impacts of fossil fuels on the Earth's climate is immaterial." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id. 142. "Analyzing the unfairness claim is not much harder.... [the]

allegation that Exxon Mobil's statements and omissions were in contravention of Connecticut's public policy of promoting truth in advertising... have absolutely nothing to do with the federal common law of transboundary pollution...." (Citation omitted; internal quotation marks omitted.) Id.

**\*11** The defendant distinguishes the Second Circuit's characterization of the plaintiff's claims in the present case based on the procedural context within which the Second Circuit construed those claims, but the court is not persuaded. When the Second Circuit characterized the plaintiff's claims it was considering the application of exceptions to the "well-pleaded complaint" rule that governs federal question jurisdiction. "Under [the well-pleaded complaint] rule, federal-question jurisdiction generally exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint and cannot be triggered on the basis of a federal defense, ... even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.... The principal effect of the well-pleaded complaint rule is to make[ ] the plaintiff the master of the claim, meaning that – subject to certain exceptions – plaintiffs may avoid federal jurisdiction by exclusive reliance on state law.... In other words, the general rule is that federal courts lack federal-question jurisdiction if the complaint does not affirmatively allege a federal claim." (Citation omitted; internal quotation marks omitted.) Id., 132. [1] In that context, the Second Circuit accepted the allegations of the complaint at face value, just as this court must do when assessing the legal sufficiency of the plaintiff's complaint. *Geysen v. Securitas Security Services USA, Inc.*, supra, 322 Conn. 398. In ruling on the defendant's motion to strike, the court accepts the claims as pleaded by the plaintiff and applies the theory reflected in the complaint, not a theory that might also be applicable. *Reclaimant Corp. v. Deutsch*, 332 Conn. 590, 607 n.11, 211 A.3d 976 (2019).

The court concurs with the Second Circuit's characterization of the complaint in the present case. The complaint does contain allegations describing the negative impacts climate change has had within the state of Connecticut. These allegations illustrate the significance of the alleged campaign of deception in terms of its tangible, negative consequences on the state's people, property, environment and infrastructure. The alleged actionable conduct, however, exclusively concerns the defendant's marketing practices. The complaint does not include causes of action for nuisance or trespass, as the complaint in *Chevron* did. Further, with one arguable exception, the relief requested includes neither

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 12 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

damages for the negative impacts of climate change, nor any restraint on the defendant's right to sell fossil fuels in Connecticut. The complaint seeks curative relief for the alleged unfair and deceptive conduct, such as the disclosure of information the defendant holds concerning climate change, injunctive relief aimed at its marketing practices, and civil penalties as authorized by General Statutes § 42-110*o*.

The prayer for relief also includes a claim for "equitable relief pursuant to [General Statutes] § 42-110m for past and ongoing deceptive acts and practices associated with climate change, including but not limited to relief for mitigation, adaptation and resiliency." This claim for relief is open to an interpretation that would directly associate the relief ordered by the court with the alleged impacts of climate change. Invoking the court's broad authority to enter relief pursuant to § 42-110m, however, does not change the fundamental objective of the lawsuit, including the other claims for relief, to remedy the defendant's alleged unfair and deceptive marketing practices. Section 42-110m "vest[s] the trial court with discretion to award relief and impose penalties as it deems appropriate under the circumstances of each case." *State* v. *Cardwell*, 246 Conn. 721, 742, 718 A.2d 954 (1998). To the extent that a particular request for equitable relief may appear to intrude upon federal governance of interstate and international emissions, it is up to the court to appropriately limit the scope of such relief or deny any such requests for relief if necessary.

The court concludes that the plaintiff's claims are not precluded by federal law because, despite the continued vitality of federal common law governing the regulation of interstate and international emissions (and therefore the production, sale and use of fossil fuel products), the plaintiff's complaint seeks to regulate only the defendant's marketing conduct related to those products.

## III. Legal Sufficiency of the Plaintiff's CUTPA Claims

 **\*12** The defendant argues that the complaint fails to state legally sufficient claims under CUTPA on several grounds: (1) the statements at issue were made outside Connecticut; (2) the statements were not made in the conduct of trade or commerce; (3) the statements about climate change are not deceptive because they are expressions of opinion; (4) the alleged greenwashing statements are aspirational and not alleged to be false or misleading; and (5) the complaint does not sufficiently allege that the statements were material to consumers.

### A. Geographic Scope of CUTPA

The law remains unsettled over CUTPA's reach. CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."General Statutes § 42-110b (a). Section 42-110a (4) of CUTPA defines "trade" and "commerce" as: "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value *in this state.*" (Emphasis added.) In *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 146 Conn. App. 169, 78 A.3d 167 (2013), aff'd, 322 Conn. 541, 153 A.3d 574 (2016), the Appellate Court held that CUTPA did not apply to claims of misrepresentation arising out of the sale of computer hardware and software and a software service contract between a New Mexico plaintiff and a defendant that maintained its principal place of business in Connecticut. None of the conduct at issue occurred in Connecticut. The marketing occurred outside Connecticut, the hardware and software installation occurred in New Mexico, and the service work was performed remotely from Alabama. The court held that "no 'trade' or 'commerce' within the meaning of § 42–110b (a) and § 42–110a (4) occurred in Connecticut. ... We decline to give extraterritorial effect to § 42–110a (4) for actions taken in the pursuit of trade or commerce occurring wholly outside the state. The plain meaning of §§ 42–110b (a) and 42–110a (4) does not authorize CUTPA claims regulating trade or commerce occurring outside the state." (Footnote omitted.) Id., 201. The court then engaged in a choice of law analysis "to determine whether CUTPA applies," and concluded that New Mexico law applied. Id., 202-210. Upon review, the Supreme Court held that the Appellate Court should not have reached the question of CUTPA's geographic scope but instead should have decided the case based only on the choice of law issue. *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 322 Conn. 541, 562-63, 153 A.3d 574 (2016). Consequently, the precedential value of the Appellate Court's holding on extraterritoriality is in question.

Two years prior to its decision in *Western Dermatology*, the Appellate Court referenced the analysis developed by the federal district courts in Connecticut to address CUTPA's geographical reach. *Cohen* v. *Roll-A-Cover, LLC*, 131 Conn. App. 443, 27 A.3d 1, cert. denied, 303 Conn. 915, 33 A.3d 739 (2011). As described by the Appellate Court, the federal courts have "held that CUTPA does not require that

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 13 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

a violation actually occur in Connecticut, if the violation is tied to a form of trade or commerce intimately associated with Connecticut, or if, where Connecticut choice of law principles are applicable, those principles dictate application of Connecticut law." *Id.*, 464, citing *Uniroyal Chemical Co. v. Drexel Chemical Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996) and *Victor G. Reiling Associates & Design Innovation, Inc. v. Fisher–Price, Inc.*, 406 F. Sup.2d 175, 200 (D. Conn. 2005). In *Cohen*, the Appellate Court neither endorsed nor rejected this analysis because it was undisputed that at least some of the actionable conduct had occurred in Connecticut. The Connecticut Supreme Court has not addressed the subject.

**\*13** While the Appellate Court's statement in *Western Dermatology* that CUTPA is not applicable to "trade or commerce occurring wholly outside the state" may not resolve the issue of CUTPA's geographic scope, it is significant that the court did not employ the two-part analysis developed in the federal courts when it, mistakenly, addressed the issue. It is particularly significant that the Appellate Court in *Western Dermatology* did not employ the federal courts' analysis to determine whether CUTPA applies because "the violation [was] tied to a form of trade or commerce intimately associated with Connecticut." *Cohen* v. *Roll-A-Cover, LLC*, supra, 131 Conn. App. 464. See *JKB Daira, Inc.* v. *OPS-Technology, LLC*, United States District Court, Docket No. 3:20-cv-1564 (SRU) (D. Conn. Sept. 27, 2022) (2022 WL 4484146 *12) ("continued viability of that interpretation of CUTPA is in question after *Western Dermatology*"); but see also *Ultimate Nutrition, Inc.* v. *Leprino Foods Co.*, 747 F. Supp. 3d 371, 380 (D. Conn. 2024) (applying "intimately associated with Connecticut" analysis without reference to *Western Dermatology*).

In the present case the plaintiff relies on the "intimately associated with Connecticut" formulation of the test, despite what the Appellate Court said, and argues that the Connecticut Supreme Court "held" in *Western Dermatology* that this formulation of the extraterritorial analysis is the law. This is not at all what the Supreme Court said, as it merely referenced the trial court's use of this federal district court formulation when reciting the procedural history of the case. The Supreme Court did not address the geographic scope of CUTPA in *Western Dermatology* and affirmatively held that the Appellate Court should not have done so either. Nor, contrary to the plaintiff's argument, did the Appellate Court adopt that formulation in *Cohen* by merely referring to it. In *Cohen*, the issue of CUTPA's geographic scope, limited to trade or commerce "in this state," was not before the court.

