**In the United States District Court
for the District of Kansas**

---

Case No. 25-cv-2195-TC

---

BILLIE RODRIGUEZ, ET AL.,

*Plaintiffs*

v.

EXXON MOBIL CORPORATION, ET AL.,

*Defendants*

---

## MEMORANDUM AND ORDER

The plaintiffs are eight individuals and the Board of County Commissioners of Ford County, Kansas. They bring a putative class action against various petrochemical companies, alleging dozens of causes of action. Doc. 48. The defendants move to dismiss. Doc. 247. For the following reasons, that motion is granted.

### I

### A

The defendants challenge the plaintiffs' standing to sue, which goes to whether a court has subject-matter jurisdiction.[1] A party may move to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).

---

[1] Apart from standing, the defendants move to dismiss on a variety of grounds. They contend that the Amended Complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6), *see* Doc. 248 at 39–94, 103–04, and that this Court lacks personal jurisdiction over two of them under Rule 12(b)(2), *see id.* at 95–103. The State of Kansas, which intervened as a defendant, separately contends that Ford County lacks authority to assert claims on behalf of the State or of other governmental entities. *See id.* at 105–19. This Memorandum and Order reaches only the standing issue because a federal court must assure itself of its jurisdiction before it may address the merits, *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1135 (10th Cir. 2010), and, because it concludes the plaintiffs lack standing, it is improper to consider the remaining arguments.

There are, generally speaking, two ways to challenge subject-matter jurisdiction, one being facial and the other being factual. *Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022). A facial challenge accepts the facts in the complaint as true but argues they fail to state a basis for jurisdiction, while a factual attack contests the validity of jurisdictional facts. *Id.* Either way, "[t]he objection that a federal court lacks subject-matter jurisdiction . . . may be raised . . . at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1) and 12(h)(3)).

An objection to a plaintiff's standing is an objection that a federal court lacks subject-matter jurisdiction. *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 868 (10th Cir. 2020). If jurisdictional questions are entwined with the merits of a case, then a court must convert a putative Rule 12(b)(1) motion into a Rule 12(b)(6) motion or a motion for summary judgment. *Kerr v. Polis*, 20 F.4th 686, 700 (10th Cir. 2021) (en banc).

**B**

There are eight individual plaintiffs who live in California, Florida, Kansas, and Missouri. Doc. 48 at ¶¶ 15–22.[2] In addition to these individuals, the Board of Commissioners of Ford County, Kansas, is also a named plaintiff. Doc. 48 at ¶ 23.

The defendants are nine companies that, relevant to this lawsuit, produce chemicals and precursors used in the manufacture of plastic. Doc. 48 at ¶¶ 24–32. The American Chemistry Council, a trade association for American chemical companies, is also a named defendant. Doc. 48 at ¶ 33.

Despite its length, the Amended Complaint is light on facts connecting the defendants' conduct and plaintiffs' injuries. Instead, it broadly describes an industry-wide conspiracy. The plaintiffs allege that beginning in the 1980s, the defendants conspired to trick the American public into believing that plastic is recyclable. Doc. 48 at ¶ 76; *see id.* at ¶¶ 34–155. That is false, according to the plaintiffs, because most types of plastic cannot be recycled, and those that can be recycled rarely are because of various economic and practical difficulties. Doc. 48 at ¶¶ 43, 44, 49. Nonetheless, the plaintiffs allege that the defendants implemented a marketing campaign to push the false

[2] All references to the parties' filings are to the page numbers assigned by CM/ECF.

narrative that plastic can be recycled in response to growing concern in America about landfills and plastic waste. Doc. 48 at ¶ 76.

The plaintiffs allege that the defendants' conspiracy harmed them in three ways. First, as to the individual plaintiffs, by causing them to buy more plastic products than they otherwise would have because they were led to believe in the myth of recyclability. Doc. 48 at ¶ 174. Second, the individual plaintiffs were made to pay a higher price for plastic products than they otherwise would have because the aforementioned myth increased demand for plastic. Doc. 48 at ¶ 175. And third, Ford County had to dispose of more plastic given the general public's increased consumption of plastic. Doc. 48 at ¶ 208.

It is crucial to note the breadth and concomitant imprecision of the plaintiffs' claims. The plaintiffs do not allege that they bought anything from any of the defendants. *See generally* Doc. 48; *see also id.* at ¶ 181 (emphasis added) (noting that the plaintiffs "purchased plastics *indirectly* from Defendants") (emphasis added); Doc. 248 at 30 (highlighting this fact). Nor could they. The Amended Complaint alleges that the defendants produce raw materials that are ultimately turned into consumer products by other market participants many steps down the chain of commerce. Doc. 48 at ¶ 146; *see also id.* at ¶ 24. The plaintiffs do not even allege that they purchased any plastic product that contained a product that the defendants manufactured. *See generally* Doc. 48; *see also* Doc. 248 at 35–36 (noting this fact).