While the issue remains unresolved, it is unnecessary to resolve it in the present case because the court agrees with the plaintiff's alternative argument that, as this court has already held, based on the allegations of the complaint some of the alleged tortious conduct occurred in Connecticut. *Connecticut* v. *Exxon Mobil Corp.*, Superior Court, judicial district of Hartford, Docket No. CV-20-6132568-S (July 23, 2024) (2024 WL 3580377 **12-13) (concluding court had personal jurisdiction under General Statutes § 33-929 (f) (4) based on "tortious conduct in this state"). There the court concluded that the complaint adequately alleged tortious conduct in this state because "during the period in question, the 1970s through the 1990s, newspapers predominantly circulated by means of physical distribution and, as alleged, Connecticut had tens of thousands of subscribers in Connecticut exposed to over 1500 advertorials." Id., *13. [2] The court also left the issue open, however, for further consideration on a more fully developed factual record. Id., n.13. The court does so in the context of the defendant's motion to strike as well. While the allegations of the complaint are sufficient, the defendant may continue to challenge the merits of the plaintiff's claims based on the argument that the alleged violations of CUTPA are beyond its geographic reach. See *Ultimate Nutrition, Inc.* v. *Leprino Foods Company*, supra, 747 F. Supp. 3d 380 (defendant "not foreclosed from raising arguments about CUTPA's territorial scope at a later stage and on a developed record").

B. Trade or Commerce Requirement

**\*14** The defendant next argues that the conduct alleged in the complaint does not fall within the scope of CUTPA, which limits its application to activities performed "in the conduct of any trade or commerce." CUTPA defines " '[t]rade' and 'commerce' [as] the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."General Statutes § 42-110a (4). The defendant argues that the statements described in the complaint do not advertise or offer to sell goods and that the contrary view would expose any statement made by a business to CUTPA liability. In support of its position the defendant relies upon *Lafferty* v. *Jones*, 229 Conn. App. 487, 327 A.3d 941 (2024), cert. denied, 351 Conn. 923, 333 A.3d 105 (2025) (conduct motivated by desire to sell products, but

2025 WL 3459468

otherwise unrelated to products, outside scope of "trade" and "commerce").

In *Lafferty*, the plaintiffs were surviving family members of victims killed in the Sandy Hook massacre and a first responder depicted in the media following the shootings. They sued Alex Jones and Free Speech Systems, LLC alleging that Jones had "used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers." Id., 492. Among the causes of action they asserted was a CUTPA claim alleging that the defendants had published "outrageous and malicious lies about the plaintiffs and their family members" and "engaged in a campaign of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy...." (Internal quotation marks omitted.) Id., 538. The plaintiffs maintained that the defendants engaged in this conduct to promote the sale of products advertised on the defendants' platforms. The defendants argued that the speech complained of was noncommercial speech that was not performed in the conduct of trade or commerce because "(1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to indirect commercial gains through product sales." (Emphasis omitted.) Id., 541. The court agreed with the defendants. "That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the 'trade or commerce' prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products." Id., 545. The court distinguished the Connecticut Supreme Court's earlier decision in *Soto v. Bushmaster Firearms International, LLC,* 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC v. Soto,* 589 U.S. 1059, 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019), which recognized a CUTPA claim arising out of the marketing practices of the manufacturer of the weapon used in the Sandy Hook massacre. The *Lafferty* plaintiffs "did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy... for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far." *Lafferty v. Jones,* supra 229 Conn. App. 547.

The claims in *Lafferty* are easily distinguished from the claims of the plaintiff in the present case. The plaintiff's complaint alleges more than speech motivated by a desire to sell products but otherwise unrelated to the products. The speech

at issue in the present case is expressly alleged to be about the defendant's products, if not specifically then genetically. It is not merely speech unrelated to the defendant's products that is calculated to attract attention to a media outlet that advertises its products. The defendant's argument is a close relative to its First Amendment argument addressed below wherein the question is whether the complaint is based on commercial or noncommercial speech. Like that issue, aside from the legal uncertainty surrounding the concept of commercial speech, whether the statements at issue constitute "advertising" of the defendant's products requires a factual record that is not presently before the court. "Advertising" is not limited to direct and express solicitations for the sale of a product. *Kuchta v. Arisian,* 329 Conn. 530, 538-39, 187 A.3d 408 (2018) ("advertising" includes "[a]ny form of public announcement intended to aid directly or indirectly in the sale of a commodity...."). While not all advertising is necessarily done "in the conduct of trade or commerce," without a more developed factual record, the court is not able to make that determination in the present case. The context of the statements at issue, the media employed to make them, to whom they were made and the extent to which the statements at issue reference fossil fuel products cannot be determined simply by reading the plaintiff's characterizations of those statements in the complaint. The complaint sufficiently alleges that the statements were intended to and did promote the sale of the defendant's products for purposes of a motion to strike.[3]

### C. Legal Sufficiency of the Plaintiff's Claims of Deceptive Acts or Practices

**\*15** Next, the defendant argues that the statements the plaintiff complains of are not actionable deceptive acts or practices under CUTPA. The defendant argues the statements are either expressions of opinion, aspirational statements that are not false or misleading or are immaterial to consumers' decisions or conduct. The plaintiff argues that the complaint adequately alleges that the defendant's marketing practices were deceptive and that determining whether they were deceptive is a function assigned to the factfinder.

Under CUTPA, "[A]n act or practice is deceptive if three requirements are met. First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

material — that is, likely to affect consumer decisions or conduct." (Footnote omitted; internal quotation marks omitted.) *Caldor, Inc.* v. *Heslin*, 215 Conn. 590, 597, 577 A.2d 1009 (1990), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991); *Cadco, Ltd.* v. *Doctor's Associates, Inc.*, 188 Conn. App. 122, 142, 204 A.3d 737 (2019). This standard is more flexible than common law standards applied to actions for misrepresentation or deceit. *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 158-59, 645 A.2d 505 (1994) ("CUTPA reaches conduct well beyond that proscribed by any common law analogue"). Significantly, under CUTPA, to establish an actionable deceptive act or practice, the plaintiff is not required to "prove reliance or that the representation became part of the basis of the bargain." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 617, 440 A.2d 810 (1981).

The defendant argues that the statements alleged in counts one and two are merely expressions of opinion and that opinions are not actionable under CUTPA. In support of this argument, the defendant relies on *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 223 A.3d 37 (2020). In that case, an information technology company sued the publisher of a ratings report that ranked information technology vendors. The defendant also provided consulting services to such vendors, but not to the plaintiff. The plaintiff asserted defamation claims based on the defendant's critical comments and low rating of the plaintiff in its report, claiming that the comments and the low rating were part of a pay to play business scheme. In addition to the defamation claims the plaintiff asserted a CUTPA claim alleging that the pay to play scheme constituted a false and deceptive business practice and that the defendant's report contained false and defamatory statements about the plaintiff. The court upheld the trial court's entry of summary judgment on the ground that "the defendant's statements about the plaintiff were in all respects statements of opinion, not fact...." Id., 408. In doing so, the court recognized the inherent difficulty in distinguishing opinion from fact. Id., 411. "The difficulty arises primarily because the expression of an opinion may, under certain circumstances, reasonably be understood to imply the existence of an underlying basis in an unstated fact or set of facts." Id., 411-12. "Context is a vital consideration in any effort to distinguish a nonactionable statement of opinion from an actionable statement of fact." Id., 412. Drawing that distinction requires an "analysis of three basic, overlapping considerations: (1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and

tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification." Id., 414. Although distinguishing fact from opinion in a defamation case is often a question of law, "[i]t also is true that, in defamation cases, a jury issue can arise when an expression of opinion contains an ambiguity that reasonably can be understood to convey by implication an actionable factual assertion." Id., 428.

**\*16** It may be that some of the statements referenced in counts one and two of the complaint are expressions of opinion but, unlike the court in *NetScout* addressing the issue on summary judgment, this court is being asked to make that judgment based only on the allegations of the complaint. Given the "somewhat nebulous" nature of the distinction between fact and opinion (Id., 412), and the out-of-context nature of the allegations of a complaint, the court cannot draw those distinctions on a motion to strike. See *World Championship Wrestling* v. *Titan Sports, Inc.*, 46 F. Supp. 2d 118 (D. Conn. 1999) (denying Rule 12 (b) (6) motion to dismiss product disparagement CUTPA claim based on argument that statements were nonactionable opinion). Moreover, the statements at issue in the complaint include statements that the defendant allegedly knew were untrue, such as climate change was a "lie" or a "myth," that concerns about climate change were unsupported by science and that the use of fossil fuels had little to do with climate change. The complaint alleges that these statements contradicted the defendant's own scientific research on these questions.