Nor are the plaintiffs' claims limited to any product or type of product. Rather, the plaintiffs' claim is that every time they bought *any* plastic product from *anyone*, that product was more expensive than it would have been absent the defendants' conduct, and the plaintiffs would not have bought it absent the defendants' conduct. Doc. 48 at ¶¶ 174, 175. But again, they provide no specifics. Instead, the plaintiffs' contention of harm applies to every plastic product, even those that no one thinks or has ever thought are recyclable (think televisions and dental floss). *See* Doc. 48 at ¶¶ 173, 174; *see generally id.* (referring throughout to "prices for plastics" and "demand for plastics" with no reference to any specific product).

And there are no factual allegations about any individual plaintiff either. The plaintiffs' only allegations are that they reside in a particular State and they "purchased plastic products" in that State. *See* Doc. 48 at ¶¶ 15–22. There are no factual allegations that any specific plaintiff bought any specific product, much less a product produced by any specific defendant. The Amended Complaint fails to allege that any specific plaintiff saw any specific ad or marketing material produced by any specific defendant, that any specific plaintiff relied on anything

said by any specific defendant, or that any specific plaintiff bought any product that contained plastic manufactured by any specific defendant.

Finally, there are few factual allegations about any one defendant or its particular conduct. The plaintiffs allege that Exxon and Mobil (now defendant Exxon Mobil Corporation) helped form the Council for Solid Waste Solutions in 1988, that the Council's members "pushed the plastics recycling message," and that in 1989 Mobil "misleadingly promised the public that it was 'venturing into recycling mainly out of a sense of environmental concern.'" Doc. 48 at ¶¶ 91, 92, 94. The plaintiffs also allege that "[t]he largest resin producers, including Exxon, Mobil, DuPont, and Dow, invested tens of millions of dollars into various aspects of plastic recycling, including public relations efforts to shape consumer perception of recycling." Doc. 48 at ¶ 98. And they allege that an Exxon Chemical vice president told American Plastics Council staff at a 1994 meeting, "We are committed to the activities, but not committed to the results." Doc. 48 at ¶ 134.

The plaintiffs allege that a 1994 guide distributed by the California Department of Conservation promoted "free curriculum materials on plastic recycling from Dow," and that a separate 1992 video produced by the American Plastics Council contained "blatantly false statements" about recycling. Doc. 48 at ¶ 115. It is not clear whether "Dow" refers to defendant Dow Inc., defendant Dow Chemical Company, or some other entity. Nor is it clear whether the plaintiffs contend that the California agency participated in the alleged conspiracy or was itself deceived into distributing industry materials; the Amended Complaint alleges only that the agency "distributed" the guide. *Id.* The plaintiffs allege that a representative of defendant Eastman Chemical Company told the attendees of "an industry conference in 1994" that while recycling someday "may be a reality . . . we will wake up and realize that we are not going to recycle our way out of the solid waste issue." Doc. 48 at ¶ 119.

The plaintiffs also make general allegations as to all the defendants. They allege that "Exxon Mobil and the other Defendants" produced 7.7 million tons of plastic in 2023, Doc. 48 at ¶ 147, that "Defendants and associated plastics industry trade group[s] continue their mislead[ing] advertising campaign," *id.* at ¶ 153, and that "Defendants . . . have successfully worked for over 60 years to drive the demand for single-use plastics by misleading and defrauding the American public with the unfounded notion that plastics are recyclable," *id.* at ¶ 155.

The theory is that because everyone in the United States was harmed, the plaintiffs were harmed. To repeat, the plaintiffs posit that the defendants deceived the entire American public, the entire

American public purchased plastic products believing that plastic is recyclable, and thus the entire American public was harmed—and *because* the plaintiffs are within this group, they were harmed, too.

On this theory, the plaintiffs propose three classes. The first is a "nationwide class" composed of "[a]ll persons . . . in the United States . . . who . . . purchased plastics." Doc. 48 at ¶ 161. The second is a "state law class" composed of "[a]ll persons, governmental, and non-governmental entities in the Indirect Purchaser states who indirectly purchased plastics . . . ."[3] Doc. 48 at ¶ 162. The third is a "public nuisance class" composed of "[a]ll counties, cities, and municipalities located within the United States and its territories which have incurred . . . sanitation costs for plastic waste clean-up and disposal . . . ." Doc. 48 at ¶ 163.

The Amended Complaint asserts forty-six counts. Counts I and XVIII through XLV allege violations of federal and state antitrust laws. Doc. 48 at ¶¶ 178–84, 344–512. Count II alleges a tort claim for public nuisance. Doc. 48 at ¶¶ 205–16. Counts III through XVII assert violations of various state consumer protection laws. Doc. 48 at ¶¶ 217–343. And, finally, Count XLVI alleges a claim for unjust enrichment. Doc. 48 at ¶¶ 513–20.

The defendants move collectively to dismiss. Doc. 247. Of all their arguments, the only one reached here is that the plaintiffs have no standing to sue. Doc. 248 at 37–39.

## II

The plaintiffs' Amended Complaint does not plead an injury that is fairly traceable to the defendants. That means they lack standing to sue. Accordingly, the defendants' motion is granted.