The defendant's assertion that there is blanket immunity under CUTPA for statements that may be characterized as opinion is not supported by the relevant authority. In *NetScout*, when it came to address the plaintiff's CUTPA claim, the court deemed its conclusions on the defamation claims "dispositive." "Because the defendant's statements about the plaintiff in the 2014 report were nonactionable expressions of opinion, and because the plaintiff failed to present sufficient evidence to support its pay to play claim, we are compelled to conclude that the plaintiff has failed to establish a viable claim within the purview of CUTPA." *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 430. *NetScout* does not hold that expressions of opinion are never actionable as deceptive acts under CUTPA, only that where a CUTPA claim is derivative of a defamation claim (not false advertising for example), expressions of opinion that are nonactionable in

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

the defamation context cannot sustain the derivative CUTPA claim.

General Statutes § 42-110b (b) provides that "[i]t is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C.A. § 45(a)(1)), as from time to time amended." The Federal Trade Commission's Policy Statement on Deception states that "[c]laims phrased as opinions are actionable... if they are not honestly held, if they misrepresent the qualifications of the holder or the basis of his opinion or if the recipient reasonably interprets them as implied statements of fact." FTC Policy Statement on Deception (Oct. 14, 1983), appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984) (1984 WL 565319 *48). "Statements of opinion and belief... may be actionable if the 'opinion is inconsistent with facts known' at the time the statement is made." *Commonwealth v. Exxon Mobil Corp.*, supra, 2021 WL 3493456 *10, quoting *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1030 n.24 (Mass. 2004). "Further, a 'statement that, in form, is one of opinion, in some circumstances may reasonably be interpreted by the recipient to imply that the maker of the statement knows facts that justify the opinion.' " *Commonwealth v. Exxon Mobil Corp.*, supra, 2021 WL 3493456 *10, quoting *Briggs v. Carol Cars, Inc.*, 553 N.E.2d 930, 933 (Mass. 1990). Connecticut has "repeatedly looked to the reasoning and the decisions of the Supreme Judicial Court of Massachusetts with regard to the scope of CUTPA." *Normand Josef Enterprises, Inc. v. Connecticut National Bank*, 230 Conn. 486, 521, 646 A.2d 1289 (1994). The complaint alleges that the defendant's statements about climate change and the role that fossil fuel products play in producing climate change were not honestly held and misrepresented the bases upon which they were made. Additional context is required to establish whether a consumer would reasonably interpret them as statements of fact, express or implied.

 **\*17**  The defendant also argues that the plaintiff's "greenwashing" allegations in counts five and six do not sufficiently state a cause of action for deceptive acts or practices under CUTPA. These counts are focused on the defendant's modern marketing practices that have supplanted the original alleged campaign of deception. In counts five and six the plaintiff claims that the defendant's promotion of its alternative fuels program is aimed at obscuring the role its products continue to play in causing climate change and burnishing its image as a source of solutions that will mitigate climate change. The plaintiff claims the defendant's advertising is false and misleading because it leads consumers to believe they are making a responsible choice by purchasing the defendant's fossil fuel products. The plaintiff alleges, for example, that the defendant advertises that it is " 'farming' to grow 'algae for biofuels that could one day power planes, propel ships, and fuel trucks and cut their greenhouse gas emissions in half.' The narration is accompanied by images of crops growing in a field, green pools, green spheres representing young algae, and the Earth." The plaintiff alleges that this advertising is misleading because "[e]ven if ExxonMobil met its goal and produced 10,000 barrels a day of algae biofuel in 2025, that would be approximately 0.2 percent of its current refinery capacity." The plaintiff alleges that the defendant, in its advertising, "claims that it is 'working to decrease our overall carbon footprint' " while "simultaneously devoting resources to expanding exploration of potential new oil and gas reserves." The complaint alleges further that the defendant advertises "that certain of its fossil-fuel-based products can help consumers reduce greenhouse gas emissions and improve fuel economy."

The defendant argues that the greenwashing allegations of the complaint are insufficient to establish that its statements were false because the complaint does not allege that consumers were given false information about its alternative fuel products and its corporate practices. The defendant argues further that the alleged greenwashing allegations involve non-actionable "aspirational" statements and are insufficient to establish that its marketing practices were misleading for two reasons. First, to the extent that the plaintiff's claims are based on the alleged greenwashing campaign's failure to disclose the defendant's continued focus on fossil fuels and the allegedly de minimis nature of its efforts to contribute to solving climate change, the defendant argues it has "no duty to disclose... the impact of its products and operations on global climate change." Second, the defendant argues that the alleged greenwashing statements are not likely to mislead consumers acting reasonably because, as the plaintiff alleges, the defendant is widely known for its fossil fuel business and the relationship between fossil fuels and climate change is also now well known.

While there is authority for the proposition that under CUTPA a defendant cannot be held liable for failing to disclose information it is under no duty to disclose, *Glazer v. Dress Barn, Inc., 274* Conn. 33, 85, 873 A.2d 929 (2005); *Normand*

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 17 of 29
STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....
2025 WL 3459468

*Josef Enterprises, Inc.* v. *Connecticut National Bank*, supra, 230 Conn. 523-24, whether there is such a duty must be determined "in light of all the circumstances." *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 84. "Regarding the duty to disclose, the general rule is that ... silence ... cannot give rise to an action ... to set aside the transaction as fraudulent. Certainly this is true as to all facts which are open to discovery upon reasonable inquiry.... A duty to disclose will be imposed, however, on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." (Internal quotation marks omitted.) Id., 84-85. In the present case the plaintiff alleges that the defendant chose to speak about the environmental benefits of its products, and its efforts to be sustainable, to explore and develop alternative energy sources and to contribute to the effort to address climate change. The plaintiff alleges that the defendant's speech portraying itself as an environmental steward is misleading because it vastly overstates the defendant's efforts to reduce greenhouse gas emissions, makes generalized statements about its products and its efforts to reduce its carbon footprint, all while continuing to expand its fossil fuel business. While it is a legal question whether there is a duty to disclose information, the facts and circumstances alleged in the complaint, if proved, are sufficient to give rise to such a duty. The court cannot dispose of the issue on a motion to strike.

**\*18** The defendant's argument that the greenwashing allegations in the complaint are insufficient because they are not likely to mislead a reasonable consumer also cannot be resolved on a motion to strike. There is little case law involving the relatively recent recognition that greenwashing is a means by which consumers might be deceived or manipulated. The parties have not presented any Connecticut authority on the subject. In two climate change cases against fossil fuel companies, courts have held that similar greenwashing allegations sufficiently stated claims for deceptive acts or practices under analogous state unfair trade practice statutes. *Vermont* v. *Exxon Mobil Corp.*, supra, 2024 WL 5189025 \*\*10-11; *Commonwealth* v. *Exxon Mobil Corp.*, supra, 2021 WL 3493456 \*13. The defendant relies on *New York* v. *PepsiCo, Inc.*, 85 Misc.3d 969, 222 N.Y.S.3d 907 (2024) in support of its position that aspirational statements on environmental issues are not actionable under CUTPA. See also *City of New York* v. *Exxon Mobil Corp.*, supra, 226 N.Y.S.3d 863 (dismissing greenwashing claim because statements not "made in connection with the sale ... or ... offering for sale ... of consumer goods or services").

In *PepsiCo*, the Attorney General of New York sought to hold the defendant responsible for plastic pollution that has accumulated in the Buffalo River due to the conduct of consumers who discard the defendant's plastic bottles into the river. Other than the intervening conduct of third parties who illegally dispose of the defendant's plastic bottles, the allegations are similar to those asserted against the defendant in the present case. The "[p]laintiff alleges that '[Pepsi/ Frito Lay] has failed to abate the harm or warn the public that its plastic packaging is a potential source of plastic pollution and presents a risk of harm to human health and the environment. Instead, it has misled the public about its efforts to combat plastic pollution, while increasing its production and sale of single-use plastic packaging.' " *New York* v. *PepsiCo, Inc.*, supra, 222 N.Y.S.3d 910. Further, the plaintiff alleged that the defendant "refused to use packaging alternatives, while at the same time publicly stating their concern about 'potential environmental impacts' " and had "made misleading statements about their efforts to combat plastic pollution" while simultaneously increasing its use of virgin plastics. Id. The court dismissed the case under New York's counterpart to CUTPA, concluding that "promising to reduce its use of plastics does not amount to deception" by the defendant and that the plaintiff sought "to create liability for Defendants' aspirational statements to curtail a plastic footprint." Id., 916. The court was particularly focused on the fact that "regardless of Defendant's aspirational goals, Pepsi/ Frito Lay did not pollute the Buffalo River or any other local waterways—Other people did!" Id. There is no analogous third-party involvement in the present case.