### A

The defendants move to dismiss arguing, inter alia, that the plaintiffs' Amended Complaint does not plead sufficient facts to establish standing. Doc. 248 at 37–39. That implicates a federal court's power to entertain a lawsuit under Article III.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413,

[3] The "Indirect Purchaser" states are defined as various states. Doc. 48 at 48 n.131. It is unclear what this means or what makes those states "indirect" purchasers.

423 (2021) (quoting U.S. Const. art. III, § 2, cl. 1); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "For there to be a case or controversy under Article III, the plaintiff must have . . . standing." *TransUnion*, 594 U.S. at 423. "Regardless of the stage of litigation at which [federal courts] evaluate[ ] standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). The plaintiffs "must demonstrate standing separately for each form of relief sought." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)) (internal quotation marks omitted).

Standing requires a plaintiff to have "suffered an injury in fact" that is "fairly traceable to the challenged action of the defendant" and is likely to be "redressed by a favorable decision." *Laufer*, 22 F.4th at 876 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "These requirements ensure that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction.'" *Laufer*, 22 F.4th at 876 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be concrete, it must be "real" rather than "abstract," though "concrete" is not necessarily synonymous with "tangible." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190–91 (10th Cir. 2021). In other words, "it must actually exist." *Spokeo*, 578 U.S. at 340. And "[a] statutory violation does not necessarily establish injury in fact," either. *Laufer*, 22 F.4th at 876 (explaining that *Spokeo* and *TransUnion* recently clarified that fact). "For an injury to be particularized, it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1); *see also Spokeo*, 578 U.S. at 339. "[A]ctual or imminent . . . mean[s] that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And "[a]n alleged future injury is sufficiently imminent 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Laufer*, 22 F.4th at 876 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

As to causation, the plaintiff must show that "its injury is 'fairly traceable to the challenged action'" of the defendant. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1152 (10th Cir. 2022) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 180). For Article III purposes, that means "proof of a substantial likelihood that the

defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). And to make that showing, "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's *actual action* has caused the [harm or a] substantial risk of harm." *Rocky Mountain*, 40 F.4th at 1152 (emphasis in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)) (internal quotation marks omitted).

Regarding redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1325 (10th Cir. 2022) (quoting *Lujan*, 504 U.S. at 561) (internal quotation marks omitted). In other words, "a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth*, 690 F.3d at 1182 (quoting *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011)). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *WildEarth*, 690 F.3d at 1182 (quoting *Nova Health*, 416 F.3d at 1158).

And finally, when assessing standing, federal courts are not to "open the door to merits considerations at the jurisdictional stage." *Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 121 F.4th 1374, 1378 (10th Cir. 2024) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc)). That means that, "[f]or purposes of standing, [federal courts] must assume the [p]laintiffs' claim has legal validity." *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1220 (10th Cir. 2016) (quoting *Walker*, 450 F.3d at 1092–93). In other words, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

**B**

The Amended Complaint does not plead that the individual plaintiffs suffered an injury that is fairly traceable to the defendants' conduct. As a result, they lack standing.

**1**

The plaintiffs' first theory of harm is that they purchased products that they "would not have purchased" but for the defendants' alleged conspiracy. Doc. 276 at 31. A broader and less precise theory of harm is difficult to imagine. As noted, there are no facts that any specific plaintiff purchased any specific product from any specific defendant. Instead, the plaintiffs cast the widest possible net: "[Plaintiffs] purchased plastic products." Doc. 48 at ¶ 15. Nor are there facts tying any

specific defendant's misleading conduct to any specific plaintiff. The most that can be said is that the individual plaintiffs were members of the consuming public and the defendants were members of the industry that makes plastic. *See* Doc. 48 at ¶¶ 147, 153, 155 (making generalized allegations about all the defendants).

And crucially, there are no allegations that any plaintiff *relied* on or purchased anything *because of* any specific defendant's conduct. That failure has frequently been the basis of dismissals for lack of standing. In particular, courts in this circuit and beyond have found no standing where consumers could not say that the particular product they bought was affected by the defendant's conduct, where the defendant made no representation about the product the plaintiff bought, and where a plaintiff who bought from a retailer did not allege that the product came from the upstream defendant. *See Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1305 (10th Cir. 2022) (finding no standing where no allegation that the particular packages purchased were affected); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030–31 (8th Cir. 2014) (same); *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 706–07 (9th Cir. 2020) (same where no representation about the product purchased); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1081 (N.D. Cal. 2017) (same where no allegation that the product purchased came from the upstream defendants). The Amended Complaint has all three problems at once.