In *City of New York* v. *Exxon Mobil Corp.*, supra, 226 N.Y.S.3d 863, dismissing a greenwashing claim on other grounds, the court distinguished another greenwashing case, *Earth Island Institute* v. *Coca-Cola Co.*, 321 A.3d 654 (D.C. App. 2024). That case, brought pursuant to the District of Columbia Consumer Protection Procedures Act ("DCCPA"), also involved a claim arising out of plastics pollution but the court viewed it much differently. The plaintiff alleged that the defendant "represents itself as working toward environmental sustainability," in part by touting its recycling efforts. This branding by the defendant was allegedly misleading because "recycling is a woefully ineffectual mechanism for mitigating plastic pollution on the scale that Coca-Cola produces it." Id., 659. The plaintiff also relied on numerous image enhancing statements by the defendant, which it summarized, alleging they " 'give consumers the impression that Coca-Cola is taking unprecedented and serious steps to 'take

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 18 of 29
STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....
2025 WL 3459468

responsibility' for its own plastic pollution; increase bottle collection rates; and ultimately reimagine patterns of plastic consumption by developing new bottle technology. In fact, it alleges, Coca-Cola 'is far from what consumers would understand to be a sustainable business,' and it 'greatly overstates the efficacy of recycling in addressing the plastics crisis.' " Id., 660-61. The court held that the defendant's alleged greenwashing campaign was actionable under the DCCPA, comparing the defendant's efforts to tout itself as "more sustainable" to "cigarette manufacturers marketing light or low tar cigarette as if they were 'healthier.' " Id., 664. The court concluded that the alleged advertising was plausibly misleading to environmentally conscious consumers and a factfinder could conclude that "Coca-Cola's statements, when viewed in their surrounding context, mislead consumers into believing that it is an environmental steward, when it is in fact an environmental scourge." Id., 659.

**\*19** In *Earth Island*, the court emphasized that the impact of the defendant's marketing efforts on consumers was ultimately a factual determination. "We do not presume to know what reasonable consumers understand a company to mean when it claims that it is working to be 'more sustainable' or the like. For all we know, reasonable consumers would immediately dismiss that type of speech as vacuous corporate jargon, not to be relied upon. But that is not obviously true; the concerted efforts that companies like Coca-Cola make to cultivate an image of being environmentally friendly strongly suggests that even their vague assurances have a real impact on consumers. Further, even if reasonable consumers take Coca-Cola's statements to mean that it is taking substantial strides to improve the environment, it is not at all obvious at this stage of the proceedings whether Coca-Cola's efforts on the ground align with those statements. But those are questions of proof that cannot be settled at the motion to dismiss stage. For now, Earth Island has done enough to state a plausible claim for relief." Id., 665-66.

The Federal Trade Commission has recognized the potentially misleading nature of greenwashing and has promulgated guides to "help marketers avoid making environmental claims that are unfair or deceptive...." 16 C.F.R. § 260.1 (the "Green Guides"). "The guides apply to environmental claims in... all... forms of marketing in any medium, whether asserted directly or by implication, through words, symbols, logos, depictions, product brand names, or any other means." Id. They are not regulations, but merely "provide the Commission's views on how reasonable consumers likely interpret certain claims." Id. The Green Guides provide,

as a general principle, that "[a]n environmental marketing claim should not overstate, directly or by implication, an environmental attribute or benefit. Marketers should not state or imply environmental benefits if the benefits are negligible." 16 C.F.R. § 260.3. As an example, "[a]n area rug is labeled '50% more recycled content than before.' The manufacturer increased the recycled content of its rug from 2% recycled fiber to 3%. Although the claim is technically true, it likely conveys the false impression that the manufacturer has increased significantly the use of recycled fiber." Id. The guides also advise that "marketers should not make unqualified general environmental benefit claims" and "should not imply that any specific benefit is significant if it is, in fact, negligible." 16 C.F.R. § 260.4. Both the practice of greenwashing and the FTC's adoption of the Green Guides to address it reflect the fact that many consumers are influenced by environmental issues when they are purchasing products, and that false or misleading advertising on environmental issues, as they relate to products and services in the marketplace, influences the decisions made by consumers. The greenwashing allegations of the complaint implicate some of the concerns identified by the FTC. The court concurs with the court in *Earth Island* that it is for a factfinder to determine whether the defendant's alleged greenwashing efforts are likely to mislead a reasonable consumer concerning the environmental sustainability of the defendant and its products.

Finally, the defendant argues that, to the extent any of its marketing efforts are misleading, the complaint fails to adequately allege that any misrepresentations concerning the environmental impact of its products and programs are material. The defendant maintains that "[n]othing in the [c]omplaint supports the conclusion that ExxonMobil's statements... are likely to have affected any reasonable Connecticut consumer's decision about whether to purchase ExxonMobil gasoline." A representation, omission, or practice is material if it is "likely to affect consumer decisions or conduct." *Caldor, Inc.* v. *Heslin*, supra, 215 Conn. 597. "In other words, it is information that is important to consumers" when making their decisions. FTC Policy Statement on Deception, *Cliffdale Associates, Inc., supra, 1984 WL 565319 \*49*. The FTC presumes materiality with respect to three types of claims: (1) express claims; (2) implied claims where there is evidence that the seller intended to make the claim; and (3) claims that "significantly involve health, safety, or other areas with which reasonable consumers would be concerned." Id., \*\*49-50. Otherwise, "the Commission may require evidence that the claim or

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 19 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

omission is likely to be considered important by consumers." Id. The FTC's publication of the Green Guides reflects a recognition that environmental issues are a matter of interest and concern to consumers and that, therefore, the defendant's alleged greenwashing efforts are material, at least potentially so. It is fair to be skeptical that consumers would choose to purchase gasoline from the defendant based on an erroneous impression that the defendant is proactively and earnestly engaged in efforts to reduce greenhouse gas emissions through the development of alternative energy sources and other more eco-friendly fossil fuel products. It is not a question of reliance by the consumer, however, only a question whether the consumer is influenced by the defendant's allegedly misleading environmental marketing. That is a question of fact, not a question of law. *Langan* v. *Johnson & Johnson Consumer Companies, Inc.*, 95 F.Supp.3d 284, 288-89 (D. Conn. 2015).

### D. Legal Sufficiency of the Plaintiff's Claims of Unfair Acts or Practices

**\*20** Counts three, four, seven and eight assert claims of unfair trade practices based on the same conduct the plaintiff alleges is deceptive. [4] To determine whether a practice is unfair under CUTPA, Connecticut employs the criteria set out in the cigarette rule by the FTC: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus, a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy...." *Ulbrich* v. *Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013). To the extent that deception may be considered a subset of unfairness, the sufficiency of counts one, two, five and six establishes the sufficiency of counts three, four, seven and eight. *In the matter of Figgie International, Inc.*, 107 F.T.C. 313, 373 n.5, 1986 WL 722111 (1986), aff'd, 817 F.2d 102, 1987-1 Trade Cas. (CCH) ¶ 67546 (4th Cir. 1987) ("unfair practices are not always deceptive but deceptive practices are

always unfair"). The plaintiff's allegations plausibly implicate all three prongs of the cigarette rule. The plaintiff invokes Connecticut's public policy promoting truth in advertising. *Connecticut* v. *Exxon Mobil Corp.*, supra, 83 F.4th 142. A "campaign of deception" or deceptive "greenwashing," if proved, would present a question of fact as to whether the defendant was engaged in immoral, unethical, oppressive, or unscrupulous conduct and whether the defendant's conduct has caused substantial injury to consumers. "It is well settled that whether a defendant's acts constitute... deceptive or unfair trade practices under CUTPA, is a question of fact for the trier." *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 505, 746 A.2d 1277 (2000).

The complaint sufficiently alleges unfair and deceptive acts or practices in violation of CUTPA.

### IV. First Amendment

### A. Commercial Speech Doctrine

The defendant argues that the alleged misrepresentations and misleading statements underlying the plaintiff's unfair and deceptive trade practice claims do not involve the advertisement of its products but rather constitute protected speech under the First Amendment. The defendant maintains that the plaintiff seeks to "punish ExxonMobil for expressing its views on climate change and energy policy in opinion pieces" and seeks to impose liability for "aspirational statements" concerning the defendant's efforts to develop new sources of energy. The defendant argues that, as a matter of law, all the statements placed at issue by the plaintiff's complaint constitute noncommercial speech on matters of public concern and are entitled to heightened protection under the First Amendment. The plaintiff responds that the complaint seeks a remedy for misrepresentations and misleading statements made in the course of the defendant's commercial speech, to which the First Amendment provides less protection. The plaintiff argues further that determining whether speech is commercial or noncommercial requires a "fact-driven" analysis and is not appropriately resolved on a motion to strike. The parties are at odds over what test applies to distinguish commercial from noncommercial speech, but they agree that the proper classification of the defendant's statements, as commercial or noncommercial speech, has dispositive effect.