The plaintiffs attempt to correct this deficiency in their response. They argue that "[c]onsumers relied on [Defendants'] falsehoods when buying goods in plastic packaging, thus increasing demand and prices." Doc. 276 at 37 (citing Doc. 48 at ¶ 172). This effort fails for two reasons. First, on a facial challenge the question is whether the complaint itself pleads facts establishing jurisdiction, *Laufer*, 22 F.4th at 875; *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (a facial attack "questions the sufficiency of the complaint" and is resolved on the complaint's allegations). And a plaintiff cannot broaden the complaint by adding factual or legal claims in a response brief. *See* Fed. R. Civ. P. 15(a); *see also Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to consider a claim raised in a brief but not in the complaint); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) ("The plaintiffs may not effectively amend their Complaint by alleging new facts in their response to a motion to dismiss."). Second, even if the Amended Complaint contained this new assertion, it would not matter. There are no facts explaining what actions the defendants took or what actions the plaintiffs took as a result of the defendants' actions. The additional assertion in their response brief fails to cure that omission. *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (stating that traceability requires a "threshold showing" that "a

particular defendant" did something that caused "a particular plaintiff's" injury); *Clapper*, 568 U.S. at 414 n.5 ("[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused" the harm); *Nova Health*, 416 F.3d at 1157.

The fundamental deficiency boils down to traceability. The Amended Complaint fails to plead any injury that is fairly traceable to the defendants' conduct. Instead, the plaintiffs assert that they "purchased plastic products," but they provide no facts that would permit concluding what product they purchased or that they did so *because of* the defendants' conduct. That is not sufficient. *See Warth*, 422 U.S. at 504 (plaintiffs "must allege facts from which it reasonably could be inferred that, absent" the challenged conduct, they would not have suffered the injury); *Clapper*, 568 U.S. at 414 n.5.

Moreover, Article III standing requires facts showing that the plaintiff's injury was caused by the defendant's conduct as opposed to "the independent action of some third party not before the court." *Murthy*, 603 U.S. at 57 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). A plaintiff fails to meet this burden when "speculative inferences are necessary to connect [the] injury to the challenged actions." *Nova Health*, 416 F.3d at 1157 (quoting *Simon*, 426 U.S. at 45–46); *see also Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 814–15 (10th Cir. 2021) (affirming dismissal for lack of standing where the complaint did not allege facts "capable of showing that, 'but for'" the defendants' conduct the injury would not have occurred).

The Amended Complaint attempts to meet its causation burden by listing a chain of events. Charitably described, the chain is that at least one of the defendants made a misrepresentation about recyclability, that the misrepresentation reached one of the plaintiffs, that the plaintiff believed it, and that the plaintiff bought something—what, the Amended Complaint does not say—that he or she otherwise would not have at a price that was higher than it should have been. But the chain exists only in the abstract: The Amended Complaint pleads no fact about any link in it as to any plaintiff or any defendant, such as which defendant said what, which plaintiff heard or saw it, what that plaintiff then bought, or what he or she paid.

The Supreme Court has rejected these types of chains. In *Clapper*, for example, the plaintiffs claimed that a surveillance statute would likely lead the government to intercept their communications. 568 U.S. at 410. The Court held that they lacked standing because their theory "relie[d] on a highly attenuated chain of possibilities" in which the government would have to decide to target their contacts, choose to do so

under the challenged statute rather than some other authority, obtain approval from the Foreign Intelligence Surveillance Court, succeed in intercepting the communications, and happen to capture communications to which the plaintiffs were parties. *Id.* at 410–11. This "speculative chain of possibilities" did not establish an injury that was "certainly impending or . . . fairly traceable" to the statute. *Id.* at 414. The Court noted its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors," *id.*, and it explained that a plaintiff must plead "concrete facts showing that the defendant's actual action has caused" the injury, *id.* at 414 n.5.[4]

The Tenth Circuit has also rejected the same types of claims. In *Renfro*, the Food and Drug Administration had notified a pet-food manufacturer that some of the beef tallow used in certain of its formulas was contaminated. *Renfro*, 25 F.4th at 1296–97, 1305. Purchasers of that manufacturer's dog food alleged that every bag they bought "ha[d] a risk of, or [did] contain," the contaminant. *Id.* But none of the food they actually bought was alleged to have contained the tainted ingredient. *Id.* Their theory therefore required an inference that the contaminated tallow had found its way into the particular bags these plaintiffs happened to purchase, but the complaint provided no basis for that inference. The court held that "arguing that they purchased dog food that was at risk of contamination—unlike arguing that they purchased dog food that was contaminated—is insufficient for standing because an alleged injury cannot be 'too speculative for Article III purposes.'" *Id.*

The plaintiffs here are in a weaker position still. They do not even allege that they bought any particular product made from any defendants' resin, that any defendant said anything about that product they

[4] One of the concerns in *Clapper* was whether the injury was "certainly impending." But that was not the sole focus of the Court's concern. Rather, it was that each link depended on a decision by someone other than the defendant, so that the injury could not be traced to the challenged statute without speculating about those decisions. *Id.* at 414 & n.5. In short, it had a traceability problem, and nothing suggests that problem would go away had the injury already occurred. Indeed, the Court has held that plaintiffs who had undeniably been harmed still lacked standing because the connection between the harm and the defendant's conduct ran through the independent choices of third parties. *See Simon*, 426 U.S. at 42–43 (finding no traceability even though patients had already been denied hospital care); *Warth*, 422 U.S. at 505–07 (finding no traceability even though the plaintiffs had already been unable to find housing).

ultimately bought, or that they bought it because of what was said by any defendant.