Prior to 1976, commercial speech was afforded no protection under the First Amendment. *Valentine* v. *Chrestensen*, 316 U.S. 52, 54-55, 62 S.Ct. 920, 86 L.Ed. 1262, (1942) ("purely commercial advertising" not protected). The Court extended limited First Amendment protection to commercial speech in *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The Court did not extend First Amendment protection to commercial speech that is false, deceptive or misleading. *Id.*, 771-72. "[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." (Internal quotation marks omitted.) *Board of Trustees of State University of New York* v. *Fox*, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). "With respect to noncommercial speech, this Court has sustained content-based restrictions only in the most extraordinary circumstances.... By contrast, regulation of commercial speech based on content is less problematic. In light of the greater potential for deception or confusion in the context of certain advertising messages... content-based restrictions on commercial speech may be permissible." (Citations omitted; footnote omitted.) *Bolger* v. *Youngs Drug Prods. Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). While "[t]ruthful advertising ... is entitled to the protections of the First Amendment... [m]isleading advertising may be prohibited entirely." *Ibanez* v. *Florida Department of Business and Professional Regulation, Board of Accountancy*, 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994), quoting *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982).

**\*21** "The 'core notion' of commercial speech is that 'which does no more than propose a commercial transaction.' " *Anderson* v. *Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002), cert. denied, 538 U.S. 906, 123 S.Ct 1482, 155 L.Ed.2d 225, quoting *Bolger* v. *Youngs Drug Prods. Corp.*, supra, 463 U.S. 66. The phrase, "does no more than propose a commercial transaction," however, does not define the limits of the commercial speech classification. It is not a definition or a fully formulated test.[5] "In addition to information related to proposing a particular transaction, such as price, it can include material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product." *United States* v. *Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009); *National*

*Commission On Egg Nutrition* v. *Federal Trade Commission*, 570 F.2d 157 (7th Cir.1977) (advertising and public relations campaign conveying message that eggs are harmless in response to publicity concerning the relationship between cholesterol, eggs, and heart disease was commercial speech). Often the Court has unhelpfully characterized the distinction between commercial and noncommercial speech as a matter of "common sense." *Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 423, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); *Bolger* v. *Youngs Drug Prods. Corp.*, supra, 463 U.S. 64.

In *Bolger*, informational pamphlets discussing the desirability and availability of contraceptives could not be "characterized merely as proposals to engage in commercial transactions." *Bolger* v. *Youngs Drug Prods. Corp.*, Id., 66. The pamphlets included discussions of venereal disease and family planning, issues of public concern, and thus did "more than propose a commercial transaction." The Court nevertheless determined that the pamphlets contained commercial speech. In doing so, the Court identified three salient features of the pamphlets: they contained an advertising message; they referenced a specific product; and there was an economic motive for the communication. Id., 66-67. "The combination of all these characteristics... provide[d] strong support for the... conclusion that the informational pamphlets [were] properly characterized as commercial speech." Id., 67.

Yet, even the Court's analysis in *Bolger* is not a test or a formula for identifying commercial speech. For example, the Court observed that it is not necessarily required that each of the factors it relied upon be present in other cases. "[W]e [do not] mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial. For example, we express no opinion as to whether reference to any particular product or service is a necessary element of commercial speech." Id., 67 n.14 (referencing a U.S. Senate Judiciary Committee memorandum on "corporate image advertising"). Further, "[t]hat a product is referred to generically does not... remove it from the realm of commercial speech." Id., 66 n.13. Subsequently, in *Board of Trustees of State University of New York* v. *Fox*, supra, while referring to the core notion of a proposed commercial transaction as "the test for identifying commercial speech," the Court also reaffirmed its deeper consideration of the question in *Bolger*. "As we said in *Bolger*... communications can constitute commercial speech notwithstanding the fact that they contain discussions of important public issues.... We have made clear that advertising which links a product to a current public debate is

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

not thereby entitled to the constitutional protection afforded noncommercial speech." (Internal quotation marks omitted.) *Board of Trustees of State University of New York* v. *Fox*, supra, 492 U.S. 475. "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Bolger* v. *Youngs Drug Prods. Corp.*, supra, 463 U.S. 68. Two cases cited by the plaintiff explore the contours of commercial speech under circumstances that bear some resemblance to the present case and assist in resolving the First Amendment issue for the purpose of deciding the defendant's motion to strike. *Jordan* v. *Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014); *Kasky* v. *Nike, Inc.*, 27 Cal.4th 939, 45 P.3d 243, 119 Cal.Rptr.2d 296 (2002), cert. granted, 537 U.S. 1099, 123 S.Ct. 817, 154 L.Ed.2d 767 (2003), cert. dismissed, 539 U.S. 654, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003).

**\*22** In *Jordan*, the court considered whether image advertising, which contained no explicit proposal of a commercial transaction or promotion of a product, fell within the scope of commercial speech for First Amendment purposes. When basketball great Michael Jordan was inducted into the Basketball Hall of Fame, Sports Illustrated published a commemorative issue devoted to his career and accomplishments. The defendant and other Chicago area businesses were invited to submit congratulatory advertisements, at no cost, in exchange for an agreement to stock the magazine in their stores. *Jordan* v. *Jewel Food Stores, Inc.*, supra, 743 F.3d 511. The defendant accepted and submitted a full-page advertisement with a congratulatory message and a photo of a pair of empty basketball shoes, placed on a wood floor and bearing Jordan's number 23. The advertisement conveyed no information about any products or services sold by the defendant, and it conveyed no information about the defendant's business. It did include the company logo and its slogan, "Good things are just around the corner." Id. "To Jordan the ad was not a welcome celebratory gesture but a misappropriation of his identity for the supermarket chain's commercial benefit. He responded with this $5 million lawsuit alleging violations of the federal Lanham Act, the Illinois Right of Publicity Act, the Illinois deceptive-practices statute, and the common law of unfair competition." Id., 511.

In *Jordan*, the defendant maintained that the advertisement contained noncommercial speech entitled to full First Amendment protection, while the plaintiff maintained it was commercial speech. The district court concluded that

the advertisement did not constitute commercial speech because it did not propose a commercial transaction, confirming that conclusion by applying the "subsidiary considerations" identified in *Bolger*. *Jordan* v. *Jewel Food Stores, Inc.*, 851 F. Supp. 2d 1102, 1108-12 (N.D. Ill. 2012). The Seventh Circuit reversed. The court noted the "basic definition" of commercial speech as " ' speech that proposes a commercial transaction,' " but emphasized that this "core notion of commercial speech" was merely the definitional "starting point" and that additional variants of communication could also "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues." (Internal quotation marks omitted.) *Jordan* v. *Jewel Food Stores, Inc.*, 743 F.3d 516. "[I]t's a mistake to assume that the boundaries of the commercial-speech category are marked exclusively by this 'core' definition." Id. Acknowledging the "general framework" provided in *Bolger* for classifying speech as commercial, the court proceeded to accommodate that framework to the modern realities of advertising.

> We know from common experience that commercial advertising occupies diverse media, draws on a limitless array of imaginative techniques, and is often supported by sophisticated marketing research. It is highly creative, sometimes abstract, and frequently relies on subtle cues. The notion that an advertisement counts as "commercial" only if it makes an appeal to purchase a particular product makes no sense today, and we doubt that it ever did. An advertisement is no less "commercial" because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service. Applying the "core" definition of commercial speech too rigidly ignores this reality. Very often the commercial message is general and implicit rather than specific and explicit.'

Id., 518. The court held that "considered in context, and without the rose-colored glasses, Jewel's ad has an unmistakable commercial function: enhancing the Jewel–

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

Osco brand in the minds of consumers. This commercial message is implicit but easily inferred, and is the dominant one." Id.

In *Kasky*, a private plaintiff brought a false advertising claim against Nike. The plaintiff alleged that Nike, "in response to public criticism, and to induce consumers to continue to buy its products, made false statements of fact about its labor practices and about working conditions in factories that make its products." *Kasky* v. *Nike, Inc.*, supra, 27 Cal.4th 946. Nike had been the subject of extensive news reports criticizing the working conditions in its East Asian factories. Nike responded "in press releases, in letters to newspapers, in a letter to university presidents and athletic directors, and in other documents distributed for public relations purposes. Nike also bought full-page advertisements in leading newspapers to publicize a report that GoodWorks International, LLC, had prepared under a contract with Nike. The report was based on an investigation by former United States Ambassador Andrew Young, and it found no evidence of illegal or unsafe working conditions at Nike factories in China, Vietnam, and Indonesia." Id., 948. The plaintiff alleged the statements included in these media were false and misleading. The trial court dismissed the case on First Amendment grounds, concluding that Nike's statements did not constitute commercial speech. The Court of Appeal affirmed, but the California Supreme Court reversed, 4-3.

**\*23**  Recognizing that the United States Supreme Court had acknowledged "ambiguities... at the margins" of commercial speech, and mindful of the growing sophistication and diversity of commercial advertising, the court in *Kasky* proceeded to distill a new "limited-purpose test" for commercial speech by drawing on reasoning the Supreme Court has relied upon to justify the distinction between commercial and noncommercial speech in First Amendment law. "[W]hen a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message." (Emphasis omitted.) Id., 960. Under this test, speech is commercial if the speaker is a commercial person or entity, the intended audience is likely to be consumers of the speaker's products or services, and the content of the speech includes "representations of fact about the business operations, products or services of the speaker... made for the purpose of promoting sales of, or other commercial

transactions in, the speaker's products or services." Id., 961. The court regarded its "broad definition" of *Bolger's* "product references" factor as "necessary... to adequately categorize statements made in the context of a modern, sophisticated public relations campaign intended to increase sales and profits by enhancing the image of a product or of its manufacturer or seller." Id., 961-62.