Reviewing similar cases in which the plaintiffs did have standing helps to highlight the deficiencies in the Amended Complaint. In *Downing v. Keurig Green Mountain, Inc.*, No. 20-11673, 2021 WL 2403811 (D. Mass. June 11, 2021), for example, the plaintiff argued that he had purchased Keurig pods because Keurig advertised them as recyclable. *Id.* at *1. The District of Massachusetts found that the plaintiff had standing because he identified the product he bought, even attaching photographs of Keurig's advertisements that were in effect and that he had seen when he purchased the pods. *Id.* at *3. Thus, "[h]ad Keurig not claimed that its products were recyclable when they were allegedly not entitled to do so, [plaintiff] would not have purchased the pods believing that they were recyclable. Keurig's advertising was thus adequately pled as the direct and foreseeable cause of [plaintiff's] injury." *Id.* at *4. Other cases have reached that same conclusion where there is an allegation that a particular plaintiff relied on a particular representation to purchase a particular product. *Smith v. Keurig Green Mountain, Inc.*, 393 F. Supp. 3d 837, 844 (N.D. Cal. 2019) (citation omitted) (finding standing where the complaint "alleges that if [the plaintiff] knew the Pods were not recyclable, she would have sought 'other coffee products that are otherwise compostable, recyclable or reusable'"); *Duchimaza v. Niagara Bottling, LLC*, 619 F. Supp. 3d 395, 409 (S.D.N.Y. 2022) (same where plaintiff alleged that she bought defendant's bottled water at a particular store, that its label said "100% Recyclable," and that she paid a premium because of that label); *Catholdi-Jankowski v. CVS Health Corp.*, 656 F. Supp. 3d 412, 420 (W.D.N.Y. 2023) (same where plaintiff alleged that she bought a CVS-brand product bearing the challenged label and paid a premium because of it); *Lieber v. Igloo Prods. Corp.*, No. 25-488, __ F. Supp. 3d __, 2026 WL 266301, at *9 (E.D.N.Y. Feb. 2, 2026) (allowing claims to proceed where the plaintiffs identified the coolers they bought, the stores they bought them from, and the "Biodegradable" and recycled-content labels on which they relied, and deferring to class certification whether they had standing as to products they did not buy). These cases all show a connection between a purchase and a representation.

The Amended Complaint alleges no such connection. No plaintiff identifies a product he or she purchased. Nor does any plaintiff attribute a purchase to a product that any particular defendant made, or supplied the resin to make. Indeed, the plaintiffs concede that they purchased only "indirectly" from manufacturers further down the production chain. Doc. 48 at ¶ 181.

This is not to say that a plaintiff cannot establish standing against defendants even if the connection is several steps up the supply chain. *See In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 851 (E.D. Mich. 2014). Rather, it is a recognition that the further removed plaintiffs are from defendants, the more they must plead to connect the two, *see Warth*, 422 U.S. at 505. Yet *these* plaintiffs plead nothing to bridge that gulf. Instead, they rely on decades-old statements that the Amended Complaint attributes to particular defendants, Doc. 48 at ¶¶ 91–98, 115, 119, 134, and on (admittedly more recent) marketing campaigns that the Amended Complaint attributes either to trade groups that are not parties to this case or to the "Defendants" collectively. *See id.* at ¶¶ 150–54.

Traceability turns on what the defendant did, as opposed to what others did. It requires "concrete facts showing that the defendant's actual action has caused" the plaintiff's injury, *Rocky Mountain*, 40 F.4th at 1152 (internal quotation marks omitted), and it is not satisfied where the injury instead depends on "speculative inferences," *Nova Health*, 416 F.3d at 1157, or on "the unfettered choices made by independent actors," *N. Laramie Range All. v. FERC*, 733 F.3d 1030, 1035 (10th Cir. 2013) (internal quotation marks omitted). The injury alleged here depends on the choices of the manufacturers and retailers that made and sold whatever products the plaintiffs bought, the governments that, by the plaintiffs' own account, promoted recycling, Doc. 48 at ¶ 115, and the plaintiffs themselves, who decided what to buy. The Amended Complaint pleads no facts about any of them.

**2**

The plaintiffs' second theory of harm asserts that the defendants' conduct caused increased demand for plastic that, in turn, led to the plaintiffs paying artificially inflated prices. That, too, fails because it is not fairly traceable to the defendants.

The sheer breadth of their theory undermines its viability. The plaintiffs argue that the price of every single plastic product that they have ever purchased was artificially inflated because of the defendants' conduct. That bald conclusion fails to account for the obvious intervening events and market conditions. Article III standing requires the plaintiffs to plead facts showing that the defendants' conduct—rather than "the independent action of some third party"—caused the prices they paid. *Simon*, 426 U.S. at 41–42; *Nova Health*, 416 F.3d at 1156. When a plaintiff's injury depends on how third parties respond to the defendant's conduct, the plaintiff must plead facts showing that those third parties will or did "likely react in predictable ways." *Murthy*, 603 U.S. at 57–58 (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 768

(2019)); *see also Lujan*, 504 U.S. at 562 (standing is "substantially more difficult" to establish where causation depends on "the unfettered choices made by independent actors not before the courts").