The court recognized that even under its formulation commercial and noncommercial speech would often be intermingled. The court distinguished actionable commercial speech in a Nike advertisement or other statement by limiting the scope of the plaintiff's claim. "[T]o the extent Nike's speech represents expression of opinion or points of view on general policy questions such as the value of economic 'globalization,' it is noncommercial speech subject to full First Amendment protection. Nike's speech loses that full measure of protection only when it concerns facts material to commercial transactions—here, factual statements about how Nike makes its products." Id., 967. The court remanded the case for further proceedings wherein the trial court would be required to parse the various publications at issue, carving out "representations of fact about [Nike's] business operations, products or services." Three justices dissented.

Justice Chin viewed the imposition of potential liability upon Nike's response to criticism of its labor practices as "[h]andicapping one side in this important worldwide debate [and] both ill considered and unconstitutional. Full free speech protection for one side and strict liability for the other will hardly promote vigorous and meaningful debate." Id., 971 (*Chin, J.* dissenting). Justice Chin found the majority's emphasis on the speaker's economic motivation inconsistent with the Supreme Court's admonition in *Bolger* that an economic motive underlying speech is not dispositive in determining whether speech is commercial. Id., 971-72. Because Nike had become a "poster child" in the international debate over labor rights, Nike's labor practices "became relevant in a much broader, and public, context." Id., 972. According to Justice Chin, the majority's test, exposing Nike to liability for its statements defending its labor practices, would deprive the public of an important voice in the debate, in his view because of Nike's "corporate identity." Id. "Nike's speech did not 'simply ... include[ ] references to public issues.' (*Bolger*, supra, 463 U.S. at p. 68.) Nike's labor practices and policies, and in turn, its products, *were* the public issue." (Emphasis in original.) Id., 975. Justice Chin, however, did not address the dilemma posed by the lack of clear guidance from the Supreme Court on how to

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 23 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

distinguish between commercial and noncommercial speech in the context of modern marketing practices.

Justice Brown, in dissent, while plainly frustrated by the "considerable confusion" created by Supreme Court decisions concerning the distinction between commercial and noncommercial speech, concluded that "the majority's test for commercial speech promises much, but solves nothing." Id., 978 (*Brown, J.* dissenting). The majority's test, in her view, would elevate the identity of the speaker to a nearly dispositive factor. "The majority... creates an overbroad test that, taken to its logical conclusion, renders all corporate speech commercial speech.... Because all corporate speech about a public issue reflects on the corporate image and therefore affects the corporation's business goodwill and sale value, the majority's test makes all such speech commercial." Id., 984.

**\*24** Justice Brown was equally dissatisfied with the dated, simplistic and ambivalent formulations of the commercial speech doctrine as reflected in the decisions of the Supreme Court. She aptly characterized the Supreme Court's commercial speech doctrine as "rigid," because under that doctrine "all speech is *either* commercial or noncommercial" and "all commercial speech is the *same* under the First Amendment." (Emphasis in original.) Id., 978-79. "This simple categorization presupposes that commercial speech is wholly distinct from noncommercial speech and that all commercial speech has the same value under the First Amendment. The reality, however, is quite different. With the growth of commercialism, the politicization of commercial interests, and the increasing sophistication of commercial advertising over the past century, the gap between commercial and noncommercial speech is rapidly shrinking.... Although the world has become increasingly commercial, the dichotomous nature of the commercial speech doctrine remains unchanged." Id., 979. Justice Brown nevertheless felt "constrained by this rigid dichotomy" to dissent from the majority opinion. Id., 980. She concluded, in the context of the existing doctrine, that "Nike's speech is more like noncommercial speech than commercial speech because its commercial elements are inextricably intertwined with its noncommercial elements." Id., 987. "Where regulation of the commercial component of certain speech would stifle otherwise protected speech, 'we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical'.... In such cases, courts must apply the 'test for fully protected expression' rather than

the test for commercial speech." Id., 988, quoting *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

Justice Brown went on to expose the inadequate development of the commercial speech doctrine as articulated by the Supreme Court. "In today's world, the difference between commercial and noncommercial speech is not black and white. Due to the growing politicization of commercial matters and the increased sophistication of advertising campaigns, the intersection between commercial and noncommercial speech has become larger and larger. As this gray area expands, continued adherence to the dichotomous, all-or-nothing approach developed by the United States Supreme Court will eventually lead us down one of two unappealing paths: either the voices of businesses in the public debate will be effectively silenced, or businesses will be able to dupe consumers with impunity." Id., 994. Initially, the Supreme Court appeared to agree that it was necessary for the Court to revisit the commercial speech doctrine and the Court granted certiorari on "two questions: (1) whether a corporation participating in a public debate may be subjected to liability for factual inaccuracies on the theory that its statements are commercial speech because they might affect consumers' opinions about the business as a good corporate citizen and thereby affect their purchasing decisions; and (2) even assuming the California Supreme Court properly characterized such statements as commercial speech, whether the First Amendment, as applied to the states through the Fourteenth Amendment, permit[s] subjecting speakers to the legal regime approved by that court in the decision below." (Internal quotation marks omitted.) *Nike, Inc. v. Kasky*, 539 U.S. 654, 657, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003) (*Stevens, J.* concurring). The writ of certiorari, however, was later dismissed as improvidently granted.

Justice Stevens explained that the Court dismissed the writ of certiorari because it concluded there was an absence of a final judgment and because, in his view, the parties lacked standing to invoke the Court's jurisdiction while the underlying state cause of action remained pending. Id., 657-58. Justice Stevens also offered a third reason for dismissing the case, "the importance of the difficult First Amendment questions raised in this case." Id., 663. Justice Stevens' elaboration on this third reason, keeping in mind the exchange of views expressed in the California Supreme Court, is instructive on what this court should do in the current procedural context of the present case.

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 24 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

This case presents novel First Amendment questions because the speech at issue represents a blending of commercial speech, noncommercial speech and debate on an issue of public importance.... On the one hand, if the allegations of the complaint are true, direct communications with customers and potential customers that were intended to generate sales-and possibly to maintain or enhance the market value of Nike's stock-contained significant factual misstatements. The regulatory interest in protecting market participants from being misled by such misstatements is of the highest order. That is why we have broadly (perhaps overbroadly) stated that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). On the other hand, the communications were part of an ongoing discussion and debate about important public issues that was concerned not only with Nike's labor practices, but with similar practices used by other multinational corporations.... Knowledgeable persons should be free to participate in such debate without fear of unfair reprisal. The interest in protecting such participants from the chilling effect of the prospect of expensive litigation is therefore also a matter of great importance.... That is why we have provided such broad protection for misstatements about public figures that are not animated by malice. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**\*25** Whether similar protection should extend to cover corporate misstatements made about the corporation itself, or whether we should presume that such a corporate speaker knows where the truth lies, are questions that may have to be decided in this litigation. *The correct answer to such questions, however, is more likely to result from the study of a full factual record than from a review of mere unproven allegations in a pleading. Indeed, the development of such a record may actually contribute in a positive way to the public debate.*

(Emphasis added; footnote omitted; internal quotation marks omitted.) Id., 663-65. Unfortunately, in the twenty-two years that followed the Court's decision to dismiss the writ of certiorari in *Kasky*, it still has not addressed the "important," "difficult" and "novel" issues presented.

When analyzing the allegations of the plaintiff's complaint, the defendant goes no further than offering the conclusory claim that the statements described in the complaint do not appear to propose commercial transactions. The Supreme Court precedents and the lower courts applying them, however, recognize that determining whether a communication proposes a commercial transaction is not a perfunctory exercise limited to whether a publication does so expressly. A more nuanced approach is required where a commercial speaker's products and services are the subject of public controversy and the challenged speech concerns both. "[T]he mere presence of non-commercial information in an otherwise commercial presentation does not transform the communication into fully protected speech." *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 274 (2d Cir. 2010), *aff'd, Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). "We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger* v. *Youngs Drug Prods. Corp.*, supra, 463 U.S. 68.