That is important here because the defendants do not set the price of anything the plaintiffs bought. According to the Amended Complaint, the defendants make resin, other companies turn that resin into products, and still others sell those products to consumers. Doc. 48 at ¶¶ 146, 181. The price a plaintiff paid for a plastic product was therefore set by manufacturers and retailers who are not parties to this case, in response to "multiple factors, including supply and demand, the balance of bargaining power between the buyer and manufacturer, and the availability of a substitute product to meet the buyer's needs." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1250 (10th Cir. 2014). To plead traceability, then, the plaintiffs had to allege facts showing how these defendants' statements moved those third parties' pricing decisions. They allege none.[5]

Two aspects of the Amended Complaint make that failure fatal. One is that the Amended Complaint says nothing about what any defendant did to raise prices. The only conduct alleged is a series of decades-old statements promoting recycling, and the Amended Complaint does not explain with facts how those statements translated into a higher price for any product. The other is that the theory is not confined to a product or a market. It is that *every* plastic product sold in the United States since 1990 has been overpriced. Doc. 48 at ¶¶ 161–62, 174–75. The further an injury sits from the challenged conduct, the more a plaintiff must plead to connect the two. *Warth*, 422 U.S. at 505 (indirectness makes it "substantially more difficult" to establish that "the asserted injury was the consequence of the defendants' actions"); *Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 383, (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)) (asking whether "the line of causation between the illegal conduct and injury [is] too attenuated"). The plaintiffs' theory—which runs from a handful of statements, through the buying decisions of the entire public, through the pricing decisions of every manufacturer and retailer of plastic goods, and finally to the price a particular plaintiff paid for an unidentified

[5] Again, the Amended Complaint alleges nothing about any of these variables for any product that the plaintiffs purchased. For example, it says nothing about the defendants' market share for plastic goods purchased by the plaintiffs or about the bargaining position in the supply chain between the defendants' resin and the plaintiffs' purchases. Nor did the plaintiffs argue otherwise in their opposition to the motion to dismiss. *See* Doc. 276 at 31–35.

product—is about as attenuated as a theory can be. Yet the Amended Complaint offers nothing but general conclusions about these links.

The Amended Complaint fails to establish traceability because it pleads no facts connecting any defendant's conduct to the price of any product that any plaintiff bought. The Tenth Circuit has affirmed dismissals on that very basis where the complaint offered nothing "capable of showing that 'but for'" the defendants' conduct the injury would not have occurred, *Santa Fe All.*, 993 F.3d at 815, and where the plaintiffs "still would have suffered an alleged injury" absent the defendant's conduct, *M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1262 (10th Cir. 2024). Nothing in the Amended Complaint permits the inference that any plaintiff would have paid less for anything had the defendants said nothing about recycling.

Again, comparing the Amended Complaint to similar disputes highlights the deficiencies in the Amended Complaint. In *Swartz v. Coca-Cola Co.*, for instance, the plaintiffs alleged that they bought bottled beverages supplied by the defendants, that the bottles were labeled "100% Recyclable," and that they paid a premium because of that label. No. 21-cv-04643, 2023 WL 4828680, at *2 (N.D. Cal. July 27, 2023). That sufficed for Article III standing because "each of the individual plaintiffs purchased bottles supplied by defendants, and . . . they paid a premium based on the 100% recyclable representation." *Id.* The price-premium theory was anchored to a product, a seller, a representation, and a purchase.

The Third Circuit's decision in *Finkelman v. National Football League*, 810 F.3d 187 (3d Cir. 2016), is in accord. In that case, a consumer who bought football tickets on the resale market claimed that the National Football League's practice of withholding most tickets from the public inflated the price he paid. *Id.* at 201–02. The court held that the plaintiff lacked standing. It had "no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market," and the plaintiff's contrary assertion was "pure conjecture about what the ticket resale market might have looked like" absent the challenged conduct. *Id.* "[S]peculation," the court explained, "is not enough to sustain Article III standing." *Id.* The Amended Complaint's price-inflation theory is even broader than the theory in *Finkelman* because it is stretched across an entire economy, suggesting that the defendants' statements moved the price of every plastic product ever sold without any facts about how. Notably, a later appeal in the same case found standing once the plaintiff amended to plead specific facts about how the withholding affected resale prices, he had standing. *Finkelman v. Nat'l Football League*, 877 F.3d 504, 513 (3d Cir. 2017).

The Amended Complaint contains no allegations that any plaintiff purchased any specific product or that any defendant made any specific representation. The Amended Complaint can be condensed into three sentences: "Defendants lied about recyclability. That caused high prices because it artificially increased demand on any item in the plastics market. As a result of those high prices on goods generally, Plaintiffs were harmed."