The *Bolger* factors are the closest approximation to a test for the court to apply but at this early stage of the plaintiff's case and considering the uncertain contours of the commercial speech doctrine, the court is not positioned to resolve whether and to what extent the variety of public statements at issue fall within the scope of commercial speech. The full content and context of the allegedly false and misleading statements has not been presented to the court. [6] It does appear that at least some of the alleged statements, the *New York Times* advertorials for example, utilize an advertising format and thus satisfy the first *Bolger* factor. Others may or may not do so, depending on additional factual context. Regarding the second *Bolger* factor, product reference, the extent to which the published statements at issue reference the defendant's products, generically or specifically, cannot be determined simply by reading the plaintiff's out-of-context characterizations of those statements in the complaint. Nor can the court resolve questions concerning the underlying motivation for the statements, and particularly any marketing strategy behind them, to address the third *Bolger* factor, "commercial motivation," although this too is alleged in conclusory fashion in the complaint. The court concurs with Justice Stevens' observation that the proper classification of the defendant's allegedly false and misleading speech is "more likely to result from the study of a full factual record than from a review of mere unproven allegations in a pleading." *Nike, Inc.* v. *Kasky*, supra, 539 U.S. 664. For this reason, the court denies the defendant's motion to strike on First Amendment grounds.

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....
2025 WL 3459468

B. *Noerr-Pennington* Doctrine

**\*26**  The defendant also claims First Amendment Protection under the *Noerr-Pennington* doctrine. That doctrine protects the right to petition the government through lobbying, litigation, or other advocacy including publicity campaigns. Originally conceived as a protection from anti-trust laws that might otherwise inhibit the exercise of rights of association, the doctrine "has evolved from its antitrust origins to apply to a myriad of situations in which it shields individuals from liability for petitioning a governmental entity for redress. [A]lthough the Noerr–Pennington defense is most often asserted against antitrust claims, it is equally applicable to many types of claims which seek to assign liability on the basis of the defendant's exercise of its first amendment rights." (Internal quotation marks omitted.) *Zeller v. Consolini*, 59 Conn. App. 545, 758 A.2d 376 (2000). In the present case, the threshold issue is whether the alleged "campaign of deception" by the defendant constitutes petitioning activity, that is, whether it was directed to influencing government action or whether it was directed at influencing consumers. Whether some or all of the defendant's alleged misconduct constitutes protected petitioning activity is a fact-bound determination that cannot be made on a motion to strike.

V. Claims for Relief

The defendant moves to strike certain claims for relief on the grounds that they seek government-compelled speech in violation of the First Amendment, and others that seek monetary relief on grounds of untimeliness. The court denies the motion on these grounds.

A. Demand for Education Campaign Fund

The defendant moves to strike the plaintiff's claim for relief seeking "an order that ExxonMobil fund a corrective education campaign to remedy the harm inflicted by decades of disinformation, to be administered and controlled by the State or such other independent third party as the Court may deem appropriate." [7] The defendant argues that awarding such relief would constitute government-compelled speech in violation of the First Amendment. The plaintiff responds, pointing out that its claims for relief do not compel any speech by the defendant or require the defendant to subsidize private speech. The plaintiff seeks an order compelling the

defendant to provide funds to be used by the state to pay for an education campaign that would be "corrective" of the alleged disinformation disseminated by the defendant.

The cases cited by the defendant involve government orders compelling a private party to speak directly. *Pacific Gas & Electric Co.* v. *Public Utilities Commission*, 475 U.S. 1, 5-7 (1986) (order compelling utility to include opposing private party's speech in company newsletter); *National Association of Manufacturers* v. *SEC*, 800 F.3d 518, 518-19 (D.C. Cir. 2015) (challenging SEC rule compelling manufacturers to disclose use of "conflict minerals" in products); *Kimberly-Clark Corp.* v. *District of Columbia*, 286 F. Supp. 3d 128, 139 (D. D.C. 2017) (challenging local law prohibiting the use of the word "flushable" in marketing of disposable wipes). The plaintiff relies on *Johanns* v. *Livestock Marketing Ass'n*, 544 U.S. 550, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005), which involved the use of targeted assessments to fund a government run advertising program.

In *Johanns*, the Court considered the constitutionality of a federal government program that used an assessment on beef sales and imports to fund an advertising campaign promoting beef. The advertising campaign was conducted under the supervision and authority of the Secretary of Agriculture, operating through a board comprised of beef producers and importers nominated by trade associations. The plaintiffs objected to the content of the advertising which, they believed, was contrary to the message they would have preferred to promote their own beef products. The plaintiffs argued that the program constituted government-compelled speech that violated their First Amendment rights. Addressing this claim, the Court identified two categories of compelled speech cases triggering First Amendment scrutiny: "true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." Id., 557. The Court held that the beef promotion program did not fall within either category but instead involved a "government-compelled subsidy of the government's own speech." Id. " 'Compelled support of government'— even those programs of government one does not approve — is of course perfectly constitutional, as every taxpayer must attest." Id., 559. The fact that the subsidy is funded by a "targeted assessment... rather than by general revenues" does not impact the analysis. Id., 562. "The compelled-subsidy analysis is altogether unaffected by whether the funds for the

Case 2:25-cv-02195-TC-TJJ   Document 280-1   Filed 01/07/26   Page 26 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

promotions are raised by general taxes or through a targeted assessment. Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech. And that is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object." Id.

**\*27** The defendant offers no response to the plaintiff's reliance on *Johanns*. That case establishes that the First Amendment is not implicated when the government uses a private party's money to promote a message with which the private party disagrees. Id., 564. For this reason, the defendant's position is not well taken and the motion to strike is denied on this ground.

### B. Claims for Restitution and Disgorgement

Among the plaintiff's claims for relief are a claim for civil penalties and a request that the court enter "[a]n order for restitution, including disgorgement of profits, to the State of Connecticut on behalf of its citizens for unfair and/or deceptive sales of fossil fuel-based products." The defendant argues that the plaintiff's claims for disgorgement of profits and restitution should be stricken because: they violate fundamental principles of due process; the claim for restitution is time-barred with respect to conduct prior to September, 2017; and the plaintiff may not seek disgorgement of profits "on behalf of" citizens.

The Attorney General brought this action at the request of the Commissioner of the Department of Consumer Protection, as authorized by General Statutes § 42-110m. "The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce...." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 42, 717 A.2d 77 (1998). When the Commissioner asks the Attorney General to bring an action pursuant to this authority, the Commissioner and the Attorney General are acting on behalf of the public. The current iteration of the claim for "restitution, including disgorgement of profits to the State of Connecticut on behalf of its citizens" is the result of the court's ruling on the defendant's request to revise, which ordered the plaintiff to "identify what restitution it seeks and on whose behalf it seeks restitution." The prior complaint sought "any and all equitable relief authorized under [General Statutes] § 42-110m, including but not limited to restitution and disgorgement..." The revised complaint appears to merge the claims for restitution and disgorgement.

As the court now reads this claim for relief, the plaintiff seeks disgorgement, as a form of restitution, on behalf of the public and does not seek the restoration of any specific property or loss. "[T]he recovery of restitution may take several forms, including the return of the specific property conveyed or the payment of the monetary value of the defendant's gain." (Emphasis omitted; internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 461, 970 A.2d 592 (2009). The revised complaint seeks the latter and does not contemplate the return of money or property directly to any specific citizens. Rather, the plaintiff seeks "payment of the monetary value of the defendant's gain" to the state, acting on behalf of the citizens of the state. Id. With that understanding, the court addresses the defendant's arguments.

In actions brought on behalf of the state by the Attorney General, the court is authorized to make "an order directing restitution" and to award "such other relief as may be granted in equity." General Statutes § 42-110m (a). The court may also award "legal or equitable relief as provided by other statutes or at common law." Id. Disgorgement is an equitable remedy. *Wall Systems, Inc.* v. *Pompa*, 324 Conn. 718, 733, 154 A.3d 989 (2017). " 'Like other equitable remedies ... disgorgement is a method of forcing a defendant to give up the amount by which he was unjustly enriched.' *F.T.C.* v. *Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir.2011). '[D]isgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions.' Id. Moreover, 'when a public entity seeks disgorgement it does not claim any entitlement to particular property; it seeks only to deter violations of the [ ] laws by depriving violators of their ill-gotten gains.' ... Id., at 373.... [S]uch relief is permissible under § 42–110m (a). Section 42–110m (a) expressly bestows on the court the authority to award 'such other relief as may be granted in equity' and the availability of relief in the form of disgorgement is consistent with the remedial nature of CUTPA." *State* v. *Macko*, Superior Court, judicial district of Hartford, Docket No. CV-12-6031858-S (Aug. 1, 2016) (62 Conn. L. Rptr. 862) (2016 WL 4268383 \*9). With the understanding that disgorgement is the form of restitution sought by the plaintiff, and that the Attorney General acts on behalf of the public when pursuing an enforcement action under CUTPA, the plaintiff's claim for relief is proper.

**\*28** Next, the defendant makes related arguments that the plaintiff's claim for restitution is barred by CUTPA's three-year limitations period, and that allowing the state to

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 27 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

pursue civil penalties and disgorgement of profits for over five decades of conduct, a vast period occasioned by the plaintiff's alleged delay in commencing the lawsuit, would violate due process. The court disagrees that CUTPA's three-year statute of limitations applicable to private enforcement actions applies to actions brought by the Attorney General on behalf of the state. Regarding the due process argument, to the extent that there is a legal foundation for the argument despite the doctrine of *nullum tempus*, it is in the nature of a laches argument premised upon a claim that the state unreasonably delayed the pursuit of its claim. A factual record would be required to sustain this argument, which is raised prematurely on a motion to strike.