That will not do. Article III requires an injury to the plaintiff that is fairly traceable to the defendant, *Lujan*, 504 U.S. at 560, and "the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants," *Warth*, 422 U.S. at 501. The plaintiffs' theory inverts this requirement. It starts from the premise that the public at large was harmed and reasons that the plaintiffs, as members of the public, must have been harmed too. It is reminiscent of taxpayer standing, where the Supreme Court, over a century ago, refused to accept that mode of reasoning when taxpayers sued over the use of public funds. In that context, a taxpayer's stake in the Treasury "is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain," that it cannot support a suit. *Frothingham v. Mellon*, 262 U.S. 447, 486–87 (1923).

That rule retains its vitality today. That is because whether any particular taxpayer is worse off depends on speculation about how legislators and other taxpayers respond to the challenged policy. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006); *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 137, 142–43 (2011) (finding no traceability where the alleged injury "result[ed] from the decisions of private taxpayers regarding their own funds"). That is true here, where the number of variables across the entire plastic market is infinite.

The plaintiffs' overcharge theory suffers from the same defect. In other words, whether any plaintiff paid more for any product because of the defendants' statements depends on how millions of consumers, and the manufacturers and retailers who set prices, responded to those statements. To be sure, an injury is not disqualifying merely because many people share it—a mass tort injures each victim in a particularized way. *Spokeo*, 578 U.S. at 339 n.7; *FEC v. Akins*, 524 U.S. 11, 24 (1998). But that principle presupposes facts showing how the challenged conduct reached the individual plaintiff. When the only such fact is the plaintiff's membership in the public, the connection is too "remote, fluctuating and uncertain" to satisfy Article III. *Frothingham*, 262 U.S. at 486–87.

The plaintiffs do not meaningfully argue to the contrary. *Contra* Doc. 276 at 34. Rather, they engage with generalities and platitudes, asserting that "the causal chain is direct and unbroken," that "traceability is self-evident," and that there is "no intervening cause that breaks this chain." Those are cursory conclusions devoid of any allegation of fact in the Amended Complaint. As noted, the price of a good comprises a multitude of variables. *See In re Urethane*, 768 F.3d at 1250. Even when considering just one product, the number of potential intervening causes is huge. Add to that every single plastic product, and the conclusion that the defendants caused artificially inflated prices for all those products becomes conjecture piled on conjecture. Put simply, the plaintiffs have not alleged that the defendants' unspecified statements led to the artificially inflated price of any goods they actually bought.

*Auto. Parts* harms, not helps, the plaintiffs' cause. *Contra* Doc. 276 at 34–35. *Auto. Parts* concerned automotive bearings. 50 F. Supp. 3d at 844. The defendants manufactured bearings and the plaintiffs were auto dealers and end-payors who bought vehicles, or replacement parts, containing them. *Id.* The plaintiffs alleged that the defendants colluded to fix the price of bearings and that the resulting overcharge was passed on to them. *Id.* The plaintiffs had standing because the factual allegations in that complaint "detail[ed] how Bearings follow a traceable path through the distribution chain and that overcharges for Bearings were passed through that distribution chain from [defendants to plaintiffs]. They allege[d] a physical chain of distribution from Defendants to Plaintiffs and that the costs are traceable." *Id.* at 851 (citations omitted).

Unlike in *Auto. Parts*, the Amended Complaint contains no traceable path implicating the defendants. First, the plaintiffs do not allege, as the *Auto. Parts* plaintiffs did, that these defendants overcharged their customers and that those overcharges were passed through to these plaintiffs. Rather, the theory sounds in macroeconomic terms: It is that the defendants' statements increased the demand for plastic writ large. That is not sufficient. A theory of causation pitched at the level of the national market does not show that these defendants caused these plaintiffs' injuries. *See Warth*, 422 U.S. at 506–07 (finding no standing where the complaint suggested that the plaintiffs' inability to find housing was "the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts"); *Finkelman*, 810 F.3d at 201–02 (finding no standing where the plaintiff could "only speculate" about the effect of the defendant's conduct on market prices). And second, the Amended Complaint neither focuses on a specific product, market, or market decision, nor traces how the defendants' alleged misconduct caused the particular plaintiff's alleged

injury with that product. That distinction is dispositive. Courts confronting indirect-purchaser theories have required, at a minimum, factual allegations describing the chain of distribution through which an overcharge is said to have reached the plaintiff before they will infer that the defendant's conduct caused the plaintiff's injury. *See Auto. Parts*, 50 F. Supp. 3d at 851; *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918, 2020 WL 6270948, at *2–3 (N.D. Cal. Oct. 23, 2020) (dismissing indirect purchasers' claims where the complaint pled no facts identifying the participants in the distribution chain or establishing "that each participant in the chain necessarily passed on the asserted overcharge to the next participant"). This approach remains consistent with the requirement that traceability cannot rest on "speculative inferences," *Nova Health*, 416 F.3d at 1157, and the instruction that a plaintiff whose injury runs through third parties must plead facts showing how those parties responded to the defendant's conduct. *Murthy*, 603 U.S. at 57–58.