"[O]rdinarily, [a] claim that an action is barred by the lapse of the statute of limitations must be pleaded as a special defense, not raised by a motion to strike." (Internal quotation marks omitted.) *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 344 n.12, 890 A.2d 1269 (2006). Where, however, "a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then the remedy exists only during the prescribed period and not thereafter." (Emphasis omitted.) *Avon Meadow Condominium Ass'n, Inc.* v. *Bank of Boston Connecticut*, 50 Conn. App. 688, 699–700, 719 A.2d 66 cert. denied, 247 Conn. 946, 723 A.2d 320 (1998). CUTPA's three-year limitations period is jurisdictional (*Id.*, 700) and may be raised on a motion to strike. *Foundation Capital Resources, Inc.* v. *Prayer Tabernacle Church of Love, Inc.*, Superior Court, judicial district of Fairfield, Docket No. CV-13-6036501-S (Sept. 29, 2016) (2016 WL 6395284 *10).

The court agrees with other courts that have concluded that CUTPA's three-year limitations period applicable to private enforcement actions brought pursuant to General Statutes § 42-110g does not apply to actions, like the present case, brought by the state under General Statutes §§ 42-110m and 42-110*o*. "CUTPA has separate provisions for private actions (Conn. Gen. Stat. § 42-110g) and for sovereign enforcement actions brought by the State (§§ 42-110m, 42-110*o*). While the private action provision includes a three-year statute of limitations, § 42-110g(f), the sovereign action provisions do not specify any limitations period. In the complaint, Connecticut listed only claims under the sovereign enforcement provisions. Moreover, the Connecticut Supreme Court has held that 'statutory language generally purporting to affect rights and liabilities of all persons will not be deemed to apply to the state in the absence of an express statutory reference to the state.' *State* v. *Lombardo Bros. Mason*

*Contractors*, 307 Conn. 412, 439–40 (2012) (emphasis removed). The statute of limitations provision uses only general language, and in any event refers only to Section 110g. See Conn. Gen. Stat. § 42-110g(f) ("An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."). Thus, the State is not subject to CUTPA's statute of limitations." *Connecticut* v. *Sandoz, Inc.*, United States District Court, Docket No. 3:20-cv-00802-MPS, 2025 WL 3043397 *29 (D. Conn. Oct. 31, 2025). See also *State* v. *Mobilia, Inc.*, Superior Court, judicial district of New London, Docket No. 65134 (June 3, 1983) (1983 WL 14950).

The defendant argues alternatively that the plaintiff's claims for disgorgement and civil penalties violate due process because those claims seek remedies for conduct that spans decades and should have been pursued long ago, if at all. The defendant argues that the allegations of the complaint establish that the plaintiff has been on notice of the defendant's alleged unfair and deceptive trade practices for decades but delayed bringing suit until 2020. The defendant also cites litigation brought sixteen and seventeen years prior to the commencement of the present case where the plaintiff sought remedies against the federal government and electric power companies based on the relationship between fossil fuels and climate change. *American Electric Power Co., Inc.* v. *Connecticut*, 564 U.S. 410, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011) (alleging power company emissions contribute to climate change); *Massachusetts* v. *Environmental Protection Agency*, 415 F.3d 50 (D.C. Cir. 2005) (seeking to require EPA to regulate greenhouse gas emissions). Although claims asserted by the state are generally not subject to abatement due to laches or delay in asserting those claims, the defendant argues that the delay is so significant in the present case that applying the doctrine of *nullum tempus* violates the defendant's right to due process.

**\*29** "[T]he doctrine of *nullum tempus occurrit regi* (no time runs against the king), [is] a common-law rule that exempts the state from the operation of statutes of limitation and statutes of repose and from the consequences of its laches in a manner similar to the closely related doctrine of sovereign immunity." *State* v. *Lombardo Brothers. Mason Contractors*, supra, 307 Conn. 416-17. The defendant presents scant authority in support of its proposition that an egregious delay by the sovereign violates due process – none involving Connecticut law or the doctrines of *nullum tempus* or sovereign immunity. More importantly, the defendant overlooks the court's conclusion in *Lombardo* that, due to the

Case 2:25-cv-02195-TC-TJJ    Document 280-1    Filed 01/07/26    Page 28 of 29

STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION, Not Reported in Atl....

2025 WL 3459468

doctrine's close association between the doctrine of *nullum tempus* and the doctrine of sovereign immunity, it is up to the legislature, not the judiciary, to abolish or modify the doctrine of *nullum tempus*. Id., 436-37 (rejecting defendant's proposed "balancing test" to determine whether *nullum tempus* or limitations should apply).

Even if the court were to entertain the argument that, at some point, *nullum tempus* must yield to due process, the court is in no position to do so on a motion to strike. "Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant.... Laches is purely an equitable doctrine, is largely governed by the circumstances, and is not to be imputed to one who has brought an action at law within the statutory period." (Citations omitted; internal quotation marks omitted) Id., 417 n.3. "A conclusion that a plaintiff has been guilty of laches is one of fact for the trier and not one that can be made [as a matter of law], unless the subordinate facts found make such a conclusion inevitable...." *Fay v. Merrill*, 338 Conn. 1, 23-24. 256 A.3d 622 (2021) (laches defense is "intensely factual").

The defendant is not precluded from raising due process concerns to temper the court's consideration of the monetary relief sought by the plaintiff if the case reaches that juncture. Those concerns do not, however, as a matter of law and in the absence of a factual record, warrant the outright rejection of the plaintiff's claims for restitution and civil penalties. The defendant's motion to strike the plaintiff's claims for monetary relief is denied.

CONCLUSION

The defendant's motion to strike is denied in its entirety.

**All Citations**

Not Reported in Atl. Rptr., 2025 WL 3459468

---

## Footnotes

1    One exception to the well-pleaded complaint rule applies, despite the absence of a federal cause of action, "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." (Internal quotation marks omitted.) Id., 140. The court's characterization of the plaintiff's complaint, quoted above, was made in the context of its consideration of that exception.

2    The complaint alleges that the defendant's advertorials continued, albeit less routinely, until 2007 and included alleged greenwashing misrepresentations that, on the same basis, are sufficient at the pleading stage to bring the greenwashing claims within CUTPA's geographic scope.

3    The defendant also relies on *City of New York* v. *Exxon Mobil Corp.*, 86 Misc.3d 679, 226 N.Y.S.3d 863 (2025), a case with some similarity to the present case that was dismissed for failure to sufficiently allege a cause of action under New York City's Consumer Protection Law ("CPL"), codified at N.Y.C. Administrative Code § 20-700 et seq. The CPL defines a "[d]eceptive trade practice" as a false or misleading statement made "in connection with the sale, ... or in connection with the offering for sale" of consumer goods. CUTPA applies to deceptive acts or practices performed "in the conduct of trade or commerce." More instructive are similar climate change cases construing statutes that employ language similar to that used in CUTPA. See *Commonwealth* v. *Exxon Mobil Corp.*, Superior Court of Massachusetts, Suffolk County, Docket No. 1984-CV-03333-BLS1 (June 22, 2021) (2021 WL 3493456 *11) (ExxonMobil's alleged corporate greenwashing statements made in the conduct of trade or commerce); *Vermont* v. *Exxon Mobil Corp.*, Superior Court of Vermont, Chittenden County, Docket No. 21-CV-02778 (Dec. 11, 2024) (2024 WL 5189025 *8) (to occur in commerce, "alleged deceptive acts need not have occurred in the context of a specific consumer transaction, particularly with an action brought by the Attorney General").

4    There are some claims of unfair practices in the complaint associated with statements by third parties and company executives and appearing in company publications that are not part of the deception claims. It is unnecessary to isolate them in order to conclude that the plaintiff has sufficiently alleged its claims in counts three, four, seven and eight.

5    The phrase originates in the Court's framing of the question, in the context of its precedents, whether First Amendment protection should be extended to commercial speech at all: "Our question is whether speech which does 'no more than propose a commercial transaction'... is so removed from any 'exposition of ideas' ... and from 'truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government' ... that it lacks all protection. Our answer is that it is not." (Citations omitted.) *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, supra, 425 U.S. 762.

6    The defendant sought a revision to the complaint that would have compelled the plaintiff to include in its complaint exhaustive detail concerning every allegedly false and misleading statement made by the defendant over several decades. The court sustained the plaintiff's objection to that request, ruling that a request for such detailed information is appropriately the subject of discovery.

7    The defendant also moves to strike the plaintiff's claim for relief seeking "an order that ExxonMobil disclose all research and studies in its possession... that relates to climate change." The defendant did not brief that claim and, therefore, the court does not address it.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

  © 2025 Thomson Reuters. No claim to original U.S. Government Works.