Neither does *Bennett v. Spear*, 520 U.S. 154 (1997), aid the plaintiffs. *Contra* Doc. 276 at 35. In that case, ranchers and irrigation districts challenged a Fish and Wildlife Service biological opinion that led the Bureau of Reclamation to withhold water from them. *Bennett*, 520 U.S. at 157–59. The Supreme Court found the injury traceable to the Service even though the Bureau made the final decision. But it did so because the biological opinion had a "powerful coercive effect" on the Bureau because the Bureau could disregard it only "at its own peril," given that anyone who knowingly takes a protected species without the Service's approval "is subject to substantial civil and criminal penalties, including imprisonment." *Id.* at 169–70. The Service's opinions thus had a "virtually determinative effect" on the agencies that received them. *Id.* at 170. Unlike in *Bennett*, nothing in the Amended Complaint suggests that any defendant's statements had a comparable effect on the manufacturers, retailers, and consumers whose independent decisions determine the price of plastic goods that these plaintiffs might have purchased.

**C**

Finally, Ford County asserts that it has standing because it has incurred increased costs to dispose of plastic waste. Its theory is that the defendants' deceptive advertising "caused various agencies not to ban Plastics, artificially increased the demand for Plastics and increased the amount of Plastics waste that counties have had to dispose of." Doc. 48 at ¶ 208; *see also* Doc. 276 at 34 (arguing that the scheme succeeded, "leading to a massive increase in the volume of non-recyclable plastic waste entering the municipal waste stream").

That theory fails for the reasons already given, and then some. The County's injury is one step further removed than the individual plaintiffs. It depends on regulators declining to ban plastics, on the public buying more plastic than it otherwise would have, on the public then discarding that plastic, and then, that the discarded plastic ended up in Ford County's landfill at the County's expense. Every link runs through the decisions of someone other than the defendants, including the "various agencies" that allegedly declined to regulate, Doc. 48 at ¶ 208, the manufacturers and retailers that sold plastic goods, and the members of the public who bought and threw them away. An injury that depends on "the unfettered choices made by independent actors not before the courts" is not fairly traceable to the defendant unless the plaintiff pleads facts showing that those choices "have been or will be made in such manner as to produce causation." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted). The Amended Complaint pleads no such facts. It identifies no regulatory decision that any agency made because of any defendant's statement. It does not allege how much, if any, of the waste in Ford County's landfill is attributable to purchases the defendants induced rather than to the countless other reasons people buy plastic. And it does not allege that the County's disposal costs would have been lower had the defendants said nothing.

The Supreme Court has rejected closely analogous theories. In *Simon*, for instance, indigent plaintiffs claimed that an IRS ruling relaxing the requirements for charitable hospitals caused hospitals to deny them care. *Simon*, 426 U.S. at 42–43. The Court held that the injury was not traceable to the IRS because it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement,' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* So, too, in *Allen v. Wright*, where parents claimed that the IRS's failure to deny tax exemptions to discriminatory private schools impaired their children's ability to attend desegregated public schools. The Court held that the chain was too weak as it was "entirely speculative" whether withdrawing an exemption "from any particular school would lead the school to change its policies," and "just as speculative whether any given parent" would then move a child to public school. 468 U.S. at 758. "The links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing." *Id.* at 759.

Lower courts have applied the same reasoning to governmental plaintiffs that, like Ford County, claim a defendant's conduct raised their costs by changing the behavior of the public. The D.C. Circuit held, for example, that a sheriff lacked standing to challenge federal immigration policies on the theory that those policies would increase

county law-enforcement costs because the theory rested on "a predicted chain of events" running through the decisions of third parties and was "unduly speculative." *Arpaio v. Obama*, 797 F.3d 11, 15, 19–22 (D.C. Cir. 2015); *see also Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (finding a state's claimed loss of tax revenue from the "unavoidable economic repercussions" of a federal policy was too indirect to support standing). Ford County's theory—that the defendants' statements changed the buying and disposal habits of the entire public, which in turn filled the County's landfill—closely resembles those rejected in *Simon*, *Allen*, *Arpaio*, and others. As a result, it fails for the same reason.

The plaintiffs' invocation of foreseeability does not suffice. *Contra* Doc. 276 at 35. The relevant inquiry is whether the plaintiff has pleaded facts showing that the defendant's conduct, rather than the independent choices of third parties, caused the injury. *See Simon*, 426 U.S. at 41–42; *Bennett*, 520 U.S. at 169 (finding traceability where the defendant's action had a "powerful coercive effect" on the third party, not merely a foreseeable one). And because the individual plaintiffs' own purchases are not traceable to the defendants for the reasons already given, a theory that depends on the purchases of not only the eight individual plaintiffs but also the entire consuming public is even more attenuated. Ford County therefore lacks standing as well. *See Clapper*, 568 U.S. at 410 (rejecting a theory that "relies on a highly attenuated chain of possibilities"); *Warth*, 422 U.S. at 505 (noting the "indirectness" of an injury makes standing "substantially more difficult" to establish); *Nova Health*, 416 F.3d at 1157 (finding no standing where "speculative inferences are necessary to connect [the] injury to the challenged actions").

## III

For the foregoing reasons, the defendants' Motion to Dismiss, Doc. 247, is GRANTED.

It is so ordered.

Date: September 29, 2026

s/ Toby Crouse
Toby Crouse
United States District Judge